1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF RHODE ISLAND

3

4      * * * * * * * * * * * * * * *  C.A. No. 1:25-md-03148-MSM-LDA
                                    *
5      IN RE:  GOODRX AND PHARMACY  *
       BENEFIT MANAGER ANTITRUST    * MDL No. 3148
6      LITIGATION (No. II)          *
                                    *
7      This Document Applies to:    * JUNE 23, 2025
                                    *
8      ALL CASES                    *
                                    * VIA VIDEOCONFERENCE
9      * * * * * * * * * * * * * * *  PROVIDENCE, RHODE ISLAND

10

11              BEFORE THE HONORABLE MARY S. McELROY,

12                        DISTRICT JUDGE

13                      Status Conference

14

15     APPEARANCES:

16     FOR THE PLAINTIFFS:   HEIDI M. SILTON, ESQUIRE
                             LOCKRIDGE GRINDAL NAUEN, PLLP
17                           100 Washington Avenue, South
                             Suite 2200
18                           Minneapolis, MN  55401

19     FOR THE PLAINTIFFS:   DONALD A. MIGLIORI, ESQUIRE
                             MOTLEY RICE, LLC
20                           28 Bridgeside Boulevard
                             Mount Pleasant, SC  29462
21

22     FOR THE DEFENDANTS:   DAVID J. LENDER, ESQUIRE
                             WEIL GOTSHAL & MANGES, LLP
                             767 Fifth Avenue
23                           New York, NY  10153

24     Court Reporter:       Denise A. Webb, RPR
                             One Exchange Terrace
25                           Providence, RI  02903

1    VIA VIDEOCONFERENCE

2    23 JUNE 2025

3         THE COURT:  First of all, good morning.  I'm sorry

4    we're a few minutes late starting.  I'm Mary McElroy.  I'm

5    the District Judge assigned to this case.  Some of you know

6    me; most of you probably do not.  So I'm going to introduce

7    the people that you need to know in my chambers and the

8    Magistrate Judge who's also assisting in this case.

9         So the Magistrate Judge is Judge Amy Moses, and her

10   camera is on so you can see her.  Carrie Potter is my deputy

11   clerk.  And then Kevin Rolando is my career law clerk.  And

12   Julie -- she disappeared.  Juliane Realejo is Judge Moses's

13   career law clerk.

14        So this conference is for counsel only.  So if you're

15   not an attorney of record in this case or associated with an

16   attorney of record in this case, then we need to have you

17   drop out.  It is not to be exclusionary, it's just that this

18   is a conference as if we were all in a conference room.  So

19   I'll give you a minute to drop out.  Put your last name on

20   your -- your name up if you can.  If you can't, don't worry

21   about it.  So that's my introduction.

22        We run fairly informal chambers I think as far as

23   Federal Court chambers go, but we do have some requirements.

24   First of all, cooperation; secondly, civility.  And we like

25   to -- I like to manage cases efficiently so that they move

1    through in the time where we all decided is the appropriate

2    time so they don't sit on the back bumper, they don't waste

3    resources and they don't, most importantly, waste anybody's

4    time.

5        So I'm not going to know everybody here probably ever,

6    but I'm going to try.  So this conference is really just to

7    establish a few things, to talk about the process and sort

8    of the steps that get us to answers for Rule 12 motions and

9    where we go to get there.  So what I want to do is ask the

10   Plaintiffs and then the Defendants to give us a short

11   summary of their case or statement of their case, but I

12   don't want 60 attorneys doing that.  So with the Plaintiffs

13   conference -- pre-conference statement of the case memo, it

14   seemed to have been filed by Natasha Fernandez-Silber.  Is

15   she here?

16       MS. FERNANDEZ-SILBER:  Good afternoon, your Honor.

17   Our slate has actually -- actually, all of the Plaintiffs

18   agreed that Heidi Silton of the Lockridge law firm will be

19   speaking on behalf of all Plaintiffs.

20       THE COURT:  Great.  I'm going to ask Heidi to give

21   us a 10- to 15-minute overview of your case.  And, then, who

22   will speak for the Defendants?

23       MR. LENDER:  Your Honor, this is David -- I think

24   I'm in New York Conference Room 32A.  David Lender from the

25   law firm of Weil Gotshal.  We represent GoodRX.

1    THE COURT:  Okay.  All right.  Great.  Everybody

2    else can mute themselves.  You can leave your cameras on if

3    you want, that way I'll get to place names with faces, a

4    little bit at least.  And we'll here from Ms. Silton first.

5    MS. SILTON:  Good morning, your Honor.  First, my

6    name is Heidi Silton.  I'm a partner at Lockridge Grindal

7    Nauen in Minneapolis, and I represent both Keaveny Drug, the

8    Plaintiff in the first filed complaint, and the Minnesota

9    independent pharmacists.

10    We appreciate the opportunity to be in front of you

11    today.  If I may, obviously, there are a lot of counsel on

12    Zoom today that represent different clients.  Don Migliori,

13    who is also here today, he and I have sort of divided up the

14    speaking responsibilities for today in a way that we hope is

15    organized and presents, you know, the best foot forward in

16    front of the Court today.

17    I would just like to mention that obviously there are a

18    whole bunch of people on the Zoom today.  We'll defer to you

19    if you would like us to pause as we're going to give

20    opportunity for others.  But for the most part, we think

21    that Don and I are prepared and ready to share those

22    responsibilities today.

23    THE COURT:  Okay.  I think that's great.  If

24    anybody has anything really important that they feel they

25    must weigh in on, put up your hand, which I think is part of

1    your reaction, and Carrie will let me know.  Okay.  Go

2    ahead.

3            MS. SILTON:  With that, I'm happy to summarize the

4    Plaintiffs' case.

5            THE COURT:  Great.

6            MS. SILTON:  So the MBL Plaintiffs here today

7    represent independent pharmacies nationwide, as well as

8    several associations that work to protect and promote the

9    interests of their independent pharmacy members.  These

10   Plaintiffs are part of --

11           THE COURT:  Can I stop you right there and ask, is

12   there a difference in potential class members between the

13   independent pharmacies and the associations?  Would there be

14   subclasses?

15           MS. SILTON:  Right now, all classes that have been

16   filed are class actions in one class.  Obviously, in certain

17   other cases, there are a variety of what we call tracks, but

18   right here there is just the one defined class.

19           THE COURT:  Okay.  Thank you.  I'm sorry.  I'll try

20   not to interrupt again.

21           MS. SILTON:  It's all good.  I like questions.

22   That's great.  Thank you.

23       So the Defendants in the case obviously are GoodRX and

24   then the four key pharmacy benefit managers, which we call

25   PBMs, which are Express Scripts, CVS Caremark, MedImpact and

1     Navitus.  We allege that the (indecipherable) the

2     reimbursement amounts that PBMs pay pharmacies for

3     dispensing generic drugs.

4          Just as a little background, PBMs are the powerful

5     middlemen in the U.S. prescription drug payment industry.

6     As it relates to the case here, PBMs contract generally with

7     health plans to administer prescription benefits to plan

8     members.  They also contract with pharmacies for drug

9     reimbursement and dispensing, creating networks for

10    pharmacies where health plan members can fill their

11    prescriptions.

12         When a plan member fills a prescription as a pharmacy,

13    the PBM then adjudicates the claim to determine how much is

14    paid by each party.  A certain part is paid by the pharmacy,

15    and a certain part is then paid by the patient.  PBMs

16    compete to get pharmacies to join their preferred pharmacy

17    network, including by negotiating the reimbursement rates

18    that they will pay pharmacies in exchange for dispensing the

19    generic drug prescriptions for their members.

20         In this case, we allege that rather than competing with

21    each other by offering higher reimbursements to pharmacies,

22    the PBMs -- the PBM Defendants agreed to pay independent

23    pharmacies the lowest price any PBM has negotiated for

24    generic drugs.  In other words, we allege that the PBM

25    Defendants have not -- have agreed not to outbid each other

1    for generic drug pharmacy dispensing services.

2        We allege also that GoodRX facilitated this agreement

3    through its pricing algorithm and the competitively

4    sensitive pricing information received from the PBMs.

5        Here's a little bit more background on how this works.

6    So GoodRX is a pharmacy discount aggregator.  In the past,

7    patients put access prescription discounts by presenting the

8    GoodRX discount card on the pharmacy counter and paying cash

9    for their prescriptions rather than using their prescription

10   benefits.  Put more simply, patients could choose to use the

11   GoodRX discount card or their insurance but not both.

12       Each time a pharmacy accepted the GoodRX discount card,

13   GoodRX received a fee, which it then shared with the PBM

14   whose negotiated rate was applied.

15       Some pharmacies were initially willing to accept the

16   GoodRX discount cards because they brought in business from

17   mostly uninsured, cash paying customers' business that

18   pharmacies might not otherwise get.  But over time, more and

19   more insured customers began using the GoodRX discount

20   instead of their insurance after realizing the GoodRX cash

21   prices were often lower than their copays.

22       As pharmacies began to lose money on business from the

23   insured customers, they increasingly stopped accepting the

24   GoodRX discount card.  It was then that -- it was when these

25   pharmacies slowed down the rate of accepting or in some

1    cases eliminated the use of the GoodRX discount card that

2    GoodRX and the PBM hatched the scheme to force their use and

3    this was the beginning of the conspiracy that we allege in

4    our complaints.

5        This was in late 2022 and then into the very beginning

6    of 2023.  GoodRX launched its Integrated Savings Program or

7    ISP.  It partnered with the PBM Defendants to integrate

8    GoodRX's discounts directly into patients' prescription drug

9    benefits, taking away the pharmacies' choice whether to

10   accept GoodRX.

11       Under the ISP, each time a pharmacy filled a generic

12   drug prescription for a patient, the price applied on the

13   plan was the lowest price that any PBM in GoodRX's network

14   had negotiated for the drugs, which was based on

15   competitively sensitive information that only GoodRX had.

16       So in other words, the PBM Defendants agreed to share

17   their confidential data and information about the rates with

18   GoodRX, including what should be confidential prices that

19   PBMs negotiated independently with pharmacies for the drugs.

20   They also then agreed to delegate that pricing to GoodRX,

21   they agreed not to outbid each other for pharmacy

22   reimbursements for generic drugs, and instead, GoodRX

23   applied the lowest rate that benefited a PBM.

24       Last, the PBM Defendants agreed to allow GoodRX to

25   extract a processing fee from pharmacies each time the price

1    fixed price was applied, a fee that was then shared among

2    GoodRX and the PBMs.

3         In our complaint, that's what we call the GoodRX ISP

4    curtal.  A lot of initials.  So what this means really is

5    that the PBM Defendants agreed not to compete with each

6    other on price, and they also agreed to no longer compete

7    with GoodRX, because the lowest rate in GoodRX's pricing

8    algorithm was automatically applied when patients went to

9    the pharmacy to pick up their prescription.

10        This is an antitrust price fixing case challenging the

11   Defendant's agreement to fix unsuppressed reimbursement

12   rates for PBM pharmacies for dispensing generic drug

13   prescriptions to patients, which is a violation of Section 1

14   of the Sherman Antitrust Act.

15        As a result of the Defendants' conspiracy, the class

16   member pharmacies received lower reimbursement rates than

17   they would have received in a competitive market.  The rates

18   were often unreasonably low, often less than a pharmacy's

19   acquisition cost, meaning, pharmacies are regularly losing

20   money on these transactions.  Defendants' scheme is driving

21   already struggling independent pharmacies out of business.

22        Essentially, this is a story of a conspiratorial race

23   to the bottom, a bottom that saves money and made money for

24   the PBMs and GoodRX but that cost the pharmacies hugely.

25        Through this class action, Plaintiffs seek damages to

1    compensate them for the artificially suppressed

2    reimbursement rates and the additional fees that the

3    Defendants have imposed upon them.  Plaintiffs have also

4    sued to put a stop to ISP in order to prevent future harm to

5    the class from Defendants' illegal conduct.

6        That's sort of our case in a nutshell.  I'll turn to

7    Don, I think, who has a few additional comments that he

8    wanted to make on this, unless you have questions, your

9    Honor.

10        THE COURT:  No.  Thank you.

11        MR. MIGLIORI:  Good morning, your Honor.  This is

12    Don Migliori from Motley Rice.  Actually, I thought Heidi

13    covered the question of the Court, meaning a short summary

14    of what the claim is about.  As we get into discussion,

15    there are some preliminary issues that relate to the case

16    management order and to early discovery that I'd like to

17    address for the Court.  But in terms of a summary of the

18    case, I stand by the cooperative agreement in relationship

19    with Plaintiff, but she covered it very well.

20        THE COURT:  Okay.  So if that's the case, why don't

21    we hear the Defendant's brief sort of statement of where

22    they think that there are issues of dispute and what their

23    contentions are, and then we'll come back to some of these

24    others.  Is that all right?  Does that work for every one?

25        MR. KO:  Your Honor, I was trying to raise my hand.

1    I don't think I was successful in that.

2          THE COURT:  Okay.  Mr. Ko, how are you?

3          MR. KO:  Good.  How are you?  David Ko, Keller

4    Rohrback.  Good morning from Seattle.  I agree with

5    Mr. Migliori; I think Ms. Silton did a great job.

6        I just wanted to add a couple more facts just to

7    describe to the Court the importance of this case.  So these

8    PBMs control two-thirds of the market.  What that means is

9    that in terms of prescriptions filled and prescriptions that

10   passed through their formularies, there's two-thirds --

11   these PBMs control two-thirds of the market.  And this

12   scheme is with respect to generic drugs, which consists of

13   approximately 90 percent of all drugs that are prescribed.

14       So this case is important and has far reaching and wide

15   consequences.  So I just wanted to make sure the Court was

16   aware of that factual framework for this case.

17         THE COURT:  All right.  Thank you.  Did anybody

18   else try to put their hand up or have their hand up?

19          (No response)

20         THE COURT:  All right.  So we'll hear from

21   Mr. Lender.

22         MR. LENDER:  Again, good morning, your Honor.

23   David Lender from the law firm of Weil, Gotshal & Manges on

24   behalf of the Defendants, and we represent GoodRX.  I'll try

25   to be brief but to try to give you our perspective on the

1    case and how the product works.

2        GoodRX's mission is to help patients save money on

3    their prescription drugs.  Since GoodRX was founded in 2011,

4    patients have been able to go on their website and download

5    or print off a card or a coupon that they could bring to a

6    pharmacy and pay a reduced price for their prescription

7    drugs as agreed to by the pharmacy.

8        Now, this case concerns a different product, as you

9    heard, that GoodRX launched in 2023 and is referred to as

10   the Integrated Savings Program or ISP.  What ISP does is it

11   automates the already existing GoodRX program, which, as we

12   mentioned, involves a patient showing up at the pharmacy

13   with a card or a coupon to take advantage of a lower price,

14   but it is always a lower price that the pharmacy has agreed

15   to for prescription drugs.  And that's a very important

16   point, your Honor, as I'll get into it.

17       The ISP does so by effectively incorporating GoodRX's

18   discount pricing into a patient's insurance benefit at the

19   pharmacy counter.  In essence, ISP is a more efficient way

20   for patients to reduce the prices they pay for prescription

21   drugs by providing them access to more favorable pricing

22   agreed to by the pharmacy but just without needing to

23   present the card or the coupon.

24       And I'm just going to explain very briefly how ISP

25   works.  I'm sure we'll get into this more in the briefing.

1    But this is basically how it works:  When a pharmacy fills a

2    prescription at a pharmacy, and the pharmacy submits the

3    patient's claim for payment, the claim is sent to something

4    which is called a switch, which electronically routes the

5    claim to a Pharmacy Benefit Manager, or a PBM, to determine

6    the price of the medication for that patient.

7        As you heard, PBMs are companies that manage

8    prescription drug benefits on behalf of health insurance

9    plans.  And among other things, what PBMs do is they confirm

10   the price that a patient should pay for a prescription drug,

11   and they also reimburse the pharmacy for the dispensed drug.

12       PBMs have contracts with the health insurance plans,

13   and then they separately contract with pharmacies, so in

14   some ways they act as sort of an intermediary between these

15   two entities.  And pharmacies here often will contract with

16   multiple PBMs because that gets them more traffic coming

17   into their pharmacies.

18       GoodRX entered into separately negotiated contracts.

19   These are vertical contracts with MedImpact, Navitus, ESI

20   and Caremark.  These are four individually negotiated

21   agreements, and those are the four PBMs that are named in

22   some of these lawsuits.  And these individually negotiated

23   contracts entered at different periods of time would allow

24   these PBMs to implement ISP.

25       If a pharmacy has contracted with one of these PBMs

1    that has implemented ISP, the PBM may route the claim to

2    GoodRX to return a price but only if doing so would result

3    in a more favorable price for the patient and only if the

4    pharmacy has already agreed to accept that price.

5        So when PBMs use the ISP, more prices are considered

6    and compared before a price for a medication is returned to

7    the pharmacy.  If the patient's insurance plan provides the

8    lowest price, then the switch will return the insurance

9    price.  But if the ISP identifies a more favorable price

10   from the GoodRX network that the pharmacy has agreed to

11   accept, the claim will be routed through GoodRX to return

12   the lower noninsurance price to the pharmacy which is then

13   charged to the consumer.

14       So the ISP, what it actually does is it's a

15   pro-consumer technology that allows consumers to pay lower

16   prices for prescription drugs, but as I mentioned, at every

17   instance, it's a price that the individual pharmacy agreed

18   to accept.

19       Now, your Honor, there are 32 lawsuits that have been

20   filed claiming that the GoodRX ISP violated the antitrust

21   laws.  You probably shouldn't be surprised to hear that we

22   dispute that and we plan on filing a motion to dismiss aimed

23   at those claims.  The one thing I wanted to mention to your

24   Honor is that 31 of those cases have been consolidated

25   before your Honor.  Recently, I think on June 17, a new case

1    was filed in Rhode Island, Mannino's Family Practice

2    Pharmacy, with GoodRX that will need to be consolidated

3    before your Honor.  Obviously, if the case gets assigned to,

4    that will be easy enough, because you can just consolidate

5    it with the other 31 cases.

6            THE CLERK:  Judge, if I could, it was opened this

7    morning and added to the MDL.

8            MR. LENDER:  Great.

9            THE COURT:  I was just going to say, that was one

10   we agreed to add, so that's already been added.

11           MR. LENDER:  Great.  The only other thing that I do

12   want to mention, because I'm just giving a background, is

13   several of the PBMs have arbitration agreements with the

14   independent pharmacies.  And although GoodRX intends to file

15   a motion to dismiss aimed at the consolidated complaint once

16   it gets filed and put together by whoever the lead counsel

17   will be, there are multiple PBMs that intend to file motions

18   to compel arbitration.  So when the dust settles before your

19   Honor, even if the claims were to survive the motion to

20   dismiss, we very well may have a different set of Defendants

21   before your Honor.

22           THE COURT:  So how many of the cases, of the 32

23   cases, have arbitration agreements as part of them, if you

24   know?

25           MR. LENDER:  My understanding is that three of the

1    PBMs, MedImpact, Navitus and Caremark, have arbitration

2    agreements with independent pharmacies.  And I believe that

3    will impact all of the lawsuits where those PBMs are named.

4         THE COURT:  Okay.  Okay.  Did anybody else on

5    behalf -- I see Mr. Bernick has his hand raised.

6         MR. BERNICK:  Thank you, your Honor.  Justin

7    Bernick.  I'm from Hogan Lovells.  I'm counsel for OptumRX,

8    which is a PBM subsidiary of United Health Care.  I just

9    wanted to make one quick note on behalf of OptumRX.

10        OptumRX does not participate in the ISP program with

11   GoodRX, so it's a bit curious that we find ourselves here.

12   We were named as a Defendant in four of the Mississippi

13   lawsuits that were transferred as part of the MDL.  There

14   appears to be a separate dispute related to OptumRX that's

15   flagged in those complaints that's unrelated to the GoodRX

16   dispute.

17        So we are a bit differently situated in that we are not

18   a participant in this ISP arrangement.  I wanted to make

19   sure I noted that for the Court because we might have

20   separate arguments for why we shouldn't be participating

21   here.

22        We also have arbitration clauses as well with

23   independent pharmacies, and we're concerned whether to

24   assert those.  But we are differently situated in that

25   respect, and I wanted to alert the Court to that.

1        THE COURT:  Thank you.  Anybody else want to add

2   anything in the statement of the case for the Defendants or

3   the Plaintiffs?

4        MS. RUBIN:  Your Honor, this is Jacqueline Rubin

5   for Caremark.  As to your question to Mr. Lender, Caremark

6   has entered into contractual relationships, as I think you

7   heard, with the independent pharmacies that are the

8   Plaintiffs, and we do have arbitration agreements under

9   those contracts with the independent pharmacies that are the

10  Plaintiffs in this case.

11       THE COURT:  And so the way I've done this in

12  non-MDL cases is that the motion to compel arbitration

13  usually comes in lieu of an answer, sort of in time with the

14  Rule 12 motions.  If that's -- if that works for everybody,

15  we can consider those together or (inaudible) --

16       (Overspeaking)

17       THE COURT:  -- your Rule 12 motion.

18       MR. LENDER:  Your Honor, David Lender for GoodRX.

19  In terms of the discussions with the Plaintiffs, it sounds

20  like we're -- we -- maybe -- we guess where you might be

21  coming down.  But the briefing schedule that we at least

22  discussed the Plaintiffs contemplates that you would either

23  file a motion to dismiss or a motion to compel arbitration

24  on the same schedule.

25       THE COURT:  Great.  Perfect.

1          MS. WOLFSON:  Your Honor, this is Tina Wolfson on

2    behalf of AIDS Health Care Foundation.  If I may make a

3    suggestion on the arbitration issue, I would request that

4    the Court order Defendants to provide individual arbitration

5    agreements to the Plaintiffs as soon as possible so that we

6    can have a meaningful meet and confer about the arbitration

7    motions.  It may be that many of those can be avoided and

8    your Honor doesn't have to deal with them.

9          THE COURT:  That's the limited sort of discovery

10   issue that I was going to get into.  So, yes, I think that's

11   something that we should talk about doing.  Okay.

12       So I don't want to get into the specifics of the long

13   term in the case, because we don't know who's still going to

14   be here and what the parameters of the case are if we get

15   down the road.  I know that the Plaintiffs indicated that

16   they want basically an injunction and damages, but we can I

17   think deal with what any relief, if any -- what the relief,

18   if any, should look like sort of in the next conference or

19   the next phase.

20       So I want to talk about leadership structure for both

21   the Plaintiffs and the Defendants.  I've got lead counsel

22   applications.  I know that one potential applicant filed an

23   updated application, so we're looking at those.  We've

24   reviewed them all, and we'll issue a case management order

25   that establishes lead counsel and an executive committee,

```
1    which I think is how Judge Smith did it in the Loestrin
2    case, and I think it makes sense.
3         Now, the Defendants raised the issue of objecting to
4    applications.  Have you met and conferred about that, and
5    does the Defense have objections?
6              MR. LENDER:  Your Honor, David Lender for GoodRX.
7    We have not met and conferred, but unless one of my
8    colleagues representing one of the Defendants wants to pipe
9    in, I think we're okay with just going with whatever your
10   Honor thinks is appropriate without objection.
11             THE COURT:  Anybody have anything to say there?
12   We'll get that out as soon as possible.  I just want to take
13   a look at the newest filing that we got and see where we're
14   at.
15        Defendants leadership structure, is that something that
16   I need to get involved in or has that already been
17   established?
18             MR. LENDER:  Your Honor, I think, just given the
19   nature of us, there's a fewer number of us, I think we've
20   been working very well together.  I think that will
21   continue.  I don't think we need to have a leadership
22   structure among the Defense.
23             THE COURT:  Okay.  Does anybody disagree with that?
24   All right.  So the next question sort of is about the
25   proposed either master complaint or short form complaint.
```

1    And I think that the Plaintiffs' pre-conference memorandum

2    indicated that you were going to file a consolidated

3    complaint or a master complaint; is that correct?

4         MR. MIGLIORI:  If I may, your Honor, this is Don

5    Migliori.  This sort of dovetails with the issue I alluded

6    to earlier with the production of contracts.  As Mr. Lender

7    even more clearly highlighted in his short presentation,

8    this case really comes down to what's the nature of those

9    agreements, and a consolidated complaint where they will be

10   relying on those agreements in a Rule 12 motion,

11   consolidated complaint would be much more efficiently

12   managed and directed if the limited production of those

13   agreements is permitted now, which was consistent with how

14   Judge Smith handled it when we had the Loestrin litigation

15   in front him with respect to very little settlement

16   agreements.

17        So I think the timing of that consolidated complaint is

18   something we can all agree upon.  I believe we set some time

19   in August.  But that would, from our perspective, strongly

20   be benefited by the insight -- something that's clearly, you

21   know, identifiable, easy to produce, no burden, but also

22   allows us to, for the Court, make this a much more focused

23   and efficient argument when we get to the consolidated

24   complaint and then ultimately the Rule 12 motions.

25        Organizational charts would kind of fall in the same

1    grouping.  Less important from my perspective.

2         And as Ms. Wolfson said, the individual arbitration

3    agreements, again, just for efficiency and consistent with

4    what's happened with the Loestrin litigation, that very

5    targeted production in anticipation and as soon as possible

6    will allows us to keep that August projected trajectory for

7    the consolidated complaint and ultimately the agreed upon

8    date for the filing of the Rule 12 motions.

9         THE COURT:  Mr. Lender, is the -- so I guess I

10   should ask Mr. Migliori first.  So the entire scope of the

11   limited discovery that you're looking for at this time

12   anyway is production of the arbitration agreements?

13        MR. MIGLIORI:  Also the Integrated Savings Program

14   agreements.  As Mr. Lender pointed out, it is the center of

15   the discussion.  It's what's the nature of the relationship

16   between GoodRX and these independent pharmacies.  He called

17   it a vertical contract; we've alleged a horizontal

18   agreement.  It is a -- it's a dispute that could very much

19   be focused and targeted in its argument, in its briefing if

20   we get the basic foundation out between the two groups now.

21        So it would be arbitration agreements and the

22   Integrated Savings Program agreements as among the

23   pharmacies and GoodRX.

24        MS. SILTON:  If I could add just one point.  The

25   only other thing, it's our understanding that there is a new

1    program that's just been launched called Community Link.  So

2    if we could also get that agreement.  It's a little unclear

3    from what's publicly available, frankly, if that is a

4    replacement for ISP, if it's the same, if it differs.  So I

5    would add that to the bucket of things.

6            THE COURT:  Is it something that the Plaintiffs are

7    parties to at this point?

8            MS. SILTON:  I believe the answer is yes.  Sorry,

9    Don, go ahead.

10            MR. MIGLIORI:  Your Honor, it's also believed that

11    within those agreements there may actually be

12    (indecipherable) to try to pull people into arbitration

13    agreements.  So there's sort of an overlap of issues between

14    the arbitration agreements and this new program.  So I

15    appreciate Heidi reminding me.  That's also something that

16    would be very helpful, again, to isolate and focus our

17    arguments.

18            THE COURT:  Okay.  That makes sense.  Mr. Lender,

19    what do you say to that?

20            MR. LENDER:  Thank you.  David Lender from GoodRX.

21    In terms of the, I guess the first and the third, the

22    arbitration agreements between the pharmacies and the PBMs

23    and GoodRX's new program with the pharmacies, presumably the

24    Plaintiffs, there's a lot of Plaintiff lawyers on the phone

25    who represent pharmacies.  I'm not exactly sure I understand

1    why they can't get whatever they want from their own

2    clients, because on one side is a PBM and on the other side

3    is a pharmacy.  And in the case of Community Link, which is

4    not obviously part of the complaint, at least for now I

5    guess, there is GoodRX on one side and an independent

6    pharmacy on the other side.  So those contracts, you would

7    think -- and I don't know what the confidentiality is in all

8    of those agreements, at least with the arbitration ones.

9         THE COURT:  I think what they're concerned about is

10   that through the use of this new Community Link Program that

11   GoodRX is attempting to pull people into arbitration

12   agreements who didn't have them in the prior iteration of

13   the program.  So I think that's why it sort of dovetails

14   with the other two issues.

15      Is there a reason that you can't provide that?  That

16   way we know everybody has the same information and is

17   working from the same playbook.

18         MR. LENDER:  Your Honor, if all we are going to be

19   producing, because obviously we have different Plaintiffs

20   making different requests, we have certain Plaintiffs that

21   have served document requests that are much broader --

22         THE COURT:  We're not there yet.

23         MR. LENDER:  If we're literally talking about I

24   guess the base form of the agreement between -- it involves

25   Community Link, right, because there's a form contract, for

1    lack of a better word, and the arbitration agreements, I'll

2    let the PBMs deal with that, because, honestly, I don't have

3    those documents.

4        The four ISP contracts, your Honor, they have -- they

5    do have a confidentiality clause in there, so we are going

6    to need a protective order or some protection before we can

7    just produce those, because for reasons that you could

8    probably appreciate, we don't share the ISP contracts with

9    the other PBMs.  So there's confidentiality that needs to be

10   protected and respected here.

11       But, obviously, there's no burden producing the four

12   agreements.  And, again, if that's -- if that's what we're

13   about, I'm limiting this because obviously we are a little

14   worried about discovery getting too expansive while motions

15   to dismiss are pending and motions --

16           (Overspeaking)

17           THE COURT:  Right.  I don't want to do that, but

18   I'd like to streamline it so those motions and the

19   consolidated complaints, the motions or the answers are

20   limited so that we can narrow the scope of what we actually

21   have in dispute here.

22           (Several people speaking at once)

23           MR. LENDER:  One other question, your Honor,

24   because of the concerns about confidentiality, are we going

25   to be -- who's going to be getting access to the ISP

1    contracts?  Obviously, there's a lot of people on the phone,

2    so I'm just trying to make sure I understand.

3            MR. MIGLIORI:  Your Honor, we could do -- if I may,

4    we could do an attorneys' eyes only type agreement until we

5    have more of a fulsome protective order, number one.  Number

6    two, it could be limited to the leadership that the Court

7    proposes or orders.  We just want it to be efficient, so

8    it's not that we need to have it without those types of

9    protections.

10           MR. LENDER:  Your Honor, there's one other issue --

11   if we can agree to what Mr. Migliori said, attorneys' eyes

12   only in a limited leadership group --

13           THE COURT:  Before you get on to the next issue,

14   can you confer with Plaintiffs' counsel and come up with a

15   proposed limited protective order for the ISPs so that I can

16   enter that --

17           MR. LENDER:  I will.

18           THE COURT:  -- and we can go from there.

19           MR. LENDER:  The only other issue I wanted to

20   raise, and I'm just going to raise it here, again, this is a

21   PBM issue; not our issue, but I know it from having spoken

22   to them, obviously there's a large concern that if they're

23   being asked to produce documents that somebody then says

24   they've engaged in discovery and they have, therefore,

25   waived their right to arbitration.  What I've done in the

1    past, and maybe we can pose some language to your Honor as

2    well, is just get an order from you that the production of

3    those arbitration agreements in and of itself will not be

4    deemed to be a waiver of their rights to arbitration.  We've

5    just usually gotten a court order in that regard, and it's

6    protected everyone.

7            THE COURT:  Okay.  Great.  I'm going to ask the

8    Defendants to provide that type of an order, and I'll be

9    happy to enter that.  I think that if we're going to give

10   the Plaintiffs these things prior to actual formal

11   discovery, we don't want to have any murkiness about what's

12   been waived and what hasn't.  Does that make sense?

13           MR. MIGLIORI:  Absolutely, your Honor.

14           MR. KO:  Your Honor, just one additional thought on

15   the production and who it's limited to.  My first instinct

16   was to agree with Mr. Migliori that it should be limited to

17   the leadership the Court selects, but then I think it would

18   be a bit odd if there were arbitration agreements that were

19   produced for my client, for example, that I couldn't see if

20   I wasn't on leadership.  So I think just as a preview for

21   the conferral, I think it would have to make sense that a

22   client that has filed a case should be able to see this

23   arbitration agreement.

24           THE COURT:  Their attorneys but not the clients; is

25   that what --

1          MR. KO:  Yes.

2          THE COURT:  -- Mr. Ko.  I don't think Mr. Lender

3    would have a problem with that.  I think if we're going to

4    do an attorneys' eyes only, the arbitration agreements can

5    be seen by the leadership team and the people who have

6    entered into those agreements.  Does that make sense?

7          MR. LENDER:  Yeah.

8          MS. SILTON:  It does to me.

9          MS. RUBIN:  Your Honor, this is Jacqueline Rubin

10   for Caremark.  As I mentioned, we have arbitration

11   agreements with particular Plaintiffs.  The Plaintiffs

12   themselves have entered into those contracts, so I'm not --

13   I think conferring with the Plaintiffs on those agreements

14   is appropriate and certainly something that makes a lot of

15   sense, but I'm not quite sure that I understand the

16   rationale for producing a contract that they entered into

17   themselves.

18          THE COURT:  Because what we don't want is for it to

19   have 32 different people saying 32 different things about

20   the contract that we're dealing with.  I'd like the

21   Defendants to provide them, and then that way we're all

22   operating from the same contract.  If you have them, produce

23   them.  Then nobody can say that they didn't have one or, you

24   know, we don't get into those kinds of silly semantics.  I

25   think that's the best way to sort of streamline things.  I

1   realize that it's asking you to produce something.  You're

2   not going to waive any of your arbitration rights, but if

3   you have an arbitration agreement, let's see it, see who

4   it's with and go from there.  Okay.

5         MS. McCAFFREY:  Your Honor, Meghan McCaffrey on

6   behalf of Express Scripts.  Just to clarify, Express Scripts

7   does not have arbitration agreements with the pharmacies.

8   So just to confirm, we understand that this would only apply

9   to the extent that a party is claiming or seeking -- may

10  potentially seek to enforce arbitration provisions, so we

11  would not be subject to an order to produce or provide our

12  agreements, for example, because they do not have

13  arbitration agreements.

14        THE COURT:  Right.  Just so we're clear, whoever is

15  going to produce the order, Mr. Lender, it should be

16  specific, or Mr. Migliori, specific as to that the

17  agreements that include arbitration clauses need to be

18  produced.  The ones that don't, don't need to be produced at

19  this point.  Okay?

20        MS. McCAFFREY:  Thank you, your Honor.

21        THE COURT:  Does that makes sense?

22        MR. MIGLIORI:  It does, your Honor.  And I think

23  that Mr. --

24        MS. McCAFFREY:  It does.

25        MR. MIGLIORI:  -- Lender and I and our group

29

1    collectively can meet and confer and make sure we have it

2    clear.

3          THE COURT:  Great.  Okay.  At some point -- now I'm

4    looking at the proposed deadlines that the parties have

5    provided.  So we're not going to have objections to interim

6    lead counsel to the applications, so I'm going to ask that

7    you guys meet and confer immediately, I mean soon, about the

8    interim protective order for the limited purpose of these

9    early disclosures.

10         And, now, a protective order was provided.  Are there

11    going to be objections to that protective order?

12         MR. MIGLIORI:  Your Honor, I think we have a couple

13    of examples.  We've prepared one of them.  We also have the

14    Loestrin example that we suggested out there.  So I think in

15    this meet and confer process, the best thing to do is start

16    there and see what we can agree to.  But we didn't get a

17    response back other than wait until the conference.

18         THE COURT:  So why don't -- go ahead.

19         MR. LENDER:  Your Honor, obviously, the issue for

20    us on the protective order was we didn't know exactly who

21    the lead counsel was going to be negotiating with, and then

22    there was the issue of who's going to be subject to the

23    protective order because of the arbitration issue.  But,

24    obviously, the interim production issue, I'm sure will -- it

25    sounds like we're good on the outside counsel only, so we'll

1    deal with that.  And then on the actual protective order

2    that will govern the case, obviously, we're happy to

3    negotiate that once we know who we're negotiating with.

4            THE COURT:  Okay.  So we will -- first, the lead

5    counsel on the leadership team will be established, and then

6    we'll set a date for you to provide a protective order that

7    governs the case.

8        When will be you able to produce the arbitration

9    agreements and the ISP contacts as well as the Community

10   Link Program?

11           MR. LENDER:  I think for GoodRX, which is --

12   obviously, other than the arbitration agreements, I'll let

13   the PBMs address that.  I think once we come up with our

14   agreement and its entered by your Honor, so it protects

15   everyone's rights, we can produce those documents within a

16   week of that date, if not sooner.

17           THE COURT:  Okay.  Anybody on behalf of the PBMs

18   want to say anything?

19           MS. RUBIN:  Sorry, your Honor.  Jacqueline Rubin

20   for Caremark.  I think we can probably do it within a week

21   to ten days after the order.

22           THE COURT:  Okay.  So what we're going to do is

23   you're going to get together, come up with the limited

24   protective order for the initial discovery, and in that

25   proposed order, give some deadlines for that limited

1    disclosure.  Okay?

2             MR. LENDER:  Yup.

3             THE COURT:  Okay.  So, now, after that, we're going

4    to have a master complaint or a short form complaint.  I

5    assume a master complaint is what you're assuming --

6             MS. SILTON:  I think what we're going to have is

7    going to be a consolidated complaint, your Honor.  Yup.  So

8    one complaint that will have a number of Plaintiffs and, you

9    know, the allegations that we have based on what we might --

10    what we'll know by that date.

11             THE COURT:  Okay.  So it will be a consolidated

12    amended complaint.  So the sort of deadline that has been

13    proposed is August 18th for both parties, assuming we can

14    get your leadership answers out by the end of the week or

15    the beginning of next week, and then you guys can work on

16    your protective orders.  Does that work?

17             MR. MIGLIORI:  It does, your Honor.

18             MS. SILTON:  Yes, it does.

19             THE COURT:  And then 14 days after August 18th,

20    which, Carrie, will be what?

21             THE CLERK:  Pulling up the calendar now.  Give me

22    one moment.

23             THE COURT:  Okay.  It's going to be like August --

24    September 1 or something like that.

25             THE CLERK:  It will be September 1st, which is

```
 1        Labor Day.  So would you like September 2nd?

 2                THE COURT:  Sure.  September 2nd for the Rule 26(a)

 3        disclosure.  Does that make sense?

 4                MR. MIGLIORI:  Yes, your Honor.

 5                MR. LENDER:  Yes.

 6                THE COURT:  Okay.  Now, you have October 13th for

 7        stipulations and proposed orders concerning ESI,

 8        preservation of evidence, privilege and protective order,

 9        depositions and expert discovery.  Should that come after

10        the Rule 12 motions?

11                MR. MIGLIORI:  If I may, your Honor, I think from

12        the Plaintiffs' perspective, right now it's here because

13        there's a lot to do, as you know, in that process, and the

14        efficiency -- unless there's a clear knockout, the

15        efficiency has been getting them started now is extreme.  It

16        will ripple for months afterwards.

17                THE COURT:  Okay.  So I think what we'll do is

18        we'll give you the October 6 date for the Rule 12 motions,

19        and then the 20th for opposition, and, then, I don't know --

20        and then we will have December 22nd for replies and further

21        support of -- I'm sorry -- November 20th for opposition, and

22        then another month, December 22nd, for opposition -- I mean,

23        replies in further support of Rule 12.  So they'll be fully

24        briefed in time for me to read them over Christmas.

25                So I also think that we should at some point in that
```

 1    time frame pick a date for the stipulations and proposed

 2    orders, and the stuff that you have is October 13th.  Does

 3    that date makes sense for everyone?  I realize it's sort of

 4    proceeding on two tracks, but Mr. Migliori does make a good

 5    point that if we don't have some stipulations and proposed

 6    orders in that time frame, then we will be sort of delayed

 7    into next year before we even start that process.

 8              MR. MIGLIORI:  We have lots of coordinated help

 9    here.  We've worked well to this point.  I think we can do

10    that.

11              THE COURT:  All right.

12              MS. SILTON:  I would just note, your Honor, that I

13    think that October 13th date was agreed to by both

14    Defendants and all the Plaintiffs, so I think it should be a

15    good one.

16              THE COURT:  We'll enter that date then.  I do like

17    dates to sort of be actual dates, and that's one of my sort

18    of pet peeves about federal practice is that everybody comes

19    in and asks for, not an MDL obviously, but it's six months

20    and then extends it 30 days forever, and unironically puts

21    in motions, seventh motion to extend the discovery

22    deadlines.  If we were just honest and upfront and tell me

23    how long it's going to take.  That said, stuff takes

24    longer than -- as long as you're working on it and you come

25    back and say, you know what, October 13th wasn't reasonable,

1    it's more like December 13th, fine, as long as we're sort of

2    working on it towards that date.  Okay.  So that's sort of a

3    scheduling order.

4         MS. RUBIN:  Your Honor, on the scheduling order --

5    Jacqueline Rubin for Caremark.  On the initial disclosures,

6    we would request for the Defendants that are moving to

7    compel arbitration if we could have until after your

8    decision on the motions to compel arbitration to do our

9    initial disclosures on the assumption that if we're going to

10   arbitration, then there's no need for us to do them.

11        THE COURT:  Okay.  The problem is that you want

12   those motions to come in with the Rule 12 motions.  You want

13   all of that time, I assume, correct?

14        MS. RUBIN:  Correct.

15        THE COURT:  So then you want to hold off with your

16   disclosures that's decided?

17        MS. RUBIN:  Correct, your Honor.

18        THE COURT:  I honestly think that delays things,

19   but does anybody else have a strong opinion either way?  I

20   think you can file it and then give your Rule 26(a)

21   disclosures and not engage in discovery until after that.

22        MR. MIGLIORI:  Your Honor, from the perspective of

23   the Plaintiffs, it's not a terribly onerous process.  I

24   understand certain other aspects of discovery, but the

25   disclosure is pretty straightforward.  I would ask that they

1    hold the date.

2         THE COURT:  I'm going to leave the date for the

3    Rule 26(a) disclosures because I think it makes sense for

4    the other -- the parties to have those disclosures ahead of

5    time so the Court will have them.  Otherwise, I will be

6    bifurcating the motions to dismiss and the motions to compel

7    arbitration, and it's easier for me, frankly, to deal with

8    them as one unit.  Let's leave that date.  If it becomes a

9    problem, Ms. Rubin, you can reach out to counsel on the

10    leadership team and figure out who is getting that extension

11    or figuring out a better way.  Okay?

12         MS. RUBIN:  Thank you, your Honor.  I assume we can

13    write into the order saying that it doesn't waive anything

14    with regard to the arbitration.

15         THE COURT:  Right.  I think Mr. Lender indicated he

16    would do that.

17         MS. RUBIN:  Thank you, your Honor.

18         MR. LENDER:  I will.  I will.

19         THE COURT:  Okay.  All right.  So we've gotten

20    through all the Rule 12 schedule.  Is there anything else on

21    that that we need to address?

22       Let's talk about a class certification schedule and

23    process.  Instinct tells me that should come after Rule 12,

24    but perhaps that's not correct.  I think it's supposed to

25    come sooner rather than later.  Ms. Silton, Mr. Migliori,

1    Mr. Lender, anybody else.

2         MR. LENDER:  Your Honor, David Lender.  Our

3    expectation or our hope was that we would do some early

4    discovery that we've identified, that will be identified in

5    the stip, we'll work on the ESI and the protective order,

6    but when we get to the motions to dismiss and compel

7    arbitration, once we get decisions from your Honor, figure

8    out whether what's left, if anything, and we can obviously

9    continue to meet and confer, but we would meet and confer

10   about a schedule after that.  But we haven't really

11   discussed with the other side exactly how we're going to do

12   this in terms of class versus merits and whether those are

13   combined or separated.  So we probably need to meet and

14   confer on that for sure.

15        THE COURT:  I think that makes sense.  I think the

16   sort of best practice is to do that early.  But, for me, it

17   makes sense to do a little later.  Mr. Migliori, do you

18   agree?  Disagree?

19        MR. MIGLIORI:  I do, your Honor.  I think that's

20   one of those issues that we all need to learn a little bit

21   more about where we really are in the case.  We did propose

22   in here pretty regular conferences.  We -- from the

23   Plaintiffs' perspective, I think we requested them every six

24   weeks.  There's a lot that's going to be going on, even

25   while these motions are pending, depositions, and so I think

1    maybe we take advantage of one of those sessions.

2         MR. GRZENCZYK:  Your Honor, if I may -- this is

3    Scott Grzenczyk.  I'm with the firm Girard Sharp.  I think

4    this dovetails with one observation I had, which is a big

5    gaming issue for class certification and merits and

6    everything else in cases like this, antitrust cases, is the

7    transactional data, and that can take a long time just to

8    meet and confer about, because, typically, there's a

9    production of samples, the parties review the samples.  The

10   one thing to put on the Court's radar that when leadership

11   is appointed, they might want to take up with the Defendants

12   sooner rather than later starting that process of

13   understanding what are the fields in the data, is there a

14   sample that can get produced.  That's not starting discovery

15   in full, but on the things you're talking about like class

16   certification, merits and the ultimate schedule, you can cut

17   months out of the process by having an understanding of what

18   the data systems are early in the case instead of having to

19   wait a long time just to do that groundwork level background

20   information until after the Rule 12 motions are decided.

21        THE COURT:  You're saying sort of get the

22   parameters, the lay of the land as to what's out there and

23   what it looks like, not necessarily the data but sort of the

24   structure prior to --

25        MR. GRZENCZYK:  Yes.  Exactly, your Honor.  Often

1    there's a production of a sample, the parties' experts go

2    and review those.  Structure data samples can provide input

3    (indecipherable) that way discovery, which we think it will

4    ultimately proceed, unless the Rule 12 motions are denied in

5    whole or in part, the parties are ready to move forward

6    pretty quickly with the data productions, which then take a

7    long time to be produced, the parties' experts need to work

8    with them before preparing reports for class certification.

9    So it really can advance the schedule pretty tremendously to

10   have a meeting conferring on that particular issue done

11   early.

12        MR. MIGLIORI:  Your Honor, there's a concept of

13   data dictionaries.  That sort of lays out sort of the

14   structure and the types of fields and all.  I would add to

15   Scott's comments that the algorithms in this case or pricing

16   are also going to be complicated, not just the transactional

17   work.  So it's going to have a component of needing to

18   understand the way the algorithms are built, not just how

19   they price out.

20        MR. LENDER:  Your Honor, Dave Lender.  This is why

21   oftentimes in antitrust cases they stay in discovery, when

22   every Plaintiff lawyer starts asking for individual things,

23   it starts getting very expensive and complicated and results

24   in lots and lots of discovery disputes.  That's why

25   normally, in my experience, there's either a stay of

1    discovery or as you just said a very limited set of

2    documents until we get through the 12(b) motions.  Because I

3    know the Plaintiffs would love to get access to the

4    transaction data and the algorithms, but it is putting the

5    cart before the horse a little bit here, and it is much more

6    complicated than just sitting down and having meet and

7    confer on architecture fields.

8         MR. MIGLIORI:  Your Honor, we didn't prioritize it

9    as the first thing.  We need to get to the motions.  But

10   Scott makes a really important point that the conversations

11   leading up to October 13th really do need to include some of

12   these very specific issues, because they discovery issues,

13   and we do need to understand exactly what we need to ask for

14   and how it's organized there.  So I think it's part of the

15   parallel track that has an October 13th deadline right now,

16   and that's what we'll work on.

17        MR. BONANNO:  Good morning, your Honor.  Mike

18   Bonanno on behalf of Express Scripts Defendants.  I do think

19   it's helpful, your Honor, to step back and give the Court a

20   sense of what's being requested right now by the Plaintiffs.

21   For a PBM, every time a prescription is processed across its

22   network, it's creating transaction records that have

23   literally thousands of data fields.  So if the parties were

24   to be ordered to meet and confer about the parameters of

25   data that could be relevant to the case, even identifying

1    all of the data fields for that transactional data that my

2    client has for prescriptions in our records is incredibly

3    burdensome and expensive.  I can say that because we've done

4    it in a bunch of other antitrust cases.

5        Yes, it takes time; of course the Plaintiffs will be

6    entitled to it if we get to the discovery phase of the case,

7    but to order that sort of meet and confer process now before

8    the Rule 12 process has come to rest would be exceptionally

9    expensive.  And I think we can move it expeditiously after

10   your Honor resolves the initial pleading motions, but as

11   Mr. Lender just suggested, it really puts the cart before

12   the horse to start going down the path of data discussions.

13       THE COURT:  So -- go ahead.

14       MS. RUBIN:  Jacqueline Rubin for Caremark.  I was

15   going to add that as to the arbitration agreements that my

16   client entered into with the various pharmacies at issue

17   here, those all called for very streamlined and limited

18   discovery under JAMS rules.  So having us engage in this

19   process really undercuts the agreement we've entered into.

20   And under custody efficiency is that the parties

21   (indecipherable) to JAMS arbitrations.

22       MR. PEACOCK:  Your Honor, James Peacock on behalf

23   of Navitus.  We also have arbitration agreements, and I

24   would join in Ms. Rubin's comments that we seem to be

25   sliding into more and more discovery.  We started with

1    asking for production of contracts, and I understand the

2    Court's ruling on that.  And now we're being required to do

3    Rule 26 disclosures, and I understand the Court's ruling on

4    that.  But then we get into datasets, and we're perilously

5    close to full blown discovery.

6          THE COURT:  So I don't perhaps have -- I definitely

7    don't have the background that you all have in this type of

8    litigation.  So I understood that what Mr. Migliori was

9    asking for was just sort of the parameter of datasets, not

10   the datasets themselves.  Am I mistaken?

11         (Several people speaking at once)

12         MR. MIGLIORI:  Let me be very clear, so there's no

13   confusion.  I think, your Honor, in our ESI discussions and

14   everything that's already been sort of fit into your

15   proposed case management order, the discussion of how

16   discovery works necessarily will require us understanding

17   better what they have and how they have it organized.

18      I would propose that we keep it to the October 13th

19   deadline, that we try to understand exactly -- and counsel,

20   even in the (indecipherable) litigation that I'm involved in

21   with the PBMs, the data is there, their knowledge of it,

22   their facility in getting around it is there.  We just want

23   to make sure we have a good idea of what's out there in

24   terms of data dictionaries and structures so that when we

25   get into the full wholesome discovery, we can make sure

1    we're asking for the right thing.

2        So I'm not proposing they produce data samples or sets

3    right now.  We've got a lot to work on, and I don't think

4    that that's exactly the right way to handle it right now.  I

5    think we have an October 13th deadline to really understand

6    what structures they have and the types of the data that

7    they maintain and how we need to get it all put together.

8        MS. SILTON:  One other idea, your Honor, might be

9    that we could meet and confer and come to you on the -- I

10   think it's actually on the 13th with a proposed -- with a

11   more wholesome proposed schedule.  That might also allow us

12   to sort of set out how we think all of this might unfold.

13   And that's something, perhaps, the leadership, once it's

14   appointed and then with Defendants we can meet and confer

15   and discuss and maybe put some other markers down in terms

16   of schedule that would help this conversation.

17       THE COURT:  I think that makes sense.  I don't want

18   to get too deep into the discovery, sort of down the

19   discovery path until we have the parameters of the

20   litigation set.  But I do think that with that October 13th

21   deadline, there's going to be some discussion ahead of time

22   about where -- you know, where the data is coming from, what

23   the parameters of that data is, how much data is out there.

24   I don't know if I understood Mr. Buonanno correctly, but if

25   I did, he's saying that every transaction has a thousand

1    fields.  I hope that's not true.  So I think that it makes

2    sense to confer and talk about that.  But I think Mr. -- one

3    of you suggested that we have every six weeks meetings --

4            MR. MIGLIORI:  That's correct.

5            THE COURT:  And perhaps in meeting in six weeks, we

6    can talk about that and where we are at in that and what the

7    next steps for that are so we don't go down this expensive

8    pathway, unless it's necessary.  And when we do, we limit it

9    to what is really necessary so that nobody is spending money

10   they don't need to spend in this litigation.  Does that

11   makes sense?

12           MR. MIGLIORI:  It does, your Honor.

13           MS. SILTON:  Yes.  Thank you.

14           MR. LENDER:  Thank you, your Honor.

15           THE COURT:  So let's talk about status conferences

16   and status reports.  Oh, a couple of things:  For disputes

17   about discovery, I expect you to confer first and then also

18   reach out to my clerk to let her know that you've conferred

19   and you can't reach an agreement before you file motions,

20   just for efficiency purposes.  And you can reach out to

21   Judge Moses if I'm unavailable for some reason or my clerk

22   is unavailable.  If there's a discovery issue, she may be

23   able to meet with you sooner or not, because she's been

24   pretty busy lately, but we'll see how that goes.  And we may

25   be able to work through those things without it taking time

1    for people to file motions and responses and replies and

2    certify.

3         So, we'll schedule, Carrie, a meeting or a conference

4    via Zoom every six weeks.  Does that makes sense?  We will

5    have -- you know, obviously people are going to have

6    conflicts, people on the leadership team will have

7    conflicts.  We'll work with that.  There are multiple

8    attorneys on each side.  I don't need everybody to be there,

9    but the people that are, they will need to be able to speak

10   to what's going on and update myself and Judge Moses about

11   where we're at in these different things.

12        I'm thinking that status reports -- I'm looking at what

13   the book says I should order, and it's monthly status

14   reports.  But if we're going to have conferences every six

15   weeks, I think we should have reports every six weeks but

16   starting in five weeks, so that it's a week before the

17   conference.  Does that makes sense?

18             MR. MIGLIORI:  It does.

19             MR. LENDER:  Yes.

20             THE COURT:  It doesn't have to be a week before,

21   but that makes everybody talk.  Life gets busy, other stuff

22   goes on, so it gives you a week.  If it's late, it's late.

23   But at least I have it and we can review it and see where

24   we're at for the next conference.

25        Once we get past Rule 12 and we figure out the

1    parameters of the case, we'll figure out things like

2    settlement, mediation, any of those things that are

3    possible.  If that's something that we should be discussing

4    before I bring it up, bring it up with me, because, you

5    know, I'm painfully aware of the limitations the Court has

6    for mediation.  I think this is a case that a private

7    mediator would be involved in or the Magistrate Judges have

8    some flexibility.  But I think the size of this case, if it

9    was to be a mediation process, would probably require

10   private mediation.  So we'll just make sure that, you know,

11   that you let me know, and I can help -- I can navigate that

12   through the process if everybody thinks there comes a point

13   where it makes sense.

14        There are a few motions in individual cases to withdraw

15   counsel.  Does anybody have any objection on any of those?

16   I think there are multiple attorneys entered on every case,

17   so I don't think that there should be an issue.  We'll take

18   a quick look at those to make sure.  Unless it's the only

19   attorney on a case, which I doubt, we'll probably just grant

20   those unless there are any objections.  Okay.  Is there

21   anything else we should talk about at this meeting?

22              MR. MIGLIORI:  I think we covered it.

23              MR. LENDER:  Nothing for the Defense, your Honor.

24   Thank you.

25              THE COURT:  Thank you, Mr. Lender.  Judge Moses, I

1    don't know if there's anything you wanted to add?

2              JUDGE MOSES:  Nothing else.

3              THE COURT:  Okay.  Thank you.  Sorry I threw you in

4    there, but if I'm not available, I'm sure you're more than

5    capable of handling discovery disputes.  Well, I know you

6    are.

7         So we will get an order out on the leadership team as

8    soon as possible.  And Mr. Lender or Mr. Migliori,

9    Ms. Silton and anybody else can participate in getting those

10   proposed orders together as a result of this conference so

11   that we can get everything sort of entered.

12        I can enter a text order with all of the dates or you

13   can include that in what you provide to me with the language

14   that you want, which probably makes more sense.  And the

15   only date change is that we said September 2nd for the

16   Rule 26 initial disclosures.

17             MR. MIGLIORI:  Okay.

18             THE COURT:  I think that's the only date we changed

19   a little.

20             MR. LENDER:  Don, I'll do a first draft and send it

21   to you guys, just because I, obviously, want to make sure we

22   get the language that we're going to need on the waiver.  So

23   I'll put the first draft together and I'll send it to you.

24             MR. MIGLIORI:  That sounds great.

25             THE COURT:  Mr. Lender, I know you're in contact

1    with co-defendant's counsel, can you just make sure the PBM

2    attorneys are okay with the language that you put in there?

3                MR. LENDER:  (Indecipherable), I would run it by

4    them before I send it over.  Thank you.  Absolutely.

5                THE COURT:  Thank you.  Is there anything else?

6                MS. SILTON:  No, thank you.

7                MR. LENDER:  Thank you, your Honor.

8                THE COURT:  Like I said, we're pretty informal, so

9    just reach out if there is anything.  We'll try to make this

10   as painless as possible.

11       For those of you who are not in New England, enjoy the

12   week.  For those of you who are, stay inside in the air

13   conditioning.

14       Carrie, do we have a date?  Do we want to set a date

15   right now for six weeks?

16                THE CLERK:  I can pull one right now, Judge.  Give

17   me one second.  That would be the first week in August.  Do

18   you have a preference on which day, Judge?

19                THE COURT:  No, I do not.

20                THE CLERK:  Do you want to do August 4th at

21   11:00 a.m.?

22                THE COURT:  Okay.  Does that make sense?  I

23   understand it's August and people might be, you know, doing

24   other more important things, but let's schedule it.  Let's

25   schedule a week before that, which would be July 28th; is

1    that right --

2              THE CLERK:  Yes.

3              THE COURT:  -- for a status report.  And in the

4    meantime, let's get those orders out.

5              UNIDENTIFIED SPEAKER:  Your Honor, may I ask

6    clarification?  Are your conferences also going to be Zoom,

7    or are we going to include some in-person ones?

8              THE COURT:  I defer to the parties on that, so it's

9    up to you what you want to do.  If you think in-person makes

10   sense, that's great.  If not and you'd rather do it on Zoom,

11   that's fine too.  So I defer to the parties on that.

12             MS. SILTON:  Maybe we'll talk about that.  I think

13   both are great options.

14             THE COURT:  Okay.  Well, not in February, but okay.

15             MS. SILTON:  I'm in Minnesota.  February is --

16             THE COURT:  Okay.  So you're fine.  You stay out of

17   the heat, too.  All right.  Everybody, be well, have a good

18   week, and we'll see you in a few weeks.  Thank you.

19             (Proceedings Adjourned)

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T I O N

4

5

6            I, Denise A. Webb, RPR, do hereby certify

7    that the foregoing pages is a correct transcription

8    from the official digital sound recording of the

9    proceedings in the above-entitled matter.

10

11

12            Dated this 2nd day of July, 2025

13

14

15            /s/ Denise A. Webb_____

16            Denise A. Webb, RPR
              Federal Official Court Reporter
17

18

19

20

21

22

23

24

25