## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re GoodRx and Pharmacy Benefit Manager Litigation (No. II) | Case No. 1:25-md-03148-MSM-AEM |
| | MDL No. 3148 |
| This Document Applies To: | **ORAL ARGUMENT REQUESTED** |
| ALL CASES | **REDACTED** |

## DEFENDANT MEDIMPACT HEALTHCARE SYSTEMS, INC.'S MOTION TO DISMISS OR COMPEL PLAINTIFFS TO ARBITRATION

# <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................2

    I.      MedImpact and Participation in Its Pharmacy Network.........................3

            A.     In-Network Pharmacies. .......................................................4
            B.     Out-of-Network Pharmacies. ................................................5

    II.     The ISP..........................................................................................5

LEGAL STANDARD.......................................................................................7

    I.      Enforcement of Arbitration Provisions.................................................8
    II.     Dismissal for Lack of Article III Standing under Fed. R. Civ. P. 12(b)(1). ..............................................................................................9
    III.    Dismissal for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6). ............................................................................................11

ARGUMENT .................................................................................................12

    I.      Keaveny Must Arbitrate Its Claim......................................................12
    II.     Star Discount Must Arbitrate Its Claim...............................................14
    III.    AHF and OneroRx Should Be Dismissed for Lack of Antitrust Standing or Be Compelled to Arbitration. ...........................................17

            A.     AHF and OneroRx Lack Antitrust Standing...........................18
            B.     AHF's and OneroRx's Pharmacies Are Subject to Binding Arbitration. ........................................................................19

                   1.     Agency ...............................................................24
                   2.     Estoppel.............................................................26

    IV.    NCPA and PARD Should Be Dismissed or Compelled to Arbitration. ..................................................................................27

            A.     The Associations Do Not Have Associational Standing...........28

                   1.     The Associations Fail Hunt's First Prong. ....................29

                           i.     Pharmacies not contracted with MedImpact cannot be injured by MedImpact's participation in the ISP...........................................................*30*
                   2.     The Associations Fail Hunt's Third Prong. ...................32

                           i.     Binding arbitration clauses require the participation of NCPA and PARD member pharmacies. ...................................................*32*
                           ii.    Non-contracted pharmacies must individually participate to show they have been harmed by MedImpact's participation in the ISP. .........................*35*
            B.     The Associations Fail to State a Claim. ..................................36
             C.     If Not Dismissed, the Claim Must be Arbitrated. ....................36

V.    MedImpact Joins in Defendants' Joint Motion to Dismiss and ESI's Motion to Dismiss. ....................................................................................37

CONCLUSION ....................................................................................................................39

ORAL ARGUMENT ............................................................................................................40

CERTIFICATE OF SERVICE .............................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am. v. Reno*,
  80 F.3d 477 (D.C. Cir. 1996) ................................................................36

*Air-Con, Inc. v. Daikin Applied Latin Am., LLC*,
  21 F.4th 168 (1st Cir. 2021) ..................................................................8

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ...................................................................11

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009)...............................................................................26

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983)...........................................................19

*Awuah v. Coverall N. Am., Inc.*,
  554 F.3d 7 (1st Cir. 2009) ......................................................................15

*Beaudoin v. Baker*,
  530 F. Supp. 3d 169 (D. Mass. 2021) ....................................................30

*Bossé v. New York Life Ins. Co.*,
  992 F.3d 20 (1st Cir. 2021).......................................................8, 13, 15

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*,
  799 F.2d 6 (1st Cir. 1986).......................................................................28

*Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*,
  4 F.4th 63 (1st Cir. 2021) .......................................................................10

*Comer v. Micor, Inc.*,
  436 F.3d 1098 (9th Cir. 2006) ................................................................25

*Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*,
  158 Cal. App. 4th 1061 (2008) ..............................................................26

*Cruz Strazarra v. Audio Visual Concepts*,
  No. CV 08-2069 (ADC), 2009 WL 10720188 (D.P.R. Sept. 10, 2009).................................10

*Davis v. Hannah Holdings, Inc.*,
  771 F. Supp. 3d 552 (E.D. Penn. 2025) ..................................................17

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016) ................................................................................................31

*Ensambles Hyson, S.A. de C.V. v. Sanchez,*
  718 F. Supp. 3d 1258 (S.D. Cal. 2024) ...........................................................................25

*Equal Means Equal v. Ferriero,*
  478 F. Supp. 3d 105 (D. Mass. 2020), *aff'd,* 3 F.4th 24 (1st Cir. 2021) ........................31

*Fantastic Sam's Franchise Corp. v. FSRO Ass'n,*
  824 F. Supp. 2d 221 (D. Mass. 2011) ..............................................................................29

*First Options of Chicago, Inc., v. Kaplan,*
  514 U.S. 938 (1995) ...........................................................................................................8

*G.K.A. Beverage Corp.* v. *Honickman,*
  55 F.3d 762 (2d Cir. 1995) .........................................................................................18, 36

*Gerlinger v. Amazon.com Inc., Borders Grp., Inc.,*
  526 F.3d 1253 (9th Cir. 2008) .........................................................................................17

*Goldman v. KPMG, LLP,*
  173 Cal. App. 4th 209 (2009) ..........................................................................................26

*Gove v. Career Sys. Dev. Corp.,*
  689 F.3d 1 (1st Cir. 2012) ........................................................................................8, 9, 25

*Green v. Green Mountain Coffee Roasters, Inc.,*
  279 F.R.D. 275 (D.N.J. 2011) ....................................................................................16, 17

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
  586 U.S. 63 (2019) ........................................................................................................9, 13

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................................. *passim*

*Jones v. Micron Technology Inc.,*
  400 F. Supp. 3d 897 (N.D. Cal. 2019) .............................................................................17

*JSM Tuscany, LLC v. Superior Court,*
  193 Cal. App. 4th 1222 (2011) ........................................................................................26

*Katz v. Pershing, LLC,*
  672 F.3d 64 (1st Cir. 2012) ..........................................................................................9, 10

*Kenerson v. Elemetal Direct USA, Inc.,*
  No. 1:24-CV-00156-MSM-LDA, 2024 WL 4591661 (D.R.I. Oct. 28, 2024) ................25

*Lieberson v. Johnson & Johnson Consumer Cos., Inc.*,
    865 F. Supp. 2d 529 (D.N.J. 2011) ...................................................................16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................... *passim*

*In re Managed Care Litigation*, MDL No. 1334,
    2003 WL 22410373 (S.D. Fla. Sept. 15, 2003) ............................................32, 35

*Maryland Optometric Ass'n v. Davis Vision, Inc.*,
    Civ. No. WDQ-04-02153, 2004 WL 7330337 (D. Md. Dec. 21, 2004)................................29

*Microsystems Software, Inc. v. Scandinavia Online AB*,
    226 F.3d 35 (1st Cir. 2000)..........................................................................10

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022)..................................................................................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)....................................................................................8

*Motorola Mobility LLC v. AU Optronics Corp.*,
    775 F.3d 816 (7th Cir. 2015) .......................................................................19

*Mundi v. Union Sec. Life Ins. Co.*,
    555 F.3d 1042 (9th Cir. 2009) ......................................................................26

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
    713 F. Supp. 2d 734 (N.D. Ill. 2010) ...............................................................36

*Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*,
    No. CIV. A. 99–937, 2000 WL 33365907 (W.D. Pa. Mar. 24, 2000), *rev'd on
    other grounds*, 280 F.3d 278 (3rd Cir. 2002)..........................................................29

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ............................................................30, 35

*Prograph Int'l Inc. v. Barhydt*,
    928 F. Supp. 983 (N.D. Cal. 1996) .................................................................25

*Ruiz v. Podolsky*,
    50 Cal. 4th 838 (2010) ..............................................................................25

*Sanner v. Bd. of Trade of City of Chicago*,
    62 F.3d 918 (7th Cir. 1995) .........................................................................35

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012)..........................................................................11

*Serpa Corp. v. McWane, Inc.*,
　　199 F.3d 6 (1st Cir. 1999) ................................................................................18

*Smith v. Spizzirri*,
　　601 U.S. 472 (2024) ................................................................................9, 13

*Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*,
　　526 F.3d 38 (1st Cir. 2008) ................................................................................27

*Summers v. Earth Island Inst.*,
　　555 U.S. 488 (2009) ................................................................................31

*Toll Bros. v. Twp. of Readington*,
　　555 F.3d 131 (3d Cir. 2009) ................................................................................16

*TransUnion LLC v. Ramirez*,
　　594 U.S. 413 (2021) ................................................................................9, 10

*United States v. AVX Corp.*,
　　962 F.2d 108 (1st Cir. 1992) ................................................................................10, 31

*Valentin v. Hospital Bella Vista*,
　　254 F.3d 358 (1st Cir. 2001) ................................................................................10

*Vazquez-Ramos v. Triple-S Salud, Inc.*,
　　55 F.4th 286 (1st Cir. 2022) ................................................................................11

*Warth v. Seldin*,
　　422 U.S. 490 (1975) ................................................................................28, 31

*Wiener v. MIB Grp., Inc.*,
　　86 F.4th 76 (1st Cir. 2023) ................................................................................33

*Yuen v. IDEXX Lab'ys, Inc.*,
　　710 F. Supp. 3d 57 (D. Me. 2024) ................................................................................11

**Statutes**

9 U.S.C. §§ 2–4 ................................................................................ *passim*

Cal. Civ. Code § 2295 ................................................................................25

Ohio Rev. Code § 1701.82 ................................................................................14

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ................................................................................ *passim*

Federal Rule of Civil Procedure 12(b)(6) ................................................................................ *passim*

U.S. Const. art. III, § 2, cl. 1 ...........................................................................................................9

Defendant MedImpact Healthcare Systems, Inc. ("MedImpact") respectfully moves this Court to proceed as follows:

I.  Compel Plaintiffs Keaveny Drug, Inc. ("Keaveny") and Star Discount Pharmacy, Inc. ("Star Discount") to arbitration and stay their claims as to MedImpact because they agreed "any and all disputes, controversies or claims . . . arising out of, in connection with, or relating to" their contract would be resolved exclusively through arbitration.

II.  Dismiss the claims of Plaintiffs AIDS Healthcare Foundation ("AHF") and OneroRx, Inc. ("OneroRx") as to MedImpact under Federal Rule of Civil Procedure 12(b)(6) for lack of antitrust standing. They are parent companies that are not directly injured by alleged harm to their subsidiaries. If the Court concludes they have standing, however, they are subject to binding arbitration provisions, should be compelled to arbitration, and their claims against MedImpact should be stayed because the pharmacies they operate are subject to arbitration agreements.

III.  Dismiss the claims of Plaintiffs National Community Pharmacists Association ("NCPA") and Philadelphia Association of Retail Druggists ("PARD") (collectively, "the Associations") as to MedImpact under Federal Rule of Civil Procedure 12(b)(1) for lack of associational standing or under Federal Rule of Civil Procedure 12(b)(6) for lack of antitrust standing because they allege no injury to themselves, and their injured members must arbitrate. Alternatively, they should be compelled to arbitration along with those members that signed arbitration agreements, and the matter should be stayed as to those parties, under 9 U.S.C. §§ 2–4.

While the Court does not need to reach these issues, MedImpact also adopts and joins (1) the arguments in Defendants' Joint Motion to Dismiss and (2) the arguments in Defendant Express Scripts, Inc.'s Motion to Dismiss (the "ESI Motion").

1

As explained in the ESI Motion, Plaintiffs cannot plead a per se antitrust claim against MedImpact because MedImpact's contract with GoodRx (the "MedImpact ISP Agreement") debunks any allegation that MedImpact colludes with any other defendant to fix prices. Instead, the ISP Agreement shows that MedImpact makes its own decisions.

And as explained in Defendants' joint motion to dismiss, Plaintiffs' claim fails under the rule of reason because the Integrated Savings Program ("ISP") at the heart of Plaintiffs' case operates to *reduce* prices and transaction costs for consumers purchasing generic drugs. Those are clear benefits to competition, not harm. Plaintiffs have failed to plead any allegations that the program caused higher prices or hurt competition in any market.

The Court should dismiss the Complaint as to MedImpact for the reasons below and as addressed in Defendants' Joint Motion to Dismiss and the ESI Motion.

## BACKGROUND

The Plaintiffs in this case are pharmacies, entities that manage pharmacies, and associations with individual pharmacies as members. They seek to represent a class of all independent pharmacies nationwide, alleging that participation in a discount program that indisputably saves consumers money on generic drugs is an antitrust violation. They do not allege the stand-alone discount program is an antitrust violation.[1] Instead, they allege it is an antitrust violation only when MedImpact and other pharmacy benefit manager ("PBM") defendants participate in the program.[2] This is not a proper antitrust case, but an effort by the Plaintiffs to

---

[1] "This action does not challenge GoodRx's traditional discount card business, but rather the ISP initiative." Consolidated Complaint ("Compl."), Dkt. 60-1, ¶ 129 (the Integrated Savings Program ("ISP") is the challenged program).

[2] "The ISP Scheme, which developed as a result of the partnership agreements described above, represents a fundamental change in the way the PBM Defendants and GoodRx operate in the prescription drug market." Compl. ¶ 162 (describing how the ISP was a result of Defendants

misuse antitrust law and this Court's power to gain an upper hand on Defendants at the cost of consumers.[3]

## I.      MedImpact and Participation in Its Pharmacy Network.

Unlike many other PBMs, MedImpact is an *independent* PBM. It is not vertically integrated, meaning it is not owned by a health insurer or healthcare provider, and it does not own or operate retail pharmacies. *See* Compl. ¶ 93. It therefore has no retail pharmacies of its own to supposedly benefit by harming independent competitors. Instead, MedImpact serves as a third-party administrator between health plans and their members. Its role is to facilitate efficient prescription drug transactions between pharmacies and health plans by forming networks of participating pharmacies, processing claims, and ensuring accurate reimbursement to pharmacies when prescription drugs are dispensed to patients.

MedImpact's primary aim as an independent PBM is to lower the cost of healthcare for clients and consumers, improve member access to medications, and increase customer satisfaction and value. It accomplishes that by negotiating competitive drug prices with pharmacies as part of its network formation.

Each independent pharmacy Plaintiffs allege was injured is either a pharmacy *in* MedImpact's network subject to a binding arbitration agreement, or a pharmacy *out* of MedImpact's network that has no contracted reimbursement rate with MedImpact and therefore no injury.

---

joining the discount program (the "partnership agreements"), and that is the alleged antitrust violation).

[3] MedImpact disputes the allegations against it, but for purposes of this Motion, cites to the Complaint or sources from which the Court may take judicial notice.

### A.    *In-Network Pharmacies.*

To join MedImpact's network, a pharmacy executes a participating provider agreement, known as a MedCare Pharmacy Network Agreement ("MedCare Agreement"). *See* Compl. ¶ 78; Ex. A, Declaration of Alex Rivera ("Rivera Decl.") ¶ 4. These Agreements govern the entire relationship between MedImpact and each pharmacy in its network—including drug prices.[4] Consistent with common industry practice, *they also contain binding arbitration clauses.*[5] Without the Agreement, MedImpact has no contractual relationship with the pharmacy allowing it to administer health plan benefits. All pharmacies that participate in MedImpact's network voluntarily enter this agreement.

Some MedCare Agreements are executed directly between MedImpact and individual pharmacies. Most MedCare Agreements, however, are between MedImpact and Pharmacy Services Administrative Organizations ("PSAOs"), which act as contracting representatives for groups of independent pharmacies. *See* Compl. ¶¶ 68, 77–80; Ex. B ¶ 3. As Plaintiffs acknowledge, PSAOs negotiate reimbursement rates and dispensing fees with PBMs "on the pharmacies' behalf." Compl. ¶ 68. In return, pharmacies pay PSAOs a monthly fee. *Id*.

How drug prices are calculated, paid, and disputed are a matter of contract governed by the MedCare Agreements. Pharmacies can choose not to sign the Agreements. But Plaintiffs'

---

[4] The specific pricing terms and other details of the arrangement are provided in separate addenda not currently attached to the Motion because they are not relevant to this dispute.

[5] Compl. ¶¶ 77–80; Ex. B, Declaration of Brett Masek ("Masek Decl.") ¶ 3; Ex. A-1 § XIV; Ex. A-2 § XIV; Ex. A-4 § XIII; Ex. A-7 § XIV; Ex. A-9 § XIV; Ex. A-12 § XIV; Ex. A-15 § IVX (sic); Ex. A-17 § XIV; Ex. A-19 § IVX (sic); Ex. A-22 § XIV.

Nearly all the Agreements at issue require all disputes to be mediated before going to binding arbitration. *See* Ex. A-2 § XIV; Ex. A-4 § XIII; Ex. A-9 § XIV; Ex. A-12 § XIV; Ex. A-15 § IVX (sic); Ex. A-17 § XIV; Ex. A-19 § IVX (sic); Ex. A-22 § XIV. The pharmacies have ignored this contractual obligation as well.

allegations that MedImpact has helped fix reimbursement payments to pharmacies arise out of and depend on the Agreements they entered. *See* Compl. ¶¶ 77–80; Ex. B ¶ 3.

### B.    *Out-of-Network Pharmacies.*

While MedImpact has a broad network, some independent pharmacies remain out-of-network—meaning they have not entered a MedCare Agreement with MedImpact. As a PBM, MedImpact cannot administer benefits for a plan member at an out-of-network pharmacy because there is no MedCare Agreement in place establishing contracted rates for claim reimbursement. Ex. B ¶ 5. MedImpact rejects claims submitted by out-of-network pharmacies because no rates have been established, even for members of a health plan managed by MedImpact. *Id*. Out-of-network pharmacies likewise cannot participate in any programs through MedImpact that MedImpact makes available to pharmacies in its network, like the ISP. *Id.* ¶ 6.

The distinction between out-of-network and in-network pharmacies is as follows:

| Pharmacies that **have** contracted with MedImpact | Rates are established, and can participate in the ISP through MedImpact and have reimbursements processed by MedImpact.  Agreed to arbitrate "any and all disputes." |
|---|---|
| Pharmacies that have **not** contracted with MedImpact | Have not received MedImpact rates or had reimbursements processed by MedImpact.  Do not participate in the ISP program as to MedImpact. |

## II.    The ISP.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████    This let certain pharmacies in MedImpact's network participate in the ISP. *See id.* The ISP allows members seeking to fill a prescription for generic

drugs at a pharmacy to benefit from the price based on the "lowest contracted rate" that any of the PBMs participating in the ISP have contracted for *with that particular pharmacy*. *Id*. ¶ 2.

There is no scenario in which a pharmacy outside MedImpact's network could fill a prescription that is subject to the ISP through *another PBM* (because it is in-network with that PBM) using a price based on *MedImpact's* rates. Instead, Plaintiffs' own pleading makes clear that the PBMs' involvement in the alleged scheme depends entirely on the pharmacy's contracted rates with that PBM. So a pharmacy *without* a MedImpact contract likewise has no "contracted rate" with MedImpact.

Plaintiffs emphasize the essential connection between contracted rates and their allegations throughout the Complaint. For example, those rates are the "heart" of the alleged scheme:

> 7.    The competitively sensitive information at the heart of the GoodRx ISP Scheme is the reimbursement rates that individual PBMs have contracted to with pharmacies for generic prescription drugs. GoodRx obtains this proprietary, confidential information from the roster of PBMs it works with for its popular GoodRx discount card. The traditional GoodRx discount card

Compl. ¶ 7.

And indeed, Plaintiffs' allegation turns on the use of the PBM's contracted rate:

> 8.    Consumers do not know which PBMs' Contracted Rates they are getting the benefit of. Behind the scenes, the PBM whose Contracted Rate is utilized (the "Leveraged PBM") processes the transaction and collects a fee from the pharmacy. The Leveraged PBM then shares a portion of that fee with GoodRx.

6

*Id.* ¶ 8.[6]

If there was any possible confusion, Plaintiffs also make clear their case turns on the PBMs themselves using information to calculate reimbursements for the PBM's ***own*** clients:

> 11.    As part of the ISP Scheme, GoodRx contracts with certain PBMs (i.e., the PBM Defendants) to "integrate" GoodRx's pricing technology into those PBMs' internal claims processing systems. This integration allows the PBM Defendants to use GoodRx's pricing algorithm—as well as competitively sensitive information from GoodRx's Information-Exchange Network—to calculate pharmacy reimbursement rates for prescriptions filled for patients insured by their TPP clients (often referred to by PBMs as "covered lives").

*Id.* ¶ 11.

Applying these allegations here, it is impossible that any pharmacy that has not contracted with MedImpact could have been injured by MedImpact through the alleged scheme. There is no "contracted rate" that could be used for an out-of-network, non-contracted pharmacy.

## **LEGAL STANDARD**

There are at least three legal standards for addressing the various Plaintiffs' claims: the enforcement of arbitration provisions, dismissal for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1), and dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

---

[6] *See also* Compl. ¶ 192 ("[T]he ISP Scheme deprives independent pharmacies of the benefit of contractual price guarantees.).

## I.    Enforcement of Arbitration Provisions.

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Supreme Court has long recognized the FAA as a "declaration of a liberal federal policy favoring arbitration agreements," directing parties to move disputes "out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22, 24 (1983).

The FAA allows a party to compel arbitration when its adversary "fail[s], neglect[s], or refuse[s] to arbitrate under a written agreement." 9 U.S.C. § 4.[7] "The Supreme Court has made clear that where the parties have agreed to arbitrate, the FAA requires 'courts [to] rigorously enforce arbitration agreements according to their terms.'" *Bossé v. New York Life Ins. Co.*, 992 F.3d 20, 27 (1st Cir. 2021) (quoting *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)) (alteration in original).

Courts in the First Circuit follow a three-step framework to determine whether to refer a matter to arbitration:

***First***, a court determines whether there is a valid "written agreement to arbitrate." *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012). It does so by applying "ordinary state-law [contract] principles." *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 944 (1995).

***Second***, a court determines whether "the dispute falls within the scope of that arbitration agreement." *Gove*, 689 F.3d at 4 (quoting *Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008)). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Cone Mem'l Hosp.*, 460 U.S. at 24–25. But when, as here, the parties' contract

---

[7] On a motion to compel arbitration the parties may submit—and the court may consider— evidence beyond the pleadings. *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021).

provides that the arbitrator—not the court—decides questions of arbitrability, the court's role ends there.  If so, the court sends the case to arbitration so that the arbitrator can determine the scope of the arbitration clause.  *See Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 67–68 (2019) (when a contract "delegates the arbitrability question to an arbitrator, the court must enforce that delegation").

   ***Third***, a court determines whether "the party seeking an arbitral forum has not waived its right to arbitration."  *Gove*, 689 F.3d at 4 (quoting *Combined Energies*, 514 F.3d at 171).  Such waiver requires an "intentional relinquishment or abandonment of a known right" to arbitrate. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

   Once these three steps are met "and a party requests a stay pending arbitration, § 3 of the FAA"—which applies here—"compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); 9 U.S.C. §§ 3–4.

## II.     Dismissal for Lack of Article III Standing under Fed. R. Civ. P. 12(b)(1).

   The Constitution gives the judiciary power to hear "Cases" and "Controversies," which requires plaintiffs to establish standing—a "personal stake" in the issue.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotations omitted); U.S. Const. art. III, § 2, cl. 1.  To demonstrate standing, a plaintiff must show (1) a concrete, particularized, and actual or imminent injury—an "injury in fact"; (2) the "injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) a likelihood that the injury will be redressed by a favorable decision from the court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (actual or imminent injury "ensures that the harm has either

happened or is sufficiently threatening; it is not enough that the harm might occur at some future time.").

"Standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC*, 594 U.S. at 431; *see also Katz*, 672 F.3d at 71 (each plaintiff "must have standing to bring each and every claim that she asserts"). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion*, 594 U.S. at 423 (citation and quotation omitted). "[T]he absence of standing sounds the death knell for a case." *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 39 (1st Cir. 2000).

Standing is a jurisdictional issue properly challenged under Rule 12(b)(1). *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992). Challenges to subject matter jurisdiction come in two varieties—facial challenges and factual challenges. *Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021) (citing *Torres-Negrón v. J & N Records, LLC*, 504 F.3d 151, 162 (1st Cir. 2007)). A facial attack challenges the sufficiency of the pleading itself, while a factual attack challenges the factual basis for jurisdiction. *Id.*; *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

If the defendant raises a factual challenge "by controverting the accuracy (rather than the sufficiency) of the jurisdictional facts," *Valentin*, 254 F.3d at 363, then "the court will give no presumptive weight to plaintiff's jurisdictional averments," and it must "address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Cruz Strazarra v. Audio Visual Concepts*, No. CV 08-2069 (ADC), 2009 WL 10720188, at *3 (D.P.R. Sept. 10, 2009) (quoting *Valentin*, 254 F.3d at 363).

### III. Dismissal for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6).

In ruling on a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55–56 (1st Cir. 2012) (citations omitted). The court must then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id*. (citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the court] 'to draw on' [its] 'judicial experience and common sense.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In performing its review, the court "can consider (a) 'implications from documents' attached to or fairly 'incorporated into the complaint,' (b) 'facts' susceptible to 'judicial notice,' and (c) 'concessions' in plaintiff's 'response to the motion to dismiss.'" *Id*. (quoting *Arturet–Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005)).

To bring antitrust claims, "plaintiffs must not only meet the typical requirements of Article III standing but also the requirements of the so-called 'antitrust standing' doctrine." *Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022). The standard under Fed. R. Civ. P. 12(b)(6) applies to motions to dismiss for lack of antitrust standing. *Yuen v. IDEXX Lab'ys, Inc.*, 710 F. Supp. 3d 57, 62 (D. Me. 2024). "Antitrust standing is a threshold, pleading-stage inquiry," and "when a complaint by its terms fails to establish this requirement," the court "must dismiss it as a matter of law." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (citations and quotations omitted, cleaned up).

## ARGUMENT

None of the Plaintiffs can properly litigate their claims against MedImpact in this Court. Some are bound by arbitration provisions that must be enforced. Others lack standing. Finally, even if they could clear these initial thresholds, the claim they assert fails under antitrust law.

### I.    Keaveny Must Arbitrate Its Claim.

Keaveny signed a MedCare Agreement directly with MedImpact. Ex. A-1. That Agreement contains a binding JAMS arbitration clause that applies to "any and all disputes, controversies or claims . . . arising out of, in connection with, or relating to" the Agreement:



| XIV. | ARBITRATION |
|---|---|
| | Resolution of Disputes. Any and all disputes, controversies or claims (including without limitation tort claims, requests for provisional remedies or other interim relief and issues as to arbitrability of any matter) arising out of, in connection with, or relating to this Agreement, or the breach thereof, that cannot be settled through negotiation shall be settled by arbitration administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and pursuant to the California Arbitration Act (such arbitration to be held in San Diego, California before a single arbitrator and to commence within twenty (20) days of the appointment of the arbitrator by JAMS). The Parties agree that the Expedited Procedures set forth in JAMS Comprehensive Rules 16.1 and 16.2 shall be employed. Any controversy, claim or dispute under $250,000.00 shall be handled in accordance with the JAMS Streamlined Arbitration Rules and Procedures. The arbitrator may only award remedies provided in the Agreement. The expenses of the arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award is rendered. The negotiation and arbitration provisions of this Section XIV shall be the sole and exclusive method of handling any and all disputes, claims and controversies arising out of or related to this Agreement, and the award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. The arbitration proceeding provided for herein is a private proceeding and neither party shall disclose or publicize the decision of the arbitrator other than as required by Law. The parties further agree that the existence of this remedy will not preclude MedImpact from seeking or receiving injunctive relief hereunder. |

Ex. A-1 § XIV (highlighting added).[8]

---

[8] Keaveny appears to operate through two accreditations through the National Council for Prescription Drug Programs ("NCPDP"). One of its NCPDP operations entered into the agreement described above. On information and belief, the other NCPDP registered to Keaveny's address is a long-term care facility that entered into a MedCare Agreement with MedImpact through its PSAO, GeriMed (Keaveny's "Second MedCare Agreement"). Ex. A-2 § XIV. For this Motion, MedImpact assumes without conceding that this second NCPDP number also belongs to Keaveny. Because the PSAO entered into the agreement on Keaveny's behalf, *see* Compl. ¶ 68, Keaveny is bound to the agreement. Keaveny's Second MedCare Agreement likewise contains an arbitration clause that requires arbitration of "[a]ny and all disputes, controversies or claims . . . arising out of, in connection with, or relating to this Agreement." Ex. A-2 § XIV.

Whether the issues in this case are within the provision's scope is for the arbitrator—not a court—to decide. That is because the first sentence expressly and exclusively delegates "issues as to arbitrability of any matter" to the arbitrator. *Id*. That is dispositive here. *See Henry Schein, Inc.*, 586 U.S. at 58 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."); *Bossé,* 992 F.3d at 23 (reversing ruling on arbitrability because "[t]he clause delegating all disputes about arbitrability is clear, unmistakable, and unambiguous").

But even if the Court were to reach arbitrability, this dispute is within the arbitration provision's scope. Plaintiffs' allegations depend on the agreements between MedImpact and the pharmacies, alleging MedImpact "never pay[s] pharmacies more for generic drugs than any rival PBM has agreed to pay in its separate *contracts with those pharmacies*," and that their pharmacies were reimbursed at "the Leveraged PBM's *Contracted Rates*—rather than the Primary PBM's Contracted Rates." Compl. ¶¶ 15, 31 (emphasis added). Because Keaveny's claim turns on rates under its MedCare Agreement, it necessarily "arise[s] out of" and "relate[s] to" that Agreement and is within the provision's scope.

Finally, MedImpact has expressly preserved its right to arbitrate in all filings and actions leading up to this Motion, and this Motion is MedImpact's first substantive motion in the case. *See, e.g.*, Dkts. 46 at 1–3, 62 at 1–3.

For these reasons, Plaintiff Keaveny should be ordered to proceed to arbitration, and this matter should be stayed as to Keaveny. *See Spizzirri*, 601 U.S. at 475–76 ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

## II.    Star Discount Must Arbitrate Its Claim.

Star Discount has not participated in MedImpact's pharmacy network, and MedImpact has not processed claims for it during the relevant time period under a MedCare Agreement.  Ex. B ¶¶ 7–11.  Instead, the only ISP claims MedImpact processed for Star Discount during that period resulted from MedImpact's 2024 acquisition of Rx Options, LLC (later known as "Elixir").  Those claims were subject to a binding arbitration agreement between Elixir and Star Discount.

MedImpact acquired Elixir assets in 2024 and subsequently integrated the Elixir network. *Id.* ¶ 8.  Star Discount had an active participating provider agreement with Elixir.  *Id.*; Ex. B-1 (Elixir-Star Discount participating provider agreement (the "Elixir Agreement")).  In December 2024, MedImpact offered pharmacies in Elixir's network the option to join MedImpact's pharmacy network.  Ex. B ¶ 8.  Star Discount declined and was terminated from the Elixir network effective December 31, 2024.  *Id*.

To the extent that Star Discount bases its lawsuit against MedImpact on claims processed under the Elixir Agreement in 2024, its suit is subject to a binding arbitration agreement that it signed with Elixir.  Ex. B-1; *see* Ohio Rev. Code § 1701.82 ("When a company merges with or acquires another company, the surviving or new entity possesses the . . . rights, privileges, immunities, powers, franchises, and authority, of a public as well as of a private nature, of each constituent entity . . . all of which are vested in the surviving or new entity without further act or deed.").  That agreement contains a binding AAA arbitration clause that applies to "[a]ny controversy, claim or dispute arising out of or relating to" the agreement:

> 9.4     Dispute Resolution: Any controversy, claim or dispute arising out of or relating to this Agreement or the breach thereof, whether in tort or in contract, in law or in equity, shall be exclusively settled by binding arbitration in accordance with the commercial rules of the American Arbitration Association then in effect. The arbitration shall be conducted in Cleveland, Ohio. The decision of the arbitrator shall be final and binding, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. All such arbitration proceedings shall be conducted on a confidential basis.

Ex. B-1 § 9.4.

The Elixir Agreement's arbitration clause delegates the question of arbitrability to the arbitrator—and not the Court—because it incorporates the AAA's arbitration rules. Ex. B-1 § 9.4 (claims are to be arbitrated "in accordance with the commercial rules of the American Arbitration Association then in effect"). "[The First Circuit] is clear that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator." *Bossé*, 992 F.3d at 29 (reversing district court's denial of motion to compel where clause delegated question of arbitrability to the arbitrator); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7 (1st Cir. 2009).[9] Further, even if the Court were to consider arbitrability, Star Discount's claim would still be subject to arbitration because it falls squarely within the Elixir Agreement's arbitration clause.

Although MedImpact disagrees with Plaintiffs' characterization of the ISP and MedImpact's involvement in it, their own Complaint makes clear that this dispute—at least as they allege it—is about the reimbursements they received for generic drugs. Because Star Discount's

---

[9] Indeed, the AAA's rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." AAA Com. Arb. R. & Mediation P., R-7(a), p. 14 (Sept. 2022), https://www.adr.org/media/qielmf0g/2025_commercialrules_web.pdf.

claim turns on rates under its agreement with Elixir, it necessarily "arise[s] out of" and "relate[s] to" that Agreement and is within the provision's scope.

Finally, Star Discount lacks standing to sue MedImpact for any conduct that is not associated with claims processed through the Elixir Agreement. Because Star Discount has not entered a MedCare Agreement with MedImpact during the time the ISP has been in effect: (1) MedImpact has never received any fees in connection with claims subject to the ISP that were submitted by Star Discount under a MedImpact MedCare Agreement; (2) MedImpact has never processed any ISP claims for Star Discount under a MedImpact MedCare Agreement (whether by applying its own contracted rates or by routing a claim to GoodRx); and (3) MedImpact has never requested or collected payments from Star Discount in connection with ISP claims pursuant to a MedImpact MedCare Agreement. Ex. B ¶¶ 8–11.

As a result, Star Discount would not be able to satisfy the injury or traceability requirements of Article III standing as to MedImpact for any conduct after it was terminated from Elixir. *See Lujan*, 504 U.S. at 560.[10] "If the injury-in-fact prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on *who* inflicted that harm. The plaintiff must establish that the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (citing *Lujan*, 504 U.S. at 560).[11]

---

[10] Because MedImpact does not have a contract with or process claims for Star Discount, any relief prohibiting MedImpact's participation in the ISP would fail to redress any injury to Star Discount. It fails the redressability requirement of Article III standing as well. *See Lujan*, 504 U.S. at 560.

[11] *See also Lieberson v. Johnson & Johnson Consumer Cos., Inc.*, 865 F. Supp. 2d 529, 537 (D.N.J. 2011) ("Because Plaintiff has not alleged that she purchased or used two of the four . . . products at issue here, Plaintiff cannot establish an injury-in-fact with regard to those products," and "the Court finds that Plaintiff's allegations regarding the [two products that she did not purchase] must be dismissed."); *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275,

III.    **AHF and OneroRx Should Be Dismissed for Lack of Antitrust Standing or Be Compelled to Arbitration.**

AHF and OneroRx's claims as to MedImpact should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because they lack standing to bring an antitrust claim. Additionally, if not dismissed outright, they are bound by valid arbitration agreements.[12]

AHF is a California-based nonprofit organization that operates over 60 pharmacies nationwide. Compl. ¶ 40. Each of the pharmacies AHF manages has entered a MedCare Agreement with MedImpact via a PSAO (LeaderNET).[13] The MedCare Agreement contains an arbitration clause (requiring mediation first). Ex. A-4 § XIII.

OneroRx is a private equity-backed company that buys and operates pharmacies. Compl. ¶¶ 39, 40. It operates at least 62 pharmacies in six states that have MedCare Agreements with MedImpact through six PSAOs, and one of these pharmacies also has a MedCare Agreement

_____

280 (D.N.J. 2011) (dismissing claims relating to products that plaintiff "neither purchased nor used" and holding that plaintiff lacks standing to pursue claims relating to these products); *Gerlinger v. Amazon.com Inc., Borders Grp., Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) ("[T]he plaintiff has not shown any injury-in-fact caused by the agreement. . . . He has not shown that he paid higher prices after the agreement than he would have paid otherwise. The district court properly dismissed the claim because plaintiff lacked Article III standing to pursue a claim of price fixing."); *Davis v. Hannah Holdings, Inc.*, 771 F. Supp. 3d 552, 568 (E.D. Penn. 2025) (plaintiffs could not satisfy Article III requirements to request injunctive relief against alleged anticompetitive policies and rules because they did not face a "sufficiently real and immediate" threat of suffering from the risk of being overcharged on a future transaction; *Jones v. Micron Technology Inc.*, 400 F. Supp. 3d 897, 907–08 (N.D. Cal. 2019) (plaintiffs failed to meet the traceability requirement because they could not identify the source of who sold them the overpriced products as a result of the alleged conspiracy).

[12] Here and throughout this Motion, addressing dismissal before arbitration is for analytical clarity and should not be construed as a waiver of MedImpact's right to compel arbitration. Furthermore, assertion that a Plaintiff representing multiple pharmacies should be referred to arbitration is not a concession that class or mass arbitration is permitted under the arbitration agreements or applicable arbitration rules, which would itself be a question for the arbitrator.

[13] Ex. A ¶¶ 9–11; Ex. A-4 (LeaderNET MedCare Agreement); Ex. A-5 (List of AHF pharmacies); Ex. A-6 (AHF pharmacies' Affiliation Affidavits).

directly with MedImpact.  Compl. ¶ 39; Ex. A ¶¶ 14, 16, 18, 20, 22–23; Ex. A-7 through Ex. A-22. All seven of the MedCare Agreements that bind OneroRx pharmacies have a mandatory arbitration clause, and the majority first require mediation.[14]

### A.    *AHF and OneroRx Lack Antitrust Standing.*

To have antitrust standing, plaintiffs must allege they were injured by the type of conduct the antitrust laws prevent.  AHF and OneroRx lack standing to assert their antitrust claims because the injuries they claim are "indirect," derived from alleged injuries to the pharmacies they operate. *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995) ("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." (quoting *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987))); *see also Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 11 (1st Cir. 1999) (citing *G.K.A. Beverage* for the proposition that a plaintiff lacks standing when the alleged antitrust injury is too remote).

Neither AHF nor OneroRx allege direct injury.  OneroRx alleges that "for each claim processed in connection with the Integrated Savings Program, ***the pharmacies in OneroRx's network*** were required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs they dispensed."  Compl. ¶ 39 (emphasis added).  AHF makes the same allegation: "for each claim processed in connection with the Integrated Savings Program, ***the pharmacies in AHF's network*** were required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs they dispensed."  *Id.* ¶ 40 (emphasis added).

---

[14] Ex. A-7 § XIV; Ex. A-9 § XIV; Ex. A-12 § XIV; Ex. A-15 § IVX (sic); Ex. A-17 § XIV; Ex. A-19 § IVX (sic); Ex. A-22 § XIV.

Neither OneroRx nor AHF explain *how* they were injured by MedImpact; they only state, in a vague and conclusory manner, that they were injured. *Id.* ¶¶ 39–40.

These conclusory claims of injury are not enough to confer standing on OneroRx or AHF. These plaintiffs are, at most, akin to "stockholders" that may have a financial interest in the success of the pharmacies they operate, but do not suffer direct injury if the pharmacies are injured. *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820–21 (7th Cir. 2015) (explaining that if a direct victim receiving compensation would eliminate the injury of an owner, the owner's derivative injury would not satisfy antitrust standing).

The proper plaintiffs, if there were any, would be the pharmacies that AHF and OneroRx operate. But those pharmacies are not plaintiffs, and AHF and OneroRx cannot stand in their place. *Id.* at 820; *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 542 (1983) ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general [and] is not likely to leave a significant antitrust violation undetected or unremedied.").

Accordingly, the claims of AHF and OneroRx should be dismissed under Rule 12(b)(6) for lack of antitrust standing.

### B.     *AHF's and OneroRx's Pharmacies Are Subject to Binding Arbitration.*

The arbitration provisions entered by their pharmacies also bar AHF and OneroRx from litigating in this Court. Indeed, AHF and OneroRx invoke those pharmacies' contracts, alleging that MedImpact "never pay[s] pharmacies more for generic drugs than any rival PBM has agreed to pay in its *separate contracts with those pharmacies*." Compl. ¶ 15 (emphasis added). And they

also allege that their pharmacies were being reimbursed according to "the Leveraged PBM's *Contracted Rates*—rather than the Primary PBM's *Contracted Rates*." *Id.* ¶ 31 (emphasis added).[15]  The Complaint even quotes the payment clause of the MedCare Agreements and alleges that it does not support the use of the ISP. *Id.* ¶¶ 177–78.  In short, all roads in the case as to MedImpact run through these MedCare Agreements.  There is no other path for them; and by suing on their pharmacies' behalf and explicitly relying on their pharmacies' MedCare Agreements, AHF and OneroRx stand in their pharmacies' shoes and are bound by those same Agreements.

As with other MedCare Agreements, the MedCare Agreements entered by AHF and OneroRx's pharmacies include arbitration provisions.  *Supra* n.13, 14; *infra* n.17.

AHF's pharmacies voluntarily entered into a binding MedCare Agreement with MedImpact through their PSAO, LeaderNET.  For example, thirty-seven AHF pharmacies each separately signed "Affiliation Affidavits" expressly granting LeaderNET authority to contract for them and stating that each pharmacy had received and was bound by the MedCare Agreement, as shown below.



I authorize LeaderNet (Chain code 603) (PSAO) to serve as my primary third party affiliation and to enter into contract relationships on my behalf, and agree to participate in the networks for which PSAO contracts with MedImpact. By signing below, I further agree that I have been provided with a copy of the MediCare Pharmacy Network Agreement and related documents between MedImpact and PSAO ("Agreement" incorporated herein by reference) and agree to be bound by the terms and conditions of the agreement.

Ex. A-6 (compilation of AHF pharmacy Affiliation Affidavits).[16]

---

[15] *See also* Compl. ¶ 78 ("The rates of reimbursement contracted for between a PBM and its in-network pharmacies are set forth in *network agreements*.").

[16] *See also* Ex. A-5 (list of AHF pharmacies).  These pharmacies are in MedImpact's network through MedCare Agreements that they entered through their PSAO, LeaderNET.  Ex. A ¶¶ 9–11.

As a result, AHF's pharmacies—as well as AHF itself—are bound to the MedCare Agreement that their PSAO entered with MedImpact on their behalf:

## MedCare® Pharmacy Network Agreement

This AGREEMENT is by and between Med**Impact** Healthcare Systems, Inc. ("Med**Impact**"), a California corporation, and Leader Drug Stores, Inc. d/b/a LeaderNET ("LeaderNET"), on behalf of itself and those independent retail pharmacies set forth on Exhibit A (the "Member Pharmacies" and individually a "Member Pharmacy"), and supersedes any previous MedCare Agreement(s) that may have been previously executed between the parties. In consideration of the mutual covenants and other good and sufficient consideration, Member Pharmacy agrees to participate in Med**Impact's** pharmacy networks in accordance with the following terms and conditions:

Ex. A-4 at 1 (highlighting added).

That Agreement, in turn, first requires mediation, then binding American Health Lawyers Association ("AHLA") arbitration, for "[a]ny and all disputes . . . arising out of, in connection with, or relating to this Agreement":

## XIII. MEDIATION AND ARBITRATION.

Any and all disputes, controversies or claims (including without limitation tort claims, requests for provisional remedies or other interim relief and issues as to arbitrability of any matter) arising out of, in connection with, or relating to this Agreement, or the breach hereof, that cannot be settled through negotiation shall be settled (a) first, by the parties trying in good faith to settle the dispute by mediation under the Commercial Mediation Rules of the American Health Lawyers Association ("AHLA") (such mediation session to be held in San Diego, California and to commence within 15 days of the appointment of the mediator by the AHLA), and (b) if the controversy, claim or dispute cannot be settled by mediation, then by arbitration administered by the AHLA under its Arbitration Rules (such arbitration to be held in San Diego, California before a single arbitrator and to commence within 20 days of the appointment of the arbitrator by the AHLA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any controversy, claim or dispute under $500,000 shall be handled in accordance with the expedited procedures under the AHLA Arbitration Rules. This Agreement shall be construed and enforced in accordance with the laws of the State of California, without regard to conflict of law principles. The arbitrator must follow the rule of law of California, and may only award remedies provided in the Agreement. The award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. The expenses of the arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award of the arbitrator is rendered. Any damages awarded may not exceed the amount of payments made under this Agreement (excluding amounts paid by Med**Impact** on behalf of Payors). The award of the arbitrator will not prohibit Med**Impact** from exercising any right Med**Impact** may have pursuant to the Agreement or Law. The mediation and arbitration provisions of this Section shall be binding upon all parties and shall be the sole and exclusive method of handling any and all disputes, claims and controversies arising out of or related to this Agreement.

Ex. A-4 § XIII (highlighting added).

Like AHF, OneroRx's pharmacies also voluntarily contracted with MedImpact through PSAOs. Indeed, 62 OneroRx pharmacies have MedCare Agreements with MedImpact through six different PSAOs, and one of these pharmacies (Wood River Pharmacy) also signed a MedCare Agreement with MedImpact directly.[17] The OneroRx pharmacies that entered MedCare

---

[17] Ex. A-7 (Arete MedCare Agreement); Ex. A-8 (showing Arete assigned its rights to AlignRx); Ex. A-9 (PPOk MedCare Agreement); Ex. A-10 (showing PPOk assigned its rights to AlignRx); Ex. A-12 (Access Health MedCare Agreement); Ex. A-13 (showing Access Health created and assigned its rights to Health Mart Atlas); Ex. A-15 (MHA Medcare Agreement); Ex. A-17 (MediCap MedCare Agreement); Ex. A-19 (AmerisourceBergen Corporation MedCare Agreement); Ex. A-20 (showing AmerisourceBergen Corporation changed its d/b/a to Elevate Provider Network); Ex. A-4 (LeaderNET MedCare Agreement); Ex. A-22 (Wood River Pharmacy's MedCare Agreement, contracting directly with MedImpact). OneroRx identifies the

Agreements with MedImpact through a PSAO signed Affiliation Affidavits with their respective PSAO, allowing them to contract on the pharmacy's behalf and acknowledging receipt of and agreement to be bound by the Agreement.[18]  For example:

> I authorize AlignRx, LLC (PSAO) to serve as my primary third party affiliation and to enter into contract relationships on my behalf and agree to participate in the networks for which PSAO contracts with MedImpact. By signing below, I further agree that I have been provided with a copy of the MedCare Pharmacy Network Agreement and related documents between MedImpact and PSAO ("Agreement" incorporated herein by reference) and agree to be bound by the terms and conditions of the Agreement.

Ex. A-11.

While this Affiliation Affidavit is specific to AlignRx, OneroRx's other pharmacies' affidavits with other PSAOs all contain this same language.  *See* Exs. A-11, A-14, A-16, A-18, A-21.  The OneroRx pharmacies are therefore also bound to the MedCare Agreement that their PSAO entered with MedImpact on their behalf.  Each of these MedCare Agreements also—like those binding Keaveny and AHF—contains an arbitration provision.  The majority of the Agreements first require mediation, and then binding arbitration, for "[a]ny and all disputes . . . relating to this Agreement," but the result here is the same—these pharmacies (and OneroRx itself) cannot bring this dispute in court:

---

pharmacies it operates on its website.  ONERORX, *Locations*, https://www.onerorx.com/locations (last visited November 2, 2025).

[18] Ex. A ¶¶ 14, 16, 18, 20, 22; Exs. A-11, A-14, A-16, A-18, A-21.

**XIV.    MEDIATION AND ARBITRATION.**

Any and all disputes, controversies or claims (including without limitation tort claims, requests for provisional remedies or other interim relief and issues as to arbitrability of any matter) arising out of, in connection with, or relating to this Agreement, or the breach hereof, that cannot be settled through negotiation shall be settled (a) first, by the parties trying in good faith to settle the dispute by mediation under the Commercial Mediation Rules of the American Health Lawyers Association ("AHLA") (such mediation session to be held in San Diego, California and to commence within 15 days of the appointment of the mediator by the AHLA), and (b) if the controversy, claim or dispute cannot be settled by mediation, then by arbitration administered by the AHLA under its Arbitration Rules (such arbitration to be held in San Diego, California before a single arbitrator and to commence within 20 days of the appointment of the arbitrator by the AHLA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any controversy, claim or dispute under $500,000 shall be handled in accordance with the expedited procedures under the AHLA Arbitration Rules. This Agreement shall be construed and enforced in accordance with the laws of the State of California, without regard to conflict of law principles. The arbitrator must follow the rule of Law of California, and may only award remedies provided in the Agreement. The award of the arbitrator will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. The expenses of the arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award of the arbitrator is rendered. Any damages awarded may not exceed the amount of payments made under this Agreement (excluding amounts paid by Med**Impact** on behalf of Payors). The award of the arbitrator will not prohibit Med**Impact** from exercising any right Med**Impact** may have pursuant to the Agreement or Law. The mediation and arbitration provisions of this Section shall be binding upon all parties and shall be the sole and exclusive method of handling any and all disputes, claims and controversies arising out of or related to this Agreement.

Ex. A-9 § XIV.[19]

As with the MedCare Agreement that binds Keaveny, these arbitration provisions delegate the question of arbitrability to the arbitrator. That is dispositive. *See* Arg. Sec. I, *supra*.

It would be nonsensical for AHF and OneroRx to now try to claim they are *not* bound by these Agreements. But—if they do—the following legal principles of agency and estoppel preclude any such argument.

### 1.    Agency

By bringing this suit on behalf of their pharmacies and relying on the MedCare Agreements, AHF and OneroRx act as agents of the pharmacies bound by those contracts. *See*

---

[19] The Agreement between MedImpact and PSAO Arete does not require mediation before arbitration. Ex. A-7 § XIV. Arbitration is still mandatory for "[a]ny and all disputes . . . relating to this Agreement." *Id*. Arete now operates as AlignRx. Ex. A-8.

Cal. Civ. Code § 2295 ("An agent is one who represents another, called the principal, in dealings with third persons.").[20]

Non-signatories may be bound to arbitration under ordinary contract and agency principles. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *see also Ruiz v. Podolsky*, 50 Cal. 4th 838, 852 (2010) ("case law has recognized a number of instances in the health care setting in which agreements to arbitrate have bound nonsignatory third parties"). Courts have applied these principles to allow non-signatory corporations to be compelled to arbitration "under arbitration clauses signed by their corporate parents, subsidiaries, or affiliates." *Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 990 (N.D. Cal. 1996); *see also Ensambles Hyson, S.A. de C.V. v. Sanchez*, 718 F. Supp. 3d 1258, 1273 (S.D. Cal. 2024) (discussing when agency principles permit a non-signatory to be compelled to arbitration).

AHF and OneroRx cannot pursue claims based on alleged underpayments to their pharmacies while claiming they are not bound by the very contracts governing those payments. By asserting rights derived from the MedCare Agreements, they assume the obligations those Agreements impose—including arbitration—under established principles of agency law.

---

[20] California law applies to this analysis. *See Kenerson v. Elemetal Direct USA, Inc.*, No. 1:24-CV-00156-MSM-LDA, 2024 WL 4591661, at *2 (D.R.I. Oct. 28, 2024) (applying the law selected by the contract to questions of validity). "[P]rinciples of state contract law control the determination of whether a valid agreement to arbitrate exists." *Gove*, 689 F.3d at 4. The AHF and OneroRx MedCare Agreements provide that: "This Agreement shall be construed and enforced in accordance with the laws of the State of California, without regard to conflict of law principles." Ex. A-2 § XIV; Ex. A-4 § XIII; Ex. A-9 § XIV; Ex. A-12 § XIV; Ex. A-15 § IVX (sic); Ex. A-17 § XIV; Ex. A-19 § IVX (sic); Ex. A-22 § XIV. Only the Arete MedCare Agreement differs. It states that the California Arbitration Act should apply and that the arbitration must be held in California, evincing the parties' intent to be governed by California law. Ex. A-7 § XIV. The same principles would determine which state law would apply to the arbitration clauses in any other pharmacies' MedCare Agreements.

### 2.    *Estoppel*

AHF and OneroRx are also estopped from avoiding arbitration.  They cannot rely on their pharmacies' MedCare Agreements to assert claims while disavowing the arbitration clauses.  *See Comer*, 436 F.3d at 1101 ("Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." (quotations omitted)).

Equitable estoppel applies to arbitration clauses in at least two ways.  First, "a non-signatory is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause."  *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1070 (2008); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009).  AHF and OneroRx do exactly that:  they seek the benefits of the MedCare Agreements by alleging their pharmacies are being reimbursed according to another PBM's rate "rather than the Primary PBM's Contracted Rates."  Compl. ¶ 31; *see also* ¶¶ 15, 177–78.  Those "Contracted Rates" arise solely from the MedCare Agreements they invoke.

Second, estoppel applies when a non-signatory's claims are "intertwined with" a contract containing an arbitration clause.  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (quotation omitted)); *see also JSM Tuscany, LLC v. Superior Court*, 193 Cal. App. 4th 1222, 1241 (2011) ("[A] nonsignatory plaintiff can be compelled to arbitrate a claim even against a nonsignatory defendant, when the claim is itself based on, or inextricably intertwined with, the contract containing the arbitration clause.").  Claims are intertwined "when the signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory."  *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 222 (2009).

Here, Plaintiffs' claims inescapably depend on the contracts they seek to avoid, as they allege underpayments based on "Contracted Rates" that exist only within the MedCare

Agreements.  Compl. ¶¶ 15, 39–40.  And their claims are intertwined with the contracts because AHF and OneroRx's allegations specifically refer to the contracts when they allege defendants "never pay pharmacies more for generic drugs than any rival PBM has agreed to pay in its separate contracts with those pharmacies," and that their pharmacies were being reimbursed according to "the Leveraged PBM's Contracted Rates—rather than the Primary PBM's Contracted Rates." Compl. ¶¶ 15, 31, 177 (quoting MedCare Agreement).[21]  Indeed, these Plaintiffs have been receiving payment for years for ISP (and other claims) under these contracts (which contain arbitration provisions) and cannot now claim that those provisions don't apply.  *See Sourcing Unlimited, Inc. v. Asimco Int'l, Inc.*, 526 F.3d 38, 47 (1st Cir. 2008).

## IV.    NCPA and PARD Should Be Dismissed or Compelled to Arbitration.

The Associations are trade organizations that cannot proceed in this Court because none of their members could proceed individually.  Both NCPA and PARD allege that Defendants, including MedImpact, conspired to fix pharmacy reimbursements through the ISP, in violation of Section 1 of the Sherman Act.  Compl. ¶¶ 1–2, 6, 10, 15, 162, 301–14.  The Associations assert only that their member pharmacies—not themselves—suffered harm, including "additional transaction fees" and "artificially reduced reimbursement."  *Id.* ¶¶ 41–42.  The Associations assert associational standing and explicitly bring this claim solely in a representative capacity on behalf of their members, *id.* ¶ 43, which consist of two categories of pharmacies:

| Pharmacies that **have** contracted with MedImpact | Agreed to arbitrate "any and all disputes"  Arbitrability is to be decided by arbitrator | **Required to arbitrate** |
|---|---|---|

---

[21] "Contracted Rates" by definition can only be agreed to when pharmacies enter into a PBM's network.  Pharmacies cannot have "Contracted Rates" with MedImpact unless they have a MedCare Agreement with MedImpact.  Plaintiffs therefore allege that "[t]he rates of reimbursement contracted for between a PBM and its in-network pharmacies are set forth in network agreements."  *Id.* ¶ 78.

| Pharmacies that have **not** contracted with MedImpact | No participation in ISP program as to MedImpact | **No standing** |
|---|---|---|
| | Have not received MedImpact rates or had reimbursements processed by MedImpact | |
| | No injury "fairly traceable" to MedImpact | |
| | No injury that would be redressed by a decision against MedImpact | |

This is binary: the member pharmacies are either bound to arbitrate or have no possible injury traceable to MedImpact necessary to support standing or this claim. Because associations have no greater rights than their members, the Court cannot hear the pharmacies' claim when the Association advances it. The Associations must be dismissed for lack of standing, dismissed for failure to state a claim, or at minimum be compelled to arbitration.

### A.     The Associations Do Not Have Associational Standing.

The Associations lack the associational standing they assert and must be dismissed. Compl. ¶ 43; *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp*., 799 F.2d 6, 10 (1st Cir. 1986) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) (stating that an association can only have standing as the "representative of its members . . . in certain circumstances.").

Specifically, the "*Hunt* test" states that an association lacks standing to bring suit on behalf of its members unless (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect  are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Associations fail the first and third prongs.

### 1.    *The Associations Fail* **Hunt***'s First Prong.*

The Associations cannot satisfy *Hunt*'s first prong—that an association's "members would otherwise have standing to sue in their own right," *Hunt*, 432 U.S. at 343—because associations have no greater rights than their member pharmacies. *See Fantastic Sam's Franchise Corp. v. FSRO Ass'n*, 824 F. Supp. 2d 221, 225 (D. Mass. 2011) (rejecting "attempted end-run around" individual arbitration provisions), *aff'd*, 683 F.3d 18 (1st Cir. 2012).  And here, no pharmacies belonging to the Associations can bring their claim in this Court because—according to Plaintiffs' own pleading—the ISP only applies to participating PBMs' Contracted Rates, which are the rates negotiated in agreements between participating (in-network) pharmacies and MedImpact.  *See* Compl. ¶ 7.  The Associations' member pharmacies that lack an agreement with MedImpact also lack standing to bring these claims individually, and every other member pharmacy is bound to arbitrate its claims.  The Associations cannot represent any of their member pharmacies in this Court.  *Hunt*, 432 U.S. at 34; *Fantastic Sam's*, 824 F. Supp. 2d at 225.

The Associations' members that participated in the ISP program with MedImpact (i.e., were in-network) signed valid and enforceable arbitration agreements requiring arbitration.[22] "[A]voidance of an arbitration provision by suing through a surrogate is simply not an appropriate use of associational standing." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, No. CIV. A. 99–937, 2000 WL 33365907, at *7 (W.D. Pa. Mar. 24, 2000), *rev'd on other grounds*, 280 F.3d 278 (3rd Cir. 2002); *Maryland Optometric Ass'n v. Davis Vision, Inc.*, Civ. No. WDQ-04-02153, 2004 WL 7330337, at *3 (D. Md. Dec. 21, 2004) (compelling individual members of association to arbitration where subject to an arbitration agreement with defendant).

---

[22] *See* Ex. A-1 § XIV; Ex. A-2 § XIV; Ex. A-4 § XIII; Ex. A-7 § XIV; Ex. A-9 § XIV; Ex. A-12 § XIV; Ex. A-15 § IVX (sic); Ex. A-17 § XIV; Ex. A-19 § IVX (sic); Ex. A-22 § XIV.

>      i.    *Pharmacies not contracted with MedImpact cannot be injured by MedImpact's participation in the ISP.*

The Associations' member pharmacies that do not have contracts with MedImpact cannot satisfy the injury requirement of Article III standing.  This is because Plaintiffs' own pleading makes clear that the PBMs' involvement in the alleged scheme depends entirely on the pharmacy's contracted rates with that PBM.  But obviously, a pharmacy without a MedImpact contract likewise has no "contracted rate" with MedImpact.  Yet Plaintiffs' allegations relentlessly focus on "Contracted Rates" and "reimbursement rates" "at the heart of the GoodRx ISP Scheme." Compl., ¶¶ 7, 8, 11 (*see* Background Section II for an explanation of these allegations).

Applying these allegations here, it is impossible that any pharmacy that has not contracted with MedImpact could have somehow been nonetheless injured by MedImpact through the alleged scheme.  There is no "contracted rate" that could be used for an out-of-network, non-contracted pharmacy.

Plaintiffs cannot avoid this fatal defect by alleging that the pharmacies were somehow injured by other PBMs' participation in the ISP; the Associations must establish that MedImpact's challenged actions—not the actions of some third party—caused their members' injury.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 194 (D. Mass. 2003) (dismissing association plaintiffs challenging drug price conspiracy for lack of standing where they did not allege that specific members purchased specific drugs from specific defendants); *Beaudoin v. Baker*, 530 F. Supp. 3d 169, 175 (D. Mass. 2021) (plaintiff must show that their "injury is fairly traceable to the defendant's conduct and not the result of 'the independent action of some third party not before the court.'" (quoting *Lujan,* 504 U.S. at 560–61)).

To prove MedImpact's ISP harmed their member pharmacies, the Associations would have to plausibly allege that MedImpact processed their reimbursements during the relevant time.

Merely alleging that member pharmacies have "participated" in the ISP, without more, is not enough to establish injury traceable to MedImpact.

Further, because these pharmacies are neither reimbursed using a MedImpact rate nor by having their reimbursements processed by MedImpact, no court order aimed at MedImpact could redress their supposed injury. The requested relief here is "[a] determination that the conduct set forth in the [Complaint] is unlawful under Section 1 of the Sherman Antitrust Act" and "[a]n order enjoining [MedImpact] from engaging in further unlawful conduct." Compl. ¶¶ 317–18. Elsewhere, Plaintiffs state that they seek "treble damages" in connection with Defendants' conduct. *Id.* ¶ 36. MedImpact never reimbursed non-contracted pharmacies, so those pharmacies would not be entitled to monetary damages.

An injunction against MedImpact's participation in the ISP would likewise be meaningless to non-contracted pharmacies that never have or would receive reimbursement from MedImpact. *See Warth*, 422 U.S. at 517 (denying standing to an association seeking injunctive relief because there was no injury to its members). There is no injury traceable to MedImpact, and there is no relief the Court can award as to MedImpact to redress the non-contracted pharmacies' alleged injuries. Because these non-contracted pharmacies do not have Article III standing, neither do their associational representatives. The Associations fail the *Hunt* test's first prong.[23]

---

[23] Furthermore, as explained in the motion to dismiss by the joint defense group, the Associations' failure to identify any member that has been harmed justifies dismissal of their claim. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J., sitting by designation) ("To satisfy [*Hunt*'s first prong], the association must, at the very least, 'identify a member who has suffered the requisite harm.'" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)); *Summers,* 555 U.S. at 498 (dismissing an association that did not name a harmed member); *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 120 (D. Mass. 2020), *aff'd,* 3 F.4th 24 (1st Cir. 2021) (same); *United States v. AVX Corp.*, 962 F.2d 108, 117 (1st Cir. 1992) (dismissing claims based on associational standing because "the members are unidentified; their places of abode are not stated; . . . A barebones allegation, bereft of any vestige of a factual fleshing-out, is precisely the sort of speculative argumentation that cannot pass muster where standing is contested.").

### 2.    *The Associations Fail* **Hunt***'s Third Prong.*

The Associations also fail to satisfy *Hunt*'s third prong, which withholds associational standing if the "claim asserted or the relief requested requires" individual members to participate in the case. *Hunt,* 432 U.S. at 343 (*Hunt*'s third prong).

Dooming standing here, the Associations' members must participate so that the Court can determine (1) which members' claim must be submitted to arbitration, (2) which members never entered a contract with MedImpact, and therefore never suffered any injury caused by MedImpact, and (3) which members' claim for damages must be individually proved. This is necessarily a contract-by-contract and pharmacy-by-pharmacy analysis.

### i.    *Binding arbitration clauses require the participation of NCPA and PARD member pharmacies.*

If Association members have arbitration provisions, courts require that each member participate in the litigation to defend against a motion to compel arbitration. *See In re Managed Care Litigation*, MDL No. 1334, 2003 WL 22410373, at *10 (S.D. Fla. Sept. 15, 2003) ("The only way for the Court to determine which members have claims not subject to arbitration and what prospective relief might be appropriate for those members is for each member to participate and defend against a motion to compel arbitration.").

It is undisputed that many of the Associations' pharmacy members signed MedCare Agreements with MedImpact, whether through PSAOs or directly. While both NCPA and PARD fail to allege who their member pharmacies are, it is likely that most are in-network with

MedImpact, and publicly available information identifies several member pharmacies that have entered into pharmacy network agreements with MedImpact.[24]

For NCPA, for example, MedImpact has a MedCare Agreement (containing an arbitration clause) with Capitol Heights Pharmacy, an NCPA member pharmacy located in Denver, Colorado.[25] That MedCare Agreement contains the same broad arbitration provision, requiring that "any and all disputes" arising out of or relating to the agreement be submitted to arbitration. Ex. A-9 § XIV. Capitol Heights Pharmacy intended to be bound by the arbitration provision and voluntarily elected to arbitrate any and all claims relating to its contract with MedImpact. The same contractual arrangements apply for other NCPA member pharmacies, including several owned by an NCPA board member.[26]

Several PARD member pharmacies likewise appear to be bound by arbitration agreements with MedImpact. PARD board chairman Brad Tabaac appears to be the Pharmacy Director at Port Richmond Pharmacy in Philadelphia, which has a MedCare Agreement (containing an arbitration

---

[24] When considering a to dismiss for lack of standing, this Court may take judicial notice of publicly available information. *Wiener v. MIB Grp., Inc.*, 86 F.4th 76, 83, 87 (1st Cir. 2023) (stating the same and considering public record).

[25] Capitol Heights Pharmacy signed an Affiliation Affidavit expressly granting PSAO AlignRx (formerly PPOk) authority to enter a MedCare Agreement with MedImpact on its behalf and acknowledged receipt of and agreement to that MedCare Agreement. Ex. A-23 at 1.

[26] NCPA board member and immediate past president Jeff Harrell (also an AlignRx board member) signed Affiliation Affidavits for three NCPA member pharmacies agreeing to be bound by AlignRx's MedCare Agreement containing the binding arbitration clause discussed herein. NCPA, *Leadership Team*, https://ncpa.org/leadership-team (last visited Nov. 2, 2025); (NCPA, *Pharmacy Locator*, https://ncpa.org/pharmacy-locator (last visited Nov. 2, 2025) (identifying Myrtle Drugs, Raymond Pharmacy, Aberdeen Health Mart Pharmacy, and Horizon Pharmacy as NCPA members); Ex. A-23 at 2–5 (Affiliation Affidavits as to AlignRx signed by Harrell for Myrtle Drugs, Raymond Pharmacy, Aberdeen Health Mart Pharmacy, and Horizon Pharmacy): Ex. A-9 (PPOk MedCare Agreement); Ex. A-10 (PPOk Assignment of MedCare Agreement to AlignRx).

provision) with MedImpact through its PSAO Elevate Provider Network ("Elevate").[27] Two more PARD board members own or lead pharmacies that are bound to arbitrate their disputes with MedImpact.[28]  Additionally, MedImpact has identified at least two more PARD member pharmacies that appear to have entered MedCare Agreements and are bound to arbitrate disputes with MedImpact.[29]  This is all based on online investigation—which underscores the problem.

---

[27] PROPUBLICA, *Philadelphia Association of Retail Druggists*, https://projects.propublica.org/nonprofits/organizations/230968140 (last visited Nov. 2, 2025) (identifying PARD Board of Directors); CPESN, *CPESN Pharmacist Tabaac Featured in PrimeRx Testimonials*, https://ftp.cpesn.com/blog/cpesn-pharmacist-tabaac-featured-primerx-testimonials (July 24, 2025) (identifying Brad Tabaac as Pharmacy Director at Port Richmond Pharmacy); Ex. A-24 at 1 (Port Richmond Pharmacy Affiliation Affidavit as to Elevate); Ex. A-19 § IVX (sic) (AmeriSource Bergen MedCare Agreement); Ex. A-20 (document establishing AmeriSource Bergen's operation under the name Elevate).

[28] PROPUBLICA, *Philadelphia Association of Retail Druggists* (identifying Mayank Amin and Marc Ost as PARD board members); SKIPPACK PHARMACY, *Mayank Amin*, https://www.skippackpharmacy.com/team/mayank-amin/ (last visited Nov. 2, 2025) (identifying Mayank as owner of Skippack Pharmacy); Ex. A-24 at 2 (Affiliation Affidavit of Skippack Pharmacy, establishing its agreement to join MedImpact's network through the AlignRx PSAO); Ex. A-9 (PPOk MedCare Agreement); Ex. A-10 (PPOk Assignment of MedCare Agreement to AlignRx); Congressman Brian Fitzpatrick, FACEBOOK (May 1, 2025 at 1:25pm), https://www.facebook.com/RepBrianFitz/posts/it-was-great-to-sit-down-with-our-own-marc-ost-of-horsham-cpht-owner-of-erics-rx/1276213327204829/ (identifying Marc Ost as President-Elect and Co-Owner of Eric's RX Shoppe); Ex. A-24 at 7–8 (Affiliation Affidavits of multiple NCPDPs of Eric's Rx Shoppe, establishing their agreement to join MedImpact's network through the AccessHealth and GeriMed PSAOs); Ex. A-3 (GeriMed MedCare Agreement); Ex. A-12 (AccessHealth MedCare Agreement).

[29] Northeast Times, Around Town (May 8, 2025) https://northeasttimes.com/2020/05/08/around-town-118/?utm_source=chatgpt.com (identifying Rapoport Pharmacy as a PARD member); Ex. A-24 at 3 (Affiliation Affidavits of multiple NCPDPs of Rapoport Pharmacy, establishing their agreement to join MedImpact's network through the LeaderNET and GeriMed PSAOs); Ex. A-3 (GeriMed MedCare Agreement); Ex. A-4 (LeaderNET MedCare Agreement); Philadelphia Chinatown Development Corporation, FACEBOOK (Nov. 10, 2020 at 8:35am), https://www.facebook.com/phillychinatown/posts/following-our-shopchinatown-social-media-event-pcdc-will-be-expanding-the-event-10159033678644604/?utm_source=chatgpt.com (identifying Neff Pharmacy as a member of PARD).

The only way for the Court to know with certainty which pharmacies must arbitrate their claim is for each to step out from behind the curtain of the Associations, participate, and explain why it should not be required to do so. *See In re Managed Care,* 2003 WL 22410373, at \*10 ("The only way for the Court to determine which members have claims not subject to arbitration and what prospective relief might be appropriate for those members is for each member to participate and defend against a motion to compel arbitration.").

> ii. *Non-contracted pharmacies must individually participate to show they have been harmed by MedImpact's participation in the ISP.*

While the Associations have not disclosed this information either, it is possible that some of their member pharmacies have *not* contracted with MedImpact. If so, they never participated in the ISP program with MedImpact. As explained in Section IV.A. above, those members would lack standing to bring a claim against MedImpact, and accordingly, so would the Association on their behalf. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d at 194 (dismissing association plaintiffs that did not allege specific members were harmed by specific defendants). The determination whether an Association's member pharmacy contracted with MedImpact (and therefore has an arbitration provision) or never contracted with MedImpact (and was therefore never harmed by MedImpact's participation in the ISP) requires the Court to conduct a pharmacy-by-pharmacy analysis. Member participation is the only means of making this determination, defeating associational standing and requiring dismissal of the Associations.

Furthermore, to the extent the Associations or member pharmacies seek damages,[30] member participation is required to determine the extent and amount of such damages. *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 921–22 (7th Cir. 1995); *Air Transp. Ass'n of Am. v.*

---

[30] "Plaintiffs bring this action to stop this unlawful conspiracy and to recover treble damages on behalf of themselves and others similarly situated." Compl. ¶ 36.

*Reno*, 80 F.3d 477, 483–84 (D.C. Cir. 1996).  Damages calculations are necessarily individualized inquiries, and this case is no different.

For these reasons, the Associations cannot satisfy *Hunt*'s third prong in addition to the first and must be dismissed for lack of standing.

### B.    The Associations Fail to State a Claim.

The Associations do not state a valid Sherman Act claim because they do not allege they were directly injured.  Compl. ¶¶ 41–43.  As explained as to AHF and OneroRx in Section III.A, above, the Associations lack standing as they allege injuries that are "indirect," derived from alleged injuries to the pharmacies they operate.  *See G.K.A. Beverage Corp.*, 55 F.3d at 766 ("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing.").

### C.    If Not Dismissed, the Claim Must be Arbitrated.

If the Associations are not dismissed, they can and should be bound to the arbitration agreements as non-signatories for the same reasons as AHF and OneroRx, and because associations are bound by their members' arbitration clauses when they sue in a representative capacity.  *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 744 (N.D. Ill. 2010) ("[I]f an association's members are bound to arbitrate, so too is the association when it sues in a representative capacity"); *see also infra* Argument Section III.B. (explaining why AHF and OneroRx are bound to arbitrate like the pharmacies they represent).  Accordingly, MedImpact moves to compel arbitration as to the Associations and their member pharmacies that signed arbitration agreements.

* * *

In sum, any member pharmacy the Association could—but did not—identify would either be in-network and bound to arbitrate or out-of-network and unharmed by MedImpact.  Either way,

the Associations cannot proceed in this Court as if their members had a right to on their own. MedImpact requests that the Court dismiss the claims by NCPA and PARD under Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6). If not, the Associations should be compelled to arbitration along with those members that signed arbitration agreements, and the matter should be stayed as to the Associations and those pharmacies, under 9 U.S.C. §§ 2–4.

## V.    MedImpact Joins in Defendants' Joint Motion to Dismiss and ESI's Motion to Dismiss.

The Complaint's allegations collapse when compared to the MedImpact ISP Agreement's terms and should be dismissed for the reasons in the ESI Motion. First, MedImpact has not delegated authority to GoodRx to set drug reimbursement rates. Instead, MedImpact checks GoodRx's publicly available prices, compares them to a Member's copay amount—not insurance prices—and then determines whether to route a prescription to GoodRx. The ISP Agreement does not change any of MedImpact's insurance prices with pharmacies. Second, MedImpact does not share with GoodRx—or *any* other PBM—the insurance prices that are paid to pharmacies when a prescription claim is processed and reimbursed through insurance.

GoodRx does not control or influence the design of MedImpact's benefit plans. The ISP instead operates through a simple, automated process that gives GoodRx no authority over pricing or reimbursement rates. The process works as follows:





Despite receiving MedImpact's ISP Agreement before filing their Complaint, Plaintiffs ignore these details to instead incorrectly allege that MedImpact "scheme[d] to artificially suppress reimbursement rates paid to pharmacies across the country for generic drugs," and "exchanged non-public and competitively sensitive information with [other PBMs] in order to accomplish that purpose." Compl. ¶ 304. They also claim that all PBMs in the ISP use the same "lesser-of" formula to set reimbursement rates. *Id*. ¶ 13.

The ISP Agreement shows the opposite. MedImpact acts independently, compares only public prices, and does not share its insurance pricing data with GoodRx or any other PBM. The contract itself debunks Plaintiffs' theory of coordinated price suppression.

MedImpact's ISP Agreement does not include any agreement with other PBMs to calculate pharmacy reimbursement in a particular way. MedImpact and its clients decide whether to participate in the ISP, and MedImpact and its clients decide which claims, if any, are routed to GoodRx. For each claim, MedImpact independently determines the pricing and whether to send

it through GoodRx. Nothing in the agreement requires MedImpact to change or alter its insurance prices. MedImpact's ISP Agreement directly undermines the notion that MedImpact agreed with other PBMs regarding any insurance prices or any methodology for reimbursement. It certainly does not delegate authority to GoodRx to set drug reimbursement rates. The "scheme" alleged in the Complaint that the PBMs agreed to depress pharmacy reimbursement does not exist in MedImpact's ISP Agreement.

Finally, MedImpact did not exchange "non-public and competitively sensitive information" (Compl. ¶ 304) with other Defendants as part of the ISP Agreement. Instead, the GoodRx Network Rates provided to MedImpact are publicly available, as stated in the MedImpact ISP Agreement. That is far from confidential information. MedImpact also does not provide GoodRx with its insurance prices as part of the ISP Agreement. Instead, MedImpact internally compares its copay — not confidential insurance prices as Plaintiffs' allege — against the publicly available GoodRx price and unilaterally determines where to route the claim. MedImpact's copay information is (1) not its insurance price and therefore not the confidential information at issue in the Complaint; and (2) not provided to GoodRx through the ISP. No provision in the MedImpact ISP Agreement requires providing or exchanging MedImpact's insurance prices. Because MedImpact does not share or receive confidential information under its ISP Agreement as Plaintiffs allege, Plaintiffs cannot plausibly allege that MedImpact participated in the conspiracy described in the Complaint. Therefore, Plaintiffs' antitrust claims fail as to MedImpact and should be dismissed as further explained in the ESI Motion.

## **CONCLUSION**

For the reasons in this Motion, Plaintiffs should be dismissed or compelled to arbitration as follows:

Plaintiffs Keaveny and Star Discount should be ordered to proceed to arbitration, and their claims against MedImpact should be stayed.

Plaintiffs AHF and OneroRx should be dismissed under Rule 12(b)(6) for lack of antitrust standing.  If the Court concludes they have antitrust standing, they should be compelled to arbitration, and their claims against MedImpact should be stayed.

Plaintiffs NCPA and PARD should be dismissed under Rule 12(b)(1) for lack of Article III standing, or under Rule 12(b)(6).  If the Court concludes they have standing, they should be compelled to arbitration, and their claims against MedImpact should be stayed.

All Plaintiffs' claims should be dismissed under Rule 12(b)(6) because Plaintiffs fail to state a claim upon which relief can be granted, as explained in (1) Defendants' Joint Motion to Dismiss; (2) ESI's Motion to Dismiss; and (3) in MedImpact's joinder in these motions, as provided herein.

## **ORAL ARGUMENT**

Under LR Cv 7(c), MedImpact requests oral argument, estimated at 60 minutes, on this Motion, and that it be in-person.

Dated: November 7, 2025

*/s/ Richard D. Salgado*

Richard D. Salgado
Texas Bar. No. 24060548
Marina S. Kelly
Texas Bar. No. 24093200
MCDERMOTT WILL & SCHULTE LLP
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
richard.salgado@mwe.com
mkelly@mwe.com

Michelle S. Lowery
California Bar. No. 302882
MCDERMOTT WILL & SCHULTE LLP
2049 Century Park East, Suite 3200
Los Angeles, California 90067-3206
mslowery@mwe.com

Charles D. Blackman
Rhode Island Bar No. 5522
LEVY & BLACKMAN LLP
469 Angell Street, Suite 2
Providence, RI 02906
Tel: (401) 437-4695
Fax: (401) 632-4695
cblackman@levyblackman.com

*Attorneys for Defendant MedImpact Healthcare Systems, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Richard D. Salgado*
Richard D. Salgado
