## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN RE: GOODRX AND PHARMACY BENEFIT MANAGER ANTITRUST LITIGATION (NO. II)<br><br>This Document Applies To:<br><br> ALL CASES | C.A. No.: 1:25-md-03148-MSM-AEM<br><br>MDL No. 3148 |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
### "REDACTED COPY"

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION.................................................................................... 1

II.   PARTIES AND CO-CONSPIRATORS.............................................................. 11

      A.    Plaintiffs ..................................................................................................... 11

      B.    GoodRx Defendants .................................................................................. 19

      C.    PBM Defendants ........................................................................................ 20

III.  JURISDICTION AND VENUE............................................................................ 25

IV.   FACTUAL BACKGROUND ................................................................................ 27

      A.    PBMs: The Powerful Middlemen at the Center of the U.S.
            Prescription Drug Supply Chain. ....................................................... 27

            1.    PBMs negotiate with retail pharmacies to secure pricing
                  discounts for health plans. ...................................................... 27

            2.    PBMs compete in the input market for pharmacy services
                  to build pharmacy networks................................................... 29

            3.    PBM reimbursement rates are set forth in network
                  agreements with participating pharmacies............................ 30

            4.    The PBM industry is highly concentrated. ............................ 33

            5.    Vertically integrated PBMs steer business to their affiliated
                  pharmacy chains at the expense of independent pharmacies.............. 35

            6.    PBMs have decimated independent pharmacies, depriving
                  Americans across the nation of pharmacy access. ............... 36

            7.    PBMs drive up retail drug prices.......................................... 40

      B.    The Emergence of Prescription Drug Discount Programs. ............... 41

            1.    Pharmacy savings clubs......................................................... 41

            2.    PBM discount cards................................................................ 42

            3.    GoodRx: A discount platform that aggregates PBM rates. ................... 43

i

V.      THE GOODRX ISP SCHEME.................................................................. 48

        A.      The Origins of the Scheme: GoodRx's Discount Card Empire
                Begins to Crumble. ........................................................................ 49

        B.      GoodRx Develops Its "Integrated Savings Program.".................... 52

        C.      GoodRx Invites PBMs to Participate in Its ISP Scheme, and They
                Accept............................................................................................ 54

                1.      December 2021: Navitus enters into the first ISP agreement
                        with GoodRx ....................................................................... 55

                2.      November 2022: Express Scripts joins the GoodRx ISP
                        Scheme................................................................................ 55

                3.      July to September 2023: Caremark and MedImpact join the
                        ISP Scheme. ........................................................................ 56

                4.      June 2025: GoodRx launches GoodRx Community Link. ..... 59

VI.     THE ISP SCHEME AND ITS ANTICOMPETITIVE EFFECTS.............. 60

        A.      The ISP Scheme Eliminates Competition by Using Commercially
                Sensitive Information to Suppress Reimbursement Rates. .............. 61

        B.      Independent Pharmacies did not Consent to the GoodRx ISP
                Scheme or its Pricing. .................................................................... 64

        C.      The Anticompetitive Effects of the GoodRx ISP Scheme Harmed
                Class Members................................................................................ 67

        D.      The ISP Scheme has Contributed to the Financial Distress of
                Independent Pharmacies Causing Further Harm to the
                Communities They Serve. ............................................................... 72

VII.    DIRECT AND INDIRECT EVIDENCE OF AN UNLAWFUL
        HORIZONTAL CONSPIRACY.............................................................. 74

        A.      Direct Evidence of a Horizontal Agreement. ................................. 74

                1.      PBMs' Contracts with GoodRx ........................................... 74

                2.      Public Statements ................................................................ 80

        B.      Indirect Evidence of a Horizontal Agreement................................. 87

| | 1. | Parallel Conduct ................................................................... | 87 |
| | 2. | Motives to Conspire .......................................................... | 90 |
| | 3. | Access to Competitors' Pricing Information ........................ | 91 |
| | 4. | Standardization of Reimbursement Rates............................. | 93 |
| | 5. | Actions Against Self-Interest .............................................. | 95 |
| | 6. | Industry-Related Plus Factors ............................................. | 96 |
| | | a. High Barriers to Entry............................................... | 96 |
| | | b. High Exit Barriers ..................................................... | 96 |
| | | c. Highly Concentrated Market ...................................... | 97 |
| | | d. Fungible Services...................................................... | 97 |
| | | e. Opportunities to Collude ........................................... | 97 |

VIII. RELEVANT MARKETS AND MONOPSONY POWER ......................................... 98

IX. ANTITRUST INJURY SUFFERED BY CLASS MEMBERS.................................. 101

X. CLASS ACTION ALLEGATIONS............................................................... 102

XI. CAUSE OF ACTION ............................................................................... 107

COUNT ONE .......................................................................................................... 107

Agreement in Restraint of Trade in Violation of Section 1 of the Sherman
Antitrust Act ............................................................................................. 107

XII. PETITION FOR RELIEF ......................................................................... 109

XIII. JURY DEMAND .................................................................................. 109

## TABLE OF TERMS & ABBREVIATIONS

| | |
|---|---|
| AWP | Average Wholesale Price |
| BIN | Six-digit "Bank Identification Number" associated with a PBM |
| Clawback fee or processing fee | Fee that GoodRx charges the pharmacy for a transaction |
| Contracted Rates | Drug prices set pursuant to contract, typically as part of formulas involving AWP and the PBM Defendants |
| Defendants | GoodRx and the PBM Defendants |
| DIR fees | Direct and Indirect remuneration fees |
| GoodRx | Defendants GoodRx, Inc. and GoodRx Holdings, Inc. |
| GoodRx Information-Exchange Network | The PBMs that share their competitively sensitive information with GoodRx in connection with its discount card business. |
| ISP | GoodRx's Integrated Savings Program |
| ISP Agreements | Agreements between GoodRx and the PBM Defendants, including, but not limited to, the Caremark Cost Saver Program Services Agreement between GoodRx and CVS Caremark, the Integrated Savings Program Service Agreement between GoodRx and Express Scripts, the GoodRx Services Agreement between GoodRx and MedImpact, and the RxNXT Discount Network Services Agreement between GoodRx and Navitus |
| ISP Rate | The algorithmically determined lowest reimbursement rate contracted by any PBM in the GoodRx Information-Exchange Network. |
| Leveraged PBM | The PBM whose Contracted Rate is used for a transaction. |
| MAC | Maximum Allowable Cost |
| Pass-through Requirements or Pass-Through Pricing | Terms in PBMs' contracts with TPPs that require PBMs to "pass through" all negotiated discounts in full to pharmacies, with the intent to reduce or eliminate spread retention. The amount paid to a pharmacy is the amount billed to the TPP and insured member. The PBM uses fees as a source of profit. |
| PBM Defendants | CVS Caremark; Express Scripts, Inc.; MedImpact Healthcare Systems, Inc.; and Navitus Health Solutions, LLC |
| PBM Services Market | PBM services sold to TPPs |
| PBMs | Pharmacy Benefit Managers |
| Primary PBM or Retained PBM | The PBM that the TPP hired to administer pharmacy benefits. |
| PSAO | Pharmacy Services Administrative Organization |

| Reference prices | Input factors used in formulas to calculate the pharmacy reimbursement for a particular prescription. |
|---|---|
| Spread or spread retention or spread pricing | The gap between the amount paid to the Primary PBM (by the TPP and insured member) and the amount the pharmacy receives from that PBM for dispensing the prescription. The PBM retains that spread as a source of profit. |
| TPPs | Third-party payors of prescription drugs |
| U&C | Usual and Customary |

Plaintiffs, on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 23, bring this action against Defendants. Defendants orchestrated a horizonal conspiracy to fix and suppress the rates of reimbursement paid to independent pharmacies for generic drugs. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and on information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1.    GoodRx and four of the country's largest pharmacy benefit managers (PBMs) have engaged in a scheme to suppress the prices paid to independent pharmacies for generic prescription drugs.

2.    Through its so-called Integrated Savings Program (ISP), GoodRx has orchestrated a horizontal price-fixing agreement with the PBM Defendants by coordinating the exchange of competitively sensitive information and having the PBM Defendants abandon their independent, competitive prices. Instead, the ISP agreement enforces a single, uniform lowest contracted rate for every generic drug claim. This lower rate has substantially damaged Plaintiffs and the Class.

3.    PBMs administer pharmacy benefits on behalf of health-insurance plans and other third-party payors (TPPs). Among other functions, PBMs (on behalf of their TPP clients) reimburse pharmacies for prescriptions that the pharmacies dispense and (in theory) separately negotiate those reimbursement rates with pharmacies.

4.    When it launched in 2011, GoodRx acted as a horizontal competitor of PBMs for generic prescription drug transactions. Until GoodRx and the PBM Defendants entered into the ISP, prescription drug transactions involved either the patient's prescription drug benefit, or GoodRx, but not both.

5.      Since January 1, 2024, and possibly earlier, at least four PBMs—CVS Caremark, Express Scripts, MedImpact, and Navitus—have agreed to participate in GoodRx's ISP. As part of the ISP, the PBM Defendants agree to outsource their pharmacy reimbursement rate decisions on generic drugs to a mutual third party, GoodRx, which sets the rates of reimbursement for them with full knowledge of competitively sensitive information from ostensibly rivalrous PBMs.

6.      Through their ISP agreements with GoodRx, the PBM Defendants (which are horizontal competitors with each other and with GoodRx) agree not to outbid one another on the prices they will pay to pharmacies for generic drugs. This unlawful price-fixing agreement is referred to herein as the "GoodRx ISP Scheme" or "ISP Scheme."

7.      The competitively sensitive information at the heart of the GoodRx ISP Scheme is the reimbursement rates that individual PBMs have contracted to with pharmacies for generic prescription drugs. GoodRx obtains this proprietary, confidential information from the roster of PBMs it works with for its popular GoodRx discount card.

8.      Collectively, the PBMs that share their competitively sensitive information with GoodRx in connection with its discount card business (in exchange for their portion of the fees remitted by pharmacies), control roughly 95% of the PBM Services Market (the market for PBM services sold to TPPs). Therefore, these PBMs are responsible for managing 95% of all pharmacy reimbursement claims. These PBMs include CVS Caremark, Express Scripts, OptumRx, CarelonRx, Envolve Pharmacy Solutions, Prime Therapeutics, Kaiser Permanente Pharmacy, Humana Pharmacy Solutions, MedImpact, Navitus Health Solutions, SS and C Health, and Perform Rx. Together, they make up what is referred to herein as the "GoodRx Information-Exchange Network."

9.      The traditional GoodRx discount card (described further below) makes PBM-determined drug prices (often called "Contracted Rates") available directly to consumers, so long as they pay cash for their prescriptions (rather than use their insurance benefits). This means that consumers who choose to pay the cash price under the GoodRx discount card forgo the ability to have their out-of-pocket costs automatically applied towards their insurance deductibles and out-of-pocket maximums.

10.     Consumers do not know which PBMs' Contracted Rates they are getting the benefit of. Behind the scenes, the PBM whose Contracted Rate is utilized (the "Leveraged PBM") processes the transaction and collects a fee from the pharmacy. The Leveraged PBM then shares a portion of that fee with GoodRx.

11.     This antitrust action is not about the GoodRx discount card itself, but rather a new line of business GoodRx has rolled out and called the Integrated Savings Program. At bottom, the GoodRx ISP Scheme is a price-fixing conspiracy.

12.     As part of the ISP Scheme, GoodRx contracts with certain PBMs (i.e., the PBM Defendants) to "integrate" GoodRx's pricing technology into those PBMs' internal claims processing systems. This integration allows the PBM Defendants to use GoodRx's pricing algorithm—as well as competitively sensitive information from GoodRx's Information-Exchange Network—to determine the pharmacy reimbursement rates for prescriptions filled for patients insured by their TPP clients (often referred to by PBMs as "covered lives").

13.     For each claim subject to the ISP Scheme, the PBM Defendant involved automatically utilizes the algorithmically determined lowest reimbursement rate negotiated by any PBM in the GoodRx Information-Exchange Network (the "ISP Rate").

14.    In public disclosures, GoodRx describes the ISP Scheme as follows: "Our integrated savings program embeds GoodRx directly into the member's funded benefit plan."[1] According to the company, patients simply show their insurance card "at the pharmacy counter, as they normally would" and "behind the scenes, [GoodRx's] ISP technology compares" the patient's "insurance plan" price for the drug with "GoodRx's discount price."[2] "[E]ligible insurance plan members"—i.e., individuals whose pharmacy benefits are managed by a PBM Defendant—then get "automatic access to GoodRx's prescription prices."[3] That is because (as GoodRx admits) all PBMs that participate in the ISP Scheme agree to calculate pharmacy reimbursement rates for generic drugs in the same way based on the "[l]esser of" (a) the patient's "insurance price" (the drug price the PBM that manages that patient's insurance benefits has contracted to with the dispensing pharmacy), or (b) the "GoodRx price" (the lowest price any PBM in the GoodRx Information-Exchange Network has contracted to for the same drug).

15.    Put differently, instead of using the pharmacy reimbursement rate that each TPP's own PBM (the "Primary PBM") has previously contracted to with the dispensing pharmacy, the ISP imposes a different, lower rate of reimbursement contracted to by an entirely different PBM (the "Leveraged PBM") on behalf of entirely different TPPs.

16.    The upshot of the ISP Scheme for the PBM Defendants is that, by ceding their reimbursement decisions to the GoodRx ISP, they never pay pharmacies more for generic drugs than any rival PBM has agreed to pay in its separate contracts with those pharmacies. This is nothing more than price fixing in two simple steps: First, the PBM Defendants exchange

---

[1] *Investor Day 2024*, GOODRX 51 (May 15, 2024), https://investors.goodrx.com/static-files/22f25d12-f82a-40dd-89f2-af4ef3eac111.
[2] Taryn O'Grady, *GoodRx's Integrated Savings Program Wins Fierce Healthcare Innovation Award*, GOODRX (Dec. 21, 2023), https://www.goodrx.com/corporate/business/fierce-innovation-award-2023.
[3] *Id.*

competitively sensitive information between themselves (using GoodRx as a conduit). Second, they all agree to utilize the lowest pharmacy reimbursement rate contracted to by any PBM within the GoodRx Information-Exchange Network (which GoodRx identifies).

17.    In the absence of such unlawful coordination, the PBM Defendants would have to compete for pharmacies to join their pharmacy networks, including by offering to pay pharmacies sufficiently high rates of reimbursement for generic drugs (which account for over 90% of all prescriptions), and to compete on those rates with rival PBMs. The ISP Scheme corrupts this competition between PBMs for network pharmacy services.

18.    A PBM's pharmacy network is the group of pharmacies that contract with that PBM to provide prescription medications to the PBM's TPP clients (and their insured members) under specific terms and pricing agreements. The attractiveness of a health plan is based in part on the breadth of the pharmacy network its members can conveniently access. Any PBM that cannot attract pharmacies (a must-have input) to its network will suffer competitive harms in the downstream market for PBM services sold to TPPs (the PBM Services Market), because those TPPs need to offer broad and convenient pharmacy networks to attract members into their health plans. A pharmacy's willingness to join a PBM's network depends, in part, on the competitiveness of the reimbursement rates a PBM offers and whether those rates allow the pharmacy to operate with a reasonable profit margin.

19.    The ISP Scheme curtails this competition among PBMs for pharmacies and allows PBMs to effectively charge reimbursement rates that are lower than what they would have charged in a competitive market. Rather than having to pay *more* for generic drugs to attract pharmacies to their networks, the PBM Defendants now always utilize the *lowest* pharmacy reimbursement rate that any rival PBM has succeeded in contracting to—without losing access to network pharmacy

services (a necessary input). That is because the PBM Defendants control 64% of the PBM Services Market (and thus approximately 64% of all prescriptions filled each year), meaning pharmacies cannot realistically refuse to do business with all of them. Put differently, the PBM Defendants control a choke point for any pharmacy seeking to gain access to payors and patients.

20.     The PBM Defendants benefit from the ISP Scheme in different ways. The smaller participating PBMs—MedImpact and Navitus, whose market shares are roughly 5% and 2%, respectively—can consistently free-ride off the reimbursement rates of larger PBMs at the expense of independent pharmacies. Because of the GoodRx ISP Scheme, MedImpact and Navitus now utilize the same low reimbursement rates for generic drugs as the nation's largest PBMs: Caremark and Express Scripts, which account for a combined 57% of the national PBM Services Market. In the absence of the ISP Scheme, smaller PBMs like MedImpact and Navitus would not generally qualify for the same volume discounts from pharmacies as Caremark or Express Scripts; they would have to outbid their larger rivals to attract pharmacies to their networks.

21.     The two largest PBM Defendants—Caremark and Express Scripts—have market shares of 34% and 23%, respectively, and have different incentives for participating in the ISP Scheme.[4] Given their buying power, Caremark and Express Scripts are already able to impose the lowest reimbursement rates with pharmacies. However, this does not mean that for any given drug, these PBMs will have secured the lowest price. Instead, it means that across all drugs, these large PBMs will generally obtain the best total discount package from pharmacies. The ISP Scheme ensures that for *every* generic prescription, the PBM Defendants *always* utilize the lowest price of any rival PBM.

---

[4] FED. TRADE COMM'N, PHARMACY BENEFIT MANAGERS: THE POWERFUL MIDDLEMEN INFLATING DRUG COSTS AND SQUEEZING MAIN STREET PHARMACIES 14 (2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

22.    Moreover, the ISP Scheme enables the PBM Defendants—in particular, the largest PBMs with the most power and largest market share, Caremark and Express Scripts—to profit from fees charged to dispensing pharmacies. Any time the ISP Rate is applied as part of the member's plan benefit, GoodRx charges the pharmacy a fee for the transaction (sometimes called a "processing fee" or "clawback" fee). This fee is then shared among the participants of the ISP scheme, including, on information and belief, GoodRx, the Primary PBM, and the Leveraged PBM.

23.    Because the rates contracted to by Caremark and Express Scripts will often be the lowest (and thus are adopted as the ISP Rate), these two PBM Defendants stand to gain hundreds of millions of dollars a year from their cut of the clawback fees generated by the ISP Scheme. Rather than passing on the entirety of these fees to payors as "savings," the PBM Defendants pocket at least a portion of them as profit.

24.    Notably, the fees extracted from pharmacies under the ISP Scheme reflect a gap—or "spread"—between (a) the amount paid by the TPP and its insured member to its retained PBM ("Retained" or "Primary" PBM), and (b) the net amount the pharmacy receives from that PBM for dispensing the prescription. Historically, retaining such "spreads" as profit was an important revenue stream for PBMs. However, the practice of "spread retention" (or "spread pricing") has been harshly criticized in recent years for raising drug prices and harming pharmacies, and many health plans now try to require their PBMs to "pass through" all negotiated discounts with pharmacies in full to the TPP, thus precluding spread retention, though it is far from certain whether all such discounts are in fact passed through.

25.    The ISP Scheme allows the PBM Defendants to reintroduce spread retention into their business models without violating the attempted pass-through requirements in contracts with

their own TPP clients. That's because for each prescription subject to the ISP Scheme, the spread (i.e., the clawback fee) is collected by GoodRx—not the TPP's Retained PBM. And GoodRx has no contractual relationship with either the patient or the payor. On information and belief, GoodRx then distributes this spread to the Leveraged PBM and the Retained PBM, which is a member of the ISP Scheme.

26.     For its part in orchestrating the ISP Scheme, GoodRx retains about $5 per transaction mediated through the ISP. This new revenue stream—which GoodRx sees as "$200M+ in growth opportunity"—is critical to GoodRx's long-term viability given the existential issues facing its traditional discount-card business.[5]

27.     In recent years, many pharmacies have stopped accepting GoodRx's traditional discount cards because they typically lost money on these transactions. Such pharmacy defections have led to massive disruptions in GoodRx's stock value.

28.     By "embed[ding] GoodRx directly into the … benefit plan[s]" administered by the PBM Defendants, the ISP Scheme eliminates pharmacies' ability to opt out of transacting with GoodRx and eliminates competition between the PBM Defendants and GoodRx for prescription drug transactions.[6] So long as a pharmacy is in network for one of the PBM Defendants, it has no choice but to transact with GoodRx. Indeed, under the ISP Scheme, the PBM Defendants automatically apply the ISP Rate as part of a member's plan benefit without the need for any external GoodRx discount card to be presented or accepted at the pharmacy desk. GoodRx and the PBM Defendants then extract and share a compulsory fee from the dispensing pharmacy on the back end. And because of the PBM Defendants' dominant collective market share, pharmacies

---

[5] *See supra* n.1 at 53.
[6] *Id.* at 51.

8

have little choice but to transact with the PBM Defendants. In other words, the ISP Scheme offers pharmacies a Hobson's choice—either accept the suppressed reimbursement rates under the ISP Scheme or lose the business of 64% of the PBM Services Market.

29.     The "savings" generated by the ISP Scheme come at the expense of already distressed independent pharmacies. In fact, GoodRx's own Aaron Crittenden, President of Rx Marketplace at GoodRx, admitted publicly that the "ISP has been *painful* for independent pharmacies."[7] Since going live, the ISP Scheme has dramatically suppressed reimbursements paid to independent pharmacies for generic drugs. GoodRx estimates that some 500 to 600 million prescriptions will be subject to the ISP Scheme annually. On each of those prescriptions, when the ISP Rate is leveraged, pharmacies are reimbursed at rates far lower than what they would have received absent the ISP Scheme.

30.     Plaintiffs, and member pharmacies of Plaintiff Philadelphia Association of Retail Druggists and Plaintiff National Community Pharmacists Association, have filled numerous generic prescriptions for insured patients that were subject to the ISP Scheme. For these transactions, customers presented their normal health insurance card at the pharmacy counter. These health insurance cards each contain the six-digit Bank Identification Number (BIN) associated with the PBM that the patient's health plan uses to administer pharmacy benefits (i.e., the Primary PBM). Absent the ISP Scheme, when presented with a health insurance card, an independent pharmacy would route its claim for reimbursement to the BIN of the Primary PBM.

31.     Ordinarily, the Primary PBM would determine the amount the patient and their insurer owe the pharmacy (based on the reimbursement rates that same PBM has contracted for with the dispensing pharmacy). But for prescriptions subject to the ISP Scheme, reimbursement

---

[7] AMCP, *Ep. 39 – Inside GoodRx Community Link: A New Program for Independent Pharmacies*, YOUTUBE (Sept. 5, 2025), https://www.youtube.com/watch?v=qPHI0JPurgw.

claims were routed not to a customer's Primary PBM, but to the PBM with the lowest contracted reimbursement rate for the at-issue prescription (i.e., the Leveraged PBM).

32.    For each prescription filled, independent pharmacies receive a claims summary. For prescriptions filled pursuant to the ISP Scheme, the claims summary may contain the Leveraged PBM's BIN, followed by the letters "GDRX." These claims summaries may also contain notations stating that the reimbursement amount has been calculated based on a "discount contract" (rather than the pharmacy's network agreement with the Primary PBM). For example, where the Primary PBM is Caremark, this notation may state, "non-cmk discount contract." On information and belief, the reimbursement amounts for these claims are based on the Leveraged PBM's Contracted Rates—rather than the Primary PBM's Contracted Rates with the dispensing pharmacy—pursuant to an unlawful agreement between GoodRx and the PBM Defendants to automatically apply the lowest Contracted Rate in the GoodRx Information-Exchange Network (the ISP Rate) as part of the patient's plan benefits.

33.    These rerouted claims may also reflect a "Processing Fee" of between $7 and $10, which Plaintiffs must pay to the PBMs Defendants. Plaintiffs have suffered significant losses as a result of the ISP Scheme.

34.    The GoodRx ISP Scheme is merely the latest exploitative tactic devised by the PBM industry to extract profits from pharmacies and TPPs. After two decades of intense consolidation of the PBM industry—and of PBMs' vertical integration with other parts of the drug supply chain—the largest PBMs have amassed an unfathomable degree of buying (or monopsony) power vis-à-vis pharmacies. They have wielded this monopsony power to decimate independent pharmacies, which they view as competitors to their own PBM-affiliated pharmacies.

35.     Since 2019, there have been over 7,000 retail pharmacy closures in the United States, over half of which were independent pharmacies.[8] Independent pharmacies continue to close at an astronomical rate. Between December 19, 2024 and February 28, 2025, 326 pharmacies closed, 73% of which were independent pharmacies.[9] Such closures harm both pharmacists and the communities they serve, imperiling access to medication and other health services for millions of Americans. Today, over 45% of all U.S. counties have at least one neighborhood that qualifies as a "pharmacy desert," including one-third of all neighborhoods in the 30 largest U.S. cities, affecting nearly 15 million people.[10] The ISP Scheme is poised to further exacerbate this crisis.

36.     Not only do generic drugs account for over 90% of all prescriptions that pharmacies fill, they also account for most of the profits that pharmacies are able to generate. By suppressing reimbursement rates on generic drugs, the ISP Scheme pushes already struggling pharmacies even further towards the brink.

37.     The GoodRx ISP Scheme is unlawful under Section 1 of the Sherman Act. Plaintiffs bring this action to stop this unlawful conspiracy and to recover treble damages on behalf of themselves and others similarly situated.

## II.    PARTIES AND CO-CONSPIRATORS

### A.    Plaintiffs

38.     Plaintiff **Keaveny Drug, Inc.** is incorporated under the laws of the State of Minnesota with its principal place of business located at 150 Main Ave. W, Winsted, Minnesota,

---

[8] Lucas A. Berenbrok, et al., *Why community pharmacies are closing – and* what *to do if your neighborhood location shutters*, Ohio Cap. J. (Feb. 20, 2025, 4:30 AM), https://ohiocapitaljournal.com/2025/02/20/why-community-pharmacies-are-closing-and-what-to-do-if-your-neighborhood-location-shutters/.

[9] *326 Pharmacies Have Closed Since Elon Musk Tanked PBM Reform*, Am. Econ. Liberties Project (Mar. 10, 2025), https://www.economicliberties.us/press-release/326-pharmacies-have-closed-since-elon-musk-tanked-pbm-reform/.

[10] Leigh Hopper, *One-third of all neighborhoods in the largest U.S. cities have* been *'pharmacy deserts'*, HSC News, Univ. S. Cal. (May 5, 2021), https://hscnews.usc.edu/one-third-of-all-neighborhoods-in-the-largest-u-s-cities-have-been-pharmacy-deserts.

55395. Keaveny Drug is a generationally owned and operated pharmacy that has served Minnesota communities for nearly a century. Its husband-and-wife owners, who both come from families of pharmacists, once worked for large chain pharmacies but have, since 2005, dedicated their work to serving their local community. Keaveny Drug provides personalized care to each of its customers that goes beyond just filling prescriptions, including handling special orders and making local deliveries. Plaintiff Keaveny Drug has filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, Keaveny Drug was required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs it dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, Keaveny Drug has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

39.    Plaintiff **Star Discount Pharmacy, Inc.** is incorporated under the laws of the State of Alabama with its principal place of business located at 704 Pratt Ave. NE, Huntsville, Alabama, 35801. Star Discount Pharmacy operates five stores and has been providing personalized care and pharmacy services to its community for decades. Plaintiff Star Discount Pharmacy has filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, Star Discount Pharmacy was required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs it dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, Star Discount Pharmacy has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

40.     Plaintiff **SDDDC LLC (d/b/a Orlando Pharmacy)** is incorporated under the laws of the State of Florida with its principal place of business located at 2909 N Orange Ave., Ste. 112, Orlando, Florida, 32804. Orlando Pharmacy is a veteran owned and operated business and a Minority Business Enterprise, and has been providing Orlando residents with personalized and tailored pharmacy services for over sixty years. In addition to filling prescriptions, Orlando Pharmacy offers medication therapy management, immunizations, compounding services, and medication delivery. Orlando Pharmacy's mission is to provide its community with accessible, high-quality health care at affordable prices. Plaintiff Orlando Pharmacy has filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, Orlando Pharmacy was required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs it dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, Orlando Pharmacy has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

41.     Plaintiff **Northern Arizona Pharmacy, LLC** is incorporated under the laws of the State of Arizona with its principal place of business located at 7373 E Doubletree Ranch Rd., Ste. 135, Scottsdale, Arizona, 85258. Plaintiff Northern Arizona Pharmacy owns and operates three pharmacy locations in Chino Valley, Arizona; Dewey, Arizona; and Mayer, Arizona. Northern Arizona Pharmacy and its pharmacy locations are all part of the same legal entity, with each individual pharmacy location operating under a DBA. Plaintiff Northern Arizona Pharmacy has been providing personalized pharmacy services to its community since 2016. In addition to prescription services, Northern Arizona Pharmacy also provides immunizations, medication therapy management, medication synchronization, vitamins and supplements, and medical

13

equipment. Northern Arizona Pharmacy provides critical healthcare services to rural, lightly populated areas in Arizona. Plaintiff Northern Arizona Pharmacy has filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, Northern Arizona Pharmacy was required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs it dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, Northern Arizona Pharmacy has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

42.     Plaintiff **OneroRx, Inc.** owns and operates sixty-seven pharmacies located in Illinois, Indiana, Iowa, Michigan, Missouri, Nebraska, and Wisconsin. OneroRx, formerly National Telehealth Solutions, has been providing integrated, quality pharmacy care to underserved communities since 1990. In total, Plaintiff OneroRx provides critical pharmacy services to over 750,000 patients each year. In addition to dispensing millions of prescriptions annually, OneroRx provides immunizations, telepharmacy services, prescription counseling, medication therapy management, and medical equipment. OneroRx is committed to providing personalized, integrated pharmacy services to its patients, contributing not only to the health of its patients, but to the greater welfare of its communities. OneroRx's pharmacies have filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, OneroRx's pharmacies were required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs they dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, OneroRx has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

43.    OneroRx is the sole owner and operator of each of its independent pharmacies. These pharmacies include, *inter alia*, Willowbrook Pharmacy, Community Pharmacy, Wood River Pharmacy, Sinks Pharmacy, Hometown Pharmacy, Medley Pharmacy, EverCare Pharamcy, Medicap Pharmacy, and Bert's Pharmacy. Each of OneroRx's pharmacies are wholly owned subsidiaries of OneroRx and function as a single enterprise. OneroRx houses the management team, development team, and accounting department. As the sole owner and operator of its pharmacies, OneroRx has the legal authority to enter into contracts on behalf of its pharmacies. Indeed, GoodRx pitched the Community Link program, described further below, directly to OneroRx – and not to the individual pharmacies owned and operated by OneroRx. And in December 2025, OneroRx entered into a Network Participation Agreement with GoodRx to participate in the Community Link Program. In this Network Participation Agreement, which GoodRx drafted and signed, GoodRx treats OneroRx as one entity, with OneroRx entering into the agreement on behalf of its sixty-seven pharmacies.[11] OneroRx and its subsidiary pharmacies share a complete unity of interests. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, OneroRx has suffered a decline in revenue and has been directly injured as a result of Defendants' conduct.

44.    Plaintiff **AIDS Healthcare Foundation (AHF)** is a global nonprofit organization headquartered in Los Angeles, California that owns and operates over 30 pharmacy locations in the United States. AHF and its pharmacy locations are all part of the same legal entity, with individual locations operating under fictitious names. The pharmacists and staff at each AHF pharmacy location are employees of AHF. AHF addresses barriers to care for its clients through advocacy, a network of pharmacies, thrift stores, health and wellness centers, affordable housing

---

[11] Neither OneroRx nor the 67 pharmacies it owns and operates were automatically opted into the Community Link program.

locations, and food service programs. AHF serves over two million patients in forty-seven countries regardless of ability to pay. 96 cents of every dollar made at AHF pharmacies is used to provide specialty HIV care. AHF has filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, AHF was required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs it dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, AHF has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

45.     Plaintiff **Pharmacy4Humanity (P4H)** is a nonprofit organization headquartered in Los Angeles, California that owns and operates over 20 pharmacies in the United States, serving patients with HIV and AIDS, among others. P4H and its pharmacy locations are all part of the same legal entity, with individual locations operating under fictitious names. The pharmacists and staff at each P4H pharmacy location are employees of P4H. P4H has filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, P4H was required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs it dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, P4H has suffered economic injury to its business or property and deprivation of the benefit of free and fair competition.

46.     Plaintiff **National Community Pharmacists Association (NCPA)** is a nonprofit organization based in Alexandria, Virginia. NCPA's mission is to protect and promote the interests of independent pharmacists whose current and future success is vital to their patients, their

16

communities, and the entire healthcare system. NCPA represents some 18,900 member pharmacies across the United States. These pharmacies and their pharmacists are rooted in the communities they serve and pride themselves on connecting and consulting with patients. Together, NCPA Member Pharmacies employ more than 205,000 individuals on a full- or part-time basis. NCPA Member Pharmacies have filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, NCPA Member Pharmacies were required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs they dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, NCPA Member Pharmacies have suffered economic injury to their business or property and deprivation of the benefit of free and fair competition.

47.    Plaintiff **Philadelphia Association of Retail Druggists (PARD)** is a nonprofit corporation organized under the laws of the State of Pennsylvania with its principal place of business located at 2417 Welsh Rd., Ste. #21, Philadelphia, Pennsylvania, 19114. PARD is an association of community pharmacies, comprised of over two hundred independently owned pharmacies in Pennsylvania, concentrated in the southeast region of the state. PARD works to protect the business and professional interests of its independent pharmacy members. PARD members have filled generic prescriptions for insured patients that were subject to the ISP Scheme. On information and belief, for each claim processed in connection with the Integrated Savings Program, PARD members were required to pay additional transaction fees, in addition to receiving artificially reduced payments for the drugs they dispensed. As a result of the allegations contained herein, including the ISP Scheme perpetrated by Defendants, PARD members have suffered

economic injury to their business or property and deprivation of the benefit of free and fair competition.

48.    Plaintiffs NCPA and PARD have standing, including associational standing, to bring this suit to pursue injunctive relief because (1) their member pharmacies would otherwise have standing to sue in their own right; (2) the interests that Plaintiffs NCPA and PARD seek to protect are germane to their purpose as pharmacy associations that advocate in favor of the rights and interests of independent community pharmacies; and (3) neither the claims asserted nor the injunctive relief requested requires the participation of NCPA's or PARD's individual members.

49.    NCPA has standing to sue for injunctive relief on behalf of its members because its members, including Keaveny Drug, SDDDC LLC, OneroRx, Northern Arizona Pharmacy, and AHF have been injured by the ISP Scheme, and would therefore have standing to sue in their own right. Members of NCPA have been injured in the same manner as Keaveny Drug, SDDDC LLC, OneroRx, Northern Arizona Pharmacy, and AHF were by Defendants' ISP Scheme and have a sufficient nexus to the injury inflicted by Defendants. There is no conflict between the needs and interests of the members within the organization. The relief requested, if granted, would inure to the benefit of all members of NCPA who were injured. Thus, no individual NCPA member needs to participate as a party.

50.    NCPA was founded in 1898 for the purposes of promoting and protecting the growth and prosperity of independent pharmacies nationwide. In that effort, NCPA provides business education to its members via online webinars, workshops, and conventions about issues impacting independent pharmacies. NCPA maintains a legal center and legislative action center which, amongst other things, works to respond to or advocate for nationwide legislation that may impact independent pharmacies, including but not limited to legislation impacting how Pharmacy

Benefit Managers operations impact independent pharmacies. Preventing Defendants from continuing the ISP Scheme is germane to NCPA's purpose of protecting the interests of its members and advancing their ability to continue operating as independent pharmacies in a fair and competitive marketplace. The board/members of the NCPA approved the filing of this action.

51.     PARD has standing to bring this suit for injunctive relief on behalf of its members because its members have been injured by the ISP Scheme, and would therefore have standing to sue in their own right. Members of PARD have been injured in the same manner by Defendants' ISP Scheme and have a sufficient nexus to the injury inflicted by Defendants. There is no conflict between the needs and interests of the members within the organization. The relief requested, if granted, would inure to the benefit of all members of PARD who were injured. Thus, no individual PARD member needs to participate as a party.

52.     PARD was first formed in 1989 by twenty pharmacists. In 1901, PARD was officially chartered and incorporated for the purpose of advancing the interests of pharmacies through advocacy and legislation. PARD continues its work to contribute to the survival and growth of independent pharmacies. Preventing Defendants from continuing the ISP Scheme is germane to PARD's purpose of protecting the interests of its members and advancing their ability to continue operating as independent pharmacies in a fair and competitive marketplace. The Board of Directors of PARD approved the filing of this action.

**B.     GoodRx Defendants**

53.     Defendant **GoodRx, Inc.** is a Delaware corporation with its principal office or place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. It is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which is a wholly owned subsidiary of GoodRx Holdings, Inc. GoodRx, Inc. processes 2.5% of all prescription drug claims in the United States. GoodRx, Inc. transacts or has transacted business in this District and

throughout the United States. ██████████████████████████████████████████

██████████████████

54.     Defendant **GoodRx Holdings, Inc.** is a Delaware corporation with its principal office or place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. GoodRx Holdings, Inc. transacts or has transacted business in this District and throughout the United States. GoodRx Holdings informs, shapes, creates, and implements company policies that are national in scope and reach all states and jurisdictions. GoodRx Holdings is directly involved in negotiations with the PBM Defendants and coordinates with all entities in the GoodRx ISP Scheme.

**C.     PBM Defendants**

55.     At least four PBMs have participated as co-conspirators with GoodRx in the offenses alleged, having performed acts and made statements in furtherance of the conspiracy. They include Caremark, Express Scripts, MedImpact, and Navitus. Collectively, these PBMs manage 64% of all prescription claims made annually, meaning they control 64% of the national PBM Services Market.

56.     Defendant **CaremarkPCS Health, L.L.C.** is a Delaware limited liability company with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island, 02895. It is a wholly owned subsidiary of CVS Health Corporation. CaremarkPCS Health is the largest PBM in the nation, holding roughly 34% of the U.S. PBM Services Market. It manages prescription benefits accessed by more than 100 million Americans, representing nearly one-third of all lives covered by insurance ("covered lives"), and 30% of the entire U.S. population. ████████████

████████████████████████████████████████████████████████████████████████

██████████████████

57.    Defendant **Caremark, L.L.C.** is a California limited liability company with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island, 02895. It is a wholly owned subsidiary of CVS Health Corporation. ███████████████████

████████████████████████████████████████

█████████████████████████

58.    Defendant **CaremarkPCS, L.L.C.** is a Delaware limited liability company with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island, 02895. It is a wholly owned subsidiary of CVS Health Corporation. ████████████████

████████████████████████████████████████

██████████████████████████

59.    Defendants CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; and CaremarkPCS, L.L.C. are collectively referred to herein as "**Caremark**" or "**CVS Caremark**."

60.    Defendant **CVS Health Corporation ("CVS")** is a Delaware corporation with its principal place of business located at 1 CVS Drive, Woonsocket, Rhode Island, 02895. It is the parent company of CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; and CaremarkPCS, L.L.C., which are collectively referred to as "CVS Caremark." CVS Health Corporation, a publicly-traded health care company, also owns and operates the nation's largest retail pharmacy chain, CVS Pharmacy, with over 9,000 retail locations, as well as the nation's third-largest health insurer, Aetna. CVS Caremark is the pharmacy benefit management subsidiary of CVS Health Corporation, and CVS Health Corporation has direct oversight of CVS Caremark and the PBM services that are the subject of this litigation. Indeed, CVS recently publicly announced that its Group president is responsible for "operational performance and integrated value creation across

CVS Caremark."[12] CVS Health's health services segment, which includes Caremark, was responsible for over half of CVS Health's total revenue in 2023.[13] CVS informs, shapes, creates, and implements company policies that are national in scope and reach all states and jurisdictions. CVS is directly involved in negotiations with GoodRx and coordinates with all entities in the GoodRx ISP Scheme.

61.    Defendant **Express Scripts, Inc. ("Express Scripts")** is a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121. It is a wholly owned subsidiary of Express Scripts Holding Company. Express Scripts holds a 23% share of the market for prescription drug claim reimbursements, measured by the total equivalent prescription claims managed in 2023. ███████████████████████████████████ ████████████████████████████ and Pharmacy Provider Agreements with Plaintiffs, members of the Class, and/or PSAOs on class members' behalf regarding reimbursement rates for generic drugs.

62.    Defendant **Express Scripts Holding Company** is a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121. It is the parent company of Express Scripts, Inc. Express Scripts Holding Company informs, shapes, creates, and implements company policies that are national in scope and reach all states and jurisdictions. It is directly involved in negotiations with GoodRx and coordinates with all entities in the GoodRx ISP Scheme.

63.    Defendant **The Cigna Group ("Cigna")** is a Delaware corporation with its principal place of business located at 900 Cottage Grove Road, Bloomfield, Connecticut, 06002.

---

[12] *CVS Health Announces Leadership Appointments*, CVS HEALTH (Nov. 6, 2024), https://www.cvshealth.com/news/company-news/announcing-leadership-appointments.html.

[13] Denise Myshko, *CVS's Health Services Revenue Grew to $186.8 Billion*, MANAGED HEALTHCARE EXEC. (Feb. 8, 2024), https://www.managedhealthcareexecutive.com/view/cvs-s-health-services-revenue-grew-to-186-8-billion.

Cigna is a publicly traded health services enterprise that operates a nationwide pharmacy benefit management business. It is the parent company of Express Scripts Holding Company. On December 20, 2018, Cigna acquired Express Scripts.[14] Other subsidiaries of Cigna include Cigna Healthcare, the nation's seventh-largest health insurer, and Evernorth Health Services, which operates a mail-order pharmacy, a specialty pharmacy, and a specialty drug distributor. Cigna's prescription drugs are dispensed through retail pharmacy networks, home delivery, and specialty pharmacies.[15] Cigna informs, shapes, creates, and implements company policies that are national in scope and reach all states and jurisdictions. Cigna is directly involved in negotiations with GoodRx and coordinates with all entities in the GoodRx ISP Scheme.

64.     It is clear, based on Cigna's SEC filings, including its 10-K Annual Reports, that Cigna performs functions that are the basis of Plaintiffs' price-fixing allegations. For example, Cigna states that its subsidiary, Evernorth Health Services, "includes our Pharmacy Benefit Services and Specialty and Care Services operating segments."[16] These operating segments perform core pharmacy benefit management functions that support the ISP Program challenged in this litigation.[17] These affiliates are also responsible for negotiating drug prices, including rebates and other discounts, with drug manufacturers. In doing so, they obtain a wealth of information regarding claims and pricing data that may be used in real time pricing algorithms to the detriment of Plaintiffs and the Class.

---

[14] Cigna, Annual Report (Form 10-K) at 57 (Feb. 25, 2021).

[15] *Evernorth Health Services*, THE CIGNA GROUP, https://www.thecignagroup.com/our-capabilities/evernorth-health-services (last visited Dec. 15, 2025).

[16] Cigna, Annual Report (Form 10-K) at 1 (Feb. 27, 2025).

[17] *The Cigna Group Reports Strong Third Quarter 2025 Results, Reaffirms 2025 Adjusted EPS Outlook*, THE CIGNA GROUP (Oct. 30, 2025), https://newsroom.thecignagroup.com/2025-10-30-The-Cigna-Group-Reports-Strong-Third-Quarter-2025-Results,-Reaffirms-2025-Adjusted-EPS-Outlook; *Evernorth Health Services*, THE CIGNA GROUP, https://www.thecignagroup.com/our-capabilities/evernorth-health-services (last visited Dec. 8, 2025).

65.    Furthermore, Cigna states that through its pharmacy benefit segment it "adjudicate[s] drug claims from retail network participants and provide[s] retail pharmacy network administration, benefit design consultation, drug utilization review, drug formulary management and other services."[18] Indeed, according to Cigna, it's pharmacy technology platform allows it to "adjudicate over two billion adjusted prescriptions annually."[19] This adjudication system is the same or substantially similar system that is used to process the prescriptions that are the subject of the ISP agreements and the price-fixing allegations alleged herein.

66.    Cigna further states that it "negotiate[s] with pharmacies throughout the United States to discount drug prices" and that it manages contracts with "retail network pharmacies."[20] Evernorth Health Services, which includes Cigna's pharmacy benefit services, accounted for approximately 80 percent of The Cigna Group's total consolidated revenue for 2024.[21]

67.    Defendant **MedImpact Healthcare Systems, Inc. ("MedImpact")** is a privately held California corporation with its principal place of business located at 10181 Scripps Gateway Court, San Diego, California, 92131. It is a wholly owned subsidiary of MedImpact Holdings, Inc. Other subsidiaries of MedImpact Holdings include, among others, Birdi, Inc. (a mail-order pharmacy) and Specialty by Birdi, a specialty pharmacy. MedImpact is the largest privately held PBM in the United States. It holds a 5% share of the prescription drug claim reimbursement market, measured by the total equivalent prescription claims managed in 2023, and covers more than 55 million patients, or more than 18% of covered lives. ██████████████████████

████████████████████████████████████████████████████████████████

---

[18] Cigna, Annual Report (Form 10-K) at 4 (Feb. 29, 2024).

[19] Cigna, Annual Report (Form 10-K) at 10 (Feb. 27, 2025).

[20] *Id.* at 3; Cigna, Annual Report (Form 10-K) at 4 (Feb. 29, 2024).

[21] *The Cigna Group Reports Fourth Quarter and Full Year 2024 Results, Establishes 2025 Outlook, and Increases Dividend*, THE CIGNA GROUP (Jan. 30, 2025), https://newsroom.thecignagroup.com/2025-01-30-The-Cigna-Group-Reports-Fourth-Quarter-and-Full-Year-2024-Results,-Establishes-2025-Outlook-and-Increases-Dividend.

███████████████████████████████████████████

████

68.    Defendant **Navitus Health Solutions, LLC ("Navitus")** is a privately held Wisconsin corporation with its principal place of business located at 2601 West Beltline Highway, Suite 600, Madison, Wisconsin, 53713. Navitus is jointly owned by SSM Health Care Corporation, a nonprofit Catholic healthcare system headquartered in St. Louis, Missouri, and Costco Wholesale Corporation, a Washington corporation with its principal place of business located at 999 Lake Drive, Issaquah, Washington, 98027 and the third largest retailer in the world. Costco has over 550 warehouse pharmacy locations in the United States. On information and belief, Navitus holds around 1.7% of the prescription drug claim reimbursement market and manages the prescription benefits of approximately 7 million Americans, or 2.3% of covered lives. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

69.    The PBM Defendants collectively process close to two-thirds of prescription claims processed in the United States each year, and they control pharmacies' access to more than 87% of patients with insurance.

### III.    JURISDICTION AND VENUE

70.    This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiffs seek to enjoin Defendants' anticompetitive conduct and other relief as is afforded under the laws of the United States.

71.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the

aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from that of the Defendants.

72.    This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22). All Defendants have transacted business, maintained substantial contacts with, and/or committed overt acts in furtherance of the illegal conspiracy throughout the United States, including within this District. The conspiracy was aimed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business within the United States, including in this District.

73.    In addition, this Court has personal jurisdiction over Defendants CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; CaremarkPCS, L.L.C.; and CVS Health Corporation because their principal place of business is located in this District; they transact business throughout the United States, including in this District; and they are engaging in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

74.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because Defendants CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; CaremarkPCS, L.L.C.; and CVS Health Corporation maintain business facilities in this district, and all Defendants have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District. No other forum would be more convenient for the parties and witnesses to litigate this case.

75. The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States, including this District.

## IV. FACTUAL BACKGROUND

**A. PBMs: The Powerful Middlemen at the Center of the U.S. Prescription Drug Supply Chain.**

**1. PBMs negotiate with retail pharmacies to secure pricing discounts for health plans.**

76. TPPs, including commercial insurance companies; employers or labor organizations that sponsor health insurance plans; and various public insurance programs, provide prescription drug benefits to their enrolled members.

77. TPPs retain PBMs to perform certain administrative functions. For example, TPPs retain PBMs to:

a) negotiate prices and other contract terms with pharmacies, which dictate, *inter alia*, (1) the price that TPPs and their covered beneficiaries will pay pharmacies for each prescription, and (2) the amount that the PBM will reimburse a pharmacy for the prescription medications dispensed;

b) create a network of retail pharmacies that provide discounts in exchange for access to a TPP's plan participants;

c) process or "adjudicate" pharmacies' claims for reimbursement from TPPs based (in theory) on those contract prices; and

d) negotiate with pharmaceutical manufacturers.

78. Accordingly, PBMs contract with drug manufacturers, health plans, and pharmacies.

79.    Many PBMs contract with independent pharmacies by way of contracts with groups called Pharmacy Services Administrative Organizations (PSAOs). PSAOs act as a collective bargaining group for independent pharmacies and negotiate with PBMs on the pharmacies' behalf. These negotiations include pharmacies' reimbursements rates and dispensing fees. In return, independent pharmacies pay PSAOs a monthly fee. Much like PBMs, PSAOs are a highly consolidated industry—it is estimated that there are fewer than 10 PSAOs operating today.[22] PSAOs serve as yet another middleman in the system, further limiting independent pharmacies' ability to negotiate and bargain with the PBMs.

80.    When an insured patient fills a prescription, the dispensing pharmacy typically collects only a small portion of the cost of the drug from the consumer at the point of sale, usually in the form of a "co-pay" or "co-insurance" contribution.

81.    The PBM then processes the pharmacy's claims for reimbursement, and the TPP (through its Retained PBM) pays the balance of the contracted pharmacy reimbursement rate, which is supposed to cover the ingredient cost and a small dispensing fee.

82.    In connection with each transaction, PBMs also charge pharmacies certain dispensing fees per prescription, including so-called "direct and indirect remuneration fees" ("DIR fees"). DIR fees are on top of other administrative fees charged by PBMs and are often charged retroactively—up to weeks or months after a prescription is dispensed.[23]

---

[22] Avalere Health, *The Role of Pharmacy Services Administrative Organizations for Independent Retail and Small Chain Pharmacies* 4 (Sept. 30, 2021), https://www.hda.org/getmedia/9902c3e9-81ae-422c-b413-d982e995e9d4/The-Role-of-PSAOs-for-Independent-Retail-Small-Chain-Pharmacies.pdf.

[23] H. COMM. ON OVERSIGHT AND ACCOUNTABILITY, THE ROLE OF PHARMACY BENEFIT MANAGERS IN PRESCRIPTION DRUG MARKETS 15 (2024), https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf.

83.     U.S. prescription drug spending reached $722.5 billion in 2023. Of that amount, approximately 85% was paid by TPPs rather than patients. Given this reality, pharmacies rely on reimbursements from TPPs to stay in business.

84.     The following figure shows how funds, products, and services typically move among drug manufacturers, PBMs, health plans, plan sponsors, drug wholesalers, pharmacies, and beneficiaries. This figure does not capture every relevant relationship or entity. It also does not fully depict the vertical integration that exists among these players.

**Conceptual Model of the Flow of Products, Services, and Funds for Non-Specialty Drugs Covered under Private Insurance and Purchased in a Retail Setting.[24]**



### 2.     PBMs compete in the input market for pharmacy services to build pharmacy networks.

85.     To attract and retain TPP clients, PBMs must build networks of retail pharmacies where health plan members can easily and conveniently get their prescriptions filled. Under normal market conditions, PBMs compete with each other to recruit pharmacies into their networks,

---

[24] Neeraj Sood, et al., *The Flow of Money Through the Pharmaceutical Distribution System,* USC SCHAEFFER CTR. FOR HEALTH POL'Y & ECON. 2 (June 6, 2017), https://schaeffer.usc.edu/wp-content/uploads/2024/10/The-Flow-of-Money-Through-the-Pharmaceutical-Distribution-System_Final_Spreadsheet.pdf.

offering inducements such as superior reimbursement rates, increased patient volume, and higher dispensing fees. PBMs are thus horizontal competitors in the input market for Network Pharmacy Services.

86.    A PBM that is unable to attract pharmacies to its network will risk losing clients, as health plans select PBMs based, in part, on the adequacy of their retail pharmacy networks.

87.    Pharmacies evaluate the reimbursement rates and business volumes that PBMs offer in deciding which networks to join. In general, pharmacies will accept lower reimbursement rates from PBMs that represent significantly more patients because those PBMs can offer more future business volume. Smaller PBMs (which represent fewer patients) cannot promise pharmacies as much future business, and thus do not qualify for the same volume discounts. A smaller PBM seeking to attract pharmacies to its network must therefore offer higher reimbursement rates than the larger PBMs, or else suffer competitive harm in the output market for PBM services.

### 3.    PBM reimbursement rates are set forth in network agreements with participating pharmacies.

88.    PBMs' contracts with pharmacies and PSAOs largely dictate the price of prescription drugs and how they can be accessed by hundreds of millions of Americans. Generally, health plan members who have already met their plan's annual deductible pay only a portion of their PBM's pharmacy reimbursement rate as specified by their plan's co-payment or co-insurance schedule; the remainder is paid by their plan.

89.    The rates of reimbursement contracted for between a PBM and its in-network pharmacies are set forth in network agreements. These rates (and many other aspects of these agreements) are confidential and competitively sensitive.

90.      These Contracted Rates are generally expressed not in specific dollar amounts for specific drugs, but as formulas, which are then used to calculate the pharmacy reimbursement rate for a particular prescription. These formulas rely on a set of input factors known as "reference prices."

91.      A typical network agreement will state that the PBM will reimburse the pharmacy the lowest of the following reference prices:

       a)      the Average Wholesale Price ("AWP") minus a discount percentage, plus a dispensing fee;

       b)      the Maximum Allowable Cost ("MAC"), plus a dispensing fee;

       c)      the Ingredient Cost submitted by the Provider, plus a dispensing fee;

       d)      the Usual and Customary Price ("U&C") (i.e., the pharmacy's retail list price); or

       e)      the pharmacy's Submitted Claim Amount.

92.      The first two listed reference prices in the above example are often referred to as "Contracted Rates" as they are typically the most common reference prices in contracts between PBMs and pharmacies (or their PSAOs). Because Contracted Rates are almost always lower than other reference prices, the vast majority of generic prescriptions are reimbursed based on one of the first two reference prices.

93.      The U&C price is the retail or cash price for the drug set unilaterally by the dispensing pharmacy (not a price reflected in an agreement between the pharmacy and PBM). Pharmacies' U&C prices are intended to reflect the amount they would charge to a cash-paying customer without insurance or any discount card. The U&C price is almost never lower than the Contracted Rates, so it is rarely the algorithmically selected reference price.

94.    The Submitted Claim Amount is also not a contracted rate; it's the full reimbursement amount requested from the PBM by the pharmacy, typically based on the U&C price. The Submitted Claim Amount is similarly almost never lower than the Contracted Rates, so it is also rarely the algorithmically selected reference price.

95.    MAC is a commonly used metric designed by PBMs to control drug costs for their TPP clients by establishing an ostensibly fair but competitive unit price at the product level, regardless of supplier. Some sources estimate that roughly 82% of generic prescription purchases are transacted with pharmacies at MAC prices.

96.    PBMs set their own MAC prices, which they keep as part of MAC lists. There is little transparency in how PBMs set their MAC prices, although in theory, the MAC price should account for market realities such as the cost to the pharmacy of acquiring the drug. In general, a PBM is free to change its MAC price lists any time it chooses.

97.    PBMs often maintain hundreds of MAC lists for various pharmacies and update them as frequently as daily or weekly. Because PBM reimbursement rates are defined formulaically—and because MAC prices can be changed by the PBM unilaterally at any time—pharmacies face significant uncertainty regarding how much compensation they will ultimately receive for generic drugs.

98.    Historically, each PBM creates and updates its own proprietary MAC reimbursement lists, which are not publicly disclosed or shared with any outside entities, including third-party payors and pharmacies.[25] As the pharmacy provider manual for one large PBM states: "MAC price lists and/or pricing formulas are [the PBM's] confidential and proprietary information." Similarly, Defendant Navitus requires users of its PBM MAC price to sign a

---

[25] *See* Conn. Gen. Assembly, "Insurance and Real Estate Committee Joint Favorable Report for S.B. 1052," (Mar. 30, 2015) available at https://www.cga.ct.gov/2015/JFR/S/2015SB-01052-R00INS-JFR.html.

nondisclosure agreement.[26] Defendant Cigna's 10-K acknowledges that MAC transparency laws "may require operational changes" at Express Scripts because they require PBMs to disclose "specific information related to MAC pricing to pharmacies."[27] With respect to Express Scripts, GoodRx management has told an industry analyst that GoodRx would pay a marketing fee to Express Scripts in return for helping the company acquire MACs cheaply.[28]

### 4. The PBM industry is highly concentrated.

99.    One of the most critical services that PBMs offer their TPP clients is claims adjudication (also called "claims processing"). This is the process of determining in real time, while a consumer is at the pharmacy counter, (1) whether an individual has prescription drug benefits, (2) whether the drug in question is covered, (3) the total reimbursement rate to be paid to the pharmacy based on existing contracts, and (4) the portion of that pharmacy reimbursement rate that the pharmacy is to collect directly from the consumer.

100.    Although there are estimated to be sixty-six PBMs in the United States, few of them have the technology or infrastructure required to handle real-time claims adjudication. As a result, smaller PBMs function largely as benefits consultants and typically contract with larger PBMs to perform claims adjudication on their behalf. These same few large PBMs are responsible for most pharmacy contract negotiations. This has left the PBM industry highly concentrated when it comes to the key, relevant functions.

101.    The FTC measures PBMs' market share by considering the percentage of all prescription claims managed by each PBM. By the FTC's measure, after decades of mergers and

---

[26] *MAC Non-Disclosure Agreement*, NAVITUS https://pharmacies.navitus.com/Secured-Pages/Nav/Resources/MAC-Program.aspx (last visited Dec. 15, 2025).

[27] Cigna, Annual Report (Form 10-K) at 17 (Feb. 27, 2025).

[28] Adam J. Fein, *Behind the GoodRx-Express Scripts Partnership: How PBMs Profit from Discount Cards in Pharmacy Benefits*, DRUG CHANNELS (Nov. 15, 2022) (last visited Sept. 29, 2025) https://www.drugchannels.net/2022/11/behind-goodrx-express-scripts.html.

acquisitions, the three largest PBMs—Caremark, Express Scripts, and OptumRx (the "Big Three")—now manage nearly 80% of all prescription claims in the United States.[29] If these Big Three PBMs were standalone companies, each would rank among the forty largest companies in the United States by revenue. The Big Three PBMs, together with the next three largest PBMs—Humana Pharmacy Solutions, MedImpact, and Prime Therapeutics—manage roughly 94% of prescription drug claims in the United States. As GoodRx itself states, "There is currently significant concentration in the U.S. healthcare industry and in particular there are a limited number of PBMs, including pharmacies in-house PBMs, and a limited number of national pharmacy chains."[30]

102.    As illustrated in the chart below, Caremark accounts for roughly 34% of all prescriptions filled, followed by Express Scripts at 23%, and Optum Rx at 22%. Humana accounts for 7% of the market, followed by MedImpact at 5%, and Prime at 3%. Navitus controls about 2% of the PBM Services Market.

**Figure 4. PBM Services Shares, 2016-2023**
(% of total equivalent prescription claims managed)

---

[29] FED. TRADE COMM'N, supra note 4, at 5.

[30] GoodRx, Annual Report (Form 10-K) at 12–13 (Feb. 27, 2025).

103.    PBMs use their market power and negotiation leverage to impose low reimbursement rates and other onerous contract terms on unaffiliated (i.e., independent) pharmacies.

**5.    Vertically integrated PBMs steer business to their affiliated pharmacy chains at the expense of independent pharmacies.**

104.    The Big Three PBMs (and many of the smaller ones) are also vertically integrated with other segments of the drug supply chain, including major health insurers and pharmacy chains. For example, CVS Health owns Aetna (the third-largest health insurance company by national market share), Caremark (the largest PBM), CVS Pharmacy (the largest retail pharmacy), and CVS Specialty (the largest specialty drug pharmacy). The Cigna Group owns Cigna Healthcare (the fourth-largest insurer), Express Scripts (the second-largest PBM), and Accredo (the second-largest specialty drug pharmacy).

Figure 1. PBMs: Ownership and Vertical Integration

| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
|---|---|---|---|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | ♥CVS caremark 34% | Express Scripts 23% | Optum Rx 22% | Humana Pharmacy Solutions 7% | MedImpact 5% | PRIME 3% |
| "PBM GPO"/ Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

105.    As a result of PBMs' vertical integration with pharmacy chains, PBMs are incentivized to steer patients to their own affiliated pharmacies, even when it's not in the best interest of their TPP clients or those clients' members. One way that PBMs give preference to their affiliated pharmacies is by creating "preferred" pharmacy networks which prioritize their vertically integrated pharmacies. They then relegate independent and unaffiliated pharmacies to a less preferred status within their networks, requiring patients to shoulder higher co-pays to fill their prescriptions there.

106.    PBMs can also pay their own affiliated pharmacies higher reimbursement rates than unaffiliated ones, lining their pockets at the expense of payors and patients. In 2022, commercial health plans reimbursed affiliated pharmacies roughly 80%–90% more than unaffiliated pharmacies for two cancer drugs studied by the Federal Trade Commission (generic Zytiga and generic Gleevac). A June 2024 study prepared for the Washington State Pharmacy Association also documented substantially higher reimbursement rates for generic drugs filled by PBM-affiliated mail-order pharmacies than by unaffiliated pharmacies.[31]

### 6.    PBMs have decimated independent pharmacies, depriving Americans across the nation of pharmacy access.

107.    An independent pharmacy is a retail pharmacy that is not directly affiliated with any chain of pharmacies and is not owned by a publicly traded company. Many independent pharmacies are pharmacist-owned. These pharmacies often offer specialized services such as custom compound prescriptions, medication therapy management, and home delivery.

108.    Independent pharmacies are essential healthcare providers. This is particularly true in communities with elderly populations, limited transportation options, or language barriers where

---

[31] Kat Goodner, *Groundbreaking PBM Study – Results Released!*, WASH. STATE PHARMACY ASS'N (WSPA) (June 25, 2024), https://www.wsparx.org/news/672954/Groundbreaking-PBM-Study---Results-Released.htm.

personalized care is crucial. In rural and medically underserved communities, independent pharmacies are often the sole provider of medication counseling and management as well as the main source for immunizations and rescue medications like EpiPens for allergic reactions.

109.    Until the 1980s, independent pharmacies were the norm in the United States, with just under 40,000 such establishments spread across the country. Since 1980, the number of independent pharmacies has plummeted by nearly 50%.[32]

110.    PBMs have played a primary role in the demise of independent pharmacies. As described above, industry consolidation has given the few largest PBMs enormous leverage over independent pharmacies. PBMs use their market power to demand massive discounts from independent pharmacies, steering business to their affiliated pharmacies instead. The buying power of PBMs has been further magnified by their vertical integration with health insurers and pharmacies, including retail, mail-order, and specialty pharmacies.

111.    In many instances, independent pharmacies have been replaced by chain pharmacies, the biggest of which is CVS. CVS entered the pharmacy business over 50 years ago but saw its biggest period of growth after it merged with its affiliated PBM, Caremark, in 2007. Between 2013 to 2022, the number of CVS-owned retail pharmacies increased by 28%—from about 7,600 locations to over 9,700 locations. During the same time period, other retail pharmacies declined by 7% overall (from roughly 55,200 locations to 51,400 locations) and by 10% within rural areas (from about 11,100 to 10,000).[33]

---

[32] Brian Nightengal, *What Was, Is No More: Community Pharmacy Economics*, 26 J. OF MANAGED CARE & SPECIALTY PHARMACY 6, 703 (June 2020), https://www.jmcp.org/doi/epdf/10.18553/jmcp.2020.26.6.703.

[33] Kerry Dooley Young, *Pharmacy benefit managers: What journalists need to know about the prescription drug middleman industry,* THE JOURNALIST'S RESOURCE (Dec. 6, 2024), https://journalistsresource.org/home/pharmacy-benefit-managers-what-journalists-need-to-know-about-the-prescription-drug-middleman-industry/.

112.    Vertically integrated PBMs like Caremark use their market power and negotiation leverage to impose low reimbursement rates and other onerous contract terms on independent pharmacies, whom they view as "competitors" of their affiliated CVS drug stores. Today, reimbursement rates for independent pharmacies are so low that on an estimated 30%–40% of prescriptions, the pharmacy loses money. Pharmacies thus depend upon receiving Contracted Rates on the higher end of the distribution for a majority of the prescriptions they fill to compensate for losses on other drugs with Contracted Rates that are below the pharmacy's cost.

113.    These financial losses are further compounded by various additional fees PBMs impose on independent pharmacies after drug claims are processed and paid—including so-called DIR fees, which are collected after the point of sale, ostensibly for the "benefit" of using PBMs' claims processing services. Independent pharmacies are forced to pay these fees and accept increasingly unfavorable and arbitrary terms from the major PBMs because, if they opt out of PBM contracts, they will lose the ability to do business with the more than 60% of the covered lives that the major PBMs represent.

114.    Such tactics have caused, and continue to cause, thousands of independent pharmacies to go out of business. Closures of local pharmacies affect not only small business owners and their employees, but also their communities and patients. In many rural and medically underserved urban areas, independent pharmacies are the primary healthcare option for Americans, who depend on them for preventative, routine, and lifesaving health care, including to get flu shots, EpiPens, and vaccines.

115.    In 2014, researcher Dima M. Qato and colleagues coined the term "pharmacy deserts" to describe geographic areas where residents lack adequate and convenient access to prescription medications and pharmacy services. Such pharmacy deserts are depicted below.



**Newly Created Deserts**

Nearly 800 ZIP codes that had at least one pharmacy in 2015 now have none.

Notes: The data reflect closings of both chain and independent pharmacies. The map compares deserts on July 31, 2015, with deserts on Sept. 30, 2024. The Census Bureau tracks more than 33,000 ZIP codes. · Source: Luke Slindee analysis of pharmacy data · By Karl Russell

116.    According to *The New York Times*, nearly 800 ZIP codes that had at least one pharmacy in 2015 now lack a single operating pharmacy.[34] Research conducted by GoodRx itself underscores the accelerating severity of this issue: in 2021, over 41 million Americans resided in pharmacy deserts, defined as locations where individuals must drive more than 15 minutes to reach the nearest pharmacy. By 2025, GoodRx reported that number had risen to more than 48 million, an alarming increase of over 17% within just four years, a rate surpassing overall population growth.[35] Today, more than 46% of U.S. counties have become pharmacy deserts. Far from mitigating this trend, GoodRx's partnership with the major PBMs actively contributes to the

---

[34] Reed Abelson & Rebecca Robbins, *The Powerful Companies Driving Local Drugstores Out of Business*, N.Y. TIMES (Oct. 19, 2024), https://www.nytimes.com/2024/10/19/business/drugstores-closing-pbm-pharmacy.html.

[35] Tori Marsh, *48.4 Million Americans Lack Adequate Access to a Pharmacy*, GOODRX (Mar. 20, 2025), https://www.goodrx.com/healthcare-access/research/many-americans-lack-convenient-access-to-pharmacies.

proliferation of pharmacy deserts, leaving millions of Americans without convenient or equitable access to essential healthcare.

117.    The loss of independent pharmacies has hit rural America particularly hard. Between 2013 and 2022, about 10% of independent retail pharmacies in rural America closed. Today, over 2.4 million rural residents live in pharmacy deserts.

118.    Pharmacy deserts are also now common in U.S. cities, with one study showing that a third of all neighborhoods in major U.S. cities have become pharmacy deserts. Urban communities that are predominantly Black and Hispanic are most likely to suffer from lack of pharmacy access.

119.    Limited access to pharmacies leads to patient non-adherence to medication regimens, resulting in poor health outcomes and higher medical costs along with increased hospitalizations and emergency department visits. Non-adherence contributes significantly to healthcare system waste in the United States, with approximately $100 to $300 billion spent annually on avoidable health care costs due to non-adherence.

**7.    PBMs drive up retail drug prices.**

120.    While PBMs claim to reduce prescription drug costs, their "negotiating" tactics with pharmacies systemically inflate retail drug prices for consumers while driving down revenue at independent pharmacies.

121.    In particular, and as noted above, most network agreements between PBMs and pharmacies include provisions giving PBMs the right to pay pharmacies the "lesser of" various reference prices, including (a) the Contracted Rate for each dispensed drug (which, for generics, is often based on a variable MAC price set unilaterally by the PBM ) or (b) the U&C rate (the price the pharmacy charges cash-paying customers for each drug). Because these "lesser of" provisions

40

protect PBMs from being charged more than other kinds of buyers by pharmacies—namely, cash-paying customers—they are considered "most-favored nation" provisions or "MFNs."

122.    Pharmacies have unilateral control over their U&C rates, but no control over PBMs' MAC prices, which are almost always lower. However, given the variability and opacity of MAC pricing, pharmacies often do not have any idea what reimbursement rate they'll receive when they dispense a particular drug. Thus, independent pharmacies—which operate on razor thin margins—are incentivized to set their U&C prices high for *all* drugs to blunt the impact of MAC variability and ensure they will obtain at least the Contracted Rates from PBMs in connection with all prescriptions dispensed to insured patients (the majority of their customers).

123.    High U&C prices mean high costs for any consumers who purchase their medications out-of-pocket. PBMs' agreements with pharmacies deter pharmacies from giving special discounts to uninsured, cash-paying consumers on an ad hoc basis (as physicians often do), either because PBMs' agreements with pharmacies flatly forbid discounts, or because PBMs could then use these discounted rates as the pharmacy's U&C price when they perform their "lesser of" reimbursement rate calculations.

124.    The result is that PBMs' market power and "negotiation" tactics vis-à-vis pharmacies have caused the U&C price of all drugs to inflate, to the detriment of all consumers, and uninsured consumers in particular.

**B.    The Emergence of Prescription Drug Discount Programs.**

**1.    Pharmacy savings clubs.**

125.    In the 1990s, some pharmacy chains created subscription-based "savings clubs" to help uninsured customers deal with the high U&C prices that had been necessitated by PBM pricing practices. Dues-paying club members would receive discounts off the pharmacy's U&C

prices, so long as they paid for the whole cost of the drug themselves (rather than utilizing any insurance benefits).

126.    Pharmacy savings clubs helped patients afford the medications they needed and enabled pharmacies to tap into revenues from consumers who were willing to pay cash for prescription drugs (particularly generics) but were unwilling or unable to cover inflated U&C prices. Customers who pay cash for drugs—either because they do not have insurance or because they've elected not to use their benefits on a given transaction—are known as "direct-pay" (or "cash-pay") customers. As health plans with high deductibles (as well as high co-pays) became more prevalent, the number of direct-pay customers grew as a potential revenue stream.

127.    Pharmacy savings clubs allowed pharmacies to reach direct-pay customers on their own terms, as each pharmacy could set its own discount rates and eligibility requirements, and for their own benefit, as club proceeds did not have to be shared with PBMs or any other third-party intermediaries. These clubs also enabled pharmacies to build customer loyalty, as members would typically continue to frequent the pharmacy even after obtaining insurance.

### 2.    PBM discount cards.

128.    In the early 2000s, some PBMs launched their own discount card programs to compete with pharmacy savings clubs for direct-pay business, including the CVS Health Savings Pass, the Citizens Health Card (administered by Express Scripts), and the Advance-PCS Prescription Plan (which was acquired by Caremark). These PBM-sponsored initiatives offered external discount cards which consumers could present at pharmacies. Pharmacies that accepted these cards agreed to honor the discounts offered by the sponsoring PBM and pay a remittance to the PBM for directing the sale their way. Such remittances reflected a difference—or "spread"— between (a) what the payor (*i.e.*, the patient) paid for the prescription, and (b) the net sums that the pharmacy earned for dispensing the drugs.

129.    Initially, only larger pharmacies accepted PBM discount cards because, after honoring the discounts and sharing a portion of the proceeds with the PBM, pharmacies made little to no money on these transactions. But as the prevalence of cash paying customers grew, more and more PBMs wanted to tap into those sales. These discount cards allowed more PBMs to gain access to the growing direct-pay, "business to consumer" (B2C) revenue stream, a revenue stream that would otherwise be captured by pharmacies. Eventually, most PBMs began requiring in-network pharmacies to accept their discount cards.

130.    Discount cards also allowed PBMs to keep drug costs down for their TPP clients, who benefitted when members elected not to use their prescription drug benefits (i.e., where the TPP pays some or most of the drug cost) and instead paid cash using a discount card. When a traditional B2C discount card is used to purchase medications, the TPP doesn't have to pay anything. Drug costs are covered entirely by the patient, on an out-of-pocket basis, and their spending on the transaction typically does not count towards the patient's deductible.

131.    PBM discount cards competed directly with pharmacy savings clubs for direct-pay customers. But eventually, PBMs and the TPPs they served set out to eliminate the competition posed by pharmacy-sponsored clubs. Over the last decade, TPPs or their members brought several lawsuits against pharmacies that operated discount clubs, claiming that the discounts offered to club members could be treated as pharmacies' U&C prices (meaning they could be factored into PBMs' "lesser of" reimbursement calculations). By 2016, such litigation had largely eliminated pharmacy savings clubs.

### 3.    GoodRx: A discount platform that aggregates PBM rates.

132.    In 2011, GoodRx, then a start-up, launched a new kind of B2C discount card program. Whereas other discount cards were sponsored by a single PBM and reflected only the

discounts offered by that PBM, GoodRx's model was to aggregate discount rates from a variety
of PBMs and market the lowest prices to potential direct-pay consumers.

133.    GoodRx's traditional B2C discount card model took advantage of the variability in
the pricing of drugs in the United States. Drug prices are the product of contractual relationships
with PBMs and pharmacies, but these prices (such as MAC prices) may be, in effect, unilaterally
established by PBMs. These Contracted Rates can differ dramatically across PBMs, with generic
medications subject to the most price fluctuation because of the variable and non-transparent
nature of MAC prices. Contracted Rates can also differ across pharmacies, with larger pharmacy
chains (which have more market power) demanding higher pharmacy reimbursement rates from
PBMs (although more recently, many large pharmacy chains have become corporate affiliates of
the largest PBMs). Depending on the rates PBMs have with particular pharmacies, two consumers
might pay wildly different prices for identical prescriptions in the same geographic area. The
upshot of all this variation is that consumers, through GoodRx, could potentially reduce their
prescription costs by paying the entire cost—at a discounted rate contracted for by another PBM—
out-of-pocket.

134.    GoodRx's B2C discount card program provides consumers the ability to engage in
this kind of rate-comparison shopping. GoodRx partners with over a dozen PBMs to aggregate
information on pharmacy reimbursement rates. These PBMs (which include the four PBM
Defendants) collectively control over 95% of all prescription drug claims. Each of GoodRx's
partner PBMs agrees to share its Contracted Rates with GoodRx, which are competitively sensitive
and subject to contractual confidentiality provisions.

135.    GoodRx has recognized the value of these PBM partnerships, stating that "[a]s we
have agreements with PBMs to market their negotiated rates through our platform, our ability to

44

present discounted prices is in part dependent upon the arrangements that such PBMs have negotiated with pharmacies and upon the resulting availability and allocation of discounts for medications subject to these arrangements."[36] GoodRx further recognized the financial value gained as a result of these partnerships, as its "three largest PBM partners accounted for 32% of [its] revenue in 2023, 31% of [its] revenue in 2022, and 34% of [its] revenue in 2021."[37] Indeed, Express Scripts alone accounted for more than 10% of GoodRx's revenue in 2021, 2022,[38] and 2023. And Navitus accounted for more than 10% of GoodRx's revenue in 2021.[39]

136.    GoodRx "aggregates" and "normalizes" all this PBM data—which the company claims amounts to "over 150 billion prescription pricing data points every day." It then uses its patented algorithm to determine the lowest available price on any given date for a particular drug in a particular geographic area. Through GoodRx's "price comparison platform," the company presents users with "curated, geographically relevant prescription pricing" selected by GoodRx's algorithm from among the "negotiated rate[s] provided by one of [GoodRx's] PBM partners." Once a user has selected the lowest rate for their prescription available at their preferred local pharmacy, GoodRx displays a "GoodRx code" to the user on its mobile app or website interface. This code reflects "the most favorable prices at the pharmacies based on user locations" (i.e., the "GoodRx Rate"), as illustrated in the screen captures below.

---

[36] GoodRx, Annual Report (Form 10-K) (Feb. 29, 2024).

[37] *Id.*

[38] GoodRx, Annual Report (Form 10-K) (Mar. 1, 2023).

[39] *Id.*



137.    Consumers can take advantage of the GoodRx Rate by presenting the GoodRx
discount card at participating pharmacies. But they must be willing to pay cash to fill their
prescriptions, without using any insurance benefits they might have. As GoodRx's website states:
"You can use a GoodRx discount instead of your prescription insurance or Medicare if the cost is

lower. However, GoodRx cannot be combined with your insurance . . . ,"[40] acknowledging that it competes with PBMs for prescription drug transactions, even though it often calls them "partners." GoodRx has stated that it competes with companies that provide savings off of list prices on prescription drugs. This includes the PBM Defendants because, as GoodRx has admitted to investors, "nearly all PBMs also have consumer direct or cash network pricing that they negotiated with pharmacies for patients who choose to purchase prescriptions outside of insurance."

138.    For direct-pay customers using the GoodRx discount card, the Leveraged PBM collects a per-prescription processing fee from the pharmacy whenever a customer buys a drug using the card and pays the price set by the Leveraged PBM. Per its agreement with GoodRx, that PBM then shares a cut of those fees with GoodRx, either as a fixed fee or a percentage of the fee paid by the pharmacy to the PBM. As GoodRx's 10-K discloses, the majority of GoodRx's contracts with PBMs feature a "percentage of fee arrangement, where fees are a percentage of the fees that PBMs charge to pharmacies[.]"[41]

139.    As a result, the more volume that goes through the GoodRx platform, the more revenue GoodRx generates. In fact, the "majority of [GoodRx's] revenue" comes from prescription transactions.[42] This is because, "[w]hen a consumer uses a GoodRx code to fill a prescription and saves money compared to the list price at that pharmacy, [GoodRx] receive[s] fees from [its] partners, including PBMs, pharma manufacturers and pharmacies, as applicable."[43] GoodRx claims to obtain, on average, a "15-16%" cut of the overall drug price. The revenue from these transactions, the majority of which is generated from "consumer transactions at brick-and-mortar

---

[40] *See* GoodRx, https://www.goodrx.com/insurance-and-goodrx (last visited Sept. 15, 2025).
[41] GoodRx Annual Report (Form 10-K) at 21 (Feb. 27, 2025).
[42] *Id.* at 19.
[43] *Id.*

pharmacies," was "73%, 72%, and 80% of [GoodRx's] revenue for the years ended December 31, 2023, 2022, and 2021, respectively."[44] Put simply, GoodRx prescription transactions revenue is "primarily generated from PBMs, or customers, when a prescription is filled with the Company's code provided through the Company's platform." This revenue is substantial.

140.    Indeed, GoodRx's business model proved wildly profitable. In 2023, its gross profit margin was 77.33%. In 2019 alone, GoodRx collected $364 million in fees on $2.5 billion in consumer prescription drug spending through its platform, a 15% commission. For the year ending on December 31, 2023, GoodRx's prescription transactions revenue was $550.7 million, the majority of which is related to revenue generated from PBMs. And in the first three months of 2024, GoodRx brought in over $145 million in prescription transactions revenue.

## V.    THE GOODRX ISP SCHEME

141.    This action does not challenge GoodRx's traditional discount card business, but rather the ISP initiative launched by GoodRx as part of an anticompetitive scheme with the PBM Defendants. As detailed below, the ISP Scheme makes large amounts of competitively sensitive information available to competitor PBMs who participate in the scheme and have agreed to allow GoodRx to set reimbursement rates for them based on this competitively sensitive information.

142.    GoodRx has amassed and continues to amass, in its own words, "the largest database of aggregated pricing information across PBMs in the United States." This includes PBMs' Contracted Rates of reimbursements for generic drugs, competitively sensitive information made available through the GoodRx Information-Exchange Network. The origins and nature of the ISP Scheme are described below.

---

[44] GoodRx, Annual Report (Form 10-K) at 20 (Feb. 29, 2024).

**A.     The Origins of the Scheme: GoodRx's Discount Card Empire Begins to Crumble.**

143.     By 2019, GoodRx had grown into a highly lucrative company, vaunted for its innovation. When the company went public in 2020, it was valued at nearly $18 billion, more than six times the valuation it had commanded during its last private fundraising only a few years prior.

144.     Much of this success stemmed from GoodRx's popularity with insured consumers. But these individuals were not the company's intended customer base. When GoodRx launched in 2011, it marketed itself as a program for uninsured consumers who must pay inflated U&C prices. GoodRx claimed to provide this economically vulnerable pool of customers with a way to access discounted rates similar to those made available to insured consumers—at no cost to the consumer. And it claimed to offer pharmacies a way to bring in new business from uninsured consumers who might not otherwise purchase any medications at all due to cost.

145.     But over time, however, many insured consumers began to flock to GoodRx as well. This was largely a function of increases in out-of-pocket costs for insured consumers, as insurers and PBMs began to shift more of the costs of prescription drugs onto patients in the form of higher co-pay, co-insurance, and deductible amounts. Increasingly, insured individuals realized it was often cheaper to pay cash for medications at the GoodRx Rate than it was to use their plan benefits once the required out-of-pocket contributions were factored in. This was particularly true for high-deductible plan members, who must pay the full cost of their prescription drugs until their annual deductibles are met.

146.     The influx of business from insured customers benefitted GoodRx's bottom line tremendously. But behind the scenes, GoodRx's increasing popularity among insured consumers was sowing the seeds of a looming crisis. GoodRx's discount card business depended on large numbers of retail pharmacies voluntarily accepting the GoodRx discount card. Yet pharmacies

often lose money on GoodRx discount card transactions after paying the required fees to the Leveraged PBM.

147.    In the early days of GoodRx, pharmacies were willing to absorb these losses to help uninsured patients (a relatively small pool of consumers) and to bring in new customers. But this goodwill was premised on the proportion of drug sales using the GoodRx discount card being relatively low, and users of the GoodRx card being mostly uninsured patients who otherwise might not purchase any medicines at all. After large numbers of insured patients began using GoodRx, the benefit of accepting the card for most pharmacies evaporated: each time an insured patient uses a GoodRx discount card, the pharmacy does not bring a new customer through the door; it simply loses money on a sale it likely would have made anyway. Since 2016, over 80% of GoodRx's prescription transactions have consisted of repeat purchases by an existing GoodRx consumer.[45]

148.    As GoodRx's user base tilted towards insured patients, pharmacies' willingness to accept the GoodRx card waned, and many pharmacies began opting out of accepting the GoodRx discount card altogether. This problem reached a tipping point in 2022, when Kroger—which accounted for a huge share of GoodRx's business—announced it would no longer accept the GoodRx card. This decision by Kroger, which GoodRx described as its "grocer issue" had a "material adverse impact on [GoodRx's] prescription transactions revenue and Monthly Active Consumers."[46] The loss of Kroger caused GoodRx's stock value to plummet by more than 25% overnight.

149.    GoodRx's increasing popularity with insured patients also brought unwanted regulatory scrutiny to the PBM industry, posing another threat to the company's long-term

---

[45] GoodRx, Registration Statement (Form S-1/A) (Sept. 14, 2020).
[46] GoodRx, Quarterly Report (Form 10-Q) (Nov. 9, 2023).

viability. The fact that so many insured patients found it cheaper to use the GoodRx discount card than their own insurance plans undermined the narrative that PBMs offered a valuable service to health plans and patients. After all, why allow PBMs to manage prescription drug benefits at all—extracting billions of dollars in the process—if they do not help make drugs more affordable? Indeed, "PBMs have recognized that discount cards undermine the perceived value of pharmacy benefit management. Why pay thousands for 'insurance' when better prices are available to anyone with a smartphone?"[47]

150.    Financial tensions also arose between GoodRx and its partner PBMs. Early in the history of pharmacy discount cards, many of GoodRx's partner PBMs also competed with GoodRx through the PBMs' own discount cards. But as GoodRx's market share grew, it was able to insert onerous contractual provisions into its agreements with partner PBMs that were intended to (in GoodRx's own words) "restrict the ability of PBMs to compete with [GoodRx] and solicit [its] consumers" through those PBMs' rival discount cards.

151.    Then, as even more transactions were being paid for using GoodRx's discount card rather than the patients' plan benefits or competing discount cards, GoodRx sought to extract higher fees from the PBMs whose rates were being leveraged. But many PBMs balked at the prospect of paying even more money under restrictive contract terms to a company that merely aggregates the PBMs' own Contracted Rates—and which would disappear overnight if PBMs decided to stop sharing their payment data. Some PBMs threatened to leave the GoodRx ecosystem altogether.

152.    These issues made increasingly clear to GoodRx executives that the company's original discount card model—which was premised on pharmacies' voluntary acceptance of an

---

[47] *Supra* note 28.

external, consumer-facing discount card—might not be viable long-term. It was also clear that the most successful path would be for GoodRx to bring PBMs into its business model instead of competing against them. This situation set the stage for GoodRx to begin orchestrating the ISP Scheme.

**B.      GoodRx Develops Its "Integrated Savings Program."**

153.    In 2021, less than a year after going public, GoodRx began to lay the groundwork for the ISP Scheme.

154.    On July 7, 2021, GoodRx acquired a technology platform called RxNXT LLC.[48] RxNXT enabled GoodRx to rapidly exchange claims data and reimbursement rates, both considered competitively sensitive information, with PBMs. This new technology would enable GoodRx to execute what it called the "Integrated Savings Program," the program at the heart of this complaint.[49]

155.    Under the ISP, GoodRx's "price comparison technology"—a pricing algorithm and an associated database—"is . . . integrated with" participating PBMs' internal claims processing platforms, so that each PBM's plan members "won't have to do this comparison [of out-of-pocket prescription costs] themselves."[50] Around the same time, GoodRx announced that it was launching a new "B2B2C [i.e., business-to-business-to-consumer] vertical."

156.    As a result of this integration, whenever one of the PBM Defendants' "covered lives" would seek to fill a generic drug prescription using their insurance benefits (i.e., without using the GoodRx discount card), GoodRx's ISP platform would "automatically compare their

---

[48] GoodRx, Annual Report (Form 10-K) (Mar. 1, 2022).

[49] *Investor Presentation*, GOODRX, (Feb. 2025), https://investors.goodrx.com/static-files/f31a5842-9748-4849-9b67-9db94fa6eab7.

[50] Marissa Plescia, *GoodRx, MedImpact Launch Medication Savings Solution*, MEDCITY NEWS (Sept. 14, 2023, 6:47 PM), https://medcitynews.com/2023/09/goodrx-medimpact-launch-medication-savings-solution/.

benefit and the GoodRx price and then deliver the lowest one."[51] If the ISP Rate (i.e., the lowest from any participating PBM) was lower than what the consumer would pay using their own insurance, it would be applied automatically as part of the patient's plan benefit, and the amount spent on the drug applied to the member's deductible. Additionally, GoodRx would receive clawback fees from dispensing pharmacies every time the ISP Rate was leveraged on behalf of a consumer whose prescription would otherwise be processed by a PBM Defendant. The switch from a PBM's Contracted Rate to the ISP Rate was done without the knowledge of either the pharmacy or the patient.

157.    The ISP Scheme was designed to solve GoodRx's growing existential problems in three ways. *First*, it eliminated pharmacies' ability to opt out of transacting with GoodRx, because the GoodRx ISP Rate would be automatically calculated and applied as part of an insured patient's health plan benefits without the need for any external GoodRx card. *Second*, insured patients would no longer have occasion to learn that their PBM had been unable to secure the best drug prices available; they would simply receive the lowest rate of *any* PBM automatically through their health plan. *Third*, the proposal would increase the total number of transactions processed through GoodRx, as its pricing algorithm would be applied to every generic drug transaction filled through benefits administered by any PBM Defendant. Indeed, GoodRx estimates that some 500 to 600 million claims will be subject to the ISP Scheme each year, up from 100 million under its traditional discount card program.

158.    Participating PBMs also stood to gain from GoodRx's ISP Scheme. Smaller PBMs would be able to take advantage of the lower reimbursement rates secured by larger PBMs. And even larger PBMs could take advantage of lower rates from other PBMs. In other words, the lowest

---

[51] *GoodRx and MedImpact Announce Program to Ensure Seamless Access to Affordable Prescriptions*, GOODRX (Sept. 13, 2023), https://investors.goodrx.com/node/9246/pdf.

reimbursement rate of *any* PBM would be the reimbursement rate utilized by *every* PBM. That is good for PBMs, but bad for pharmacies.

159.    Of course, there is one glaring problem with GoodRx's ISP Scheme—it constitutes naked price fixing by horizontal rivals. Instead of competing for pharmacies by outbidding one another's pharmacy reimbursement rates—which would create incentives to raise reimbursement rates and pay pharmacies more—through the ISP Scheme, rival PBMs agree (1) to share real-time competitively sensitive information, including pricing data with one another, using GoodRx as a conduit, and (2) to always utilize the *lowest* rate of *any* PBM in the GoodRx Information-Exchange Network. This is just price-fixing in two steps: anticompetitive sharing of competitively sensitive information among horizontal rivals, followed by their agreement not to outbid and instead utilize the lowest rate any of them has obtained.

160.    The coordination between PBMs, facilitated by GoodRx, would result in an artificially suppressed reimbursement rate for the pharmacies. And the curtailment of competition for pharmacy services among PBMs would drive down all reimbursement rates below competitive levels over time, benefiting all PBMs through their collective monopsony power.

## C.    GoodRx Invites PBMs to Participate in Its ISP Scheme, and They Accept.

161.    Between December 2021, and October 13, 2023, GoodRx announced deals with several PBMs. Pursuant to these deals, a participating PBM would integrate GoodRx's pricing technology into its in-house pharmacy benefit plans by no later than January 1, 2024, and sooner for some PBMs. This was a sudden departure from prior practice, which several competitors undertook on or around the same time, implying coordination. Pursuant to Case Management Order 2, on August 12, 2025, Defendant GoodRx produced the ISP Agreements at issue in this case. Plaintiffs and the Class incorporate by reference these contracts into this Complaint.

### 1.    December 2021: Navitus enters into the first ISP agreement with GoodRx

162.    GoodRx entered into the first of its ISP agreements with PBM Navitus in ███████

███  This agreement, which was rebranded as "Savings Connect" █████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

### 2.    November 2022: Express Scripts joins the GoodRx ISP Scheme.

163.    On November 8, 2022, GoodRx announced the second of its ISP agreements with

the nation's second largest PBM, Express Scripts. ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████[52] Express Scripts refers to its ISP program as "Price Assure."

164.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████

---

[52] *Supra* note 28.

165.     GoodRx co-founder and then co-CEO Trevor Bezdek described the arrangement as

follows:

> Under this innovative program, eligible Express group members will automatically access GoodRx prices as part of their pharmacy benefit. This means an eligible Express Scripts member will have seamless access to GoodRx prices for eligible generic medication in instances where that price is lower than their benefit price. Importantly, this keeps visibility of the eligible members' GoodRx claims within the pharmacy benefit, and it enables out-of-pocket claims [to count toward a] member[']s deductible. . . . We believe this innovative collaboration is a strong validation of . . . the deep trust consumers have in our technology powered by last year's acquisition of RxNXT. Next, this collaboration creates a new distribution channel that we believe expands our market opportunity and represents a way to efficiently gain many incremental users.

166.     ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███

**3.     July to September 2023: Caremark and MedImpact join the ISP Scheme.**

167.     On July 12, 2023, GoodRx announced an identical arrangement ███████████

███ with another of the Big Three PBMs, Caremark, which was set to go into effect January 1,

2024. Caremark's ISP agreement, which it refers to as "Caremark Cost Saver," ███████



███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

168.    On September 13, 2023, GoodRx announced that it had inked the same deal ███████

███████████    with the PBM MedImpact, to go into effect January 1, 2024. ███████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

169.    In its 2023 Annual Report, GoodRx reported:

> Our . . . priority has been to hone our growth plans for our core prescription transactions offering which includes extending the benefit of GoodRx to commercial insurance programs, or 'funded plans'. We've done this through our Integrated Savings Program, or ISP, with PBM partners like CVS Caremark, Express Scripts, MedImpact and Navitus who aggregate demand for our prescription discounts. We are driving real value with payers and their members by seamlessly lowering the cost of their prescriptions automatically at the point of sale. We are quickly becoming a leader in the commercial market for integrated benefits, and while our programs are currently only available to a subset of our partner PBMs' eligible members, these PBMs cover over 60% of eligible U.S. lives so the opportunity could be significant. The early traction on this program is encouraging and we look forward to continuing to ramp it over time by working to add more PBMs and types of prescription transactions to the program.[53]

170.    By lowering the reimbursements actually paid by PBMs to pharmacies, the ISP

Scheme also increased the PBM's "spread," which is the difference between what the PBM

receives from the TPP and the (lower) amount the PBM then pays to the pharmacy for transactions.

---

[53] *2023 Annual* Report, GOODRX, 5 (Mar. 1, 2022). https://investors.goodrx.com/static-files/427043f3-7d5c-4dbb-b3a4-cc6c1457471c (last visited Sept. 15, 2025).

Retaining spreads as profit has been an important revenue stream for PBMs, particularly for the generic drugs at issue. As described above, spread retention has been criticized for raising drug prices and harming pharmacies, leading some state regulators and many TPPs to require PBMs to "pass through" all contracted discounts and fees in full to the TPP, precluding spread retention. The ISP Scheme is an end-run around these contractual and statutory protections, allowing PBMs to benefit from lower net payments to pharmacies without violating pass-through provisions in their contracts with TPPs. That's because, for each prescription that is subject to the ISP Scheme, the fee is collected by GoodRx, which has no contractual relationship to any PBM's TPP client.

171.    GoodRx further incentivized PBMs to participate in the agreement in two ways. *First*, by sharing the conspiracy's profits. GoodRx's ISP agreements with most, if not all, of the PBMs required ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███

### 4.    June 2025: GoodRx launches GoodRx Community Link.

172.    On June 9, 2025, GoodRx announced that it would be launching "GoodRx Community Link," a program that would allow "independent pharmacies to direct contract with GoodRx, manage participation in the company's Integrated Savings Program, and access over 90 brand medication partnership offerings."[54] According to GoodRx, as of July 1, 2025, "all independent pharmacies will be opted out of GoodRx's Integrated Savings Program by default."[55] Pharmacies who choose to directly contract with GoodRx will have the option to opt in to participate in GoodRx's Integrated Programs.[56]

173.    While GoodRx claims that independent pharmacies are automatically opted out of GoodRx's ISP Scheme as of July 1, 2025, they continue to potentially be harmed by the ISP Scheme. The purported automatic opt out applies only to independent pharmacies. This means that PBM-affiliated pharmacies will continue to participate in the anticompetitive ISP Scheme to the detriment of independent pharmacies, who risk losing business to the PBM-affiliated pharmacies. The PBM Defendants will continue to access and utilize competitively sensitive ISP Rates for their own affiliated pharmacies.

174.    Plaintiffs and the Class Members do not know the full impact of the ISP Scheme, nor can Plaintiffs state with certainty that the alleged conduct is no longer taking place. Even assuming, *arguendo*, that the Community Link program stopped the unlawful conduct alleged

---

[54] GoodRx, *GoodRx Launches Community Link to Offer Independent Pharmacies Cost-Plus Pricing*, GOODRX (June 9, 2025), https://investors.goodrx.com/node/10746/pdf.

[55] *Id.*

[56] *Id.*

herein by opting independent pharmacies out of the GoodRx Integrated Savings Program, the full effects of the GoodRx Integrated Savings Program remain to be seen, and the threat of injury remains. As explained above, the Community Link program also incorporates GoodRx's Integrated Programs—the same programs that GoodRx and the PBM Defendants used in connection with the ISP Agreements to the detriment of Plaintiffs and the Class. There is certainly no guarantee or conclusive evidence that suggests that the full impact of the ISP Scheme has ended as a result of the Community Link program.

175.    Furthermore, the timing of the GoodRx Community Link program suggests that it was launched in direct response to this litigation. Absent injunctive relief, the Class Members face the prospect of GoodRx reimposing the ISP Scheme on all pharmacies, including Plaintiffs and the Class Members. Indeed, Defendants' assertions that the GoodRx Integrated Savings Program is procompetitive underscores the need for a court order to stop the unlawful conduct.

## VI.    THE ISP SCHEME AND ITS ANTICOMPETITIVE EFFECTS

176.    The ISP Scheme, which developed as a result of the partnership agreements described above, represents a fundamental change in the way the PBM Defendants and GoodRx operate in the prescription drug market. These ISP agreements amount to a naked price-fixing conspiracy with the intent and effect of eliminating price competition among PBMs, drastically reducing the reimbursements paid to independent pharmacies for dispensing generic drugs. The ISP Scheme also provides a mechanism by which the Defendants can extract fees from pharmacies for filling prescriptions for insured patients—an entirely new source of revenue for the PBM Defendants and GoodRx garnered at the expense of independent pharmacies.

177.    The combination of decreased overall reimbursements and additional fees charged through the ISP Scheme represents a direct transfer of prescription drug dispensing revenue from independent pharmacies to Defendants. This decline in revenue will further contribute to the

financial ruin of independent pharmacies, causing more pharmacies to close, and thereby
negatively impacting the communities and patients they serve.

### A. The ISP Scheme Eliminates Competition by Using Commercially Sensitive Information to Suppress Reimbursement Rates.

178. As described above, prior to the ISP Scheme, a patient could use *either* a GoodRx
discount card *or* their health insurance using their PBM's pharmacy benefit; they could not use
both. If a patient used a GoodRx discount card, they would pay for the prescription entirely out-
of-pocket at the GoodRx discounted rate (which was based on a PBM's discount rate), and the
pharmacy would be charged a fee for the transaction by GoodRx. If a patient used insurance, the
reimbursement rate of the PBM associated with the patient's insurance would be applied to the
transaction, and the patient would pay a co-pay or co-insurance. Thus, under an insurance
transaction, the pharmacy that filled the prescription would receive the expected reimbursement
from the PBM and the patient co-pay.

179. As set forth above, the ISP Scheme changed this process entirely for the PBM
Defendants and eliminated competition for prescription drug transactions that existed between
them and GoodRx. Under the ISP, an insured patient does not choose between using a GoodRx
discount card or their insurance. Instead, the new process, which occurs entirely out of a patient's
view, is as follows: each time an insured patient, whose health plan is affiliated with one of the
PBM Defendants, presents a prescription and their insurance card to a pharmacy, GoodRx's ISP
"price comparison technology"—a pricing algorithm and associated database—automatically
compares the patient's out-of-pocket expense (co-pay or co-insurance) with the prices of one of
the PBM's dozens of competitors.[57] If the ISP price comparison technology identifies a rate lower
than the patient's PBM rate, the patient's PBM directs the pharmacy to use that lower rate—the

---

[57] *See* GOODRX, https://www.goodrx.com/search (last visited Sept. 11, 2025).

rate of the PBM's competitor—instead of the rate the PBM previously agreed to pay to the pharmacy. And to make matters worse for the pharmacy, a fee is then charged to the pharmacy for the transaction as if it were a GoodRx "discount card" transaction. The ISP transaction is depicted in the graphic below:" transaction. The ISP transaction is depicted in the graphic below:[58]



180.    Here is an example: Caremark contracted with a small pharmacy in Minnesota called Hopkins Drug Center. When a Caremark member presented their insurance card at Hopkins to pay for a prescription of 56 tablets of the antibiotic doxycycline 100 mg, Caremark searched GoodRx's pricing data using GoodRx's price comparison technology and discovered that another PBM, called CerPassRx, had a Contracted Rate of $14.32 for that prescription at that pharmacy. This was lower than Caremark's Contracted Rate of $19.02 (i.e., the competitive price).

---

[58] *Adapted* from Adam J. Fein, *The 2022 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers*, DRUG CHANNELS INST. (Mar. 2022), https://drugchannelsinstitute.com/files/2022-PharmacyPBM-DCI-Overview.pdf

181.    Facilitated by the GoodRx ISP Scheme, the pharmacy then received the CerPassRx's price, instead of Caremark's price, and the transaction was treated like a GoodRx "discount card" transaction which meant that Hopkins Drug Center not only received a lower price, it also paid a fee, lowering its total reimbursement for the transaction even further. These fees did not exist in regular insurance transactions and serve to make ISP Scheme transactions more profitable for the Defendant PBMs.

182.    Thus, the PBM Defendants, by accessing the pricing data of their PBM competitors and automatically using the GoodRx ISP to apply the lowest pharmacy reimbursement rate on every claim possible, have delegated their pricing decisions to the GoodRx ISP, replacing their independent decision-making with respect to reimbursement rates with a single, collective decision-maker, GoodRx, disrupting what would otherwise be a competitive process.

183.    The ISP Scheme ensures that the maximum possible number of prescription drug transactions are funneled through the GoodRx ISP, making those transactions more profitable to Defendants, at the expense of independent pharmacies which depend on the revenues of regular insurance transactions to cover their own costs of purchasing generic drugs.

184.    GoodRx also benefits from the ISP Scheme, because it increases the number of transactions on which GoodRx can collect fees. Thus, in addition to collecting fees on prescriptions filled by patients that visit GoodRx's website or use GoodRx's app to present a coupon at the pharmacy counter, it now also collects fees every time a GoodRx ISP-supplied price is algorithmically selected and used by one of the PBM Defendants to pay for a prescription from an insured patient.

185.    While the Defendant PBMs and their patients may garner savings under the ISP Scheme, the "savings" generated come at the expense of already distressed independent

pharmacies. Since going live, the ISP Scheme has dramatically suppressed overall reimbursements paid to independent pharmacies for generic drugs. GoodRx estimated that 500 million to 600 million prescriptions have been subject to the ISP Scheme annually. On each of those prescriptions, when the ISP Rate is leveraged, pharmacies are reimbursed at rates far lower than what they would have received absent the ISP Scheme.

**B.      Independent Pharmacies did not Consent to the GoodRx ISP Scheme or its Pricing.**

186.    Independent pharmacies had no choice but to be subjected to the ISP and its artificially low pricing. Under their agreements with the PBM Defendants, they must fill the generic drug prescriptions of patients who present their insurance cards at the pharmacy counter, and each of those transactions are automatically processed through the ISP to see if the ISP Rate is lower than the insurance rate.

187.    Moreover, although independent pharmacies typically do not know the amount of reimbursement they will receive from a PBM until they run a claim, independent pharmacies certainly did not agree, consent, or expect to be paid the lowest prices of *any* PBM in the GoodRx database, or its Information-Exchange Network, for the generic drugs they dispense. The contracts between Defendant PBMs and pharmacies—or the pharmacies' Pharmacy Services Administrative Organization (PSAO)—do not set forth provisions allowing any PBM Defendant to switch its contracted rates to the lowest reimbursement rates set by any other, rival PBMs.

188.    As explained above, MAC is the predominant basis for setting the reimbursement rates for generic drugs. MAC price lists are proprietary and created, maintained, and updated by PBMs. Every PBM creates and maintains its own set of MAC prices. As the pharmacy provider manual for one large PBM states: "MAC price lists and/or pricing formulas are [the PBM's] confidential and proprietary information." As discussed *supra*, Navitus requires users of its PBM list to sign a nondisclosure agreement.

189.     When a pharmacy reimbursement is MAC-based, the PBM's payment is equal to the MAC price plus the dispensing fee and any PBM incentive amounts. Thus, a pharmacy expects to be paid the MAC prices of the PBM pursuant to its agreement with the PBM—not the lowest MAC prices of *any* of the PBM's rivals.

190.     Moreover, the contracts between pharmacies' PSAOs and PBM Defendants ██████

████████████████████████████████████████████████████

Although contracts between PSAOs and PBMs ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

191.     For example, agreements between MedImpact and large PSAOs provide ███

███████████████

████████████████████████████████████████

MEDIMPACT_00000024; MEDIMPACT_00000061.

192.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

193.     Similarly, a contract between a PSAO and Navitus provides the following as to payment:



NAVITUS_0000144.

194.    This agreement contemplates that, where a drug is covered by insurance, ███



195.    Contracts between PSAOs and CVS Caremark contain similar provisions, stating:

CRMRK-00000172.



CRMRK-00000174.

196.    The language of this agreement also contemplates that, when a drug is covered by Caremark's network, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

197.    Last, nothing in pharmacies' contracts with GoodRx to participate in GoodRx's

discount program ████████████████████████████████ Pharmacies that wish to contract with

GoodRx to participate in its discount program only agree that ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

198.    ████████████████████████████████████████████

████████████████████████████████████████

| Claim Type | Days' Supply | Contracted Rate | Average Administrative Fee |
|---|---|---|---|
| Brand and Generic Drugs | All Days' Supply | NADAC + $10 | $5.00 |
| Brand Drugs (fallback rate) | All Days' Supply | AWP-15.75% | $5.00 |
| Generic Drugs (fallback rate) | All Days' Supply | AWP-75% | $5.00 |

GDRX_MDL_G00000011.

199.    Thus, under their agreements with GoodRx, ████████████████████████████

████████████████████████████████████████

## C.    The Anticompetitive Effects of the GoodRx ISP Scheme Harmed Class Members.

200.    The brunt of the harm caused by Defendants' anticompetitive conduct is borne by

independent pharmacies which are not affiliated with a major PBM. As the FTC notes in a July

2024 report, PBMs (even those without affiliated retail pharmacies) view these pharmacies as a

competitive threat:

> In addition to increasing market power from consolidation, leading PBMs have
> vertically integrated not only with their own retail pharmacies, but also with
> specialty and mail order pharmacies. This vertical integration may be increasing
> PBMs' ability and incentive to disadvantage rival, independent pharmacies that

directly compete with the PBMs' affiliated pharmacies. One internal PBM document—from a PBM that does not operate a retail pharmacy—makes clear that smaller, unaffiliated pharmacies are viewed as competitors with even the PBMs' non-retail affiliated pharmacies: "Retailers are our competitors. There is no win-win solution. We are seeking the same Rx. We need the best rates."[59]

201.    PBM Defendants therefore have the incentive to disadvantage independent pharmacies within their networks because those independent pharmacies compete with PBM Defendants' retail and mail order pharmacies.

202.    As explained herein, GoodRx and the PBM Defendants profit handsomely from the GoodRx ISP Scheme, at the expense of independent pharmacies. As the President of Rx Marketplace at GoodRx has admitted, the ISP "has been painful for independent pharmacies."[60]

203.    First, the ISP Scheme empowers GoodRx to collect fees on more prescription claims than it could under its original GoodRx discount card program. From its inception and until the formation of the ISP Scheme, GoodRx could collect fees only when a patient used GoodRx's discount codes, which necessarily meant not using their pharmacy benefit. Now, GoodRx's prices are automatically applied whenever they are lower than a PBM Defendant's and the patient's co-pay, so GoodRx can now collect a fee on prescription drug claims processed through patients' prescription benefits.

204.    GoodRx predicted that 5% of the claims processed from January to around October 2024 using its aggregated pricing data are attributable to the ISP. With more than 100 million paid claims per year, and with an average fee of $5 per transaction, that amounts to more than a projected $25 million per year in additional fees extracted from pharmacies by GoodRx.

---

[59] FED. TRADE COMM'N, supra note 4, at 54.

[60] AMCP, *Ep. 39 – Inside GoodRx Community Link: A New Program for Independent Pharmacies*, YOUTUBE (Sept. 5, 2025), https://www.youtube.com/watch?v=qPHI0JPurgw.

205.     Second, the ISP Scheme empowers the PBM Defendants to artificially suppress the reimbursements they pay to pharmacies. PBMs profit from paying lower reimbursements to and extracting larger fees from pharmacies. Once again, suppressing the reimbursement rates paid to pharmacies represents greater profits for PBM Defendants at the expense of independent pharmacies. And on top of that, PBM Defendants can now charge the pharmacies fees, and claw back payments to pharmacies on prescriptions that, prior to the programs, they could not.

206.     Third, the ISP Scheme deprives independent pharmacies of the benefit of contractual price guarantees. A common term in a network pharmacy contract between a PBM and an independent pharmacy is an "effective rate" guarantee. In the pharmacy context, an effective rate guarantee clause is a promise from a PBM to a pharmacy that the PBM will assure a minimum level of aggregate reimbursement to a pharmacy (usually expressed as a percentage of a benchmark price, such as "AWP – 85%"). PBMs and pharmacies periodically "true up" the reimbursement payments from PBMs to pharmacies, which often results in PBMs remitting thousands of dollars they owe to pharmacies to meet the minimum guaranteed reimbursement level.

207.     However, pharmacies' effective rate guarantees contractually do not apply to any prescription claims adjudicated through discount card programs like GoodRx—meaning that the PBM Defendants can evade their minimum payment obligations to independent pharmacies whenever claims are processed using a reimbursement rate supplied by GoodRx.

208.     Upon information and belief, the prescription claims shunted through the ISP Scheme disproportionately represent claims that, if processed through ordinary reimbursement mechanisms, would have required the PBM Defendants to provide additional payments to independent pharmacies. As a result, pharmacies lose out on thousands of dollars a month. Upon information and belief, these losses are steep, and can be equal to, or as much as double, the losses

independent pharmacies sustain from the additional GoodRx fees and depressed reimbursement rates.

209.    PBM Defendants therefore use the ISP Scheme to artificially extract more value from independent pharmacies, carried out through increased fees, decreased reimbursement rates, and the elimination of contractual price guarantees.

210.    Class Members, including Plaintiffs, have been harmed as a direct result of Defendants' actions. The following graphs are two examples from Plaintiff OneroRx that demonstrate the decline in reimbursement received for generic prescription drugs dispensed by Plaintiff OneroRx following the implementation of the ISP agreements with two different PBMs:





211.   Similarly, Plaintiff Star Discount Pharmacy saw a decline in reimbursement received for generic prescription drugs following the implementation of the at-issue ISP agreements.

212.   As evidenced by the above, Plaintiffs and the Class have clearly been harmed by Defendants' price-fixing scheme. And, despite Defendant GoodRx's purported proclamation that the harms from the ISP Agreements have stopped, these charts show that reimbursement rates continue to decline and are far below the amounts and rates Plaintiffs and the Class received before the ISP Agreements began.

213.   These anticompetitive effects are a consequence of the PBM Defendants jointly outsourcing their rate-setting decisions to GoodRx, which has access to a massive amount of

competitively sensitive information, including each PBM's Contracted Rates with pharmacies. Both economic theory and antitrust jurisprudence recognize that joint delegation schemes like the ISP, when accompanied by information exchange, reduce the intensity of price competition and artificially suppress compensation below competitive levels. The ISP Scheme therefore reduces PBM Defendants' need and incentive to offer competitive reimbursement rates to pharmacies.

214.    For instance, the smaller PBM Defendants—MedImpact and Navitus—can consistently free ride off the reimbursement rates imposed by larger PBMs, at the expense of independent pharmacies. Because of the ISP Scheme, MedImpact and Navitus now utilize the same low reimbursement rates for generic drugs as the nation's largest PBMs. In the absence of the ISP Scheme, such smaller PBMs would not qualify for the same volume discounts from pharmacies and would have to outbid their larger rivals to build their pharmacy networks.

215.    The two largest PBMs—Caremark and Express Scripts—are already able to impose the best average discounts from pharmacies, but this does not mean that for any given drug, these PBMs will have contracted for the lowest price. Instead, it means that across all drugs, these large PBMs will generally obtain the best total discount package from pharmacies. The ISP Scheme ensures that for every generic prescription, the Defendant PBMs always utilize the lowest price contracted to by any rival PBM. Thus, the ISP Scheme removes the incentive of Caremark and Express Scripts to offer competitive reimbursement rates to pharmacies.

**D.    The ISP Scheme has Contributed to the Financial Distress of Independent Pharmacies Causing Further Harm to the Communities They Serve.**

216.    As set forth above, the ISP Scheme disproportionately harms independent pharmacies. The combination of decreased overall reimbursements from PBM Defendants and increased fees paid to Defendants have led to a decline in revenue and contributed to the financial ruin of independent pharmacies, many of which have had to close.

217.    Independent pharmacies provide essential services to patients. Unlike large retail pharmacy chains, independent pharmacies are more likely to be integrated into their communities and maintain closer relationships with their customers. They provide services to patients who have prescriptions that require special administration, whose conditions may make it difficult to manage their prescriptions, or who otherwise benefit from more individualized, personal care. In rural and underserved areas which large chain pharmacies avoid because they are less profitable, independent community pharmacies may be the core of an individual's healthcare support system. They may also be rural patients' only option for filling prescriptions.

218.    Independent pharmacies are also an important source of innovation. Smaller, local pharmacies are more likely to utilize new technology and services that improve the experience of patients. Large pharmacies owned by healthcare conglomerates face significant challenges in introducing new technologies, practices, or services due to their size and bureaucratic nature. For example, implementing new technologies across hundreds or thousands of pharmacies can be a daunting task, requiring significant investment in time and resources. In contrast, local pharmacies have fewer stores and can implement new technologies more quickly and efficiently.

219.    The ability of independent pharmacies to provide individualized, flexible, and non-traditional care to their customers is a key advantage that they use to compete with larger chains. This arena of competition has been, and will be, eliminated by the anticompetitive conduct set forth herein.

220.    Independent pharmacies have been deeply affected by the conduct of Defendants, including the ISP Scheme. In 2023, independent pharmacies went out of business at a rate of approximately one per day due to financial distress.[61] In a February 2024 survey of 10,000

---

[61] *Local Pharmacies on the Brink, New Survey Reveals*, NAT'L CMTY. PHARMACISTS ASS'N (NCPA) (Feb. 27, 2024), https://ncpa.org/newsroom/news-releases/2024/02/27/local-pharmacies-brink-new-survey-reveals.

independent pharmacy owners and managers conducted by Plaintiff National Community
Pharmacists Association, a third said they were considering shutting their doors in 2024 due to
financial constraints.[62] Once a staple of every community, today there are only about 20,000
independent pharmacies left, with over a third at imminent risk of insolvency.

221.    As described above, the closure of independent pharmacies has contributed to the
growth of pharmacy deserts, which are particularly prevalent in communities underserved by large
chain pharmacies, such as those with elderly populations, language barriers, or limited
transportation options.

222.    As detailed above, the loss of independent pharmacies has hit rural America
particularly hard, with over 2.4 million rural residents now living in pharmacy deserts. Pharmacy
deserts are also common in U.S. cities, and urban communities of lower income individuals are
most likely to suffer from lack of pharmacy access. All told, over 40% of U.S. counties are now
pharmacy deserts. As detailed above, limited access to pharmacies can have drastic consequences
on the health of individuals and communities.

223.    The pace of closures of independent pharmacies has been quickened by the increase
in discount card transactions. Although this benefits vertically integrated PBMs and their affiliated
retail pharmacy chains, it harms the patients and communities that independent pharmacies serve.

## VII.    DIRECT AND INDIRECT EVIDENCE OF AN UNLAWFUL HORIZONTAL CONSPIRACY

### A.    Direct Evidence of a Horizontal Agreement.

#### 1.    PBMs' Contracts with GoodRx

224.    ███████████████████████████████████████████

███████████████████████████████████████████████████

---

[62] *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Thus, the ISP enables each PBM Defendant to cap its generic drug pharmacy reimbursement rates at the lowest rate of any rival PBM has agreed to pay. Each PBM Defendant has agreed to join the ISP knowing that the other PBM Defendants have agreed to do the same because GoodRx and each PBM Defendant have publicly announced their agreements. In joining the ISP Scheme, each PBM agreed to charge the selected ISP price instead of making independent pricing decisions and/or adhering to the prices they had individually negotiated with pharmacies. Thus, the Defendants' ISP agreements constitute direct evidence of a horizontal conspiracy among the PBM Defendants in which GoodRx participates.

225.    ███████████████████████████████████████████

██████████████████████████████████    In October 2023, Navitus rebranded its ISP program as "Savings Connect." On October 12, 2023, GoodRx and Navitus announced that through Savings Connect, they team up to provide Navitus' members with "automatic access to GoodRx prices on generic drugs in a seamless experience at the pharmacy counter."[63]

226.    Next, on    ████████████    GoodRx and Express Scripts    ████████████████



_____

[63] Motley Fool Transcribing, *GoodRx Holdings, Inc. (GDRX) Q3 2022 Earnings Call Transcript*, Motley Fool, (Nov. 8, 2022 at 10:00 PM). https://www.fool.com/earnings/call-transcripts/2022/11/08/goodrx-holdings-inc-gdrx-q3-2022-earnings-call-tra/.

[64] GDRX_MDL_G00000041.



228.    In addition, as GoodRx reported to analysts after the agreement was announced, Express Scripts "would be acting as a distribution partner" to GoodRx, and GoodRx "would pay a marketing fee to Express Scripts in return for helping the company acquire MACs cheaply."[65]

229.    As early as July 2022, Express Scripts made public the news of its new collaboration with GoodRx, which Express Scripts called "Price Assure."[66] Through the program, according to Express Scripts, Express Scripts had integrated GoodRx pricing into the pharmacy benefit for generic medications to allow customers to access lower GoodRx prices, if available. Cigna, the parent company of Express Scripts, similarly advertised the Price Assure program in its own publicly-available materials. For example, in Cigna Newsroom, Cigna's online newsletter, Cigna wrote that "Cigna Pharmacy also offers Price Assure, powered by GoodRx, a prescription price comparison tool accepted at more than 70,000 retail pharmacies in the United States."[67]

---

[65] *Supra* note 28.

[66] *How* Partnership *Drives Improved Affordability and Safety at the Pharmacy*, Evernorth Health Servs. (July 15, 2022), https://www.evernorth.com/articles/increased-pharmacy-savings-and-affordable-prescription-medication.

[67] *5 Ways to Save Money on Prescription Drugs and Medication*, Cigna Healthcare (Oct. 14, 2025), https://newsroom.cigna.com/5-ways-to-save-money-on-prescription-drugs-medication.

According to Cigna, through Price Assure, "GoodRx pricing is available for many commonly used generic mediations filled in a 30-day or 90-day supply at any in-network retail pharmacy that accepts GoodRx discount cards."[68]

230.    In its 2022 Annual 10-K Report, GoodRx announced that through the Price Assure program, its "system compares the price available through the customer's Cigna Pharmacy benefit to the GoodRx price; customers are charged whichever price is lower."[69]

231.    During a November 8, 2022 earnings call, GoodRx boasted that, through its collaboration with Express Scripts, GoodRx could gain access to many new users—and charge new fees—and Express Scripts could keep collecting fees from members who might otherwise utilize GoodRx's standalone consumer discount pricing because the program "keeps visibility of the eligible member[s'] GoodRx claim[s] within the pharmacy benefit."[70]

232.    ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

---

[68] *Id.*

[69] GoodRx, Annual Report (Form 10-K) at 4 (Feb. 28, 2023); Giselle Abramovich, *5 ways to save money on prescription medications*, CIGNA HEALTHCARE, https://newsroom.cigna.com/5-ways-to-save-money-on-prescription-drugs-medication (last visited Dec. 15, 2025).

[70] Motley Fool Transcribing, *GoodRx Holdings, Inc. (GDRX) Q3 2022 Earnings Call Transcript*, Motley Fool, (Nov. 8, 2022 at 10:00PM), https://www.fool.com/earnings/call-transcripts/2022/11/08/goodrx-holdings-inc-gdrxq3-2022-earnings-call-tra/.

233. ██████████████████████████████████████████

█████████████████████████████████████████████████

████████████ [71] ███████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

234.    Soon thereafter, ██████████████ GoodRx entered into another ISP agreement

with a different PBM: Caremark. ██████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████

235.    Caremark ████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████

236.    On July 12, 2023, CVS Health publicly announced this program.[72] CVS called it

the "Caremark® Cost Saver™" program. According to the press release, as of January 1, 2024,

"CVS Caremark's eligible members [would] have automatic access to GoodRx's prescription

---

[71] GDRX_MDL_G00000038.

[72] *CVS Caremark and GoodRx to launch Caremark® Cost Saver™ to help lower out-of-pocket drug costs for CVS Caremark clients' members*, GOODRX (July 12, 2023) https://investors.goodrx.com/node/9096/pdf; *CVS Caremark and GoodRx to launch Caremark Cost Saver to help lower out-of-pocket drug costs for CVS Caremark clients' members*, CVS HEALTH (July 12, 2023), https://www.cvshealth.com/news/prescription-savings/cvs-caremark-and-goodrx-to-launch-caremark-cost-saver.html.

pricing to allow them to pay lower prices, when available, on generic medications in a seamless experience at the pharmacy counter." Under the program, patients' out-of-pocket cost would count towards plan members' deductibles and out-of-pocket maximums. No longer would patients have to choose between the prices offered by two competitors: Caremark and GoodRx. CVS Health again publicly advertised its partnership with GoodRx in its Healthy 2030 2023 Impact Report, writing that through a "new collaboration with GoodRx," members can "pay lower prices on generic medications . . . without having to take any additional action."[73]

237.



238.

---

[73] *Healthy 2030 2023 Impact Report*, CVS HEALTH (2023), https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/2023/Healthy-2030-Impact-Report.pdf.
[74] GDRX_MDL_G00000074.

███████████████████████[75]███████████████████████████████████████

█████████████████████████████

239.    On September 13, 2023, GoodRx and MedImpact announced their partnership starting January 1, 2024.[76] MedImpact would integrate GoodRx's platform into its pharmacy benefit, so that when a MedImpact member filled a generic prescription at the pharmacy counter, the member would automatically benefit from GoodRx's prices if they were lower than the prices MedImpact otherwise offered. The patient's cost-sharing obligations would count towards their deductible. In the press release announcing the GoodRx-MedImpact partnership, GoodRx boasted that this "program" with Express Scripts, Caremark, and MedImpact now "reach[ed] over 60% of insured lives." Once again GoodRx made clear that two former competitors had decided to collude, rather than compete.

### 2.    Public Statements

240.    Additional direct evidence of a horizontal conspiracy among the PBMs can be found in public statements issued by GoodRx (including those quoted above) and by each of the PBM Defendants admitting to both the existence and nature of the ISP Scheme.

241.    For instance, the press releases announcing each new partnership between GoodRx and a PBM Defendant admit both the PBM's agreement to share competitively sensitive information and its agreement to utilize the lowest Contracted Rate of any PBM in GoodRx's Information-Exchange Network.

242.    In its press release announcing the partnership with MedImpact, for example, GoodRx explained that, under the ISP Scheme, "[c]ompanies team up at the pharmacy counter" by "integrating GoodRx's price comparison technology with MedImpact's advanced [claims

---

[75] GDRX_MDL_G00000072.

[76] GoodRx, *supra* note 51.

processing] technology platform." Once MedImpact had joined the ISP Scheme, "when an eligible MedImpact member fills a prescription for a generic medication," the ISP algorithm and database "will automatically compare their benefit and the GoodRx price and then deliver the lowest one."[77]

243.    Each of the PBM Defendants issued a joint press release with GoodRx upon joining the ISP that admits to identical features of the Scheme.

244.    Likewise, GoodRx's own public statements in Securities and Exchange Commission filings and on investor calls admit to the ISP Scheme and its anticompetitive motivations and effects.

245.    For example, in GoodRx's 2024 annual statement (2024 10-K), filed February 29, 2024, GoodRx recognized the need to maintain its relationships with PBMs and pharmacies, noting the potential adverse impacts of consolidation of PBMs or pharmacy chains:

> If one or more pharmacy chains terminates its cash network contracts with PBMs that we work with, enters into cash network contracts with PBMs that we work with at less competitive rates or, to the extent a pharmacy chain has entered into a direct contractual arrangement with us, terminates such contractual arrangement, our business may be negatively effected. . . . Such actions could be exacerbated by further consolidation of PBMs or pharmacy chains. If such changes, individually or in the aggregate, are material, they would have an adverse effect on our business, results of operations and financial condition. If there is a decline in revenue generated from any of the PBMs or pharmacies we contract with, as a result of consolidation of PBMs or pharmacy chains, pricing competition among industry participants or otherwise if we are unable to maintain or grow our relationships with PBMs and pharmacies or if we lose one or more of the PBMs or partner pharmacies we contract with and cannot replace such PBM or partner pharmacy in a timely matter or at all, there would be an adverse effect on our business, financial condition and results of operation.[78]

246.    In its 2024 10-K, GoodRx also noted its access to and aggregation of commercially sensitive pricing data—which it uses to impact drug pricing:

> We have built a vast network of relationships, contracts and integrations with key stakeholders in the healthcare industry. **Our proprietary technology enables us**

---

[77] *Id.*

[78] GoodRx, Annual Report (Form 10-K) at 23 (Feb. 29, 2024).

**to aggregate prescription pricing data points from sources spanning the healthcare industry**. We **structure and normalize the presentation of the data** to give consumers curated, geographically relevant pricing information that is accessible through our apps or websites for free. **By normalize, we refer to a process of taking the various different pricing methodologies and medication lists from each of our sources, and homogenizing the presentation of this data so that prices are directly comparable**. Consumers can choose the lowest price from a selection of nearby pharmacies, save a GoodRx code to their mobile device for free and present that code at their pharmacy to access that low price.[79]

(Emphasis added).

247.    GoodRx's 2024 10-K acknowledged that it obtained that sensitive pricing information from PBMs, and both PBMs and GoodRx profit in turn:

Our platform aggregates and analyzes pricing data from a number of different sources. The discounted prices that we present through our platform are based in large part upon pricing structures negotiated by industry participants. . . .

Our pricing sources span the healthcare industry and include PBMs, pharmacies, pharma manufacturers, patient assistance programs, and others, making it difficult to replicate the data we possess and share with consumers. . . .

**PBMs are the most common source of pricing information. Our proprietary technology enables us to combine prices from multiple PBMs and other industry sources and display it on a single consumer interface. We believe that we maintain the largest database of aggregated pricing information across PBMs in the United States**. When a transaction occurs in which one of our consumers fills a prescription and saves compared to the list price using a GoodRx code, the PBM receives a portion of the price that the consumer paid. We receive a percentage of this amount or a fixed payment from the PBM as compensation for directing the consumer to that PBM's pricing and the pharmacy.[80]

248.    In aggregating data, GoodRx utilizes its "proprietary patented technology related to collecting and normalizing prices from multiple PBMs and presenting them using a single consumer interface."[81]

---

[79] *Id.*

[80] *Id.*

[81] GoodRx, Annual Report (Form 10-K) at 11 (Feb. 27, 2025).

249.    GoodRx emphasized the importance of this data from the PBMs, stating that "[t]he data we collect and process is an integral part of our products and services, allowing us to ensure our prices are accurate, surface the most relevant prices and reach consumers with savings information."[82]

250.    In its 2024 10-K, GoodRx explained how its ISP agreements allow it to profit even if a PBM contract is terminated, so long as it uses a PBM's pricing to suppress reimbursement rates, because the Scheme requires PBMs to continue to pay GoodRx for such activity, thereby discouraging PBMs from departing from the Scheme:

> We have steadily increased the number of PBMs with which we work over time. To date, no PBM has terminated a relationship with GoodRx, Inc. **Even if a contract with a PBM were to be terminated, many of our contracts require the PBM to continue to pay us for activity by consumers originally directed to their pricing by us, even subsequent to the contract termination**. The ongoing payment obligation can continue for so long as the underlying PBM-specific pricing is used, or for certain partners, for a specified multi-year period, depending on the terms of our contract with the PBM. . . . We believe that our sources of pricing are sufficiently broad and robust that the loss of any one PBM or other healthcare partner would generally result in minimal disruption in our ability to provide competitive discounts and pricing. . . .[83]

(Emphasis added.)

251.    In its 2024 10-K filing, GoodRx continued to emphasize the importance of its partnerships with PBMs:

> While we have consistently renewed and extended the term of our contracts with PBMs over time, there can be no assurance that PBMs will enter into future contracts or renew existing contracts with us, or that any future contracts they enter into will be on equally favorable terms. Changes that limit or otherwise negatively impact our ability to receive fees from these partners would have an adverse effect on our business, financial condition and results of operations. Consolidation of PBMs or the loss of a PBM could negatively impact the discounts and prices that

---

[82] *Id.* at 14.
[83] GoodRx, supra note 74 at 9.

we present through our platform and may result in less competitive discounts and prices on our platform.[84]

252.    Talking about its partnerships with Express and Caremark, in its 2024 10-K, GoodRx described the initial partnerships that were the foundation of the ISP. In GoodRx's own words, the ISP

> integrates our competitive discounts and pricing in a seamless experience at the pharmacy counter for eligible plan members they serve. Eligible plan members need only to utilize their existing benefit card at their preferred in-network pharmacy to benefit from our discounts and pricing, with no further action required.[85]

253.    GoodRx made clear that this was just the beginning, noting that "[a]s part of our business strategy, we will continue to pursue strategic opportunities, including commercial relationships and acquisitions, to strengthen our market position and enhance our capabilities."[86]

254.    Likewise, on its May 9, 2024, quarterly earnings call for Q1:2024[87], GoodRx touted its aggregation of demand and coordination with the PBM Defendants, which GoodRx identified by name, noting those PBMs cover 60% of the market:

> Our second priority has been to hone our growth plans for our core prescription transaction offering, which includes extending the benefit of GoodRx to commercial insurance programs or funded plans. We've done this through our integrated savings program, or ISP, with PBM partners like CVS Caremark, Express Scripts, MedImpact and Navitus, who efficiently aggregate demand for our prescription discounts. We're driving real value with payers and their members by seamlessly lowering the cost of their prescriptions automatically at the point of sale. We're quickly becoming a leader in the commercial market for integrated benefits, and while our programs are currently only available to a subset of our partner PBM eligible members, these PBMs do cover over 60% of eligible U.S. lives, so the market opportunity remains a key area of focus for us. We estimate that the potions

---

[84] *Id.* at 22.

[85] *Id.* at 12.

[86] *Id.*

[87] GoodRx Holdings, Inc. (GDRX) Stock, *GoodRx Holdings, Inc. (GDRX) Q1 2024 Earnings Call Transcript*, SEEKING ALPHA (May 9, 2024, 5:15 PM ET), https://seekingalpha.com/article/4691558-goodrx-holdings-inc-gdrx-q1-2024-earnings-call-transcript?feed_item_type=transcript&utm_medium=referral&utm_source=conferencecalltranscripts%27%20target=.

and prescriptions filled in ISP have negligible overlap with those in our direct to consumer offering, which means that our ISP product line is almost entirely SAM expanding. So far this year, ISP is tracking in line with our expectations, and the traction that we're seeing is exciting as we continue to gain more lives and types of transactions. We look forward to working to continue to ramp this program over time with both our PBM partners and retailers and types of prescription transactions in the program.

255.    Also on the Q1:2024 call, GoodRx discussed rolling out the ISP "hand-in-hand with

[its] PBM partners:

[Question from Daniel Grosslight with Citi:] "Scott, I think you mentioned that now over 20% of the volume is coming through direct contracts. I'm curious, where do you think that trends over the next year? So do you think you'll ever get to kind of a majority of volume flowing through direct contract? And maybe if you can comment on how that might change your relationships or dynamic with the PBMs?"

[GoodRx Answer:] . . . And relative to your PBM commentary or question, the PBMs, **we're going to have a business relationship with the PBMs for a long, long time for all the reasons that we had one at the inception of this business, which is it's a way of working together, adding incremental lives**. ISP is obviously, a new evolution where the GoodRx benefit, which is really off insurance is being brought closer to plans, not just in integrated savings, but I do think and hope that over the next not just quarters, but a couple years, integrated savings is going to evolve into a series of different efforts that sort of bridge that gap. **And we're going to do that hand-in-hand with our PBM partners**.[88]

(Emphasis added).

256.    Elsewhere on its Q1:2024 call, GoodRx again emphasized its partnerships with the

market-dominant PBM Defendants, expressing their intention to add more PBMs and more

sponsors to PBMs, and acknowledging the ISP Scheme's impact on the market, as seasonal

fluctuations in ISP demand wane in favor of ISP dominance:

[Question from Michael Cherny with Leerink Partners:] Maybe if I can just ask a question on ISP. As you think about the ramping effects, think about the integrations that you've had so far with the PBMs you're working with, where have been the greatest opportunities where you've seen the contribution? And in terms of the guidance for the rest of the year, how do you see ISP ramping as a either

---

[88] *Id.*

percent of volumes, a percent of growth, any other additional color we can look into as you think about where this goes over time would be great?

[GoodRx Answer:] I think there are two parts to your question. The first part was where we see the opportunity and how do we see the rest of the year. With respect to both of those matters, I think we see the opportunity in four major areas. The first major area is continuing to add incremental PBMs. The second area is to add incremental plan sponsors from each PBM. The third area is formulary expansion. So the inclusion of, for example, completely off formulary medications. And then the final area of expansion is that there are still certain retailers who haven't been elected to participate in ISP. Of those for us, the really big ones are around expanding the number of sponsors associated with particular PBM and formulary and, of course, adding new PBMs because that creates a big positive effect indeed, even though we already have PBMs covering approximately 60% of U.S. lives. With respect to trajectory through the rest of the year, traditionally we would see ISP be expected to shrink in its contribution as the year progresses because folks hit their deductibles, for example, and have less need for ISP at certain points in the year. I think what we're noticing now is that is probably going to be less of an effect in 2024 because of the growth vectors I described, namely PBMs continuing to add members and add formulary in particular that are in our already existing PBM base of business today. So I think the seasonality that we've historically talked about will likely be less pronounced or not that pronounced at all this year relative to what we would have expected and saw, for example, last year. Hopefully that's helpful.[89]

257.    GoodRx again emphasized the "mutual effort" between GoodRx and PBMs on its

Q1:2024 call, noting—when asked about ISP growth—"we're doing it together," GoodRx is

"following the lead of [its] PBM partners," and "working together" with PBMs:

[Question from Charles Ryhee with TD Cowen:] ". . . wanted to ask a little bit more, I think he talked about sort of the big areas for growth, particularly in ISP is among them, right, the types of transactions, particularly off-formulary generics. Can you talk about sort of what the process is with the various PBMs on how those decisions are made? . . . .

[GoodRx Answer:] Charles, let me, hopefully I hit the mark with my answer to this. I'm understanding your question is the process of how we're ramping or working through with the PBMs. And I would say this is a mutual effort with a couple of people on our end and a couple of people on theirs actually flowing through lives and then actually looking at some of the price point and data. And what that means is that we're doing it together, but it's very much an incremental rollout. I think in a manner that we've tried to communicate to people, and again, on this one, we are following the lead of our PBM partners. So I think the punchline audit is we're working together, and it has, if you might think about it as a step-by-step and an

---

[89] Id.

incremental approach to all of these. And I'll let Karsten address the EBITDA question.[90]

258.    In September 2025, GoodRx's President of Rx Marketplace discussed the company's integrated pricing relationships with pharmacy benefit managers, including CVS Caremark and Express Scripts, in a manner that confirms the coordination between these entities in the routing and pricing of prescription transactions. He admitted that it is "integrated into a handful of benefit plans" and that when a patient presents an insurance card, the system "will check the price amongst GoodRx versus the price of your insurance." He further admits that this "ISP has been painful for independent pharmacies."[91]

## B.    Indirect Evidence of a Horizontal Agreement

### 1.    Parallel Conduct

259.    Defendants' parallel conduct is circumstantial evidence that the Scheme exists.

260.    GoodRx and the PBM Defendants engaged in parallel conduct: they suppressed the amount paid and increased the fees charged to independent pharmacists for filling prescriptions for the PBM Defendants' insured members through the ISP Scheme. They acted in concert by each executing an ISP agreement, and in doing so, delegated generic drug price decision-making to the GoodRx ISP, which automatically applies the lowest reimbursement rate of any PBM competitor in its database for entire categories of transactions instead of the Contracted Rate that was determined independently by each PBM.

261.    GoodRx ISP also facilitated a transition away from a marketplace in which the PBM Defendants competed with one another by offering attractive reimbursement agreements to independent pharmacies towards a coordinated regime. Under this regime, the PBM Defendants

---

[90] *Id.*

[91] AMCP, *Ep. 39 – Inside GoodRx Community Link: A New Program for Independent Pharmacies*, YOUTUBE (Sept. 5, 2025), https://www.youtube.com/watch?v=qPHI0JPurgw.

no longer compete to secure a competitive reimbursement rate; instead, they just adopt and use the lowest Contracted Rate offered by any competitor, then split the resulting fees with GoodRx. This shift represents a sudden departure from the way the PBM industry has operated for years.

262.    As described above, since GoodRx's founding in 2011, GoodRx and PBMs have competed for prescription drug transactions at the pharmacy counter. If an insured patient chose to use their insured prescription benefit, then their Primary PBM adjudicated the prescription drug claim, and the pharmacy paid the PBM for doing so. If that patient opted to use GoodRx instead, then the pharmacy paid a fee to GoodRx, which GoodRx shared with the Leveraged PBM (that supplied the reimbursement rate used by the patient), and the patient's Primary PBM collected no revenue whatsoever from the transaction. But under the ISP Scheme, the PBM Defendants automatically divert prescription drug claims to GoodRx, which returns the lowest rate; the patient's PBM *and* GoodRx *and* the supplying PBM collect fees from the pharmacy. As a result, pharmacists must, suddenly, pay more fees, and fees to more entities, for many of the prescription drug claims adjudicated through the PBM Defendants.

263.    Furthermore, pharmacists historically could choose whether to accept GoodRx's discount codes. Accepting those codes meant paying GoodRx's fees. For all pharmacists, these fees strain their already paltry margins. The average GoodRx fee is approximately $5. When a pharmacy's margins on a prescription drug claim are already mere pennies, at best, accepting GoodRx and its additional fees could mean the difference between making $0.03 for dispensing a prescription and losing money on the prescription, or between losing money on a prescription and losing even *more* money on a prescription. For that reason, some independent pharmacies have historically opted *not* to accept GoodRx coupons. Under the ISP Scheme, however, the PBM Defendants and GoodRx have decided to take that choice away from pharmacists. Now, any

pharmacist that is in-network with one of the PBM Defendants (and being in-network with large PBMs like the PBM Defendants is necessary for virtually all independent pharmacies) has no choice but to pay GoodRx's fees whenever a PBM Defendant invokes a GoodRx price instead of its own.

264.    The ISP Scheme's structure also generates standardized reimbursements to pharmacists. Previously, a prescription claim adjudicated by Caremark would be reimbursed according to Caremark's Contracted Rate; a prescription claim adjudicated by Express Scripts would be reimbursed according to Express Scripts' Contracted Rate; a prescription claim adjudicated by MedImpact would be adjudicated according to MedImpact's Contracted rate; and so on. Now, regardless of whether the prescription claim is adjudicated by Caremark, Express Scripts, MedImpact, or Navitus, the claim is adjudicated according to the exact same rate: the lowest rate secured by one of any dozens of PBMs. Defendants' agreement, therefore, standardizes prescription drug reimbursements at the lowest possible rate.

265.    In a competitive market, competing PBMs would not agree to use a common tool provided by a competitor to suppress prescription drug reimbursement rates. Among other things, by paying reasonable reimbursement rates, PBMs could be certain that pharmacists would continue to serve patients tied to their services.

266.    Even if the PBM Defendants' only incentive were to pay the lowest available rate for prescription drug claims, in a competitive market, they would not agree to do so using the same program offered by the same provider (i.e., GoodRx's ISP), which also happens to be a competitor in the prescription drug claim reimbursement market. Rather, they would compete to find the optimal balance between keeping the costs of claims down while also minimizing the risk that pharmacies would refuse to do business with them. Absent a conspiracy, the PBM Defendants

would contract for their own reimbursement rates that accurately reflected their size, bargaining power, and business strategies. Now, instead, they just borrow the rate of a competitor. That rate—contracted to by the competitor PBM and a participating pharmacy—reflects that pharmacy's judgment about what reimbursement rate it can accept, considering the volume of patients subject to that rate, the fees that particular PBM would charge, and other factors that are unique to that PBM.

267.    By implementing the exact same reimbursement suppression strategies, the PBM Defendants can collectively maximize their profit while still charging their fees (regardless of whether they are comparable to their competitors' fees), and split their ill-gotten gains with GoodRx, which would otherwise not profit from reimbursement claims adjudicated under the PBMs' pharmacy benefits. The only market players who lose are the pharmacies, who have no choice but to accept suppressed payments and pay inflated fees.

### 2.    Motives to Conspire

268.    GoodRx and the PBM Defendants had distinct, complementary motives to conspire—the ultimate aim of which, for all involved, was additional revenue at the expense of pharmacies. GoodRx's motive was to gain back and increase the volume of fees it had lost when its partnership with Kroger dissolved. GoodRx could not control the prescription prices it offered through its platform—those were determined by agreements between PBMs and pharmacies. Therefore, it could not slash prices to lure additional patients to choose GoodRx over their insurance at the pharmacy counter. The number of monthly active patients that elected to visit GoodRx's platform had remained relatively stable (fluctuating between 5.7 million and 6.4 million) since the end of 2020 when healthcare access normalized following the emergence of the Covid-19 pandemic. Therefore, there was not an organic source of new patients visiting GoodRx's platform.

269.     The PBM Defendants, meanwhile, had their own motive to conspire with GoodRx and each other. First, the ISP Scheme eliminates competition between the PBM Defendants and GoodRx for generic prescription drug transactions. Prior to the ISP, each time a patient chose to forsake their insured pharmacy benefit and utilize GoodRx's discounts, the PBMs lost out on the fees and other payouts from pharmacies, manufacturers, and health plans that PBMs receive from insured transactions. Without the ISP, the PBM Defendants would have to compete more effectively with GoodRx by restoring some of the value of a prescription drug benefit to patients; but doing so would cut into their lucrative margins. By colluding with GoodRx, rather than competing, the PBM Defendants could shift the cost of offering better value for patients onto pharmacies. Second, the ISP Scheme allows the PBM Defendants to pay nothing to a network pharmacy, instead of its Contracted Rate, when an ISP Rate is applied to a transaction, and it allows the PBM Defendant to still collect a fee on each ISP transaction. Third, the ISP eliminates the need for PBMs to compete vigorously with each other by offering pharmacies competitive reimbursement rates for generic drugs. In short, the PBM Defendants could make more money by colluding than by continuing to compete.

### 3.     Access to Competitors' Pricing Information

270.     GoodRx has, by virtue of its discount card aggregation business, access to more than a dozen PBMs' prescription drug pricing information which consists mainly of PBM MAC prices. This is specific, granulated data which varies drug by drug and pharmacy by pharmacy and is highly confidential.

271.     MAC prices are determined and generated solely by PBMs. PBMs can have hundreds of different MAC lists and use different lists to reimburse different pharmacies.[92]

---

[92] *The Need for Maximum Allowable Cost (MAC) Pharmacy Pricing Reform*, OHIO PHARMACISTS ASSOC., 1–2, https://www.ohiopharmacists.org/aws/OPA/asset_manager/get_file/99424.

GoodRx aggregates this information and when a patient seeks to use GoodRx's discount at the pharmacy counter, it provides to the pharmacy the BIN and Processor Control Number (PCN) codes necessary to route the prescription to the Leveraged PBM.

272.    Within the ISP Scheme, *all* of GoodRx's data, including which PBMs are offering which rates and discounts, is integrated into the PBM Defendants' claims processing systems. When an insured patient presents their prescription benefit card at the pharmacy, the pharmacist sends the claim to the patient's PBM. The ISP then enables the PBM Defendants to search through the rates from their PBM competitors, select the lowest one, and then instruct the pharmacy to apply the lowest rate of its competitor by transmitting the competitors' identification codes to the pharmacy. In short, the ISP provides the PBM Defendants with access to the confidential rates of other PBMs, and the ISP's price comparison technology makes pricing decisions on behalf of the PBM Defendants using those confidential rates.

273.    By participating in the GoodRx ISP Scheme, the PBM Defendants gain invaluable information about their competitors' deals with pharmacies: they know when a competitor has contracted for a lower price than they have every time the ISP converts an insurance transaction to an ISP transaction and a fee is split among GoodRx, the PBM Defendant, and the Leveraged PBM. This price sharing practice is particularly aberrant among PBMs, who are typically "fanatical about the secrecy of their pricing," and thus strong circumstantial evidence of a conspiracy.

274.    When the ISP Scheme was first instituted between GoodRx and Express Scripts, GoodRx management reported that Express Scripts "would be acting as a distribution partner," and therefore "GDRX would pay a marketing fee to Express Scripts in return for helping the

company acquire MACs cheaply."[93] The payment of this marketing fee displays the value of the competitively sensitive, non-public MAC data which GoodRx provides to the PBM Defendants through the ISP Scheme.

275.    Not only does GoodRx share its pricing data—which is really the pricing data of other PBM competitors—with the PBM Defendants, its competitors, this data sharing is pervasive, occurring each time a patient insured by one of the PBM Defendants accesses their prescription drug benefit.

276.    Approximately 6.3 billion prescriptions are filled every year, and 90% of those prescriptions filled are for generic drugs.[94] The PBM Defendants collectively account for close to two-thirds of all prescription drug claims[95]—4.1 billion to 4.4 billion prescription claims each year. That means that GoodRx shared pricing data with the PBM Defendants more than 10 million times *every day*.

277.    The ISP Scheme facilitates both the access and use of reimbursement rates among the PBM Defendants—competitively sensitive data that would otherwise not be exchanged among them. This obviates the need for the PBM Defendants to obtain the rates directly from each other and their other PBM competitors to implement their scheme.

### 4.    Standardization of Reimbursement Rates

278.    The result of the ISP Scheme—indeed, its goal—is the artificial standardization of the prices paid to pharmacies for prescription drug claims.

---

[93] *Supra* note 28.

[94] *See* Jessica Ho, *Life Course Patterns of Prescription Drug Use in the United States*, 60 DEMOGRAPHY 1549, 1549 (2023).

[95] Adam Fein, *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead*, DRUG CHANNELS (Apr. 10, 2024), https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html; GoodRx 2024 Investor Day Presentation at 52; Luke Slindee, *How GoodRx Helped Steal $7 From My Pharmacy (Featuring Algorithmic Price Fixing)*, YOUTUBE (Mar. 25, 2024).

279.     In a competitive market, each PBM would secure its own reimbursement rate agreements with independent pharmacies. The PBMs would seek to differentiate themselves from competitors based on the number of covered patients they can offer the pharmacy access to, the reimbursements offered, and the fees attached to the agreement. PBMs would seek the lowest possible cost for pharmacists' services. Pharmacists would push back to secure a more lucrative deal. This competition would result in competitive rates for independent pharmacists' services.

280.     But the GoodRx ISP Scheme eliminates all motivation for the PBM Defendants to compete. Caremark, Express Scripts, MedImpact, and Navitus no longer need to seek to offer higher prices to pharmacies, and their efforts to secure a lower price cannot be constrained by pharmacy pushback. Instead, the PBM Defendants automatically choose the lowest available price offered to a pharmacy by *any* PBM in every GoodRx-related transaction.

281.     The ISP Scheme also results in the standardization and inflation of fees charged to pharmacists in every GoodRx-related transaction. Before the GoodRx ISP Scheme was formed, pharmacists had to pay fees to only one PBM per transaction, and they had to pay GoodRx's 15% fee only when an insured patient opted to use GoodRx instead of their insurance benefits. But under the ISP Scheme, Defendants force pharmacists to pay fees to two PBMs (a PBM Defendant and the PBM that supplied the price paid). Now, Defendants force pharmacies to pay GoodRx's fee on each of the billions of prescriptions adjudicated using a price supplied by GoodRx.

282.     Since the PBM Defendants control close to two-thirds of all prescription claims adjudicated, pharmacists receive the lowest possible reimbursement, and pay additional fees, for close to two-thirds of all prescriptions filled. This largely standardizes the prices paid to, and fees extracted from, independent pharmacies across the entire prescription drug claim reimbursement market.

94

5.     **Actions Against Self-Interest**

283.     As part of the ISP Scheme, each Defendant engages in actions that, in the absence of concerted action, would be against their individual economic self-interest, but that maximizes profits for the collective under the scheme. These actions against self-interest are strong circumstantial evidence of a horizontal agreement among the Defendants to reduce competition for pharmacy business and suppress reimbursement rates.

284.     First, it would be against the unilateral economic self-interest of any individual PBM to pay below-market reimbursement rates to pharmacies for generic drugs (the goal and consequence of coordinating their pricing through GoodRx) because doing so would cause pharmacy defections from those PBMs' networks. In the absence of collusion, PBMs would reimburse pharmacies at competitive rates to achieve greater pharmacy satisfaction and avoid harming their businesses with diminished networks. However, because PBMs know that their competitors have also agreed to pay below-market reimbursement rates, they are insulated from the competitive risks that would exist absent coordination.

285.     Second, it would be against the economic self-interest of any individual PBM Defendant to share its competitively sensitive and proprietary pricing data through a common third party so that other PBMs could utilize their lowest rates, unless it knew its main PBM competitors had agreed to do the same. In the absence of concerted action, PBMs would not share such information with rivals (through an intermediary or otherwise) because of the risk of competitive harm. After all, competitor PBMs could use the information to make superior bids to unaffiliated pharmacies and strengthen their pharmacy networks relative to the competition.

286.     Third, but for the ISP, it would be against the economic self-interest of the PBM Defendants to allow their members' prescription drug transactions to be handed over to another PBM for adjudication and lose out on the fees from those transactions. Under the ISP, using

95

another PBM's reimbursement rate benefits all parties because they each receive a share of the fee extracted from the pharmacy from the ISP transaction.

### 6.    Industry-Related Plus Factors

287.    The PBM Services Market is characterized by numerous features, sometimes called "plus factors," that render it susceptible to collusion and bolster the plausibility of the ISP Scheme alleged herein.

### a.    *High Barriers to Entry*

288.    First, on the PBM side, there are high barriers to entry that make it difficult for new PBMs to enter the market for pharmacy benefit management services. These barriers include state and federal regulatory requirements and the costs associated with developing pharmacy networks, building client relationships, and developing the kinds of technologies and infrastructures that enable PBMs to electronically adjudicate millions of pharmacy reimbursement claims each day. As alleged herein, only a few PBMs have the technology or infrastructure to handle real-time claims administration.

### b.    *High Exit Barriers*

289.    Second, on the pharmacy side, pharmacies face high exit barriers in the Network Pharmacy Services Market. In the United States, over 80% of all prescription drug costs are covered by TPPs. These payors all use PBMs to negotiate prices with pharmacies or pharmacies' PSAOs, process drug claims, and pay reimbursements. Given this reality, pharmacies have no substitutes from which to seek reimbursement for generic drugs but from PBMs retained by TPPs. The only way for pharmacies to "exit" this TPP system is to refuse to fill prescriptions for the vast majority of patients who will not or cannot pay cash, which would spell financial ruin for most pharmacies.

### c.   *Highly Concentrated Market*

290.   Third, the associated output market for PBM services is highly concentrated. Currently, the three biggest PBMs manage 79% of prescription drug claims, and the six largest PBMs collectively manage 94% of all claims. The largest PBM, Caremark, accounts for 34% of all prescription drug claims, followed by Express Scripts (23%), OptumRx (22%), Humana (7%), MedImpact (5%), and Prime Therapeutics (3%). Furthermore, five of those six largest PBMs are vertically integrated with major health insurers. GoodRx itself recognizes that "There is currently significant concentration in the U.S. healthcare industry, and in particular there are a limited number of PBMs[.]"

### d.   *Fungible Services*

291.   Fourth, the claims submitted by pharmacies to PBMs for reimbursement from insurers are fungible. All claims are submitted using uniform billing codes, no matter the insurer or the pharmacy. This allows GoodRx to set reimbursement rates for drug claims submitted by different pharmacies to different insurers across different health plans, across the entire country, making it feasible for GoodRx and the PBM Defendants to implement their anticompetitive scheme nationwide.

### e.   *Opportunities to Collude*

292.   Fifth, members of the alleged ISP Scheme have had ample opportunity to meet and collude. The PBMs' trade association, the Pharmaceutical Care Management Association (PCMA), holds annual meetings, business forums, and policy forums. In addition, several GoodRx executives were formerly executives of PBMs. Scott Paul, GoodRx's Senior Vice President of Healthcare & Consumer Innovation, was the Executive Vice President of MedImpact before moving to GoodRx in May 2022, mere months before GoodRx began soliciting PBMs to join its ISP Scheme. Another GoodRx Senior Vice President, Cynthia Meiners, spent twelve years at

Express Scripts as a Vice President for Pharmaceutical & Retail Strategies. Agnes Rey-Giraud, a current member of GoodRx's Board of Directors, also spent twelve years at Express Scripts, including as Senior Vice President for Contracting, Strategic Sourcing & Corporate Strategy. Jim Sheninger, a GoodRx Pharmacy Strategy Officer, has previously worked in leadership at both CVS Health and as Senior Vice President for Cigna Pharmacy Management. The revolving doors that exist between GoodRx and the PBM Defendants create ready opportunities among their executives for explicit agreements to collude.

## VIII.   RELEVANT MARKETS AND MONOPSONY POWER

293.    This case concerns a horizontal price-fixing arrangement, which is *per se* illegal and for which a market definition is not needed. To the extent that proof of market and/or monopsony power is needed, the collective power of the PBM Defendants can be established with direct evidence, obviating the need for a market definition. On information and belief, the ISP Scheme reduces net reimbursement amounts for generic drugs (1) subject to the ISP Scheme (i.e., the amounts pharmacies earn on prescriptions subject to the ISP Scheme after all fees are paid to PBMs) and (2) generic reimbursement to pharmacies overall The PBM Defendants would not have been able profitably to impose such significant reductions in generic reimbursement rates—well in excess of a small but significant non-transitory decrease in prices of a hypothetical monopsonist—unless they collectively possessed market (buying) power over pharmacists.

294.    Moreover, the PBM Defendants that now use GoodRx to set generic drug reimbursement rates are responsible for managing 64% of all prescription drug claims in the United States. That market share understates the market power of the PBM Defendants. An essential part of pharmacy operations is dispensing prescription drugs to consumers. But a pharmacy can only do so if the pharmacy is in the network of the PBM that is responsible for administering that consumer's prescription drug benefits. Thus, even though the PBM Defendants

manage 60-70% of prescription drug claims, nearly all independent pharmacies are likely in one or (likely) more of the PBM Defendants' pharmacy networks. Caremark, for example, reports that its network includes more than 65,000 pharmacies, of which more than 27,000 are independent pharmacies (*i.e.* nearly all independent pharmacies).

295.    Given these realities, pharmacies have no real alternative to using one or more of the PBM Defendants to access consumers (*i.e.* demand for the prescription drugs they sell), as the PBM Defendants gatekeep access to a huge portion of potential patients and prescriptions. The PBM Defendants' market share is additional direct evidence of the ISP Scheme members' collective market (buying) power over pharmacies.

296.    To the extent an antitrust market needs to be defined, the relevant market is the market for network pharmacy services for purchase by PBMs on behalf of TPP clients (the "Network Pharmacy Services Market"). PBMs operate "networks" that individual pharmacies can belong to. To dispense a drug to a consumer under that consumer's health plan, the pharmacy needs to be in the network of the PBM that the health plan has contracted with to manage its prescription drug benefits. PBMs need to offer sufficiently attractive services for a pharmacy to elect to be in that PBM's network. The most important "service" that a PBM offers a pharmacy is its reimbursement rate for prescription drugs; *i.e.* the higher the reimbursement rate the PBM offers, the more attractive its "services" are, and the more likely it is that a pharmacy will elect to be in that PBM's network. Where a PBM offers reimbursement rates that are too low, it risks having fewer pharmacies enroll in its networks, which would then in turn also make that PBM less attractive to health plans as compared to other PBMs. PBMs thus compete with one another with respect to the size and scope of their pharmacy networks, and the most important aspect of that competition is the reimbursement rates that the PBMs offer.

297.    The Network Pharmacy Services Market is the market that has been corrupted by the ISP Scheme. Absent the scheme, PBMs would compete to enroll pharmacies in their networks by offering superior reimbursement rates on prescription drugs (including generics); instead, the PBM Defendants now agree not to outbid each other on pharmacy reimbursement rates for generic drugs. The relevant geographic market is the entire United States, because PBMs enroll pharmacies in their networks (to provide services to their covered lives) nationwide.

298.    The Network Pharmacy Services Market is an input market. Absent network pharmacy services, PBMs would struggle to compete in the associated output market for PBM services for purchase by TPPs (the PBM Services Market). That's because TPPs decide which PBMs to hire based on the quality and breadth of their pharmacy networks.

299.    In this input market, pharmacies are sellers of prescription drugs, while PBMs (like the PBM Defendants) pay for those products on behalf of their TPP clients. Pharmacies have no reasonable economic substitutes to which they could turn in response to a small decrease in reimbursements (below competitive levels) provided by PBMs for generic drugs.

300.    The Network Pharmacy Services Market can be corroborated by practical indicia of the contours of competition. With regard to industry or public recognition of the market, there is widespread recognition in the PBM industry that network pharmacy services are a vital input. And pharmacies commonly express decreased willingness to join particular PBMs' networks when they receive below-market reimbursements from those PBMs.

301.    With regard to the peculiar characteristics and uses of network pharmacy services, such services are unique because network pharmacists are compensated at pre-contracted rates by the PBM after the transactions have occurred. By contrast, in the retail or cash-pay market for

prescription drugs, patients pay the pharmacy at the point of sale, based upon U&C (non-discounted) prices which are unilaterally set by the pharmacy.

302.    The PBM Defendants' collective market (buying) power over independent pharmacies can be inferred based on their combined market share in the PBM Services Market, plus evidence of barriers to entry. Four PBMs, including the nation's two largest, have agreed to use GoodRx's ISP pricing methodology for generic drug claims. As stated above, these PBM Defendants account for at least 64% of all prescription drug claims managed in the United States.

## IX.    ANTITRUST INJURY SUFFERED BY CLASS MEMBERS

303.    During the relevant time period, Defendants' ISP Scheme caused Plaintiffs, Plaintiffs' member pharmacies, and Class Members to suffer substantial losses and damage to their business and property. Rather than paying their own Contracted Rates for generic drugs, the PBM Defendants outsourced their rate-setting decisions to GoodRx, which has access to a massive amount of competitively sensitive price information of the PBM Defendants and their competitors. Through the ISP Scheme, the PBM Defendants agree to always select the lowest rate possible of any PBM when determining what to pay Plaintiffs, Plaintiffs' member pharmacies, and Class Members. The PBM Defendants have entered into an unlawful agreement not to outbid each other's reimbursements to Plaintiffs, Plaintiffs' member pharmacies, and Class Members for generic drugs. Through the ISP, the PBM Defendants have also agreed not to compete with GoodRx for prescription drug transactions.

304.    Defendants' anticompetitive conduct implemented through the ISP Scheme caused Plaintiffs, Plaintiffs' member pharmacies, and Class Members to suffer antitrust injury in the form of:

a)    Decreased reimbursements for dispensing generic prescription drugs;

b)      Increased fees charged to Plaintiffs, Plaintiffs' member pharmacies, and

Class Members by Defendants resulting from the ISP scheme; and

c)      Reduced competition in the Relevant Market.

305.    These are injuries of the type that the antitrust laws were meant to prevent and
punish.

## X.      CLASS ACTION ALLEGATIONS

306.    Plaintiffs Keaveny Drug, Inc., Star Discount Pharmacy, Inc, SDDDC LLC,
Northern Arizona Pharmacy, LLC, OneroRx, Inc., AHF, and P4H, bring this action on behalf of
themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a),
and 23(b)(3) as representatives of the proposed Damages Class, which is defined as follows:

> All pharmacies and/or entities that dispense pharmaceutical drugs in
> the United States that were or are reimbursed for generic drugs in
> connection with the GoodRx Integrated Savings Program.

307.    All Plaintiffs bring this action on behalf of themselves, their member pharmacies,
and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2)
as representatives as the proposed Injunctive Relief Class, which is defined as follows:

> All pharmacies and/or entities that dispense pharmaceutical drugs in
> the United States that were or are reimbursed for generic drugs in
> connection with the GoodRx Integrated Savings Program.

308.    Excluded from the Classes are Defendants and any entities owned or operated by
Pharmacy Benefit Managers, including, but not limited to, the PBM Defendants, and/or their
officers, directors, management, employees, parents, subsidiaries, or affiliates, and all
governmental entities. For the avoidance of doubt, any pharmacies that are part of the same
vertically integrated entity as any PBM are excluded from the Classes.

309.     Plaintiffs and the Classes have been harmed by Defendants' misconduct since at least ████████████████████████████████████████████████████

████████████████████

310.     The proposed Classes satisfy Rule 23(a)(1)'s numerosity requirement because each class is so numerous that joinder of all members is impractical. There are thousands of members of the proposed Classes.

311.     The proposed Classes satisfy Rule 23(a)(2)'s commonality requirement because there are questions of law or fact common to each Class. Common questions include:

  a)     Whether Defendants entered into an agreement, contract, combination, or conspiracy to artificially suppress the reimbursement rates paid to pharmacies for generic prescription medications;

  b)     Whether Defendants' unlawful and anticompetitive behavior constitutes a *per se* violation of Section 1 of the Sherman Act;

  c)     Whether Defendants' unlawful and anticompetitive behavior injured the members of the proposed class; and

  d)     The proper amount of damages for the proposed class, as well as the contours of appropriate injunctive, declaratory, or equitable relief.

312.     The proposed Classes satisfy Rule 23(a)(3)'s typicality requirement because Plaintiffs press the same legal theories, and seek to redress the same injury, for themselves as for all members of the proposed Classes. Plaintiffs, Plaintiffs' member pharmacies, and all members of the Classes were injured by the same unlawful conduct, which resulted in all of them or their members receiving less compensation for generic drugs from PBMs than they otherwise would have in a competitive market.

313.    The proposed Classes satisfy Rule 23(a)(4)'s adequacy requirement because no conflicts exist between the interests of Plaintiffs and the interests of the respective class they seek to represent. Plaintiffs will fairly and adequately protect and represent the interests of their respective Classes. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust class actions.

314.    Class certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a whole. Specifically, Defendants have entered into a price fixing scheme forbidden by federal antitrust law, which should be enjoined and declared unlawful for the Class as a whole.

315.    Class certification for the Pharmacy Class is warranted under Rule 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

316.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

317.    In the alternative, Plaintiffs seek class certification under Rule 23(c)(4) of an issue class to resolve each of the common issues identified above, including but not limited to whether Defendants' conduct constitutes a *per se* violation of the federal antitrust laws. Resolution of these issues on a classwide basis would materially advance the resolution of each class member's individual suit for damages.

318.    Each Class is so numerous that joinder of all members in this action is impracticable. There are likely at least tens of thousands of members in the proposed Classes.

319.    Plaintiffs' claims (and, for the association Plaintiffs, those of its members) are typical of those of the respective class they seek to represent because Plaintiffs press the same legal theories, and seek to redress the same injury, for themselves (and for the association Plaintiffs, their members) as for all members of the proposed Classes.

320.    Plaintiffs, Plaintiffs' member pharmacies, and all members of each respective class were injured by the same unlawful conduct, which resulted in all of them receiving less compensation for generic drugs from PBMs than they otherwise would have in a competitive market.

321.    Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiffs (and, for the association Plaintiffs, their members) are not antagonistic to the Class.

322.    Questions of law and fact common to the members of each Class predominate over questions, if any, that may affect only individual members.

323.    Defendants have acted and refused to act on grounds generally applicable to members of each proposed Class, such that injunctive and declaratory relief is appropriate with respect to the proposed Class as a whole.

324.    Questions of law and fact common to each Class include but are not limited to:

a)    whether GoodRx and the PBM Defendants have entered into a contract, combination, conspiracy, or common understanding to artificially suppress reimbursement rates for generic prescription drugs;

b)    whether, if GoodRx and the PBM Defendants entered into such a contract, combination, conspiracy, or common understanding, that conduct is a *per se* violation of Section 1 of the Sherman Act;

c)    whether the conduct of GoodRx and the PBM Defendants has in fact artificially suppressed reimbursement rates paid to members of the proposed Class;

d)    the proper measure of damages for the proposed Damages Class; and

e)    the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

325.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

326.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

327.    Defendants have acted or refused to act on grounds that apply generally to the Federal Rule of Civil Procedure 23(b)(2) Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the (b)(2) Class as a whole.

328.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XI.    CAUSE OF ACTION

### COUNT ONE
### Agreement in Restraint of Trade in Violation of
### Section 1 of the Sherman Antitrust Act

329.    Plaintiffs incorporate each allegation above as if fully set forth herein.

330.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase and reimbursement of prescription drugs for health plan members and in the provision of PBM services.

331.    Defendants entered into and engaged in an unlawful contract, combination, or agreement in restraint of trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

332.    Specifically, Defendants have combined to form a Scheme to artificially suppress reimbursement rates paid to pharmacies across the country for generic drugs, and they have exchanged non-public and competitively sensitive information with one another in order to accomplish that purpose.

333.    The conduct of Defendants was undertaken with the intent, purpose, and effect of artificially suppressing reimbursement rates on generic drugs below competitive levels.

334.    Defendants perpetrated this scheme with the specific intent of decreasing pharmacy reimbursement rates for their own benefit.

335.    The unlawful contract, combination or conspiracy alleged herein has had the following effects:

a)      Generic prescription drug reimbursement rates paid to Plaintiffs, Plaintiffs' member pharmacies, and members of the Class have been fixed, maintained, stabilized or suppressed at artificially low levels;

b)      Plaintiffs, Plaintiffs' member pharmacies, and members of the Class have been forced to pay artificially inflated service fees to GoodRx which GoodRx then shared with one or more PBMs; and

c)      Plaintiffs, Plaintiffs' member pharmacies, and members of the Class have been deprived the benefits of free and unrestrained competition in that the PBMs agreed to refrain from outbidding one another or engage in reimbursement rate negotiation as they had done prior to the GoodRx ISP scheme.

336.    The conduct of Defendants in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

337.    The GoodRx ISP Scheme has caused the Class to suffer damages in the form of artificially suppressed reimbursement rates.

338.    There are no procompetitive justifications for the GoodRx ISP Scheme, and any proffered justifications, to the extent cognizable, could be achieved through less restrictive means.

339.    The GoodRx ISP Scheme is unlawful under a *per se* mode of analysis. In the alternative, the GoodRx ISP Scheme is unlawful under either a quick look or rule of reason mode of analysis.

340.    As a direct and proximate result of this unlawful scheme, Plaintiffs (and association Plaintiffs' members) and the members of the proposed Class have suffered injury to their business

or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

341.    An award of damages is insufficient to prevent this future harm, and thus, Plaintiffs (and association Plaintiffs' members) and members of the Class face irreparable harm absent an order permanently enjoining Defendants from continuing their unlawful conduct.

342.    Plaintiffs (and association Plaintiffs' members) and the Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein as well as any other equitable relief the Court deems proper.

## XII.    PETITION FOR RELIEF

343.    Plaintiffs petition for the following relief:

344.    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives for the classes they seek to represent, and that Plaintiffs' counsel be appointed as class counsel;

345.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act;

346.    An order enjoining the Defendants from engaging in further unlawful conduct;

347.    An award of attorneys' fees and costs;

348.    Such other and further relief as the Court deems just and equitable.

## XIII.    JURY DEMAND

349.    Plaintiffs, on behalf of themselves, their members, and the Class, demand a jury trial on all issues triable as of right before a jury.

RESPECTFULLY SUBMITTED this 15th day of December, 2025.

By: */s/ David J. Ko*
David J. Ko
dko@kellerrohrback.com

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101
Tel: 206.623.1900

By: */s/ Heidi M. Silton*
Heidi M. Silton
hmsilton@locklaw.com
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: 612.339.6900

By: */s/ Donald A. Migliori*
Donald A. Migliori
dmigliori@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: 843.216.9241

*Plaintiffs' Interim Co-Lead Counsel*