# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re GoodRx and Pharmacy Benefit Manager Antitrust Litigation (No. II)<br><br>This Document Applies To:<br><br>ALL CASES | Case No.: 1:25-md-03148-MSM-AEM<br><br>MDL No. 3148 |

## EXPRESS SCRIPTS, INC. AND EXPRESS SCRIPTS HOLDING CO.'S MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................. 4

LEGAL STANDARD .......................................................................................... 7

ARGUMENT ................................................................................................... 8

I.     The Express Scripts ISP Agreement Is Not a *Per Se* Price-Fixing Arrangement ............. 10

II.    Plaintiffs' Theory Does Not Apply to Express Scripts Because It Does Not Share or Receive Non-Public Information Under Its ISP Agreement .......................................... 12

CONCLUSION ................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Addamax Corp. v. Open Software Found., Inc.*,
  152 F.3d 48 (1st Cir. 1998)..................................................................................... 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .........................................................................................7, 10

*Bd. of Trade of City of Chicago v. United States*,
  246 U.S. 231 (1918) ............................................................................................... 8

*Beddall v. State St. Bank & Tr. Co.*,
  137 F.3d 12 (1st Cir. 1998).............................................................................4, 7, 15

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ................................................................................................. 12

*Business Electronics Corp. v. Sharp Electronics Corp.*,
  485 U.S. 717 (1988) ............................................................................................... 9

*Cheng v. Neumann*,
  51 F.4th 438 (1st Cir. 2022)................................................................................... 8

*In re Citric Acid Litig.*,
  996 F. Supp. 951 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) ............ 13

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)................................................................................................ 10

*Contractor Tool Supply, Inc. v. JPW Indus., Inc.*,
  785 F. Supp. 3d 1107 (M.D. Fla. 2025) ................................................................ 14

*Coyne v. City of Somerville*,
  972 F.2d 440 (1st Cir. 1992)................................................................................... 7

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025)............................................................................... 8

*Jorge v. Rumsfeld*,
  404 F.3d 556 (1st Cir. 2005)................................................................................... 7

*Lee v. Life Ins. Co. of N. Am.*,
  829 F. Supp. 529 (D.R.I. 1993), *aff'd*, 23 F.3d 14 (1st Cir. 1994)............................ 9

*In re LTL Shipping Servs. Antitrust Litig.*,
   2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ................................................................ 13

*Attorney General ex rel Maddox v. Elsevier, Inc.*,
   732 F.3d 77 (1st Cir. 2013) ...................................................................................... 8

*Maple Flooring Mfrs.' Ass'n v. United States*,
   268 U.S. 563 (1925) ................................................................................................ 13

*Mooney v. AXA Advisors, L.L.C.*,
   19 F.Supp.3d 486 (S.D.N.Y. 2014) ........................................................................ 15

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021) .................................................................................................. 9

*Paladin Assocs., Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ................................................................................ 12

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
   767 F. Supp. 3d 681 (N.D. Ohio 2025) .................................................................. 14

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
   632 F. Supp. 3d 1108 (S.D. Cal. 2022) .................................................................. 13

*In re Processed Egg Prods. Antitrust Litig.*,
   962 F.3d 719 (3d Cir. 2020) ................................................................................... 10

*PSKS, Inc. v. Leegin Creative Leather Prods.*,
   615 F.3d 412 (5th Cir. 2010) .................................................................................. 14

*PSW, Inc. v. VISA U.S.A., Inc.*,
   No. 04-347, 2006 WL 519670 (D.R.I. Feb. 28, 2006) ........................................... 14

*Soscia Holdings, LLC v. Gray*,
   725 F. Supp. 3d 156 (D.R.I. 2024) ......................................................................... 8

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ................................................................................................. 8, 9

*Sterling Merch., Inc. v. Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011) .................................................................................. 12

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) ................................................................................. 9, 10

*Sullivan v. Tagliabue*,
   795 F. Supp. 56 (D. Mass. 1992) ............................................................................ 9

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ................................................................................... 13, 14

*United States v. Avx Corp.*,
    962 F.2d 108 (1st Cir. 1992) ........................................................................................... 7

*United States v. Citizens & S. Nat. Bank*,
    422 U.S. 86 (1975) ........................................................................................................ 11

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ........................................................................................................ 8

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ...................................................................................................... 11

*Yacubian v. United States*,
    750 F.3d 100 (1st Cir. 2014) ..................................................................................... 8, 12

*Yagoozon, Inc. v. Kids Fly Safe*,
    2014 WL 3109797 (D.R.I. July 8, 2014) .................................................................... 14

**Statutes**

15 U.S.C. § 1 ........................................................................................................................ 8

**Other Authorities**

Herbert Hovenkamp & Phillip Areeda,
    *A*NTITRUST *L*AW: *A*N *A*NALYSIS OF *A*NTITRUST *P*RINCIPLES AND *T*HEIR *A*PPLICATION
    (5th ed. 2022) .............................................................................................................. 13

Express Scripts, Inc. and Express Scripts Holding Company (collectively, "Express Scripts") adopts and joins the arguments set forth in Defendants' Joint Motion to Dismiss[1], and it separately moves to dismiss on the independent ground that the plain text of Express Scripts' contract with GoodRx forecloses the possibility that it participated in the alleged conspiracy described in the Amended Consolidated Complaint.

## PRELIMINARY STATEMENT

Plaintiffs' claim "this case really comes down to what's the nature of" the contracts between each PBM and GoodRx that govern the Integrated Savings Program ("ISP") for each PBM. June 23, 2025 Hr'g Tr. 20:8–9. Plaintiffs sought and obtained pre-complaint discovery of those agreements, yet their first Consolidated Complaint completely ignored the terms of the Express Scripts ISP Agreement. Express Scripts' original motion to dismiss likewise identified this exact defect, and Plaintiffs' Amended Consolidated Complaint still makes no effort to cure it. The reason for that is clear: on its face, the Express Scripts ISP Agreement completely refutes the core premises of Plaintiffs' case.

Express Scripts has not delegated authority to GoodRx to set drug reimbursement rates. Express Scripts independently sets the reimbursement rates paid to pharmacies for prescription claims processed under insurance benefits administered by Express Scripts. The ISP Agreement does not—and never has—changed that process. Instead, the ISP Agreement merely allows Express Scripts to access cash discount cards that GoodRx makes ***publicly available*** on its website—the same discount cards any consumer can access on their own through GoodRx.com or the GoodRx mobile app. And Express Scripts, in its sole discretion, determines when to route a prescription claim to GoodRx. When that happens, the consumer pays the GoodRx public cash

---

[1] Express Scripts also joins The Cigna Group's Motion to Dismiss as it relates to claim splitting.

1

price, and the pharmacy is not owed any form of reimbursement under insurance. The ISP Agreement does not require Express Scripts to change any of the drug reimbursement rates under its contracts with pharmacies, which only apply when a claim is processed through insurance.

Moreover, Express Scripts does not share with GoodRx (or any other PBM) the drug reimbursement rates that are paid to pharmacies when a prescription claim is processed and reimbursed through insurance. Indeed, Express Scripts does not even compare those rates to GoodRx's cash discount card prices. As is clear from the face of the ISP Agreement, when deciding whether to route a claim to GoodRx, Express Scripts compares a health plan member's copay to the best-available discount card price provided by GoodRx. A copay is *not* the rate paid to a pharmacy when a prescription claim is processed through insurance; it is instead the member's out of pocket contribution toward the cost of the prescription (while insurance covers the remainder). Under the ISP Agreement, Express Scripts only routes prescription claims to GoodRx when the member's copay exceeds the cash price available through GoodRx, which helps consumers access a lower out-of-pocket price for their medication.

When standing at the pharmacy counter, consumers can do the same comparison themselves that is conducted under the ISP Agreement by utilizing GoodRx's "traditional discount card business"—which Plaintiffs do not challenge. They simply need to visit GoodRx.com or use the GoodRx mobile app to download the discount card or coupon and then compare that cash discount card price available through GoodRx to the copay under their insurance. The consumer can then present the discount card to the pharmacist, pay cash, and receive the prescription. The ISP merely automates that process.

When the actual terms of Express Scripts' ISP Agreement with GoodRx are evaluated, Plaintiffs' conspiracy claim against Express Scripts is not plausible and fails as a matter of law.

*First*, Plaintiffs cannot allege a *per se* price-fixing claim based on the Express Scripts ISP Agreement. Express Scripts has not agreed with GoodRx (or anyone else) to adopt or enforce any particular price or pricing methodology. The *per se* rule is reserved for a narrow category of restraints with no redeeming qualities, and that clearly is not the case for the Express Scripts ISP Agreement. By automating access to publicly available information, the ISP Agreement reduces transaction costs for consumers and gives them access to lower prices for prescription drugs. Those compelling procompetitive benefits foreclose *per se* treatment.

*Second*, the text of the ISP Agreement is clear that Express Scripts does not share confidential drug reimbursement rates with GoodRx (or other PBMs), and it does not share or receive confidential drug reimbursement rates from GoodRx or other PBMs. Express Scripts receives only discount card information that is available to the general public on GoodRx's website. Thus, Plaintiffs' entire theory—which is premised on the exchange of confidential information about drug reimbursement rates through GoodRx—does not apply to Express Scripts.

Moreover, even if the Plaintiffs had accurately described the terms of the Express Scripts ISP Agreement, they would not have a viable claim. Under well-established Supreme Court precedent, a mere agreement to share information is evaluated under the rule of reason, which requires proof of anticompetitive effects. The exchange of publicly available information—which is all that Express Scripts receives from GoodRx—cannot plausibly cause harm to competition in any way. Instead, broad dissemination of public pricing information under the ISP Agreement makes the market ***more*** competitive, by reducing transaction costs and promoting access to the lowest available prescription drug prices for consumers.

For these reasons, in addition to those set forth in Defendants' joint motion, Express Scripts respectfully submits that the claim against Express Scripts should be dismissed with prejudice.

## FACTUAL BACKGROUND[2]

GoodRx provides a service that aggregates cash discount card prices for prescription drugs. Am. Compl. ¶¶ 132–34.  GoodRx makes those discount card prices directly available to the general public through its public website (www.goodrx.com) and through the GoodRx mobile app.  *Id*. ¶ 136.  Anyone can use GoodRx's website or mobile app at any time to benefit from its discounted prices.

When a consumer uses a discount card provided by GoodRx, "they pay cash for their prescriptions (rather than use their insurance benefits)."  *Id*. ¶¶ 9, 137.  The pharmacy does not receive any form of remuneration from a patient's health plan.  *Compare id*. ¶ 88 (when insurance is used, "[g]enerally, health plan members who have already met their plan's annual deductible pay only a portion of their PBM's pharmacy reimbursement rate as specified by their plan's co-payment or co-insurance schedule; the remainder is paid by their plan.").

In July 2021, GoodRx acquired RxNXT LLC, a technology company that GoodRx used to develop its "Integrated Savings Program" and expand distribution of GoodRx's discount cards. *Id*. ¶¶ 154–55.  In June 2022, GoodRx and Express Scripts announced their ISP agreement.  *Id*. ¶¶ 163, 229, 232.  The Express Scripts ISP Agreement enabled members of certain Express Scripts clients (*e.g.*, health insurance plans and employer-sponsored benefit plans) to automatically access the publicly available discount card prices aggregated by GoodRx, available to consumers through its app and website.  *Id*. ¶¶ 163, 229–30.

---

[2] The following facts from the Amended Consolidated Complaint are assumed true solely for purposes of this motion to dismiss.  Where specified, Express Scripts draws from the Express Scripts ISP Agreement, as Plaintiffs expressly incorporate by reference the contracts executed between GoodRx and Defendants, Am. Compl. ¶ 161, attached hereto as Ex. A, and the Court may properly consider their content.  *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████    For clients who participate in the ISP, the following

"workflow" applies when prescription claims are adjudicated for their members:

1. The prescription claim is routed to Express Scripts ████████████████████ *Id.*
   § 2.3.3.

2. Express Scripts, ██████████████████████████████
   ████████████████████████████ *Id.*

3. ████████████████████████████████████████████
   ████████████████████████ *Id.*

4. ████████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   *id.* § 2.3.4.

   The term ████████████████ refers to ██████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
   *Id.* § 1.10.[4]

5. After reviewing the discount cards available from GoodRx, Express Scripts routes only
   ████████████████████████ *id.* § 2.3.3., which are claims █████████
   ████████████████████████ *Id.* § 1.17.

████████████████████████████████████████████████

█████████████████████████    *Id.* §§ 2.3.1, 2.3.3.  And GoodRx discount cards are only



---

[3] ████████████████████████████████████████ Ex. A § 2.5.

[4] "Pricing Exclusion" is defined as ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ *Id.* § 2.3.4.  These categories of prices, even
if available on the GoodRx website, are ***not*** provided to Express Scripts under the ISP.

used if the health plan member's copayment—*not* the drug reimbursement price received by the pharmacy under insurance benefits—is higher than the publicly available discount card prices. *Id.* § 1.10.

This process was explained by GoodRx on a public website that is cited (but misquoted) in the Amended Consolidated Complaint:

> The program allows eligible insurance plan members to have automatic access to GoodRx's prescription prices. Members show their prescription card at the pharmacy counter, as they normally would. Then, behind the scenes, the ISP technology compares the *insurance plan's copay* with GoodRx's discount price and delivers the lowest price for the medication.

Taryn O'Grady, *GoodRx's Integrated Savings Program Wins Fierce Healthcare Innovation Award*, GOODRX (Dec. 21, 2023), https://www.goodrx.com/corporate/business/fierce-innovation-award-2023 (emphasis added); *see also* Am. Compl. ¶ 14 n.2–3 (citing but misquoting same source).

While Plaintiffs purport to quote from this description, they improperly replaced the term "insurance plan's copay" with the term "insurance price"—without signaling the alternation to the quote in brackets. Am. Compl. ¶ 14. Through this unacknowledged modification, Plaintiffs conflate two distinct concepts.[5] Plaintiffs define the term "insurance price" as "the drug price the PBM that manages that patient's insurance benefits has contracted to with the dispensing pharmacy." *Id.* But as Plaintiffs acknowledge elsewhere in the Amended Consolidated Complaint, a patient's copay is *not* the drug reimbursement price that a PBM has contracted to pay the dispensing pharmacy. A copay instead represents a patient's out-of-pocket responsibility,

---

[5] This conflation is not an inadvertent error. Express Scripts' original motion to dismiss squarely identified Plaintiffs' misrepresentation. Plaintiffs' conscious decision to repeat the same "quote" in their Amended Consolidated Complaint underscores their inability to plead their theory without distorting the record. Am. Compl. ¶ 14.

which is only a small part of the remuneration a pharmacy receives when it dispenses drugs that

are covered by insurance. *See id.* ¶ 178. The remainder of the drug's price is paid by the member's

health plan. *See id.*

It is only by ignoring the terms of the Express Scripts ISP Agreement (and altering the

language that appears on GoodRx's website) that Plaintiffs are able to claim "all PBMs that

participate in the ISP Scheme agree to calculate pharmacy reimbursement rates for generic drugs

in the same way based on the 'lesser of' (a) the patient's 'insurance price' (the drug price the PBM

that manages that patient's insurance benefits has contracted to with the dispensing pharmacy), or

(b) the 'GoodRx price' (the lowest price any PBM in the GoodRx Information-Exchange Network

has contracted to for the same drug)." *Id.* ¶ 14. Under the Express Scripts ISP Agreement, that is

clearly not the case.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal when a complaint fails to allege

facts sufficient to establish a plausible entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). When evaluating a Rule 12 motion, the Court generally takes as true "the well-pleaded

facts as they appear in the complaint." *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.

1992). This "does not mean, however, that a court must (or should) accept every allegation made

by the complainant, no matter how conclusory or generalized." *United States v. Avx Corp.*, 962

F.2d 108, 115 (1st Cir. 1992).

When "a complaint's factual allegations are expressly linked to—and admittedly

dependent upon—a document (the authenticity of which is not challenged), that document

effectively merges into the pleadings and the trial court can review it in deciding a motion to

dismiss under Rule 12(b)(6)." *Beddall*, 137 F.3d at 17; *Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st

Cir. 2005) (a court may properly "augment [pleaded] facts with facts extractable from

documentation annexed to or incorporated by reference in the complaint."); *Attorney General ex rel Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (same).

To the extent the allegations in the Consolidated Complaint contradict the express terms of the ISP agreement, those allegations should be disregarded by the Court when ruling on a Rule 12 motion. *See*, *e.g.*, *Cheng v. Neumann*, 51 F.4th 438, 445 (1st Cir. 2022) ("A complaint cannot plausibly allege falsity where, as here, materials incorporated into the complaint refute that very assertion."); *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) ("[I]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (cleaned up); *Soscia Holdings, LLC v. Gray*, 725 F. Supp. 3d 156, 171 (D.R.I. 2024) (dismissing contract claim where terms of a deed contradicted the plaintiff's allegations).

## ARGUMENT

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. In interpreting the statute, however, the Supreme Court long ago held "that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 606 (1972). Instead, "Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

"Contracts, like '[e]very agreement concerning trade,' restrain trade." *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1080 (9th Cir. 2025) (quoting *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918)). "But to allege a Section 1 violation requires more than merely identifying a contract." *Id*. A plaintiff must instead allege facts—not conclusions or labels—that plausibly suggest a contract is the sort of restraint that could be deemed "unreasonable" under

Section 1 because of its potential to harm competition. *Sullivan v. Tagliabue*, 795 F. Supp. 56, 57–58 (D. Mass. 1992) ("To establish a cause of action under the Sherman Act, plaintiffs must allege and prove three essential elements: (1) an agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; (3) and which actually causes injury to competition."); *Lee v. Life Ins. Co. of N. Am.*, 829 F. Supp. 529, 534 (D.R.I. 1993), *aff'd*, 23 F.3d 14 (1st Cir. 1994) (same).

Unreasonable restraints fall into two categories. There is a narrow category of restraints that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*," without any analysis of the restraint's impact on competition. *Khan*, 522 U.S. at 10; *see also Lee*, 829 F. Supp. at 535 ("The *per se* approach is appropriate where the challenged conduct is 'manifestly anticompetitive' and thus no in-depth analysis of the market effect is necessary") (quoting *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723–34 (1988)). All other restraints are evaluated under the rule of reason, which requires "a fact-specific assessment of market power and market structure aimed at assessing the challenged restraint's actual effect on competition—especially its capacity to reduce output and increase price." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88 (2021) (quotation omitted). "Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).

Thus, to pass muster under Rule 12, a plaintiff must allege facts—not conclusions or labels—that plausibly establish either (1) the challenged restraint falls within a recognized *per se* category; or (2) that the nature of the alleged restraint plausibly gives rise to anticompetitive effects

9

that could sustain a rule of reason claim. Plaintiffs cannot meet that burden here with respect to the Express Scripts ISP Agreement.

## I.    The Express Scripts ISP Agreement Is Not a *Per Se* Price-Fixing Arrangement

While Plaintiffs allege the "GoodRx ISP Scheme is a price-fixing conspiracy," Am. Compl. ¶ 11, and therefore subject to *per se* treatment, *id.* ¶ 293, their conclusory allegations need not by credited by the Court. *Iqbal*, 556 U.S. at 678 (a court is "not bound to accept as true a legal conclusion couched as a factual allegation." (quotation omitted)). Plaintiffs have not alleged well-pleaded ***facts*** that plausibly suggest Express Scripts agreed with GoodRx—or anyone else—to fix or suppress drug reimbursement prices through its ISP Agreement.

"[T]he per se rule is applied sparingly and only where the adverse impact on competition is obvious and substantial." *Stop & Shop*, 239 F. Supp. 2d at 189. For that reason, "courts have been very careful to confine per se treatment to conduct of the type that is almost always actually or potentially anticompetitive and has no redeeming benefits (*e.g.*, reduced costs, increased competition) worthy of being weighed against the negative effects." *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 51 (1st Cir. 1998). When a challenged practice has any possible "redeeming virtue," it must be evaluated under the rule of reason. *See Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50 (1977) ("Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive.") (quotation omitted).

To pursue a *per se* price-fixing claim, Plaintiffs must advance plausible factual allegations that competitors have reached an agreement on some aspect of price or price-setting. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 728-29 (3d Cir. 2020) (rejecting *per se* treatment for an alleged horizontal agreement that did not directly involve an agreement on output or price, even when plaintiffs alleged price effects). They have failed to do so here. Nothing in the Express Scripts ISP Agreement restrains Express Scripts pricing decisions in any way. It does

not require Express Scripts to pay a particular price to pharmacies, change the reimbursement rates it pays to pharmacies, or apply a common methodology for determining reimbursement rates. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. § 2.3.3.

At most, under its ISP Agreement with GoodRx, Express Scripts has agreed to receive certain information—***publicly available*** discount card prices—from GoodRx.  Such exchanges of information, even between horizontal competitors, must be evaluated under the rule of reason. *United States v. Citizens & S. Nat. Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a per se violation of the Sherman Act."); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.  For this reason, we have held that such exchanges of information do not constitute a per se violation of the Sherman Act.").

Furthermore, the Express Scripts ISP Agreement—which reduces transaction costs and makes lower prices available to consumers—has obvious procompetitive benefits, which confirms it cannot be subject to *per se* treatment.  In a nutshell, the Express Scripts ISP Agreement provides a more efficient means to conduct the same comparison that any consumer could perform at the pharmacy counter by visiting the GoodRx website or mobile app to download a card or coupon— which is a practice Plaintiffs do not challenge as unlawful.  Am. Compl. ¶ 141 ("This action does not challenge GoodRx's traditional discount card business.").  Commercial arrangements that reduce transaction costs, offer more efficient distribution, improve quality, or provide access to lower prices have procompetitive benefits that render *per se* treatment inappropriate.  *See Broad.*

*Music*, *Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979) (finding that aggregated, blanket copyright license that eliminated the need for costly individual negotiations reduced transaction costs and therefore was not a *per se* restraint); *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123 (1st Cir. 2011) ("Given their capacity to enable markets to operate more efficiently and benefit consumers, [exclusive dealing] agreements are not subject to per se treatment, but are instead subject to rule of reason analysis."); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155, 1157 (9th Cir. 2003) (agreements "assigning transportation on a five-year basis [are] more efficient than [agreements] assigning transportation on a yearly basis, because [they] eliminate[] the transaction costs of renegotiating agreements on a yearly basis. Such efficiencies are procompetitive."). That is the case here as well.

## II. Plaintiffs' Theory Does Not Apply to Express Scripts Because It Does Not Share or Receive Non-Public Information Under Its ISP Agreement

Even under the rule of reason, Plaintiffs' claim against Express Scripts fails because their core allegations are refuted by the plain terms of the ISP Agreement, and the terms of the agreement "trump" any inconsistent allegations they have advanced. *Yacubian*, 750 F.3d at 108.

Plaintiffs allege that by entering the ISP Agreement with GoodRx, Express Scripts joined a "[s]cheme to artificially suppress reimbursement rates paid to pharmacies across the country for generic drugs," and "exchanged non-public and competitively sensitive information with [other PBMs] in order to accomplish that purpose," Am. Compl. ¶ 332. Central to this "theory" is Plaintiffs' assertion that "the ISP . . . enables PBM Defendants to search through the rates from their PBM competitors, select the lowest one, and then instruct the pharmacy to apply the lowest rate." *Id.* ¶ 272. But this allegation is irreconcilable with the ISP Agreement. Express Scripts neither provides nor receives non-public information about drug reimbursement. █████████ ████████████████████████████████████████████████████████████████ Ex. A § 1.10.

12

████████

██████. Such an agreement cannot support a plausible claim under the rule of reason against Express Scripts. A district court evaluating an agreement to merely share information must first evaluate whether the information being shared is the type of information that could possibly harm competition. Courts uniformly recognize that the mere exchange of public information, without more, cannot plausibly harm competition. *See Maple Flooring Mfrs.' Ass'n v. United States,* 268 U.S. 563, 573 (1925) (information exchange was not a violation of Section 1 where "[t]he statistics gathered by the defendant association are given wide publicity."); *Todd v. Exxon Corp.,* 275 F.3d 191, 213 (2d Cir. 2001) ("Public dissemination is a primary way for data exchange to realize its procompetitive potential. . . . [a] court is therefore more likely to approve a data exchange where the information is made public."); *see also In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219, at *13 (N.D. Ga. Jan. 28, 2009) (allegations concerning "the sharing of surcharge price information publicly using websites" did not give rise to an inference of an unlawful conspiracy); *In re Citric Acid Litig.*, 996 F. Supp. 951, 959 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) (the mere "exchange of publicly available information," without more, "does not support an inference of conspiracy"); *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1141 (S.D. Cal. 2022) ("The Court also agrees that incidental sharing of already public information to explain the need to buy or a sell, without more, is consistent with legitimate business conduct.").

Wide distribution of publicly available data does not raise the prospect of competitive harm because it is decidedly procompetitive; it makes markets more efficient and reduces search costs. *See* Herbert Hovenkamp & Phillip Areeda, *ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION* ¶ 2111b2 (5th ed. 2022) (observing that "[g]ood market information reduces search costs and minimizes price disparities and unpredictability" and "while good market

information does reduce search costs, the principal benefits occur when consumers as well as producers have the information"). It is for that reason that "perhaps the most common anticompetitive use of price information exchanges is to facilitate 'price leadership' in industries *where the price is <u>not</u> readily observable*." *Id.* ¶ 2111d1 (emphasis added). On the other hand, when prices are readily observable, including by consumers, there is no plausible prospect of competitive harm from increased distribution of that information. *See Todd*, 275 F.3d at 213 (collecting cases); *see also In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 716 (N.D. Ohio 2025) (explaining why it is implausible for the exchange of public pricing among competitors to have anticompetitive utility).

Because the plaintiff bears the threshold burden of plausibly alleging that the challenged restraint reduces competition in a relevant antitrust market, a complaint must be dismissed when it lacks sufficient allegations to plausibly suggest the challenged restraint could harm competition. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 419 (5th Cir. 2010) ("[Plaintiff] has further failed to allege any relevant factors that would indicate a plausible anticompetitive effect"); *PSW, Inc. v. VISA U.S.A., Inc.*, 2006 WL 519670, at *7 (D.R.I. Feb. 28, 2006) ("PSW's failure to allege an injury to competition is fatal to its antitrust claim"); *Yagoozon, Inc. v. Kids Fly Safe*, 2014 WL 3109797, at *9 (D.R.I. July 8, 2014) ("With no factual allegations permitting the inference that Defendants are engaged in sinister practices or otherwise suffocating competition, this pleading is insufficient to block the swing of the ax.") (internal quotations omitted); *Contractor Tool Supply, Inc. v. JPW Indus., Inc.*, 785 F. Supp. 3d 1107, 1118 (M.D. Fla. 2025) (dismissing a Sherman Act claim because the plaintiff failed to establish either actual or potential competitive harm); *Mooney v. AXA Advisors, L.L.C.*, 19 F.Supp.3d 486, 502 (S.D.N.Y. 2014) (dismissing antitrust claims at the motion to dismiss stage because plaintiff "ha[d] failed to

plausibly allege how this dynamic harms competition"). That is the case here. The public information received by Express Scripts through GoodRx makes the market more competitive, not less.

As such, Plaintiffs' alleged conspiracy, which is premised on the exchange of non-public information, completely fails with respect to Express Scripts, even under the rule of reason. That merits dismissal.

## **CONCLUSION**

For the foregoing reasons, and those set forth in the Joint Motion, Express Scripts respectfully requests that the Court dismiss the claim against Express Scripts with prejudice.

Dated: February 27, 2026
Providence, Rhode Island

By: */s/ Nicole J. Benjamin*

John A. Tarantino (#2586)
jtarantino@apslaw.com
Nicole J. Benjamin (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, RI 02903-1345
Tel: (401) 274-7200
Fax: (401) 351-4607

Meghan McCaffrey
Mike Bonanno
Alec Levy
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 13th Street NW, Suite 600
Washington, DC 20004
meghanmccaffrey@quinnemanuel.com
mikebonanno@quinnemanuel.com
aleclevy@quinnemanuel.com

Anthony P. Alden
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
anthonyalden@quinnemanuel.com

*Attorneys for Defendants Express Scripts Inc. and Express Scripts Holding Company*