# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re GoodRx and Pharmacy Benefit Manager Antitrust Litigation (No. II)<br><br>This Document Applies To:<br><br>ALL CASES | Case No.: 1:25-md-03148-MSM-AEM<br><br>MDL No. 3148<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT

# Public Version

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 4

     I.     The Parties ................................................................................................... 4

           A.     Pharmacies ................................................................................... 4

           B.     Pharmacy Benefit Managers ....................................................... 5

           C.     GoodRx ....................................................................................... 6

     II.     The Integrated Savings Programs ............................................................... 8

     III.     Plaintiffs' Conclusory Allegations of a "Price-Fixing Conspiracy" ..................... 11

LEGAL STANDARD .............................................................................................................. 12

ARGUMENT AND AUTHORITIES ....................................................................................... 13

     I.     Plaintiffs Do Not Allege a *Per Se* Unlawful Agreement ........................................ 15

           A.     Plaintiffs Fail to Allege Any Evidence of an Agreement Among the PBM Defendants ...................................................................... 16

                 1.     Plaintiffs Fail to Allege Any Direct Evidence of an Agreement Among the PBM Defendants .............................. 17

                 2.     Plaintiffs Fail to Allege Any Circumstantial Evidence of an Agreement Among the PBM Defendants ........................ 19

           B.     GoodRx and the PBM Defendants Are Not Horizontal Competitors ....... 30

     II.     Plaintiffs Do Not Allege a Violation of Sherman Act Section 1 Under the Rule of Reason ......................................................................................... 33

           A.     Plaintiffs Fail to Define a Relevant Market ............................... 34

           B.     Plaintiffs Fail to Allege the Required Substantial Anticompetitive Effects from the Challenged Conduct ......................................... 38

                 1.     Plaintiffs Plead No Direct Evidence of Market-Wide Anticompetitive Effects ............................................... 40

                 2.     Plaintiffs Plead No Indirect Evidence of Anticompetitive Effects ............................................................................ 44

     III.     Additional Defects Require Dismissal ..................................................... 47

           A.     This Court Does Not Have Subject Matter Jurisdiction Over the New Named Plaintiff ............................................................... 47

           B.     Certain Plaintiffs Lack Standing to Sue on Behalf of Subsidiaries or Members ............................................................................... 49

           C.     Plaintiffs Lack Standing to Seek Injunctive Relief .................... 51

CONCLUSION ........................................................................................................................ 53

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Addamax Corp. v. Open Software Found., Inc.*,
    152 F.3d 48 (1st Cir. 1998) ........................................................................14

*Adidas Am., Inc. v. NCAA*,
    64 F. Supp. 2d 1097 (D. Kan. 1999) ..........................................................37

*Advanced Tech. Corp. v. Instron, Inc.*,
    925 F. Supp. 2d (D. Mass. 2013) ...............................................................22

*ALA, Inc. v. CCAir, Inc.*,
    29 F.3d 855 (3d Cir. 1994) ........................................................................10

*Allen v. Verizon Commc'ns, Inc.*,
    2019 WL 399922 (D.N.J. Jan. 31, 2019) ...................................................28

*Am. Sales Co. v. AstraZeneca LP (In re Nexium (Esomeprazole) Antitrust Litig.)*,
    845 F.3d 470 (1st Cir. 2017) ......................................................................53

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................12

*Bearden v. Ballad Health*,
    967 F.3d 513 (6th Cir. 2020) ...............................................................51, 52

*Beaver Cnty. Ret. Bd. v. LCA-Vision Inc.*,
    2009 WL 3720651 (S.D. Ohio Nov. 5, 2009) ...........................................54

*Beddall v. State St. Bank & Tr. Co.*,
    137 F.3d 12 (1st Cir. 1998) ........................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................ *passim*

*Blinder v. Gerber Prods. Co. (In re Baby Food Antitrust Litig.)*,
    166 F.3d 112 (3d Cir. 1999) ......................................................................17

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979) ......................................................................................14

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) .......................................................................35, 37, 44

*Brown v. Am. Honda (In re New Motor Vehicles Canadian Exp. Antitrust Litig.)*,
   522 F.3d 6 (1st Cir. 2008) ................................................................52, 53

*Brownback v. King*,
   592 U.S. 209 (2021) ...............................................................................13

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ...............................................................................34

*In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*,
   2025 WL 1836591 (D. Minn. July 3, 2025) ...........................................48

*Chapman v. N.Y.S. Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)..............................................................34, 36

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015)...................................................................30

*In re Citric Acid Litig.*,
   996 F. Supp. 951 (N.D. Cal. 1998) ...................................................39, 44

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
   433 U.S. 36 (1977).................................................................................14

*Contractor Tool Supply, Inc. v. JPW Indus., Inc.*,
   785 F. Supp. 3d 1107 (M.D. Fla. 2025) .................................................40

*Datagate, Inc. v. Hewlett-Packard Co.*,
   941 F.2d 864 (9th Cir. 1991) .................................................................53

*Davies v. Genesis Med. Ctr.*,
   994 F. Supp. 1078 (S.D. Iowa 1998) .....................................................41

*Dennis v. Husqvarna Forest & Garden Co.*,
   1994 WL 759187 (D.N.H. Dec. 27, 1994).............................................16

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) .................................................................17

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010)..............................................................25, 57

*DM Rsch. Inc. v. Coll. of Am. Pathologists*,
   2 F. Supp. 2d 226 (D.R.I. 1998).............................................................19

*Draper v. Healey*,
   827 F.3d 1 (1st Cir. 2016) ......................................................................49

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
   472 F.3d 23 (2d Cir. 2006) ........................................................................38

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*,
   357 F.3d 1 (1st Cir. 2004) ...................................................................35, 46

*Euromodas, Inc. v. Zanella, Ltd.*,
   368 F.3d 11 (1st Cir. 2004) .................................................................19, 42

*In re Eyewear Antitrust Litig.*,
   2025 WL 2773064 (S.D.N.Y. Sept. 26, 2025) ..........................................45

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
   2017 WL 6402992 (E.D. Mich. Mar. 21, 2017) .......................................48

*Flovac, Inc. v. Airvac, Inc.*,
   817 F.3d 849 (1st Cir. 2016) ...............................................................34, 46

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*,
   508 F.2d 547 (1st Cir. 1974) .....................................................................35

*Gibson v. Cendyn Grp., LLC*,
   148 F.4th 1069 (9th Cir. 2025) ...........................................................19, 20

*Giordano v. Saks Inc.*,
   654 F. Supp. 3d 174 (E.D.N.Y. 2023) ......................................................45

*Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997) ...........................................................35

*In re Granulated Sugar Antitrust Litig.*,
   2025 WL 3012238 (D. Minn. Oct. 15, 2025) ...........................................26

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp.2d 1011 (N.D. Cal. 2007) .....................................................29

*Grappone, Inc. v. Subaru of New England, Inc.*,
   858 F.2d 792 (1st Cir. 1988) .....................................................................46

*Heymer v. Harley-Davidson Motor Co. Grp., LLC (In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.)*,
   151 F.4th 922 (7th Cir. 2025) ...................................................................37

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ..................................................................................49

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
   127 F. Supp. 2d 411 (S.D.N.Y. 2000) ......................................................51

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
   477 U.S. 274 (1986).................................................................................50

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   580 F. Supp. 3d 1243 (S.D. Fla. 2022) ....................................................47

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019) .....................................................30

*Jorge v. Rumsfeld*,
   404 F.3d 556 (1st Cir. 2005)..............................................................13, 25

*K&F Rest. Holdings, Ltd. v. Rouse*,
   2018 WL 3553422 (M.D. La. July 24, 2018) ..........................................30

*Kartell v. Blue Shield of Mass., Inc.*,
   749 F.2d 922 (1st Cir. 1984)...................................................................32

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................................22

*Kleen Prods., LLC v. Int'l Paper*,
   276 F. Supp. 3d 811 (N.D. Ill. 2017), ....................................................28

*Lee v. Life Ins. Co. of N. Am.*,
   829 F. Supp. 529 (D.R.I. 1993)) ............................................................37

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..............................................14, 15, 33, 34, 39

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of New York*
   *Inc.*, 2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023).............................43, 48

*In re LTL Shipping Servs. Antitrust Litig.*,
   2009 WL 323219 (N.D. Ga. Jan. 28, 2009)............................................39

*A.G. ex rel Maddox v. Elsevier, Inc.*,
   732 F.3d 77 (1st Cir. 2013)......................................................................13

*Maple Flooring Mfrs.' Ass'n v. United States*,
   268 U.S. 563 (1925)............................................................................38, 44

*Mayor of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)................................................................17, 23

*Melvin v. Cnty. of Westchester*,
   2016 WL 1254394 (S.D.N.Y. Mar. 29, 2016) ........................................54

*Mooney v. AXA Advisors, L.L.C.*,
19 F.Supp.3d 486 (S.D.N.Y. 2014).........................................................................39

*In re Mortg. Elec. Registration Sys. (Mers) Litig.*,
2016 WL 3931820 (D. Ariz. July 21, 2016))...........................................................48

*Motorola Mobility LLC v. AU Optronics Corp.*,
775 F.3d 816 (7th Cir. 2015) ...................................................................................51

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ...................................................................................................15

*NCAA v. Bd. of Regents of the Univ of Okla.*,
468 U.S. 85 (1984)......................................................................................................34

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) .............................................................................51

*Newcal Indus., Inc. v. Ikon Office Sol.*,
513 F.3d 1038 (9th Cir. 2008) .................................................................................34

*Newton Covenant Church v. Great Am. Ins. Co.*,
956 F.3d 32 (1st Cir. 2020)........................................................................................7

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998)....................................................................................................14

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)............................................................................................ *passim*

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) .............................................................................20, 21

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
767 F. Supp. 3d 681 (N.D. Ohio 2025)...................................................................39

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024) ......................................................................40

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)........................................................................................................50

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
632 F. Supp. 3d 1108 (S.D. Cal. 2022)..............................................................39, 44

*In re Philips Recalled CPAP, Bi-Level PAP, & Mech. Ventilator Prods. Litig.*,
781 F. Supp. 3d 353 (W.D. Pa. 2025)...............................................................47, 48

*In re Processed Egg Prods. Antitrust Litig.*,
   962 F.3d 719 (3d Cir. 2020)................................................................32

*PSW, Inc. v. VISA U.S.A., Inc.*,
   2006 WL 519670 (D.R.I. Feb. 28, 2006)...........................................40

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) ..........................................................21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)................................................................37

*Ramsey v. Nat'l Ass'n of Music Merchs, Inc. (In re Musical Instruments & Equip. Antitrust Litig.)*,
   798 F.3d 1186 (9th Cir. 2015) ..............................15, 19, 21, 23, 29

*Sarvis v. Polyvore, Inc.*,
   2013 WL 4056208 (D. Mass. Aug. 9, 2013) ........................................6

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
   188 F.3d 11 (1st Cir. 1999)..................................................................45

*In re Soc'y Ins. Co. Covid-19 Bus. Interruption Prot. Ins. Litig.*,
   2021 WL 3290962 (N.D. Ill. Aug. 1, 2021) ......................................48

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)..............................................................................51

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004)..................................................................34

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .............................................................................49

*Theatre Party Assocs., Inc. v. Shubert Org., Inc.*,
   695 F. Supp. 150 (S.D.N.Y. 1988)......................................................37

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001).......................................................*passim*

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
   552 F.3d 430 (6th Cir. 2008) ..............................................................34

*Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*,
   2007 WL 2050860 (9th Cir. 2007) .....................................................32

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
   517 U.S. 544 (1996)..............................................................................50

*United States v. AVX Corp.*,
   962 F.2d 108 (1st Cir. 1992) ............................................................................49

*United States v. Citizens and S. Nat. Bank*,
   422 U.S. 86 (1975) ............................................................................26

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ............................................................14, 26, 33, 39

*Verlus v. Experian Info. Sols., Inc.*,
   2025 WL 836588 (D. Mass. Mar. 17, 2025) ..............................................13

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ............................................................52

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ............................................................................34

*Waller v. DuBois*,
   2019 WL 1434576 (S.D.N.Y. Mar. 29, 2019) ..........................................54

*Warren Gen. Hosp. v. Amgen, Inc.*,
   2010 WL 2326254 (D.N.J. June 7, 2010) ..............................................10

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................................................29

*White v. R.M. Packer Co., Inc.*,
   635 F.3d 571 (1st Cir. 2011) ............................................................16, 24, 28

*Wisconsin v. Indivior Inc. (In re Suboxone Antitrust Litig.)*,
   622 F. Supp. 3d 22 (E.D. Pa. 2022) ......................................................41

*Yacubian v. United States*,
   750 F.3d 100 (1st Cir. 2014) ............................................................13, 24

*Yagoozon, Inc. v. Kids Fly Safe and SCS Direct, Inc.*,
   2014 WL 3109797 (D.R.I. July 8, 2014) ..............................................34, 40

*Young v. Wells Fargo Bank, N.A.*,
   717 F.3d 224 (1st Cir. 2013) ............................................................10, 24

*In re Zofran (Ondansetron) Prods. Liab. Litig.*,
   2017 WL 1458193 (D. Mass. Apr. 24, 2017) ..........................................48

**Statutes**

28 U.S.C. § 1407(a) ............................................................................48

Clayton Act Section 16, 15 U.S.C. § 26 ...........................................................50, 52, 53

Sherman Act Section 1, 15 U.S.C. § 1 .................................................................... *passim*

FED. R. CIV. P. 12(b)(1) ........................................................................................ *passim*

FED. R. CIV. P. 12(b)(6) ........................................................................................ *passim*

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*
    *Principles and Their Application*, (5th ed. 2025) ...............................................26, 35, 39, 45

GoodRx, *About GoodRx*, available at:
    https://www.goodrx.com/about?srsltid=AfmBOoo8mt2al6SyuoND-
    QX8mbtW0sp3fD8wxU6X-vreFX4VwaWcFzcT (last accessed Feb. 26,
    2026) ...............................................................................................................................6

GoodRx, *FAQs from Pharmacy Professionals*, available at:
    https://www.goodrx.com/corporate/business/faqs-from-pharmacy-
    professionals (last accessed Feb. 26, 2026) .............................................................6

GoodRx, *GoodRx Reports Third Quarter 2025 Results*, available at:
    https://investors.goodrx.com/news-releases/news-release-details/goodrx-
    reports-third-quarter-2025-results?mobile=1&mobile=1&mobile=1 (last
    accessed Feb. 26, 2026) ...............................................................................................25

Defendants[1] move to dismiss Plaintiffs' Amended Consolidated Class Action Complaint (the "**Amended Consolidated Complaint**") [ECF No. 104] pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).  As set forth below, Plaintiffs (i) fail to state a claim upon which relief may be granted and (ii) lack constitutional standing.

## PRELIMINARY STATEMENT

Plaintiffs had the benefit of seeing Defendants' motion to dismiss the original consolidated complaint in this action, in which Defendants identified the various ways in which the complaint's allegations were wholly inconsistent with the contracts incorporated by reference into the complaint.  Defendants' motion also identified other material defects in the original complaint.  Yet the Amended Consolidated Complaint does not remedy any of these flaws.  Plaintiffs' Amended Complaint instead continues to attack a fictitious description of GoodRx's Integrated Savings Programs ("**ISPs**"), which was apparently lifted from an article citing a third-party blog post, claiming the ISPs require the PBMs to share insurance reimbursement rates (such as maximum allowable costs, or "**MACs**") with GoodRx and change how much pharmacies are paid when a prescription claim is reimbursed through insurance.  In fact, the full blog post passage reveals that the author was referring to *monthly active consumers*, not reimbursement rates.  As is clear from the face of the ISP agreements ("**ISP Contracts**"), which have been produced to Plaintiffs, the allegations concerning the sharing of MACs are simply false.  Having now had multiple bites at the apple to allege real-world facts (not just conclusions) that are necessary to

---

[1] GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "**GoodRx**"); CaremarkPCS Health, L.L.C., Caremark, L.L.C., CaremarkPCS, L.L.C., and CVS Health Corporation (collectively "**Caremark**"); Express Scripts, Inc., Express Scripts Holding Company, and The Cigna Group (collectively, "**Express Scripts**"); MedImpact Healthcare Systems, Inc. ("**MedImpact**"); and Navitus Health Solutions, LLC ("**Navitus**") (collectively, the "**PBM Defendants**"). While the allegations set forth by Plaintiffs are accepted as true for purposes of this Motion, CVS Health Corporation is a holding company and not a PBM.

plead an antitrust claim, Plaintiffs' Amended Consolidated Complaint should be dismissed with prejudice.

The ISP Contracts are abundantly clear: the ISPs are procompetitive, efficiency-enhancing programs that save consumers money at the pharmacy counter—precisely the kind of conduct the antitrust laws were designed to encourage. Each Defendant's ISP does nothing more than automate a comparison between a consumer's out-of-pocket insurance cost (a co-pay or deductible) and GoodRx's cash discount prices that GoodRx makes available to consumers. Nothing in these contracts requires (or even incentivizes) the PBM Defendants to change the reimbursement rates they pay pharmacies for claims filled using a consumer's insurance; they merely give the consumer access to the cash discount card pricing when it would lower their out-of-pocket costs. Plaintiffs fail to advance any factual allegations that plausibly suggest there is any agreement among the Defendants with respect to any aspect of price, including drug reimbursement rates paid for claims processed through insurance. Plaintiffs therefore fail to allege the facts necessary to plausibly plead a *per se* price-fixing claim.

Plaintiffs' claim fares no better under a rule of reason analysis. As Plaintiffs acknowledge, since 2011, GoodRx has aggregated cash discount prices for prescription drugs and made them directly available to consumers through its public website and mobile app. Consumers can visit GoodRx.com and download a card or coupon that gives them access to a lower price for their prescriptions (a "**cash discount price**"). If the cash discount price from GoodRx is less than the consumer's insurance out-of-pocket cost, they can present the GoodRx card or coupon to their pharmacist, pay cash for their prescription (instead of using insurance), and save money. Plaintiffs concede there is nothing wrong with this "traditional" discount card business—indeed, they embrace it because it expands their customer base. But they take issue with GoodRx's ISP

Contracts with each of the PBM Defendants, which do nothing more than automate the same process, claiming they are a form of anticompetitive agreement. That is wrong. The market impact of the ISPs is indistinguishable from GoodRx's "traditional" discount card business, because both simply provide consumers with access to GoodRx's publicly available discount prices. The ISPs merely provide a more efficient way for consumers to access the discount prices that are already publicly available through GoodRx, meaning more consumers can benefit from lower prices on prescription drugs.

Given the fundamental defects in their theory, it is unsurprising that Plaintiffs fail to muster sufficient factual allegations that could support their Sherman Act Section 1 claim under the rule of reason. Plaintiffs fail to allege a plausible relevant antitrust market, as required, but even using Plaintiffs' own market definition, the ISP Contracts apply to a negligible amount of prescription claims (less than 1% of prescription drug sales). This falls short of the market-wide harm they must allege to survive a motion to dismiss. Nor have Plaintiffs pleaded any facts that reimbursement rates have changed as a result of the ISP Contracts. As a matter of law, absent such allegations, Plaintiffs' case cannot proceed past the pleading stage.

Further, setting aside the substantive defects fatal to the Amended Consolidated Complaint as a whole, there are party-specific deficiencies. Specifically, Plaintiffs improperly attempt to add a new named Plaintiff (Pharmacy4Humanity ("**P4H**")) to the Amended Consolidated Complaint, which serves as the master complaint in this multidistrict litigation ("**MDL**"). But P4H is not and has never been a Plaintiff in any of the underlying complaints consolidated in the MDL, which is required before they can be named as a plaintiff here. In addition, several Plaintiffs lack standing to pursue their claims because they do not allege injury to themselves attributable to Defendants' conduct, and do not otherwise establish standing to sue on behalf of their allegedly affiliated

pharmacies.  And finally, none of the Plaintiffs has standing to pursue injunctive relief because, as the Amended Consolidated Complaint concedes, all independent pharmacies were opted out of all ISP arrangements as of July 1, 2025.

For all of these reasons, Defendants respectfully submit that the law requires dismissal of Plaintiffs' claims.  Because Plaintiffs have now twice failed to plead an antitrust claim, dismissal should be with prejudice as further amendment would be futile.

## FACTUAL BACKGROUND

### I.    The Parties

#### A.    Pharmacies

Pharmacies buy medications from drug wholesalers or manufacturers and sell them to patients.  ECF No. 104 ("**Am. Compl.**") ¶ 84.  Pharmacies are compensated for prescription drug sales in several ways.  For example, if they dispense a drug to a consumer enrolled in an insurance plan, *i.e.*, a plan member, they are typically compensated by both the PBM and the consumer: they collect an out-of-pocket payment directly from the consumer at the pharmacy counter, *id.* ¶ 80, and also receive a contracted insurance reimbursement amount from the PBM that manages that consumer's prescription drug benefits, *id.* ¶ 81.  A pharmacy may also sell the drug to the consumer for a cash price.  Such cash sales may be in the context of a discount program, in which a pharmacy agrees in advance to offer a discounted price for the cash sale of certain prescription drugs.  As explained in more detail below, GoodRx offers a cash discount program enabling consumers to pay cash discount prices at pharmacies.  *Id.* ¶ 132.

Plaintiffs purport to be "independent pharmacies," but that is not the case.  Plaintiff OneroRx, Inc. ("**OneroRx**") admits that it is not itself a pharmacy that sold any generic drugs, but instead that it owns and operates sixty-seven locations across Illinois, Indiana, Iowa, Michigan, Missouri, Nebraska, and Wisconsin.  *Id.* ¶ 42.  Plaintiff AIDS Healthcare Foundation ("**AHF**"), a

global nonprofit organization and also not a pharmacy, claims to operate over thirty pharmacies across the United States. *Id*. ¶ 44. Similarly, Plaintiff Northern Arizona Pharmacy, LLC ("**Northern Arizona Pharmacy**") is not itself a pharmacy but purports to own and operate three pharmacies in Arizona, and new Plaintiff P4H is a nonprofit organization that itself is not a pharmacy but purports to own and operate over twenty pharmacies in the U.S. *Id*. ¶¶ 41, 45. In other words, OneroRx, AHF, Northern Arizona Pharmacy, and P4H are not pharmacies themselves that could have been subject to the ISP program at issue here, but purport to own and operate ***other companies*** that are pharmacies. In addition, Plaintiffs National Community of Pharmacists Association ("**NCPA**") and Philadelphia Association of Retail Druggists ("**PARD**") are both associations that purport to represent the interests of pharmacies, but, again, are not pharmacies themselves. *Id*. ¶¶ 46, 47.

P4H also has not filed an individual underlying complaint—a requirement to be a named plaintiff in an MDL. As explained *supra* Argument, Section III.A., P4H's claims must be dismissed because this Court lacks subject matter jurisdiction over it.

### B.    Pharmacy Benefit Managers

Pharmacy benefit managers ("**PBMs**") "administer pharmacy benefits on behalf of health-insurance plans and other third-party payors." *Id*. ¶ 3. In order to attract and retain third-party payor ("**TPP**") clients, PBMs build networks of retail pharmacies "where health plan members can easily and conveniently get their prescriptions filled." *Id*. ¶ 85. When one of these health plan members gets a prescription filled at the pharmacy, the PBM affiliated with the member's prescription drug benefit plan serves as the "claims process[or]" for the transaction and reimburses the dispensing pharmacy for a certain pre-determined amount of the drug sale. *Id*. ¶ 99. This reimbursement amount is determined pursuant to network agreements between the PBMs and pharmacies, which generally include: (1) the price that TPPs and health plan members pay

pharmacies for each prescription,[2] and (2) the rates at which pharmacies are reimbursed by PBMs for dispensing a drug (including any out-of-pocket cost to the patient). *Id.* ¶¶ 77, 89.

### C.    GoodRx

Launched in 2011, GoodRx is a consumer-focused digital healthcare platform with a mission to "build better ways for people to find the right care at the best price."[3]  Since its inception, consumers have used GoodRx's cash discount program to "save[] money" at the pharmacy counter. *Id.* ¶ 138.  GoodRx has been popular among both insured and uninsured patients because it results in lower out-of-pocket costs for prescription drugs. *Id.* ¶¶ 144–45.  GoodRx partners with pricing providers ("**Pricing Providers**" and each, a "**Pricing Provider**") to display negotiated cash discount prices to consumers.[4]  GoodRx aggregates the Pricing Providers' cash discount prices and determines "the lowest available price on any given date for a particular drug in a particular geographic area." *Id.* ¶ 136.  GoodRx's publicly available website identifies the pharmacies in an area and lists the cash prices available for prescription drugs at those pharmacies. *Id.*  These pharmacies, themselves or through their pharmacy services administrative organization ("**PSAO**"),[5] elected to become members of the GoodRx network and accept GoodRx discount

---

[2] As noted above, this includes a consumer's out-of-pocket costs.

[3] GoodRx, *About GoodRx*, available at: https://www.goodrx.com/about?srsltid=AfmBOoo8mt2al6SyuoND-QX8mbtW0sp3fD8wxU6X-vreFX4VwaWcFzcT (last accessed Feb. 26, 2026).  "[F]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is 'capable of accurate and ready determination.'" *Sarvis v. Polyvore, Inc.*, 2013 WL 4056208, at *3 (D. Mass. Aug. 9, 2013) (citation omitted).

[4]    GoodRx,    *FAQs    from    Pharmacy    Professionals*,    available    at: https://www.goodrx.com/corporate/business/faqs-from-pharmacy-professionals (last accessed Feb. 26, 2026). "GoodRx does not negotiate or set any medication prices. For GoodRx coupons, prices are negotiated between pharmacies or pharmacy purchasing groups and PBMs. GoodRx partners with PBMs to display the contracted price at each pharmacy.  Additionally, GoodRx also lists prices from a variety of sources, including pharmacy-specific savings programs (e.g., $4 generic medications) and manufacturer copay cards.  In these cases, the prices are set by the pharmacies or manufacturers themselves."

[5] PSAOs "act as a collective bargaining group for independent pharmacies and negotiate with PBMs on the pharmacies' behalf.  These negotiations include pharmacies' reimbursement rates and dispensing fees." *Id.* ¶ 79.

cards and coupons through their agreement to participate in PBM networks, including those that incorporate an ISP.  *See* Ex. A (*Integrated Program Service Agreement* effective as of ███████ ██████████████████████████ GoodRx (GDRX_MDL_G00000041) (the "**ESI ISP Contract**")) §§ 2.3.4, 2.3.6; Ex. B (*Program Services Agreement* effective as of ██████ ████████████ GoodRx ████████████████ (GDRX_MDL_G00000013) (the "**Caremark ISP Contract**")) § 7.3, Ex. 1, Ex. 4; Ex. D (*GoodRx Services Agreement* effective ██████ ████ ████ ████ ████ ██████████ ██████ ███ GoodRx  (GDRX_MDL_G00000074) ("**MedImpact ISP Contract**")) §§ 1(f)–(g); Ex. F (*RxNXT Services Agreement* effective ████ ██████████████████████████ GoodRx (GDRX_MDL_G00000092) ("**Navitus ISP Contract**")) §§ 1(f)–(g).[6]

Importantly, GoodRx cash prices are not confidential and are accessible to any purchaser of prescription drugs.  As the ISP Contracts state, the GoodRx cash discount prices are those that ████████████████████████████████████████████████████████████ ██████████████████████████ *See, e.g.*, Ex. B (Caremark ISP Contract) § 7.3; *see also* Ex. A (ESI ISP Contract) §§ 1.10, 2.3.4; Am. Compl. ¶ 136.  Consumers can use the GoodRx website or mobile application to view and download a GoodRx coupon, which gives them access to lower prices for prescription drugs that they can present to their pharmacy to benefit from that price.  Am. Compl. ¶ 137.  Consumers can also use a GoodRx card, which gives consumers access to discount coupons.  *Id*.  When a consumer uses a GoodRx card or coupon at the pharmacy, the consumer pays the cash discount price for the prescription drug, which includes an administrative

---

[6] Plaintiffs incorporate the ISP Contracts into their Amended Consolidated Complaint by reference.  Am. Compl. ¶ 161.  In adjudicating a motion to dismiss for failure to state a claim, a court may "consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'"  *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020).

fee that the consumer pays and the pharmacy passes through to the Pricing Provider. *Id.* ¶ 138. The Pricing Provider then pays a portion of that fee to GoodRx. *Id.* Plaintiffs state that they do not challenge the legality of the GoodRx cash discount program. *Id.* ¶ 141. In other words, Plaintiffs concede that it is perfectly lawful for GoodRx to run the very cash discount program that the ISPs merely automate.

Plaintiffs do not allege that GoodRx sells drugs, or that it determines the price of any drug. Neither do they allege that GoodRx offers services to TPPs that PBMs offer, such as (1) negotiating the amounts TPPs will cover for prescriptions; (2) establishing how much patients must pay out-of-pocket for drugs; (3) determining reimbursement rates with pharmacies; or (4) negotiating other payments and terms with drug manufacturers to TPPs. *See id.* ¶ 77.

## II.    The Integrated Savings Programs

During the period between ███████████████████, each PBM Defendant negotiated and entered into a separate, bilateral contract with GoodRx to seamlessly offer integrated cash discount pricing access to certain PBM clients' members. Am. Compl. ¶ 162 (Navitus in ███████); ¶ 163 (Express Scripts on ███████); ¶ 167 (Caremark on ███); ¶ 168 (MedImpact on ███████).

GoodRx entered into its first ISP Contract with Navitus in ███████, effective ███████. Ex. F (Navitus ISP Contract). In ███████, Navitus named its ISP "Savings Connect." Am. Compl. ¶¶ 162, 225. Then came Express Scripts in ███████; Express Scripts branded its ISP "Price Assure." *Id.* ¶¶ 163, 229, 232. Next was Caremark, which entered into an ISP Contract with GoodRx ███████. *Id.* ¶ 234. Caremark branded its ISP "Caremark Cost Saver" and described the program as providing eligible members with "access to GoodRx's prescription pricing to allow them to pay lower prices, when available, on generic medications in a seamless experience at the pharmacy counter." *Id.* ¶ 236. Caremark's Cost Saver

program launched on January 1, 2024.  *Id.*  Next, MedImpact entered into its ISP Contract with

GoodRx on ███████████.  *Id.* ¶¶ 168, 237.

Each ISP Contract is separate and distinct, with different terms and conditions, and no one

implementation of GoodRx's ISP is the same.  *See* Ex. A (ESI ISP Contract); Ex. B (Caremark

ISP Contract); Ex. C (*Amendment 1 to the Integrated Savings Program Service Agreement*

███████████████████████████████ GoodRx (GDRX_MDL_G00000038) ("**ESI**

**ISP Amendment**")); Ex. D (MedImpact ISP Contract); Ex. E (*First Amendment to GoodRx*

*Services Agreement* ████████████████████████████ GoodRx

(GDRX_MDL_G00000072) ("**MedImpact ISP Amendment**")); Ex. F (Navitus ISP Contract).

Importantly, Plaintiffs do not allege any coordination among the Defendants in negotiating these

separate, vertical agreements.

Notwithstanding the differences between each ISP, the ISPs merely automate the GoodRx

cash discount program in which pharmacies, themselves or through their PSAOs, elected to

participate.  Am. Compl. ¶¶ 155, 156; *see also* Ex. A (ESI ISP Contract) §§ 2.3.4, 2.3.6; Ex. B

(Caremark ISP Contract) §§ 2.1–2.3, 7.3, Ex. 1, Ex. 4; Ex. D (MedImpact ISP Contract) §§ 1(f)–

(g); Ex. F (Navitus ISP Contract) §§ 1(f)–(g).  The ISPs streamline the process and thus offer a

more efficient way for consumers to find and pay a low price for their generic prescription drugs.

Am. Compl. ¶ 155 (describing ISP as a "price comparison technology"); *see also* Am. Compl.

¶ 163.  Specifically, each ISP ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[redacted].[7] *See, e.g.*, Ex. B (Caremark ISP Contract) § 2.1, Ex. 1 (describing ISP as [redacted] and defining the [redacted] as [redacted]); *see also* Ex. A (ESI ISP Contract) § 1.11 (defining [redacted] as [redacted]). For example, under the ISPs, [redacted]. *See* Ex. A (ESI ISP Contract) § 2.3.3; Ex. B (Caremark ISP Contract) §§ 2.1–2.3, Ex. 4. [redacted] *Id.*

[redacted] *See* Am. Compl. ¶¶ 178, 179; *see also* Ex. B (Caremark ISP Contract) § 2.4 [redacted]. Notably, the publicly available cash prices for these transactions are available through GoodRx's website and mobile app, and accessed through a GoodRx coupon or card that the patient presents at the

[7] "When there is a disparity between a complaint's allegations and the written instruments on which the allegations or claims are based, the written instrument controls." *Warren Gen. Hosp. v. Amgen, Inc.*, 2010 WL 2326254, at *3 (D.N.J. June 7, 2010) (citing *ALA, Inc. v. CCAir, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994)). *See also Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n.1 (1st Cir. 2013) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (citation omitted).

pharmacy.  Am. Compl. ¶¶ 136, 137.  ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████      See, e.g., Ex. A (ESI ISP Contract) §§ 5.1, 6.1.2; Ex. B (Caremark ISP Contract)

Ex. 4; Ex. D (MedImpact ISP Contract) § 5(b); Ex. F (Navitus ISP Contract) §§ 2(b), 5(b).  Each

ISP simply eliminates the extra step for the patient of presenting the GoodRx card or coupon at

the pharmacy counter to access these lower prices.  This facilitates easier access to the lowest out-

of-pocket cost for the patient.

The ISPs do not involve the exchange of competitively sensitive information between or

among any PBM Defendants or competitors.  See, e.g., Ex. B (Caremark ISP Contract) § 2.1, Ex.

1 (describing ISP as ███████████████████████ and defining the██████████

███████████ as ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████); see also Ex. A (ESI ISP Contract) § 1.11 (defining ██████████

████████████ as ████████████████████████████████████████████).

## III.    Plaintiffs' Conclusory Allegations of a "Price-Fixing Conspiracy"

Plaintiffs allege that "GoodRx has orchestrated a horizontal price-fixing agreement with

the PBM Defendants by coordinating the exchange of competitively sensitive information" and

enforcing "a single, uniform lowest contracted rate for every generic drug claim."  Am. Compl.

¶ 2.  Plaintiffs base this conclusory assertion on two mischaracterizations: first, that GoodRx has

been a "horizontal competitor of PBMs for generic prescription drug transactions," id. ¶ 4, and

second, that the ISPs involve the PBM Defendants "agree[ing] to outsource their pharmacy

reimbursement rate decisions on generic drugs to a mutual third party, GoodRx, which sets the

rates of reimbursement for them with full knowledge of competitively sensitive information across

ostensibly rivalrous PBMs."  Id. ¶ 5.  Plaintiffs allege that all of this amounts to "price fixing in

two simple steps: first, the PBM Defendants exchange competitively sensitive information between themselves (using GoodRx as a conduit).  Second, they all agree to utilize the lowest pharmacy reimbursement rate contracted to by any PBM within the GoodRx Information-Exchange Network (which GoodRx identifies)."  *Id.* ¶ 16.

Plaintiffs' conclusory characterizations are not supported by the documents on which they rely or the actual facts they allege.  GoodRx is not a horizontal competitor of the PBM Defendants.  None of the facts alleged by Plaintiffs establish that the PBM Defendants have agreed to anything among themselves.  The facts alleged do not demonstrate that the PBM Defendants are exchanging competitively sensitive information with each other, much less that they have agreed among themselves to allow GoodRx to establish their reimbursement rates, or that they have agreed among themselves to utilize any pharmacy reimbursement rate.  In short, the actual facts alleged by Plaintiffs (as opposed to their conclusory, unsupported, and legally irrelevant characterizations of the facts) do not establish any of the "factual matters" needed to support the horizontal price-fixing claim that Plaintiffs assert.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## <u>LEGAL STANDARD</u>

A complaint must be dismissed under Rule 12(b)(6) when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 556 U.S. at 678 (citation omitted).  To state a "plausible" claim, Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which requires "more than a sheer possibility that a defendant acted unlawfully."  *Id.* at 663, 678.

Although the Court must assume that the allegations in the complaint are true, the Court is not required to accept as true any legal conclusions couched as factual allegations.  *Bell Atl. Corp.*,

550 U.S. at 555. Further, under Rule 12(b)(6), the Court may consider information beyond the pleadings—including contradictory information—where factual allegations in a complaint are "expressly linked to—and admittedly dependent upon—a document." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). In that circumstance, when the document's authenticity remains unchallenged, such document "effectively merges into the pleadings" and is properly considered on a motion to dismiss. *Id.*; *see also Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005) (observing that courts may "augment [pleaded] facts with facts extractable from documentation annexed to or incorporated by reference in the complaint"); *A.G. ex rel Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (similar). If incorporated documents conflict with pleaded allegations, "the exhibit trumps the allegations." *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) (citation omitted).

"A motion to dismiss based on lack of standing may be evaluated under 12(b)(1) if it relates to constitutional Article III standing, or 12(b)(6) if it relates to prudential/statutory standing." *Verlus v. Experian Info. Sols., Inc.*, 2025 WL 836588, at *1 (D. Mass. Mar. 17, 2025) (citation omitted). To survive a Rule 12(b)(1) motion to dismiss, factual allegations of standing must be both plausible and non-conclusory. *Brownback v. King*, 592 U.S. 209, 217 (2021).

## ARGUMENT AND AUTHORITIES

"Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting 15 U.S.C. § 1). Not every contract, however, is actionable under Section 1. To plead a viable Section 1 claim, a plaintiff must plausibly allege

(i) an agreement and (ii) that the alleged agreement unreasonably restrains trade.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998).

The Sherman Act is enforced through two distinct analytical frameworks.  Certain practices, such as horizontal price fixing, are deemed unreasonable *per se* because they "tend to restrict competition and decrease output."  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979).  For conduct that falls outside the narrow *per se* categories, courts apply the rule of reason, which requires a case-by-case analysis of whether the practice unreasonably restrains trade through a burden-shifting framework that imposes the initial burden on the plaintiff.  *See Am. Express Co.*, 585 U.S. at 540; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001).  Under the rule of reason, an agreement breaches the Sherman Act only if an overall substantial anticompetitive effect in a relevant market has been established.  *See Am. Express Co.*, 585 U.S. at 541.

"[C]ourts have been very careful to confine per se treatment to conduct of the type that is almost always actually or potentially anticompetitive and has no redeeming benefits (*e.g.*, reduced costs, increased competition) worthy of being weighed against the negative effects."  *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 51 (1st Cir. 1998); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977) (The *per se* rule only applies to "conduct that is manifestly anticompetitive.").  For that reason, not all agreements between horizontal competitors fall into the *per se* category.  Certain agreements between competitors, such as information exchanges, which can increase efficiency or have other procompetitive benefits, fall outside of the *per se* category.  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render

14

markets more, rather than less, competitive.  For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act.").

Moreover, "[i]n analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')."  *Ramsey v. Nat'l Ass'n of Music Merchs, Inc. (In re Musical Instruments & Equip. Antitrust Litig.)*, 798 F.3d 1186, 1191 (9th Cir. 2015) (citation omitted). "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'— qualify as unreasonable *per se*."  *Am. Express Co.*, 585 U.S. at 540–41 (citation omitted).

All agreements that fall outside of a recognized *per se* category are evaluated under the "rule of reason."  That is because the goal of the rule of reason analysis is to "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Am. Express Co.*, 585 U.S. at 541 (quoting *Leegin,* 551 U.S. at 886).  The rule of reason requires "courts [to] examine 'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' to determine the effect on competition in the relevant product market."  *In re Musical Instruments*, 798 F.3d at 1191–92 (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States,* 435 U.S. 679, 692, (1978)).

In this case, Plaintiffs fail to state a plausible claim under either the *per* se or rule of reason standard.

## I.    Plaintiffs Do Not Allege a *Per Se* Unlawful Agreement

Plaintiffs claim that Defendants have orchestrated a "horizontal price-fixing arrangement, which is *per se* illegal," Am. Compl. ¶ 293, but they fail to plead the "factual matter" necessary to support any such conspiracy among the Defendants.  First, Plaintiffs fail to plausibly allege facts to establish any direct or indirect evidence of *any* agreement (*per se* or otherwise) among the PBM

Defendants themselves.  Second, there can be no horizontal agreement between GoodRx and any PBM Defendant because GoodRx is not a competitor of the PBM Defendants, but rather offers a service to each of the PBM Defendants that enables certain of their clients' members to pay a lower price at the pharmacy counter.  Third, even assuming, *arguendo*, that GoodRx competes with the PBM Defendants, the ISP Contracts are not a price-fixing agreement between GoodRx and each PBM Defendant; they are agreements under which GoodRx provides publicly available information to each PBM Defendant.  Such agreements are evaluated under the rule of reason.

As a result, Plaintiffs fail to allege facts sufficient to sustain a *per se* claim, even at the pleading stage.

### A.    Plaintiffs Fail to Allege Any Evidence of an Agreement Among the PBM Defendants

Plaintiffs fail to allege any facts establishing an agreement (unlawful or otherwise) among the PBM Defendants.  *See Bell Atl. Corp.*, 550 U.S. at 553; *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 575 (1st Cir. 2011) ("Section 1 by its plain terms reaches only 'agreements'—whether tacit or express.").  Plaintiffs must adequately plead the existence of an agreement through either direct or circumstantial evidence.  *See Dennis v. Husqvarna Forest & Garden Co.,* 1994 WL 759187, at *3 (D.N.H. Dec. 27, 1994) ("[T]here must be direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective.") (citation omitted); *see also Bell Atl. Corp.*, 550 U.S. at 555–56 (Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made.").  There are no facts alleged in the Amended Consolidated Complaint—

nor set forth in the terms of the individual ISP Contracts—to sustain a claim of conspiracy among the PBM Defendants through either means of proof.[8]

### 1. Plaintiffs Fail to Allege Any Direct Evidence of an Agreement Among the PBM Defendants

"Direct evidence in [an antitrust] conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Blinder v. Gerber Prods. Co. (In re Baby Food Antitrust Litig.)*, 166 F.3d 112, 118 (3d Cir. 1999). In practice, "direct evidence" is the proverbial "smoking gun" evidence of an agreement, such as "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Plaintiffs allege no direct evidence of an agreement among the PBM Defendants. There are no allegations of any communications among the PBM Defendants reflecting an agreement to coordinate their pricing negotiations with pharmacies, to agree with one another to enter into the ISP Contracts, or to agree on pharmacy reimbursement rates. Plaintiffs instead spend pages of their Amended Consolidated Complaint alleging facts relating to the ***vertical agreements*** between GoodRx and each PBM Defendant, calling them direct evidence of "a horizontal conspiracy." Am. Compl. ¶ 224; *see generally id*. ¶¶ 226–39. But calling these vertical agreements a "conspiracy" does not make them one, and certainly not a horizontal one. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) (affirming Rule 12(b)(6) dismissal where plaintiff alleged that "various defendants enter[ed] into separate agreements with a common defendant, but where the

---

[8] In fact, Plaintiffs' allegation that ███████████████████████████████████ undermines Plaintiffs' allegation that Defendants conspired to all enter into ISP Contracts together. Am. Compl. ¶¶ 166, 232; Ex. A (ESI ISP Contract) § 2.7. If anything, ███████████████████████████ signals the *lack* of agreement among PBM Defendants. *Compare with* Am. Compl. ¶ 224 ("Each PBM Defendant has agreed to join the ISP knowing that the other PBM Defendants have agreed to do the same[.]").

defendants ha[d] no connection with one another, other than the common defendant's involvement in each transaction").

Plaintiffs sought and obtained each of the ISP Contracts before filing their initial consolidated complaint, yet nowhere do Plaintiffs reference any provision or term of those contracts to support their claim of a horizontal agreement. Instead, Plaintiffs allege—without citing *any* source, not even the very contracts that they incorporate by reference into their Amended Consolidated Complaint—that the ISP Contracts required PBMs not to outbid their competitors on reimbursement rates paid to pharmacies for generic drugs, and to share their competitively sensitive information with rivals through GoodRx. *See, e.g.*, Am. Compl. ¶¶ 162, 164, 167, 168. But there is no basis for this allegation. ███████████████████████████████ ███████████████████████████ *See supra* Factual Background, Section II. Nor do the ISP Contracts address or impact any so-called "bidding" via the reimbursement rates that PBMs pay pharmacies, as reimbursement rates are negotiated and set forth in agreements between PBMs and pharmacies in which GoodRx is not involved. Therefore, the ISP Contracts cannot constitute direct evidence of a *per se* unlawful price-fixing agreement among the PBM Defendants. *See* Am. Compl. ¶ 224.

Plaintiffs' allegations that the Defendants' public statements about the ISPs amount to direct evidence of a horizontal conspiracy fail as well. Each reference cited in Plaintiffs' Amended Consolidated Complaint does nothing more than establish that each PBM Defendant entered into a separate, vertical ISP Contract with GoodRx. *See id*. ¶¶ 242, 245–57. For example, Plaintiffs cite statements from GoodRx's SEC filings that speak of the importance of GoodRx's "partnerships" with PBMs. *See id*. ¶¶ 245, 251. That GoodRx may consider its relationships with

PBMs important does not begin to raise an inference that GoodRx has organized a conspiracy among the PBM Defendants.

Because the Amended Consolidated Complaint fails to allege any agreement ***among*** the PBM Defendants, Plaintiffs' allegations of a *per se* unlawful horizontal price-fixing conspiracy fail.

### 2. Plaintiffs Fail to Allege Any Circumstantial Evidence of an Agreement Among the PBM Defendants

To sufficiently plead a claim under Section 1 of the Sherman Act when, as here, there is no direct evidence of the challenged agreement, Plaintiffs must allege (1) parallel conduct and (2) "plus factors" that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp.*, 550 U.S. at 553, 556–57; *see also DM Rsch. Inc. v. Coll. of Am. Pathologists*, 2 F. Supp. 2d 226, 229 (D.R.I. 1998) ("[P]arallel behavior, by itself, does not constitute a conspiracy"); *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 (9th Cir. 2025) (quoting *In re Musical Instruments*, 798 F.3d at 1193) ("[C]ompetitors engage in what antitrust law calls 'parallel conduct' when they make the same independent business decisions as each other. But . . . even consciously parallel conduct . . . does not violate Section 1.")). Both need to be pleaded to avoid dismissal. *See Bell Atl. Corp.,* 550 U.S. at 570 (affirming dismissal when plaintiffs failed to plead plus factors to "nudge[] their claims across the line from conceivable to plausible"). Moreover, "[i]f the evidence shows conduct that is as consistent with lawful competition as it is with an illicit conspiracy, it cannot be said to support an inference of concerted action." *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 19 (1st Cir. 2004). Here, Plaintiffs fail to plausibly allege parallel conduct among the PBM Defendants, much less any plausible plus factors.

### a.    Plaintiffs Do Not Allege Parallel Conduct

Plaintiffs make conclusory allegations that "implementing the exact same reimbursement suppression strategies" constitutes "parallel conduct."  Am. Compl. ¶ 267.  Plaintiffs appear to mean that the bare fact that the four PBM Defendants each entered into a separate vertical contract with GoodRx, at different points in time, gives rise to an inference that the PBM Defendants must also have agreed with each other to fix prices.  But parallel conduct, by its nature, demands temporal proximity: while precise synchronization is not necessary, Plaintiffs cannot allege that Defendants acted in wholly disparate timeframes and still claim parallelism.  *Gibson*, 148 F.4th at 1083 (rejecting allegations that adoption of the same software at different points in time forms a basis for a Section 1 claim); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018) (finding failure to plead parallel conduct where alleged actions took place six months apart).

That is why the type of "parallel conduct" at issue here is nothing like the kind that courts have recognized as potentially creating a suspicion of collusion.  As Plaintiffs acknowledge, GoodRx entered into separate, distinct agreements—containing distinct terms and conditions—with each PBM Defendant at meaningfully different times.  *See* Am. Compl. ¶¶ 163–68.  Navitus entered its agreement in ███████████. Ex. F (Navitus ISP Contract).  Express Scripts entered its agreement on ███████████.  Am. Compl. ¶ 226.  Caremark did not enter its agreement until ███████████████████████████████████████████████████. *Id.* ¶¶ 167, 234.  MedImpact followed on ███████████.  *Id.* ¶¶ 168, 237.  This staggered timing ███████████████████████ is inconsistent with coordinated action.  *See Gibson*, 148 F.4th at 1083; *Park Irmat Drug Corp.*, 911 F.3d at 516–17.  As courts have found, even the slow adoption of similar policies "does not reveal anything more than [a] similar reaction to similar pressures within an

independent market, or conscious parallelism." *In re Musical Instruments*, 798 F.3d at 1196; *see also Park Irmat Drug Corp.*, 911 F.3d at 516–17.

Moreover, Plaintiffs fail to allege any mechanism for achieving parallel pricing because, as discussed in greater detail below, the PBM Defendants have not changed their contracted pricing with their network pharmacies to align with one another. *See infra* Argument, Section II.B. When an ISP transaction routes to the GoodRx cash discount program price, there is no reimbursement paid by a PBM Defendant—the pharmacy only receives a cash payment directly from the consumer at the publicly available GoodRx cash discount price. *See* Am. Compl. ¶¶ 32, 178, 179. Any claim processed using a patient's insurance continues to use the unique reimbursement rates that have been separately negotiated between the adjudicating PBM and the pharmacy, while any claim processed through an ISP uses the pre-existing publicly available cash discount pricing that has always been available through the publicly available GoodRx cash discount program. *See id.* ¶¶ 128, 137. Plaintiffs do not allege that these reimbursement rates have been modified by the ISPs or any other alleged agreement between the Defendants here.

In short, Plaintiffs do not meet the threshold of alleging parallel conduct sufficient to create a potential inference of conspiracy.

### b.    Plaintiffs Do Not Allege Plausible Plus Factors

Because Plaintiffs fail to plead parallel conduct, the Court need not consider plus factors. But even if Plaintiffs had pleaded parallel conduct, Plaintiffs' alleged plus factors do not elevate their allegations beyond "a bare assertion of conspiracy," as required to plead a Section 1 claim. *Bell Atl. Corp.*, 550 U.S. at 556–57; *see also Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1270 (11th Cir. 2019). Plus factors are circumstances making parallel conduct look plausibly like the product of an agreement rather than independent self-interested decision making. *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 178 (D.

Mass. 2013). Without plus factors, allegations of "facts that could just as easily suggest rational, legal business behavior by the defendants" are insufficient to plead a Section 1 violation. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008). In *Twombly,* the Supreme Court found that even though the defendants had all engaged in the same behavior—dragging their feet in complying with their regulatory obligations to interconnect with new competitors and declining to enter each other's markets—Plaintiffs had not alleged facts raising a plausible inference that the incumbent phone companies had done anything other than act in their unilateral self-interest. *See Bell Atl. Corp.*, 550 U.S. at 556–57. The same is true here: Plaintiffs fail to allege any facts raising an inference that the PBM Defendants did not act in their own individual self-interest when entering into separate agreements with GoodRx to provide consumers with lower prices and a better service experience at the pharmacy counter.

   ***Motives to Conspire.*** Plaintiffs assert that the PBM Defendants were motivated to conspire because they were losing transaction volume—and associated revenue—to GoodRx's competing discount platform. Am. Compl. ¶¶ 149, 150, 269. Simultaneously, however, Plaintiffs allege that GoodRx pursued "ISP partnerships" because pharmacies had begun refusing GoodRx discount cards due to losses on those transactions, threatening GoodRx's business model. *Id*. ¶¶ 27, 148, 149. In other words, Plaintiffs allege both that GoodRx was so successful that PBMs felt compelled to join forces to stop it *and* GoodRx was failing. These allegations are irreconcilable. If pharmacies were abandoning GoodRx *en masse*, the PBM Defendants would have had no reason to conspire—the supposed competitive threat would have resolved itself. Conversely, if GoodRx was thriving at the PBMs' expense, GoodRx would have had no motive to enter into arrangements that Plaintiffs claim benefit PBMs. One of these trends would have won out, negating either GoodRx's or the PBM Defendants' purported "motive to conspire."

Plaintiffs advance another—and similarly flawed—motive: they allege that a conspiracy here was more likely because GoodRx and the PBM Defendants had complementary motives to achieve profits. *Id.* ¶¶ 268, 269. But a common "motive" to increase profits "always exists," and it "does not suggest an agreement." *In re Musical Instruments*, 798 F.3d at 1194 & n.8; *Quality Auto Painting*, 917 F.3d at 1263 n.14 (explaining that if a desire to maximize profits were a common motive evidencing the existence of a conspiracy, "most businesses with similar pricing would be deemed in cahoots with each other because that is the goal of most corporations"). In *Twombly*, the plaintiffs' claim that a "'compelling common motivation' to thwart the [competitors'] competitive efforts naturally led them to form a conspiracy," 550 U.S. at 551, did not render their allegations plausible, *see id.* at 566 ("[T]here was just no need for joint encouragement" to do what each defendant already had incentive to do.) (citation omitted).

Every firm is motivated to increase its profits. Thus, positing a "common motive to conspire" as sufficient to allow any conspiracy claim to go forward would read the plausibility requirement out of *Twombly*.

> [C]ommon motive does not suggest an agreement. Any firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors. Thus, alleging "common motive to conspire" simply restates that a market is interdependent (i.e., that the profitability of a firm's decisions regarding pricing depends on competitors' reactions). Interdependence, however, does not entail collusion, as interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement.

*In re Musical Instruments*, 798 F.3d at 1194–95 (citing *Bell Atl. Corp.*, 550 U.S. at 556–57). In short, a "common motive" is "insufficient to support the inference of conspiracy." *Mayor of Balt.*, 709 F.3d at 139; *see also White*, 635 F.3d at 582 (rejecting "motive to conspire" to "earn supracompetitive profits" as a plus factor).

***Access to Competitors' Pricing Information.*** Plaintiffs claim that, by integrating GoodRx's cash discount program pricing into their members' insurance benefits, the PBM Defendants somehow gain "invaluable information about their competitors' deals with pharmacies." Am. Compl. ¶ 273. They further allege that, through the ISPs, the PBM Defendants get access to each other's "competitively sensitive, non-public MAC data." *Id.* ¶ 274. But this conclusory claim is contradicted by the ISP Contracts themselves and should not be credited.[9] *See supra* Factual Background, Section II.

Rather than describing the actual function of the ISP consistent with the ISP Contracts, Plaintiffs instead rely on an excerpted—and manipulated—quote from a securities analyst shared in a blog post purporting to describe the Express Scripts ISP: "GoodRx would pay a marketing fee to Express Scripts in return for helping the company acquire MACs cheaply." Am. Compl. ¶ 98. But Plaintiffs did not do their homework. The full quote from the Truist analyst report that the blog post purports to cite states in full:

> For these transactions, GDRX would earn an admin fee whenever a consumer uses a cash-pay price that is lower than his or her benefit price with Express Scripts, which management expects to be quite often given that GDRX discounts prices are cheaper than co-pays over half the time by more than half the amount. ***GDRX would also benefit from incremental consumer and fill that GDRX otherwise wouldn't have had captured, which would increase MAC count***. As Express Scripts would be acting as a distribution partner, GDRX would pay a marketing fee to Express Scripts in return for helping the company acquire MACs. As consumers would be paying cash, Express Scripts would not incur a cost associated with the transaction.

---

[9] Plaintiffs were put on notice that their allegations were demonstrably false with respect to the ISPs , and in particular the purported exchange of confidential information, when Defendants filed their joint motion to dismiss in November 2025. Nevertheless, Plaintiffs did not remedy these issues in their Amended Consolidated Complaint and even incorporated the ISP Contracts therein, which demonstrate that Plaintiffs' claims are baseless. Am. Compl. ¶ 161. As is always the case when factual allegations are contradicted by a written instrument attached to the complaint, those allegations need not be credited. *Yacubian*, 750 F.3d at 108 ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (quoting *Young*, 717 F.3d at 229 n. 1).

Ex. G (Jailendra Singh & Eduardo Ron, Truist Analyst Report, "HCIT: Opportunities Abundant Across Various Digital Health/HCIT Spectrums; West Coast Bus Tour Recap.") at 20 (emphasis added).[10]  When the entire quote is provided, it is clear that the "MAC" referred to is not "Monthly Allowable Costs" but instead "Monthly Active Consumers," a metric that GoodRx identifies it tracks in its SEC filings.[11]  This patently false allegation is yet another example of Plaintiffs' failure to plead any viable antitrust claim against Defendants.

Furthermore, as the ISP Contracts demonstrate, in an ISP transaction, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮  *See, e.g.*, Ex. A (ESI ISP Contract) § 2.3.4; Ex. B (Caremark ISP Contract) § 2.1; Ex. 1; Ex. D (MedImpact ISP Contract) § 3(a); Ex. F (Navitus ISP Contract), 1.  Each PBM Defendant only receives from GoodRx ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮.  Ex. A (ESI ISP Contract) § 2.3.4; Ex. B (Caremark ISP Contract) § 2.1; Ex. 1; Ex. D (MedImpact ISP Contract) § 3(a); Ex. F (Navitus ISP Contract), 1.  No PBM Defendant receives ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See, e.g.*, Ex. A (ESI ISP Contract) §§ 2.5, 5.1, 6.1.2; Ex. B (Caremark ISP Contract) Ex. 4; Ex. D (MedImpact ISP Contract) § 5(b); Ex. F (Navitus ISP Contract) §§ 2(b), 5(b).  And, most importantly, any exchange of GoodRx's publicly available cash discount prices pursuant to the

---

[10] "Where a document is not incorporated by reference, the court may nerveless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005) ("[The district court appropriately may consider the whole of a document integral to or explicitly relied upon in a complaint, even if that document is not annexed to the complaint.").

[11] *See, e.g.*, GoodRx, *GoodRx Reports Third Quarter 2025 Results*, available at: https://investors.goodrx.com/news-releases/news-release-details/goodrx-reports-third-quarter-2025-results?mobile=1&mobile=1&mobile=1 (last accessed Feb. 26, 2026) ("**Key Operating Metrics**…Monthly Active Consumers (MACs) refers to the number of unique consumers who have used a GoodRx code to purchase a prescription medication in a given calendar month and have saved money compared to the list price of the medication.") (emphasis in original).

ISPs' operation is to further the procompetitive, price-saving goals of the program: to check whether a patient is able to obtain a lower price. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, at ¶ 2111b2 (5th ed. 2025) (observing that "[g]ood market information reduces search costs and minimizes price disparities and unpredictability" and "while good market information does reduce search costs, the principal benefits occur when consumers as well as producers have the information.").

Importantly, the Supreme Court has found that information exchanges—even between horizontal competitors—can be procompetitive. *Gypsum Co.*, 438 U.S. at 441 n. 16 ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."). As a result, courts must evaluate any alleged information exchange under the rule of reason; it does not fall into the very limited category of *per se* unlawful restraints. *United States v. Citizens and S. Nat. Bank*, 422 U.S. 86, 113 (1975) (holding that "the dissemination of price information is not itself a *per se* violation of the Sherman Act."); *Todd*, 275 F.3d at 198 (noting that "exchange of information is not illegal *per se,* but can be found unlawful under a rule of reason analysis"); *In re Granulated Sugar Antitrust Litig.*, 2025 WL 3012238, at *11 (D. Minn. Oct. 15, 2025) ("Information exchanges are not *per se* unlawful."). Hence, even if Plaintiffs had adequately alleged facts showing that the PBM Defendants agreed to exchange price information among themselves (which they have not), that would be insufficient to establish a *per se* illegal agreement under Section 1 of the Sherman Act. Plaintiffs would have to satisfy the pleading requirements of a rule of reason case which, as discussed below, they have not.

*Standardization of Reimbursement Rates.* Plaintiffs allege that the ISPs result in "the artificial standardization of the prices paid to pharmacies for prescription drug claims." Am. Compl. ¶ 278. But the ISPs do not "set" prices for any product— ████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████  *See supra* Factual Background, Section IV. The ISPs do not alter GoodRx's cash discount prices or change any PBM Defendant's drug reimbursement rates, which apply only to claims processed through insurance.

*Actions Against Self-Interest.* Plaintiffs allege that, as a part of the ISPs, "each Defendant engages in actions that, in the absence of concerted action, would be against their individual economic self-interest, but that maximizes profits for the collective under the scheme." Am. Compl. ¶ 283. Plaintiffs further allege that "but for the ISP, it would be against the economic self-interest of the PBM Defendants to allow their members' prescription drug transactions to be handed over to another PBM for adjudication and lose out on the fees from those transactions." *Id.* ¶ 286. But the ISP does not "hand over" transactions to competing PBMs. And the Amended Consolidated Complaint demonstrates precisely why the ISPs benefit each Defendant individually, regardless of whether any other PBM enters into its own ISP contract with GoodRx: the ISPs save patients money, which in turn benefits the TPPs (the PBM Defendants' clients) and their members, making the PBMs more competitive when bidding for TPP business. *Id.* ¶ 149 (acknowledging the value to patients—and therefore, the importance and benefit to PBMs—of patient access to "better prices" through ISP). The ISPs also allow the PBM Defendants to have more touchpoints with their clients' members. *Id.* ¶ 156 (explaining that under ISP, even if the cash discount price is used and the transaction is not processed as a traditional insurance transaction, the cash discount price is "applied automatically as part of the patient's plan benefit, and the amount spent on the

drug applied to the member's deductible"). It is apparent that the ISPs are not "against self-interest," but rather are consistent with vigorous competition among PBM Defendants for the business of their clients.

*Other Industry Plus Factors.* Plaintiffs make various claims relating to other "industry-related plus factors," but none of these alleged "plus factors" move the needle in Plaintiffs' favor. First, Plaintiffs' allegations concerning market structure are neutral facts that do not indicate a conspiracy. *See Kleen Prods., LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 823 (N.D. Ill. 2017) ("In treating the market structure of the [ ] industry as relevant but far from dispositive, the Court is following well-trodden ground."), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018). Generic "plus factors" such as these are routinely rejected by courts as insufficient to support the existence of a conspiracy. *See, e.g.*, *Allen v. Verizon Commc'ns, Inc.*, 2019 WL 399922, at *4 (D.N.J. Jan. 31, 2019).

Second, Plaintiffs allege that there are high barriers for new PBMs to enter the alleged "market for pharmacy benefit management services," for pharmacies to exit the alleged "Network Pharmacy Services Market," and that the alleged "output market for PBM services" is highly concentrated. Am. Compl. ¶¶ 288–90. As an initial matter, Plaintiffs admit that there are over sixty-six PBMs operating in the marketplace, which undermines the allegation that barriers to entry are high. *Id.* ¶ 100. In any event, high barriers to entry do not automatically indicate anything beyond a market may be susceptible to mere conscious parallelism. *White*, 635 F.3d at 582 ("High barriers to entry and inelastic demand are two hallmarks of oligopolistic markets susceptible to successful parallel pricing practices, but neither helps to distinguish between agreement and mere conscious parallelism as the root cause of those practices."). Further, Plaintiffs do not plead particular facts indicating the ease or difficulty of entry.

***Fungible Services.*** Plaintiffs allege that "claims submitted by pharmacies to PBMs for reimbursement from insurers are fungible," which Plaintiffs allege makes it "feasible for GoodRx and the PBM Defendants to implement their anticompetitive scheme nationwide." Am. Compl. ¶ 291. But this is belied by Plaintiffs' own allegations that each prescription drug transaction, drug price, and "reimbursement rate[] for drug claims submitted [are] by ***different*** pharmacies to ***different*** insurers across ***different*** health plans[.]" *Id.* (emphasis added); *see also id.* ¶¶ 88–97 (explaining that each PBM's price for a drug at each pharmacy, set by that PBM's contract with that pharmacy, which is renegotiated periodically, varies, sometimes daily). And Plaintiffs ignore that each of the ISP Contracts is separate and distinct—they are a bilateral arrangement between GoodRx and each PBM Defendant. Taken together, Plaintiffs' allegations show that there is no real fungibility here—and certainly not the sort that courts have targeted in other Sherman Act cases. In any event, allegations that independent pharmacies' claims are uniform are not enough to survive dismissal. *See Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018) ("If the complaint's allegations must render it more than merely possible that the defendants entered into an illegal agreement, it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss.").

***Opportunities to Collude.*** Plaintiffs allege that the Defendants "have had ample opportunity to meet and collude," because the PBM Defendants were part of a trade association, and several GoodRx executives formerly worked at PBMs. Am. Compl. ¶ 292. However, it is well-established that mere participation in trade associations is insufficient to support an allegation of conspiracy. *See In re Musical Instruments*, 798 F.3d at 1186; *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp.2d 1011, 1023 (N.D. Cal. 2007). And Plaintiffs do nothing to tip the

scales in favor of a plausible conspiracy by alleging generalized conclusions that Defendants had "opportunities to collude." *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015) (speculative "same place at the same time" allegations devoid of any facts about what defendants supposedly discussed or agreed on are insufficient to support a conspiracy); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019) (finding on a motion to dismiss that "an opportunity, without more, is insufficient to state a claim under" Section 1 of the Sherman Act).

### B.    GoodRx and the PBM Defendants Are Not Horizontal Competitors

Not only do Plaintiffs fail to allege facts showing that the PBM Defendants agreed to exchange information among themselves, much less that they agreed to fix prices, Plaintiffs also fail to allege facts showing that GoodRx and the PBM Defendants are horizontal competitors. Plaintiffs' alleged conspiracy cannot be horizontal because GoodRx is not a competitor of the PBM Defendants (or any PBM), Am. Compl. ¶ 293, and *per se* unlawful price-fixing conspiracies can only occur only among horizontal competitors, *Am. Express Co.*, 585 U.S. at 540–41; *see also K&F Rest. Holdings, Ltd. v. Rouse*, 2018 WL 3553422, at *9–10 (M.D. La. July 24, 2018) (finding that defendants were not competitors and thus could not be in horizontal agreement), *aff'd on other grounds*, 798 F. App'x 808 (5th Cir. 2020).

As Plaintiffs allege, GoodRx is a technology company that provides a "price comparison" service, allowing consumers to benefit from lower prices for prescription drugs. Am. Compl. ¶ 136. Plaintiffs do not allege that the PBM Defendants offer such a service. In other words, GoodRx does not compete with the PBM Defendants, and vice versa. For example, Plaintiffs allege that PBMs perform administrative functions for health insurers and third party payors, including (1) negotiating the prices that health insurance companies and other third party payors will pay pharmacies for each prescription filled by a covered life; (2) negotiating the amount the

PBM will reimburse a pharmacy under insurance; (3) processing or "adjudicating" pharmacies' claims for reimbursement from TPPs under insurance based on the negotiated prices; and (4) creating a network of retail pharmacies where covered lives can access their insurance benefits. *Id.* ¶¶ 76–82. Plaintiffs do not allege that GoodRx does any of these things (because it does not).[12] Plaintiffs' Amended Consolidated Complaint demonstrates that GoodRx and PBMs are in separate and distinct businesses and do not offer the same services in the marketplace.

Plaintiffs claim that GoodRx and PBMs "compete" for the sale of prescription drugs, but this is contradicted by the Amended Consolidated Complaint and the documents incorporated by reference therein. As Plaintiffs allege, GoodRx is a "discount platform that aggregates PBM rates." Am. Compl. Part IV.B.3. ██████████████████████████████

████████████████████████████████ *See* Ex. A (ESI ISP Contract) § 2.3.6; Ex. B (Caremark ISP Contract) §§ 7.3, Ex. 1, Ex. 4; Ex. D (MedImpact ISP Contract) §§ 1(f)–(g); Ex. F (Navitus ISP Contract) §§ 1(f)–(g). Because GoodRx merely aggregates various cash prices for drugs at local pharmacies and makes those cash prices available for consumers, GoodRx cannot "compete" for prescription drug sales and therefore cannot be a competitor for purposes of supporting a horizontal conspiracy, including price-fixing.

### C. Even if GoodRx and the PBM Defendants Are Considered Horizontal Competitors, the ISP Contracts Are Not *Per Se* Price-Fixing Agreements

Even if the Court were to accept at the pleading stage Plaintiffs' conclusory assertion that GoodRx and PBMs are horizontal competitors (and it should not), Am. Compl. ¶¶ 4, 6, 159, that would not be enough to invoke the *per se* rule. Plaintiffs must still plead facts that plausibly

---

[12] Even Plaintiffs' market-related allegations highlight that GoodRx does not compete with the PBM Defendants: Plaintiffs allege that the PBM Defendants compete for network pharmacy services, but Plaintiffs tellingly omit GoodRx from this competition. Am. Compl. ¶ 17 ("The ISP Scheme corrupts this competition between PBMs for network pharmacy services.").

suggest the agreements between GoodRx and each PBM Defendant are a horizontal ***price-fixing*** arrangement, which they have not done.

To adequately plead their *per se* price-fixing claim, Plaintiffs must advance plausible factual allegations that competitors have reached an agreement on some aspect of price or price-setting. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.,* 962 F.3d 719, 729 (3d Cir. 2020) (rejecting *per se* treatment for an alleged horizontal agreement that did not directly involve an agreement on output or price, even when plaintiffs alleged price effects). Plaintiffs fail to do so. There is nothing in any of the ISP Contracts that suggests that any PBM Defendant has surrendered its freedom to set prices independently (and nothing indicating that GoodRx sets any price at all). *See Kartell v. Blue Shield of Mass., Inc.,* 749 F.2d 922, 930 (1st Cir. 1984) (The crux of any horizontal agreement is the relinquishment of the freedom to "mak[e] *independent* decisions about the terms as to which they will bargain."); *see also Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 2007 WL 2050860, at *1 (9th Cir. 2007) (finding plaintiff presented insufficient evidence to suggest defendant "dictated the rates" of alleged co-conspirators).

Contrary to what Plaintiffs allege, the ISP Contracts do not explicitly require each PBM "to cap its generic drug pharmacy reimbursement rates at the lowest rate any rival PBM has agreed to pay." Am. Compl. ¶ 224. The ISP Contracts do not require GoodRx to change discount prices or PBMs to change drug reimbursement rates. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████  *See, e.g.*, Ex. A (ESI ISP Contract) § 2.3.4; Ex. B (Caremark ISP Contract) §§ 2.1–2.3, 7.3, Ex. 1, Ex. 4; Ex. D (MedImpact ISP Contract) §§ 1(f)–(g); Ex. F

(Navitus ISP Contract) §§ 1(f)–(g).  ████████████████████████████

████████████████████████████████    *See id.*

The ISP Contracts also do not change the parties' incentives with respect to competing vigorously in the marketplace.  GoodRx remains incentivized to assemble low-cost, cash discount prices to attract consumers to use its services.  And because only the consumer's out-of-pocket cost is compared to GoodRx's discount prices, a change in PBM drug reimbursement rates would have no impact whatsoever on whether a claim is routed to GoodRx or processed under insurance.

At most, the ISPs ███████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  And mere agreements to exchange information, even between horizontal competitors (which GoodRx and the PBM Defendants are not), are evaluated under the rule of reason, not the *per se* rule.  *Gypsum*, 438 U.S. at 441 n.16; *Todd*, 275 F.3d at 199.

\* \* \*

Any way the Amended Consolidated Complaint is construed, Plaintiffs fail to allege facts which, if proven true, would establish a *per se* illegal horizontal conspiracy.  At most, Plaintiffs allege separate vertical agreements between GoodRx and each PBM Defendant, which Plaintiffs must plausibly allege are unlawful under the rule of reason.  *See Am. Express Co.*, 585 U.S. at 541. As discussed below, Plaintiffs fail to do so.

## II.    Plaintiffs Do Not Allege a Violation of Sherman Act Section 1 Under the Rule of Reason

Since Plaintiffs fail to plead a *per se* agreement, their claim must be evaluated under the rule of reason.  *Leegin*, 551 U.S. at 886.  Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms

consumers in the relevant market." *Am. Express Co.*, 585 U.S. at 541. This allows courts to "distinguis[h] between restraints with anticompetitive effect[s] that are harmful to consumers and restraints stimulating competition that are in the consumer's best interest." *Id.* (quoting *Leegin,* 551 U.S. at 886).[13] In this case, Plaintiffs' allegations concerning the relevant market and the supposed anticompetitive effects from GoodRx's ISP Contracts fall short.

### A.    Plaintiffs Fail to Define a Relevant Market

The rule of reason analysis starts with the requirement of a properly defined relevant antitrust market. *See Yagoozon, Inc. v. Kids Fly Safe and SCS Direct, Inc.*, 2014 WL 3109797, at *10 (D.R.I. July 8, 2014). Failure to plead a plausible relevant market is fatal to a Sherman Act claim at the motion to dismiss stage. *See id.* at *9–10 (dismissing Sherman Act claims for failure to plead a plausible relevant market).[14] That is because, "[w]ithout a definition of [the] relevant market, there is no way to measure [the defendant's] ability to lessen or destroy competition." *Am. Express*, 585 U.S. at 543 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177 (1965)); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57, 69 (1st Cir. 2004) ("It is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition in a properly defined relevant market."); *see also Flovac,*

---

[13] The "quick look" analysis is also inapplicable here. That analysis is used only to analyze "agreement(s) not to compete in terms of price or output" such that "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement" including "proof of market power." *NCAA v. Bd. of Regents of the Univ of Okla.*, 468 U.S. 85, 109–10 (1984) (citations omitted); *see, e.g., Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770–81 (1999) (holding that a "quick look" analysis was inappropriate for restrictions that could plausibly be thought to have procompetitive effect on competition). This analysis is inapplicable here because, at best, Plaintiffs' allegations arise within the context of a distribution agreement that is limited in scope and do not involve any clear "artificial limit" on output. *See NCAA*, 468 U.S. at 99 ("By restraining the quantity of television rights available for sale, the challenged practices create a limitation on output[.]").

[14] *See also Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (explaining that where a plaintiff "fail[s] to identify a relevant product market," the court "must dismiss the case for failure to state a claim"); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." ); *Chapman v. N.Y.S. Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

*Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016) (explaining the relationship between market definition and market power).

As the Supreme Court has stated, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand ***between the product itself and substitutes for it***." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added). This standard requires a plaintiff to plead facts that identify which products are within the relevant market and why they are reasonable substitutes, while products that fall outside of the relevant market are not. The exercise of market definition is intended to identify substitution that occurs between products or services in response to changes in price in order to identify a group of products that is susceptible to the exercise of market power. *See Todd*, 275 F.3d at 202. For that reason, a "[p]laintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." *Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.). Critically, in a supply-side price-fixing case, market definition is set by the substitutability from the perspective of the consumer. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 551 (1st Cir. 1974) (citations omitted).

Here, Plaintiffs allege that the "relevant market is the market for network pharmacy services for purchase by PBMs on behalf of TPP clients (the 'Network Pharmacy Services Market')," Am. Compl. ¶ 296, but this market is implausibly narrow and excludes clearly interchangeable substitutes. *See E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 3 (1st Cir. 2004) (affirming lower court's rejection of plaintiff's proposed market definition as "extremely narrow"). Indeed, Plaintiffs attempt to define the contours of their "network pharmacy services" market by reference to what it does not include, Am. Compl. ¶ 301,

35

ignoring the fact that their own allegations indicate that their proposed relevant market does not encompass all interchangeable substitutes. *See Chapman*, 546 F.3d at 238 (A proposed relevant market is "legally insufficient and a motion to dismiss may be granted" where plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute[s].") (citation omitted). Specifically, Plaintiffs never explain why prescription drugs that are sold in conjunction with "network pharmacy services" (which appears to refer to claims processed through insurance) are distinct from (and therefore not reasonably interchangeable with) drugs sold in "cash-pay markets."

In fact, Plaintiffs' own allegations appear to show the interchangeability of insurance and cash discount transactions (which are nonetheless excluded from their alleged relevant market). Plaintiffs allege that, in response to a reduction in the cash prices for discount card transactions, pharmacies would stop accepting cash discount cards and rely solely on cash transactions or those reimbursed through insurance. *See* Am. Compl. ¶ 27 ("In recent years, many pharmacies have stopped accepting GoodRx's traditional discount cards because they typically lost money on these transactions."). If that is true, then Plaintiffs' allegations demonstrate that cash transactions (including those transacted with discount cards) must be part of the same relevant market as transactions covered by insurance. Plaintiffs allege the opposite.

Contrary to Plaintiffs' definition of the network pharmacy services market, the Amended Consolidated Complaint states that consumers switch between paying for their prescriptions through insurance or by using a cash discount (a process which ISP helps make more efficient), *id.* ¶¶ 9, 37, which further demonstrates that cash discount transactions and insurance transactions are substitutes and must both be included in a relevant market. More fully explained below, for this reason, Plaintiffs' alleged market cannot support their allegations of anticompetitive effects.

Indeed, the entire purpose of the ISP is to facilitate the comparison between the patient's out-of-pocket costs based on the terms of their insurance plan and the cash discount price for a drug to enable the lower-cost choice for the patient, which demonstrates the inherent interchangeability of the two types of transactions.

Plaintiffs' proposed market, which excludes cash transactions, is nothing more than an attempt to define a market that covers only the practice complained of. By excluding cash discount transactions, Plaintiffs gerrymander away the substitutes that would expose the negligible competitive significance of the ISPs. Courts routinely reject such litigation-driven market definitions. *See Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) ("An antitrust plaintiff may not 'define a market so as to cover only the practice complained of.'") (citation omitted); *Lee v. Life Ins. Co. of N. Am.*, 829 F. Supp. 529, 541 (D.R.I. 1993) (rejecting "attempt by plaintiffs to bootstrap an antitrust claim to a narrowly drawn market"), *aff'd,* 23 F.3d 14 (1st Cir. 1994); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.,* 695 F. Supp. 150, 154 (S.D.N.Y. 1988) (rejecting market narrowly defined to conform to the facts of the case). In sum, Plaintiffs "allege[] a proposed relevant market that clearly does not encompass all interchangeable substitute[s]," *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), rendering it too narrow.[15] That alone merits dismissal.

---

[15] Plaintiffs' reference to practical indicia to support their relevant market fall short as well. As the Supreme Court stated, the boundaries of a particular relevant market "may be determined by examining practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. Here, Plaintiffs make conclusory reference to two of the *Brown Shoe* factors, Am. Compl. ¶¶ 300, 301, but this is not enough. *See, e.g., Heymer v. Harley-Davidson Motor Co. Grp., LLC (In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.)*, 151 F.4th 922, 933–34 (7th Cir. 2025) (Rule 12(b)(6) dismissal finding the conclusory reference to two *Brown Shoe* factors that illustrated a single brand market was insufficient to define the contours of a relevant market.).

### B.     Plaintiffs Fail to Allege the Required Substantial Anticompetitive Effects from the Challenged Conduct

To state a plausible Section 1 claim under the rule of reason, a plaintiff must allege that the challenged restraint caused a substantial anticompetitive effect that harms consumers in the relevant market.  *See Am. Express Co.*, 585 U.S. at 541; *see also Todd*, 275 F.3d at 213 ("An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide."); *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006).   A plaintiff in any rule of reason case must plausibly establish market-wide anticompetitive effects through direct or indirect evidence.  *Am. Express Co.*, 585 U.S. at 542.  In this case, Plaintiffs allege neither.

As previously noted, at most, the ISPs are agreements between each PBM Defendant and GoodRx that involve the exchange of publicly available information necessary to determine a lower out-of-pocket price for consumers.  In a rule of reason case challenging the exchange of information, a plaintiff must show that the type of information that is being exchanged could plausibly harm competition.  *See Todd,* 275 F.3d at 213.  Plaintiffs cannot meet that burden here, even at the pleading stage, because the ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████; *see also supra* Factual Background, Section II.

The exchange of publicly available information, without more, cannot plausibly harm competition.  *See Maple Flooring Mfrs.' Ass'n v. United States,* 268 U.S. 563, 573 (1925) (information exchange was not a violation of Section 1 where "[t]he statistics gathered by the defendant association are given wide publicity"); *Todd,* 275 F.3d at 213 ("Public dissemination is a primary way for data exchange to realize its procompetitive potential. . . . A court is therefore

more likely to approve a data exchange where the information is made public.").[16]  That is because "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *Gypsum*, 438 U.S. at 441 n.16; *see also* Areeda & Hovenkamp, *supra* ¶ 2111b2 (observing that "[g]ood market information reduces search costs and minimizes price disparities and unpredictability" and "while good market information does reduce search costs, the principal benefits occur when consumers as well as producers have the information").  It is for that reason that "perhaps the most common anticompetitive use of price information exchanges is to facilitate 'price leadership' in industries *where the price is not readily observable*."  Areeda & Hovenkamp, *supra* ¶ 2111d1 (emphasis added).  On the other hand, when prices are "readily observable," including by consumers, there is no plausible prospect of competitive harm from increased distribution of that information.  *Todd*, 275 F.3d at 213 (collecting cases); *see also In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 716 (N.D. Ohio 2025) (explaining why it is implausible for the exchange of public pricing among competitors to have anticompetitive utility).

Because Plaintiffs bear the threshold burden of plausibly alleging that the challenged restraint reduces competition in a relevant antitrust market, a complaint must be dismissed when it lacks sufficient allegations to plausibly suggest the challenged restraint could harm competition. *See, e.g.*, *Leegin*, 615 F.3d at 419 ("[Plaintiff] has further failed to allege any relevant factors that

---

[16] *See also In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219, at *13 (N.D. Ga. Jan. 28, 2009) (allegations concerning "the sharing of surcharge price information publicly using websites" did not give rise to an inference of an unlawful conspiracy); *In re Citric Acid Litig.*, 996 F. Supp. 951, 959 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) (The mere "exchange of publicly available information," without more, "does not support an inference of conspiracy."); *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1141 (S.D. Cal. 2022) ("The Court also agrees that incidental sharing of already public information to explain the need to buy or a sell, without more, is consistent with legitimate business conduct.").

would indicate a plausible anticompetitive effect."); *PSW, Inc. v. VISA U.S.A., Inc.*, 2006 WL
519670, at *7 (D.R.I. Feb. 28, 2006) ("PSW's failure to allege an injury to competition is fatal to
its antitrust claim."); *Yagoozon*, 2014 WL 3109797, at *9 ("With no factual allegations permitting
the inference that Defendants are engaged in sinister practices or otherwise suffocating
competition, this pleading is insufficient to block the swing of the ax.") (citation and internal
quotation marks omitted).[17]

That is the case here. The public information received by each PBM Defendant through
GoodRx makes the marketplace more competitive, not less.  But even if the Court were to allow
Plaintiffs to pursue an information exchange theory based solely on the exchange of publicly
available data, the Amended Consolidated Complaint is still fatally flawed.

### 1.    Plaintiffs Plead No Direct Evidence of Market-Wide Anticompetitive Effects

Direct evidence of anticompetitive effects is rarely established, because it requires a
plaintiff to provide "'proof of actual detrimental effects [on competition]' such as reduced output,
increased prices, or decreased quality in the relevant market."  *Am. Express Co.*, 585 U.S. at 542;
*see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65,
90 (E.D.N.Y. 2024) (As the Second Circuit stated in *1-800 Contacts*, direct evidence must be
"empirical;" "theoretical [or] anecdotal evidence . . . is not 'direct.'") (citations omitted).

Here, Plaintiffs do not allege direct evidence of market-wide anticompetitive effects.
Plaintiffs allege that the conspiracy reduced the level of reimbursements to independent
pharmacies on generic drugs when processed through the ISPs.  *See* Am. Compl. ¶ 1.  But as noted

---

[17] *See also Contractor Tool Supply, Inc. v. JPW Indus., Inc.*, 785 F. Supp. 3d 1107, 1118 (M.D. Fla. 2025)
(dismissing a Sherman Act claim because the plaintiff failed to establish either actual or potential competitive harm);
*Mooney v. AXA Advisors, L.L.C.*, 19 F.Supp.3d 486, 502 (S.D.N.Y. 2014) (dismissing antitrust claims at the motion
to dismiss stage because plaintiff "has failed to plausibly allege how this dynamic harms competition").

above, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████  *See supra* Factual Background, Section II.  Moreover, even if

Plaintiffs' contrived theory is credited, Plaintiffs fail to plausibly allege **market-wide**

anticompetitive effects, because Plaintiffs must allege the prices paid to pharmacies were lower

across **the entire market** than they would have been absent the alleged ISP conspiracy.  *Wisconsin*

*v. Indivior Inc. (In re Suboxone Antitrust Litig.)*, 622 F. Supp. 3d 22, 48 (E.D. Pa. 2022); *Davies*

*v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1097 (S.D. Iowa 1998).  Plaintiffs, however, do not and

cannot allege market-wide anticompetitive effects because, as they admit, ISP transactions amount

to less than 1% of all transactions.  *See supra* Argument, Section II.B.2.

The Amended Consolidated Complaint now includes two charts, which Plaintiffs claim

show a "decline in reimbursement rates" for OneroRx, but in fact are indecipherable and appear

inconsistent with Plaintiffs' claims.  Am. Compl. ¶ 210.  First, the charts purport to measure

"Variance from Baseline Payment," but there is no indication of what "baseline" means, what

payments (and by whom) are reflected in the charts (and variance between them may exist), or any

other necessary background to interpret the charts.  This variance could be based on data from

transactions for a specific prescription generic drug or group of drugs, or an average of all

prescription generic drugs sold by OneroRx, or something else.  In the case of a group of drugs or

an average, the specific drugs that constitute the mix may have disparate pricing and

reimbursement rates, potentially impacted by many factors including or not including ISP, over

the depicted time period.  It is not even clear from the charts and related allegations whether the

baseline payments and variance are calculated for only ISP transactions, or include non-ISP

transactions such as regular cash payments or transactions covered by insurance copays and reimbursement. In sum, the charts raise many questions but provide no answer.[18]

Even if credited, these charts fail to establish market-wide anticompetitive effects for two independent reasons. First, they depict data from a single pharmacy—which says nothing about competition across the market as a whole (or even the payments received by the other named Plaintiffs).

Second, the timing of the reimbursement changes reflected in the charts does not correspond to the implementation of the ISPs. Plaintiffs claim that the charts demonstrate the decline in reimbursements received by OneroRx following the implementation of the ISP Contracts with ███████████, but the timing shows just the opposite: Plaintiffs allege that the ██████████████████████████████████████████ ██████████████████████████ Am. Compl. ¶¶ 163, 167. According to the charts, the purported large drop in Caremark payment rates occurs at the beginning of 2021, ████████ *before* the Caremark ISP took effect. *Id.* ¶ 210. Even more troubling for Plaintiffs' theory, the Express Scripts chart shows that Express Scripts' payment rates *increased* after the ISP ██ ██████████. *Id.* ¶ 210. Those rates also remained consistent from the first quarter of 2024—the time at which Express Scripts *ceased running the Price Assure ISP* at independent pharmacies—through the end of 2025, when the chart ends. *Id.* The only time that there appears to be a decline in payment rates is when there were no changes made to the ISP at all. *Id.* If anything, these charts show that payment rates are *not* driven by ISPs.

---

[18] Plaintiffs' subsequent allegation that "Similarly, Plaintiff Star Discount Pharmacy saw a decline in reimbursement received for generic prescription drugs following the implementation of the at-issue ISP agreements," without any graphs or factual allegations to support it, is entirely conclusory. Am. Compl. ¶ 211. And Plaintiffs make no attempt to allege any harm specific to any other named Plaintiffs.

Plaintiffs' charts do not show harm to competition. They show, at most, that one pharmacy's revenues fluctuated. But a plaintiff's individual financial performance is not a proxy for market-wide competitive harm. *See Euromodas, Inc.*, 368 F.3d at 21 ("Although it tendered evidence of its own losses, an injury to an individual competitor is not the legal equivalent of an injury to competition in the relevant market."); *see also Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of New York Inc.*, 2023 WL 8096909, at *5 (E.D.N.Y. Nov. 21, 2023) (dismissing antitrust claim where "plaintiff ha[d] failed to allege that the lower reimbursement rates have had an actual or likely adverse effect on competition among insurers in the insurance market," having pointed only to the financial impact on its own business and extrapolated to the market as a whole). Despite having access to the necessary records and data, Plaintiffs do not allege that any PBM changed its contracted reimbursement rates as a result of the ISPs, that GoodRx's cash discount prices changed, or that Plaintiffs were excluded from any PBM network. In short, Plaintiffs allege no facts suggesting the ISPs had any effect on the competitive dynamics of the market—because they did not.

Plaintiffs' failure to allege anticompetitive effects is unsurprising, because the Amended Consolidated Complaint's own allegations reveal the opposite—that the ISPs generate substantial procompetitive benefits. For example, Plaintiffs acknowledge that the ISPs provide the PBM Defendants' members with efficient "access to GoodRx's prescription [cash] pricing to allow them to pay lower prices." Am. Compl. ¶ 236. Plaintiffs do "not challenge GoodRx's traditional discount card business," which Plaintiffs acknowledge "aggregate[s] discount rates" to offer "the lowest prices" to consumers to "potentially reduce their prescription costs." *Id.* ¶¶ 141, 133. And, because Plaintiffs do not allege that the original GoodRx cash discount program causes

anticompetitive effects, they cannot allege that an automated version of that same program causes anticompetitive effects.

Furthermore, Plaintiffs concede that, in making prescription drugs more affordable for consumers, GoodRx's cash discount program (and the ISPs) is ***expanding*** access and increasing output. *See id*. ¶ 144 (GoodRx enables access for consumers "who might not otherwise purchase any medications at all due to cost"). The ISPs exemplify the type of efficiency-enhancing innovation that the antitrust laws exist to promote: reducing transaction costs and expanding consumer access to lower pricing. That pharmacies may face pricing pressure from this transparency and efficiency is not cognizable antitrust injury—it is the competitive marketplace functioning as intended. *See Brown Shoe*, 370 U.S. at 320.

Finally, as explained *supra*, ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *See, e.g.,* Ex. A (ESI ISP Contract) §§ 1.10, 2.3.4. The mere exchange of publicly available information, without more, cannot plausibly harm competition. *See Maple Flooring*, 268 U.S. at 573 (information exchange not a violation of Section 1 where "[t]he statistics gathered by the defendant association are given wide publicity"); *In re Citric Acid Litig.*, 996 F. Supp. at 959 (The mere "exchange of publicly available information," without more, "does not support an inference of conspiracy."); *Persian Gulf*, 632 F. Supp. 3d at 1141 ("The Court also agrees that incidental sharing of already public information to explain the need to buy or a sell, without more, is consistent with legitimate business conduct.").

### 2. Plaintiffs Plead No Indirect Evidence of Anticompetitive Effects

Failing to plead direct evidence of anticompetitive effects, Plaintiffs must adequately plead indirect evidence for their claim to survive a 12(b)(6) motion. Plaintiffs must offer "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*

*Co.*, 585 U.S. at 542.  As explained above, Plaintiffs do not plausibly allege a relevant market and are therefore incapable of properly alleging market power.  *See supra* Argument, Section II.A.  But even if "network pharmacy services" were a market, they do not plead that any single Defendant has market power in that (or any other) market.

"Market power is the ability to raise price profitably by restricting output."  *Id.* at 549 (quoting Areeda & Hovenkamp § 5.01), and ordinarily, "[m]arket share [in the relevant market] may be used as a proxy for market power."  *See Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 208 (E.D.N.Y. 2023) (citation omitted); *see also SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999).  Conclusory allegations that a defendant "dominates" a market are not enough to support a claim of market power; a plaintiff must "allege specific facts from which the Court can reasonably infer that [a defendant] excludes competition."  *In re Eyewear Antitrust Litig.*, 2025 WL 2773064, at *13 (S.D.N.Y. Sept. 26, 2025).

As explained above, Plaintiffs do not plead that GoodRx participates in their proposed relevant market, and thus, under Plaintiffs' own theory, GoodRx is incapable of having market power.  As for each of the PBM Defendants, Plaintiffs do not offer any number, percentage, or other fact indicating the existence of market power or even market share in their alleged relevant market.  Plaintiffs allege the PBM Defendants' share of "prescription drug claims," Am. Compl. ¶ 290, and the PBM Defendants' combined share of "prescription drugs claims," *id.* ¶ 8, but neither of these purported market shares say anything about each of the PBM Defendants' shares of the so-called "market for network pharmacy services," *id.* ¶ 296.  Indeed, Plaintiffs' reliance on shares

of "claims" ignores the fact that ISP transactions result in a cash payment by the consumer, so there is no "claim" that is reimbursed by the PBM Defendants.[19]

Moreover, Plaintiffs' Amended Consolidated Complaint presents figures indicating that ISPs could only have affected a tiny percentage of prescription drug sales. Plaintiffs acknowledge that "GoodRx, Inc. processes 2.5% of all prescription drug claims," which is so low a rate that it is simply not capable of impacting competition as a whole. *Id*. ¶ 53; *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 797 (1st Cir. 1988) (holding market share between less than 1 and 4.4 percent was "miniscule" and insufficient to demonstrate market power); *Flovac*, 817 F.3d at 854 ("[A] 2% market share would be too puny to provide any semblance of market power."); *E. Food Servs., Inc.*, 357 F.3d at 7 ("[A] contract restricting a small percentage of a larger available market will have no anti-competitive effect on that market."). Plaintiffs also allege that "GoodRx predicted that 5% of the claims processed from January to around October 2024 using its aggregated pricing data are attributable to the ISP." Am. Compl. ¶ 204. When taken together, ***these figures indicate that only 0.125% of prescription drug claims are affected through the ISPs.*** Taking as true the facts that Plaintiffs themselves allege, it is impossible for the ISPs to have had any market-wide anticompetitive effect.

Because Plaintiffs fail to plausibly allege any adverse effect on competition in the relevant market, the Court must dismiss their Section 1 claim.

___

[19] Plaintiffs claim that "[t]he PBM Defendants would not have been able profitably to impose such significant reductions in generic reimbursement rates—well in excess of a small but significant non-transitory decrease in prices of a hypothetical monopsonist—unless they collectively possessed market (buying) power over pharmacists." Am. Compl. ¶ 293. But since the PBM Defendants do not make any payments to pharmacies when the GoodRx cash discount price is used in an ISP transaction, Plaintiffs' argument is without merit and makes no sense.

### III.    Additional Defects Require Dismissal

Beyond the substantive defects in Plaintiffs' allegations, Plaintiffs' claims independently fail for other reasons.  First, Plaintiffs attempt to name one new plaintiff in the Amended Consolidated Complaint, which has not filed a separate, underlying complaint, and thus this Court does not have subject matter jurisdiction over its claims.  Second, several Plaintiffs lack associational or organizational standing to pursue their claims.  Third, none of the Plaintiffs have standing to seek injunctive relief because, as Plaintiffs concede, all independent pharmacies were opted out of all ISP arrangements as of July 1, 2025.

### A.    This Court Does Not Have Subject Matter Jurisdiction Over the New Named Plaintiff

Plaintiffs seek to add a new named plaintiff in their Amended Consolidated Complaint: P4H.  But P4H has not filed an individual underlying complaint that was subsequently transferred to this Court and consolidated in this MDL, which is required for this Court to assert subject matter jurisdiction.

"A close review of the language of the MDL statute and Panel rules indicates that a plaintiff's claims are properly before an MDL court *only* where the plaintiff has first asserted his or her claims in a separate action."  *See In re Philips Recalled CPAP, Bi-Level PAP, & Mech. Ventilator Prods. Litig.*, 781 F. Supp. 3d 353, 372 (W.D. Pa. 2025) (emphasis added).  The "failure to assert [a plaintiff's] claims in a separate action[] not only directly contravenes the procedures set forth by statute and Panel Rules, but it is also inconsistent with the Supreme Court's directive that MDL member cases be remanded to their originating courts upon completion of pretrial proceedings."  *In re Jan. 2021 Short Squeeze Trading Litig.*, 580 F. Supp. 3d 1243, 1249 (S.D. Fla. 2022).  Accordingly, this Court only has subject matter jurisdiction over plaintiffs that were either: (1) named in the underlying complaints consolidated in the instant action by the Judicial

Panel for Multidistrict Litigation, or (2) plaintiffs that file new underlying complaints that are consolidated with the instant action.  P4H has done neither.

P4H was not a party to an underlying complaint that has since been consolidated into the instant action (and Plaintiffs do not allege otherwise), and it has not filed an underlying "short-form" complaint as set out in a case management order, or a traditional complaint and moved for it to be transferred and consolidated with the instant case.  *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *6 (D. Mass. Apr. 24, 2017) (ordering that short-form complaints together with the applicable master complaint are "legally operative and binding as to that plaintiff").[20]  Instead, Plaintiffs simply added P4H to the Amended Consolidated Complaint; but "simply adding a party as a plaintiff in a master complaint [is] not sufficient for the district court to have subject-matter jurisdiction over that plaintiff's claims."  *See In re Philips*, 781 F. Supp. 3d at 372.  As a result, this Court lacks subject matter jurisdiction over P4H, and its claims must be dismissed under Federal Rule of Civil Procedure 12(b)(1).  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 6402992, at *1 (E.D. Mich. Mar. 21, 2017) (granting motion to strike plaintiffs from the MDL who did not file any lawsuit in any court before the consolidation "[b]ecause Congress authorized multidistrict litigation to 'consolidate[ ]' *existing* 'civil actions . . . pending in different districts,' 28 U.S.C. § 1407(a), not to create *new* actions'").[21]

---

[20] Moreover, P4H does not reside in this District.  Am. Compl. ¶ 45 (P4H is headquartered in Los Angeles, California);  *In re Soc'y Ins. Co. Covid-19 Bus. Interruption Prot. Ins. Litig.*, 2021 WL 3290962, at *6 (N.D. Ill. Aug. 1, 2021) (holding that it is improper to add new plaintiffs who had not filed or joined in any complaints currently within the MDL—especially those not located within the district of the consolidated case—directly to the MDL).

[21] *See also In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, 2025 WL 1836591, at *1 (D. Minn. July 3, 2025) ("If a plaintiff was not part of any discrete case, that plaintiff should not be included in a master [MDL] complaint."); *In re Mortg. Elec. Registration Sys. (Mers) Litig.*, 2016 WL 3931820, at *2 (D. Ariz. July 21, 2016) (similar), *aff'd sub nom. In re Mortg. Elec. Registration Sys., Inc., Litig.*, 719 F. App'x 550 (9th Cir. 2017).

### B. Certain Plaintiffs Lack Standing to Sue on Behalf of Subsidiaries or Members

Several Plaintiffs additionally lack Article III and/or antitrust standing to pursue their claims against Defendants because, as trade association and parent organization plaintiffs rather than individual plaintiffs, they fail to adequately plead standing. Specifically, Plaintiffs PARD and NCPA lack associational standing under Article III, and Plaintiffs AHF, OneroRx, Northern Arizona Pharmacy, and P4H (the "**Organization Plaintiffs**") lack antitrust standing to pursue their claims against Defendants. None of these Plaintiffs' claims can proceed.

First, Plaintiffs PARD and NCPA claim to possess associational standing. Am. Compl. ¶ 48. To invoke associational standing under Article III, an organization must adequately plead that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Under the first prong of the *Hunt* test, both PARD and NCPA must allege that "at least one of the group's members have standing as an individual," and "'identify [a] member[] who ha[s] suffered the requisite harm.'" *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). But PARD has not identified a single member by name who has standing to sue in its own right.[22] *See United States v. AVX Corp.*, 962 F.2d 108, 117 (1st Cir. 1992) (holding that association did not have standing to bring suit on behalf of its members where "the members are unidentified; their places of abode are not stated; the extent and frequency of . . . [their injury] is

---

[22] It is telling that, whereas Plaintiffs used their Amended Consolidated Complaint to attempt to address several standing issues that Defendants raised in their motion to dismiss the original consolidated complaint, Plaintiffs have not made any attempt to cure this defect with amended allegations.

left open to surmise"). And NCPA has only identified purported members who are already named Plaintiffs in this action, including Plaintiffs AHF, OneroRx, Northern Arizona Pharmacy, each of which do not have standing to sue Defendants as discussed below.

Further, *Hunt*'s second prong is complementary to the first because it raises an assurance that "the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 545 (1996). Here, Plaintiffs make conclusory allegations that "preventing Defendants from continuing the ISP Scheme is germane to PARD's purpose of protecting the interests of its members and advancing their ability to continue operating as independent pharmacies in a fair and competitive marketplace," Am. Compl. ¶ 52, but do not make any factual allegations about what PARD's purpose is, and whether it is consistent with its participation in this lawsuit. *Cf. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 275 (1986) ("[T]here is little question that the interests the union seeks to protect in this action are 'germane' to its purpose of obtaining benefits, including unemployment benefits, for its members."); *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (second *Hunt* prong satisfied where the association was organized for the purpose of representing injured parties in the lawsuit). Because Plaintiffs neither identify any purported members of PARD nor allege that the interests PARD purports to protect on behalf of its unidentified members are germane to its purpose, PARD does not have associational standing to sue Defendants.

Second, the Organization Plaintiffs base their claims on injuries suffered by the pharmacies they "own and operate." Am. Compl. ¶¶ 41, 42, 44–45. But as parent companies whose subsidiaries suffered the alleged injuries that the claims at issue are based on, Organization Plaintiffs lack standing to sue Defendants. For antitrust standing purposes, a parent company is a

"stockholder" that is not directly injured by the injuries to its subsidiaries and may not assert an antitrust claim on behalf of its subsidiaries. *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820–21 (7th Cir. 2015); *see Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 413–15 (S.D.N.Y. 2000). Thus, as the parent company of the individual pharmacies they purport to own and operate, the Organization Plaintiffs lack standing to bring antitrust claims against Defendants. Instead, the proper plaintiffs are the subsidiaries themselves. *Motorola Mobility LLC*, 775 F.3d at 821.

Accordingly, Plaintiffs PARD, AHF, OneroRx, Northern Arizona Pharmacy, and P4H lack standing to pursue their claims against Defendants and, therefore, their claims must be dismissed under Federal Rule of Civil Procedure 12(b)(6) or under Federal Rule of Civil Procedure 12(b)(1).

### C.    Plaintiffs Lack Standing to Seek Injunctive Relief

Setting aside that the Amended Consolidated Complaint is subject to dismissal in its entirety, Plaintiffs' request for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, *see* Amend. Compl. ¶ 70, should be dismissed for an independent reason as well: Plaintiffs fail to meet the constitutional minimum of Article III standing required to obtain their requested injunction. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016), *as revised* (May 24, 2016); *Bearden v. Ballad Health*, 967 F.3d 513, 518 (6th Cir. 2020) (citing *Spokeo* and explaining that, "[a]s far as we are aware, there's no Clayton Antitrust Act exception to" the injury in fact requirement). To establish Article III standing to sue for "forward-looking" injunctive relief,[23] Plaintiffs must allege (1) a "'real and immediate,' not 'conjectural' or 'hypothetical'" threat of injury that is redressable

---

[23] In focusing on allegations of potential future harm as supporting its request for injunctive relief in the form of an Order requiring the cessation of the ISP, the Amended Consolidated Complaint seeks a "preventive injunction"— one that attempts to foreclose a future harmful act—as opposed to a "reparative injunction"—one intended to prevent future harmful effects of past acts, and which can include an order of divestiture where the past act is an unlawful merger. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 29 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (internal quotation marks omitted) (citing cases).

by an injunction, *Brown v. Am. Honda (In re New Motor Vehicles Canadian Exp. Antitrust Litig.),* 522 F.3d 6, 14 (1st Cir. 2008) (citation omitted), and (2) that there is a "non-speculative likelihood that the injury can be remedied by the requested relief[,]" *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP,* 549 F.3d 100, 107 (2d Cir. 2008); *see also Bearden,* 967 F.3d at 518 (recognizing that the "[Clayton] Act provides for injunctive relief only 'under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity'") (quoting 15 U.S.C. § 26).  Plaintiffs fail to do so.

Plaintiffs cannot show that they face a threat of injury that is real and immediate because their own Amended Consolidated Complaint establishes that the alleged conspiracy is not ongoing or likely to resume.  Plaintiffs admit that, as of July 1, 2025, "all independent pharmacies [were] opted out of GoodRx's Integrated Savings Program by default" and now only participate if they choose to do so by directly contracting with GoodRx.  Am. Compl. ¶ 172.[24]  Considering Plaintiffs' allegations that they either have been, or are able to be, opted out of the very program that they challenge, Plaintiffs cannot show that their alleged injury can be remedied by forward-looking injunctive relief.[25]  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 522 F.3d at 14.

---

[24] Plaintiffs' allegation that "[n]either OneroRx nor the 67 pharmacies it owns and operates were automatically opted into the Community Link program," is inapposite, confusing, and contradictory.  Am. Compl. ¶ 43 n.11.  First, the relevant fact is, as Plaintiffs allege, that "as of July 1, 2025, 'all independent pharmacies [are] opted out of GoodRx's Integrated Savings Program by default," and "[p]harmacies who choose to directly contract with GoodRx [through Community Link] will have the option to opt in to participate in GoodRx's Integrated [Savings] Programs."  *Id.* ¶ 172.  In other words, the opt-*out* of ISP (the program Plaintiffs are challenging), not the opt-*into* Community Link, is automatic.  Second, regardless of whether or not Plaintiff OneroRx was automatically opted into Community Link, it pleads that it entered into an agreement with GoodRx to participate in the Community Link Program.  *Id.* ¶ 43.  Third, the harm Plaintiffs allege relates to the continued use of ISP by PBM-affiliated pharmacies rather than its use by Plaintiffs, most of whom are opted out.  It is therefore irrelevant to Plaintiffs' theory of harm whether OneroRx is opted in or out.  *Id.* ¶ 173.

[25] Additionally, Plaintiffs' request for injunctive relief does not comport with their alleged theory of harm.  If Plaintiffs' theory of harm is that independent pharmacies are injured by their participation in the ISPs (now through Community Link), they can remedy their own injury by not opting into the ISPs.  On the other hand, if, as Plaintiffs here admit, independent pharmacies lose business if they opt out of the ISPs, Am. Compl. ¶ 173, Plaintiffs cannot plausibly allege that participating in an ISP results in injury.  There is simply no logical basis for Plaintiffs' request for injunctive relief.

Plaintiffs try to support their claim for injunctive relief by speculating that they "continue to *potentially* be harmed" because PBM-affiliated pharmacies will still participate in and "profit from" ISP.  Am. Compl. ¶ 173 (emphasis added).  They also allege that "[t]here is certainly no guarantee or conclusive evidence that suggests that the full impact of the ISP Scheme has ended as a result of the Community Link program," while conceding that "Plaintiffs . . . do not know the full impact of the ISP Scheme, nor can Plaintiffs state with certainty that the alleged conduct is no longer taking place."  *Id.* ¶ 174.  But this is exactly the type of conjectural and hypothetical harm that cannot support standing to seek forward-looking injunctive relief in an antitrust case.  *See Am. Sales Co. v. AstraZeneca LP (In re Nexium (Esomeprazole) Antitrust Litig.)*, 845 F.3d 470, 475 (1st Cir. 2017) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.") (citation omitted); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir. 1991) ("To establish a claim for injunctive relief under section 16, Datagate must demonstrate a 'cognizable danger' of injury not just a 'mere possibility.'") (citation omitted).  Threat of injury cannot be real and imminent if Plaintiffs "do not know the full impact of the ISP Scheme," and "cannot say with certainty" that it is ongoing.  Am. Compl. ¶ 174.  Plaintiffs' burden is not to hedge with double-negatives; it is to plausibly that they will continue to suffer real and imminent harm.  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d at 14.  They fail to do so, and thus the

Plaintiffs' request for injunctive relief should be dismissed under Federal Rule of Civil Procedure 12(b)(6) or under Federal Rule of Civil Procedure 12(b)(1).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Consolidated Complaint pursuant to Rule 12(b)(6).  Dismissal with prejudice is

appropriate here, where further amendment would be futile. *See Melvin v. Cnty. of Westchester*, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss in part with prejudice "because [P]laintiff has already had two bites at the apple[,] and they have proven fruitless") (citation omitted). Prior to the formation of this multidistrict litigation, thirty-two complaints were filed (eight by the Plaintiffs named in the Amended Consolidated Complaint). Plaintiffs also received discovery in the form of the ISP Contracts and contracts between the PBM Defendants and the Plaintiffs. Moreover, Plaintiffs had the benefit of seeing Defendants' motion to dismiss their original consolidated complaint, which laid bare the inconsistencies between their conclusory allegations and the ISP Contracts. As set forth herein, Plaintiffs appear to have ignored all of this, choosing instead to stand by their groundless assertions. They should not be rewarded with yet another opportunity to plead their claims. *See Waller v. DuBois*, 2019 WL 1434576, at *10 (S.D.N.Y. Mar. 29, 2019) (dismissing complaint with prejudice where it "contains substantive problems such that an amended pleading would be futile") (citation omitted); *Beaver Cnty. Ret. Bd. v. LCA-Vision Inc.*, 2009 WL 3720651, at *1 (S.D. Ohio Nov. 5, 2009) (denying motion for reconsideration of dismissal with prejudice of amended consolidated complaint).

## HEARING REQUEST

Pursuant to Local Rule Cv. 7(e), Defendants respectfully request oral argument on the within Motion, and request sixty (60) minutes for their argument in chief and twenty (20) minutes for any rebuttal argument.

Dated: February 27, 2026

Respectfully submitted,

By:  */s/ David J. Lender*
David J. Lender
Adam Hemlock
Jennifer Brooks Crozier
Alexandra Rose
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
david.lender@weil.com
adam.hemlock@weil.com
jennifer.crozier@weil.com
alexandra.rose@weil.com

David Ramraj Singh
WEIL, GOTSHAL & MANGES, LLP
201 Redwood Shores Parkway, 4th Floor
Redwood Shores, CA 94065-1134
david.singh@weil.com

Matthew T. Oliverio (#3372)
Gina Renzulli Lemay (#7405)
OLIVERIO & MARCACCIO LLP
41 Romano Vineyard Way, Suite 6140
North Kingstown, RI 02852
mto@om-rilaw.com
grl@om-rilaw.com

*Attorneys for Defendants GoodRx, Inc. and GoodRx Holdings, Inc.*

Alec Levy
Mike Bonanno
Meghan McCaffrey
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1300 I Street NW, Suite 900
Washington, DC 20005
aleclevy@quinnemanuel.com
mikebonanno@quinneemanuel.com
meghanmccaffrey@quinnemanuel.com

Anthony P. Alden
QUINN EMANUEL URQUHART &
SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
anthonyalden@quinnemanuel.com

John A. Tarantino (#2586)
Nicole J. Benjamin (#7540)
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, RI 02903-1345
jtarantino@apslaw.com
nbenjamin@apslaw.com

*Attorneys for Defendants Express Scripts
Inc. and Express Scripts Holding Company*

Michael Leffel
Kirsten Dedrickson
FOLEY & LARDNER LLP
150 East Gilman Street
Suite 5000
Madison, WI 53703
mleffel@foley.com
kirsten.dedrickson@foley.com

Olivia Brooks
FOLEY & LARDNER LLP
777 East Wisconsin Ave.
Milwaukee, WI 53202
olivia.brooks@foley.com

Rebecca Briggs
HINCKLEY, ALLEN & SNYDER LLP

100 Westminster Street, Suite 1400
Providence, Rhode Island 02903
rbriggs@hinckleyallen.com

*Attorneys for Defendants Caremark, PCS
Health, L.L.C.; Caremark, L.L.C.;
CaremarkPCS, L.L.C.; and CVS Health
Corporation*

Robert J. Herrington
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
robert.herrington@gtlaw.com

Tonya Esposito
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Tonya.Esposito@gtlaw.com

James Peacock
GREENBERG TRAURIG LLP
2200 Ross Ave., Suite 5200
Dallas, TX 75201
James.Peacock@gtlaw.com

Michael E. Jusczyk (#7791)
GREENBERG TRAURIG LLP
One International Place, Suite 2000
Boston, MA 02110
Michael.Jusczyk@gtlaw.com

*Attorney for Defendants Navitus Health
Solutions, LLC*

Richard D. Salgado
Marina S. Kelly
MCDERMOTT WILL & SCHULTE LLP
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
richard.salgado@mwe.com
mkelly@mwe.com

Michelle S. Lowery
MCDERMOTT WILL & SCHULTE LLP
2049 Century Park East, Suite 3200

Los Angeles, California 90067-3206
mslowery@mwe.com

Charles D. Blackman
Rhode Island Bar No. 5522
LEVY & BLACKMAN LLP
469 Angell Street, Suite 2
Providence, RI 02906
cblackman@levyblackman.com

*Attorneys for Defendants MedImpact
Healthcare Systems, Inc.*

## CERTIFICATION

I certify that on the 6th day of March 2026, a true copy of the within document was filed electronically per this Court's General Order Regarding Access, Service, and Management of Sealed Documents, Mic. 71-7163, and served electronically to counsel of record for Parties named in the Amended Consolidated Class Action Complaint.

By:  _/s/ Matthew T. Oliverio_____